UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| *In re* J. SHELBY SHARPE | § § § | Misc. Action No. 4:24-MC-0007-X |

## MEMORANDUM OPINION AND ORDER DENYING
## MOTION TO LIFT TEMPORARY SUSPENSION

Before Hendrix, Starr, and Means, District Judges:

On November 8, 2024, the chief judge of this Court, David Godbey, appointed (Doc. 18) Judges Wesley Hendrix, Brantley Starr, and Terry R. Means (collectively, "the Panel") to review the behavior of J. Shelby Sharpe, an attorney admitted to practice before the Court, and to determine whether Sharpe should be disciplined under Northern District of Texas Local Rules 83.8(b) and (e). The issue as to Sharpe's behavior arises out of his representation of Innovative Sand Solutions, LLC ("Innovative Sand") and Dale and Linda Behan, in case no. 4:20-cv-776-P, *Weslease 2018 Operating, LP., v. Innovative Sand Solutions, LLC*, over which the Honorable Mark T. Pittman is the presiding judge.

Immediately before the Panel is Sharpe's motion to lift the temporary suspension of his privilege to practice before this Court (Doc. 19) that was imposed by Judge Pittman on November 7, 2024, by written order (Doc. 17),[1] and his motions for leave to supplement his briefing (Docs. 22, 25).

Previously, on May 21, 2024, after numerous show-cause hearings and sanctions in the underlying case, Judge Pittman opened the above styled and

---

[1] Judge Pittman specifically permitted the Panel to reconsider his issuance of the temporary suspension. Doc. 17 at 2 n.3.

numbered disciplinary action against Sharpe.[2]  He subsequently appointed two members of the bar of this Court, Geffery W. Anderson and Stephen P. Fahey, as independent investigators to assist the Court.[3]

On November 1, Sharpe filed a motion seeking a more definite statement and requesting that a three-judge panel be appointed to preside over this disciplinary matter.[4]  On November 6, Judge Pittman referred Shelby's motion for appointment of a three-judge panel to Chief Judge Godbey.[5]  The next day, Judge Pittman, fearing that Sharpe would continue to engage in acts unbecoming of an attorney, temporarily suspended Sharpe "from practicing in the Northern District of Texas pending the resolution of this disciplinary hearing" and set a hearing for December.[6]  On Sharpe's and the investigators' motion for continuance, the Panel rescheduled the hearing to February 21, 2025.  Judge Pittman's temporary suspension of Sharpe was specifically based upon his finding that Sharpe had violated Texas Disciplinary Rule of Professional Conduct 1.08(a) by making an undisclosed $100,000 loan to his clients.[7]

But this panel is not acting as an appellate court and is thus not limited in its review to Judge Pittman's stated ground for suspension.  Instead, it is charged by order of the chief judge of this district with "reviewing various incidents involving the conduct of attorney J. Shelby Sharpe" in determining whether Sharpe should be

---

[2] Doc. 1.

[3] Docs. 5, 9, respectively.

[4] Doc. 13.

[5] Doc 16.

[6] Doc. 17.

[7] *Id.*

disciplined under NDTX Local Rules 83.8(b) and (e).[8]  Our preliminary review reveals that there are additional bases for determining that Sharpe should be temporarily suspended from the practice of law before this Court.  For example, Judge Pittman restrained Dale and Linda Behan, who became judgment debtors after Judge Pittman entered a post-verdict order piercing Innovative Sand's corporate veil, or anyone acting in concert with them, from exercising control over certain property.  Sharpe, counsel for the Behans, then allegedly facilitated a real estate transaction to sell that very property.  Sharpe has not denied those allegations despite multiple opportunities to do so.  Sharpe's argument that he was merely advocating zealously for his clients is unavailing.  If a lawyer doesn't get an order superseded, stayed, or reversed, then he has to comply with it.[9]  Not only did Sharpe apparently violate a court order, he appears to have entangled an innocent third party in this regrettable episode.

Just as this Panel was about to issue its ruling on Sharpe's motion to lift his temporary suspension, it became aware of Sharpe's December 13, 2024 filing, on behalf of the Behans, of a response to the motion of a receiver appointed by Judge Pittman to sell land.  As noted, Judge Pittman suspended Sharpe from practice before this Court on November 7, 35 days prior to his filing of the response.  His refusal to acknowledge the authority of this Court over his privilege to practice before it provides strong evidence that his temporary suspension should not be lifted.

---

[8] Doc. 18 at 1.

[9] Even if Judge Pittman was wrong to restrain the Behans and Sharpe from exercising control over the property, the way to challenge the order isn't by violating it—it's by superseding it or getting it stayed or reversed.  *Maness v. Meyers*, 419 U.S. 449, 458 (1975).  Because no order superseding, staying, or reversing had been issued as to that order, Sharpe had but one choice: abide by it.

Consequently, to protect the judicial system and the public from Sharpe's apparent unwillingness to follow court orders in this case, he must remain suspended pending this Panel's investigation and decision. Nevertheless, if Sharpe wishes to refute the relevant allegations, he is welcome to attempt to do so, and the Panel will listen and consider carefully. Therefore, Sharpe is free to supplement the record before the Panel with any exculpatory evidence that he has. If such evidence is produced, the Panel may revisit the temporary suspension. But barring a successful refutation of those facts, Sharpe should remain suspended until further order of the Panel. Accordingly, the Panel will deny the motion to lift the temporary suspension but grant his motions for leave to supplement his briefing.

By separate order, the Panel has set a schedule for an investigative report, response, and hearing to facilitate a prompt resolution to this matter.

## I. Factual Background

This disciplinary action is only the tip of the iceberg when it comes to the saga of Dale and Linda Behan and Weslease 2018 Operating, LP (Weslease). The related case has over 250 docket entries, many dealing with post-judgment turnover orders[10]

---

[10] Turnover orders are complicated. "The Texas Turnover Statute is a procedural mechanism that gives Texas courts the power to satisfy a judgment by reaching the assets of a judgment debtor that cannot be attached or levied by ordinary legal process." *Bollore S.A. v. Imp. Warehouse, Inc.*, 448 F.3d 317, 322 (5th Cir. 2006). But the turnover statute is limited in effect: "it is black-letter Texas law that proceedings pursuant to the turnover statute may not be used to determine the substantive property rights of the judgment debtors or of third parties." *Id.* Under Texas law a court has three options. It can (1) "order the judgment debtor to turn over nonexempt property that is in the debtor's possession or is subject to the debtor's control, together with all documents or records related to the property, to a designated sheriff or constable for execution," (2) "otherwise apply the property to the satisfaction of the judgment," or (3) "appoint a receiver with the authority to take possession of the nonexempt property, sell it, and pay the proceeds to the judgment creditor to the extent required to satisfy the judgment." TEX. CIV. PRAC. & REM. CODE § 31.002(b).

that form the basis for this disciplinary action. Although the story is long and winding, it is necessary to recount the facts of the case to provide an accurate picture of the events in this matter.

In 2020, Weslease sued Innovative Sand and Dale and Linda Behan. Weslease acquired the right to collect a debt of $200,000 owed to Weslease Income Growth Solutions by Innovative Sand and the Behans because, sometime before this litigation began, Weslease Income Growth Fund, LP, filed for bankruptcy in Canada.[11] Judge Pittman found that the Behans "intentionally created and maintained Innovative Sand's inability to repay the $200,000 . . . with the intent of hindering, delaying, or defrauding [Weslease Income Growth Fund]." Judge Pittman entered judgment against Innovative Sands and the Behans for a total of $724,020.30.[12]

Once that judgment was entered, Weslease filed an application for a turnover order.[13] Included in that turnover application were allegations that the Behans wholly owned a corporation called River North Farms, Inc. (River North).[14] River

---

Judge Pittman has since appointed a receiver in the underlying case and superseded the underlying turnover orders. Although the control order at Doc. 167 was superseded by the subsequent receivership appointment order at Doc. 237, during the time of the alleged real estate transaction, the order was still in effect, and Sharpe was still subject to it. Because there would be nothing preventing him from attempting the same shenanigans notwithstanding the receivership, the fact the order was later superseded does not matter in this case.

[11] Doc. 12 at 4. References to docket entries in Part I and later on with numbers greater than 27 refer to docket entries in the related case *Weslease 2018 Operating, LP v. Innovative Sand Solutions*, LLC, No. 4:20-CV-0776-P (N.D. Tex.).

[12] The total amount owed to Weslease appears to be near $9 million because of another judgment from the United States District Court for North Dakota. Doc. 185 at 5.

[13] Doc. 90.

[14] *Id*. at 4.

North owned real property in Tarrant County, Texas.[15]  The Behans claimed not to possess an ownership interest in the corporation, but records with the Texas Secretary of State suggested that they did.[16]  Weslease argued that a turnover order that gave Weslease the property was necessary for it to be able to sell the property in Tarrant County to partially satisfy the judgment.[17]

The Behans contended that they do not own or control the Tarrant County property through River North.  Rather they alleged that Amarillo National Bank had "the security on all property of Defendants Behan that is non-exempt."[18]  Specifically, the Behans "gave prior to the [Weslease] litigation by years security interests to Amarillo National Bank of all non-exempt property in which they have an interest including their ownership of River North Farms."[19]

Judge Pittman denied that application for a turnover order, not on the merits, but because Weslease sought a nearly identical turnover order before Judge O'Connor.[20]  In January of 2024, Judge O'Connor then dismissed with prejudice Weslease's cause of action for a turnover order requiring River North to convey to Weslease a portion of the property that was conveyed to Richard and Marla Robinson.[21]  But a month later, in front of Judge Pittman, Weslease applied for a

---

[15] *Id.*

[16] *Id.*

[17] *Id.* at 7.

[18] Doc. 91 at 2.

[19] *Id.* at 3.

[20] Doc. 95 at 2.

[21] Final Judgment, *Weslease 2018 Operating LP v. Behan*, No. 4:22-CV-1013-O, Doc. 94 at 1, (N.D. Tex. Jan. 9, 2024).

slightly different turnover order.  There, Weslease sought the turnover of "stock, papers, ownership, and control held in and through River North."[22]  Indeed, in response, the Behans recognized the February turnover application with Judge Pittman to seek "the *stock* of River North Farms itself."[23]

Judge Pittman granted the February turnover application.  That order states that the Behans "shall turnover all stock/membership in [River North] to the United States Marshals."[24]  The Marshals were then "commanded to take any and all necessary actions to ensure transfer of all rights and ownership of the Behans concerning River North's stock to Weslease."[25]  The order further states that the order itself serves "as a muniment of title or other legally binding evidence of Weslease's ownership of 100% of the stock of River North."[26]

One week later, Weslease moved for a show cause hearing.  This motion alleges that the Behans refused "to provide access/possession to certain assets of River North."[27]  Specifically, Weslease alleged that it could not access a property located in Hood County, dubbed the "Brazos Property," because the Behans would not "provide gate codes or access to the Brazos Property."[28]  In an email that is attached to that motion, counsel for Weslease informed counsel for the Behans (Shelby Sharpe) that

---

[22] Doc. 111 at 4.

[23] Doc. 122 at 3.

[24] Doc. 137 at 1.

[25] *Id.*

[26] *Id.*

[27] Doc. 144 at 1.

[28] *Id.* at 3.

Weslease "removed of any [and] all authority to act on behalf of River North in any way" from the Behans.[29]  Sharpe replied to counsel for Weslease that "Amarillo National Bank, not the Behans, controls who has access to its collateral.  You would need to get its permission to have access to the ranch."[30]  The Behans further claimed that Amarillo National Bank possesses the stock and the voting rights and that the right to receive distributions is vested in Amarillo National Bank alone.[31]  Ultimately, the Behans believe they are still in their positions as directors or officers of River North and could not be removed without Amarillo National Bank's voting the stock.[32]

Judge Pittman held a show cause hearing[33] and ordered that the Behans turn over financial information for any corporations or other entities in which either Mr. or Mrs. Behan have an interest dating back to 2017.[34]  That order further orders the Behans to "fully comply with all provisions of [Judge Pittman's] prior Turnover Order."[35]

After another show cause motion[36] and a response,[37] it was revealed that the Behans had filed suit against Weslease on behalf of River North in Tarrant County

---

[29] Doc. 144-2 at 2.

[30] *Id.* at 1.

[31] Doc. 146 at 6–7.

[32] *Id.* at 7.  Curiously, the Behans sought an emergency stay pending appeal of the turnover order.  Doc. 143 at 1.  If the Behans did not control any of River North, one wonders why they would file an emergency stay.

[33] Doc. 150.

[34] Doc. 149 at 1.

[35] *Id.* at 1, n.1.

[36] Doc. 157.

[37] Doc. 161.

and Parker County.[38]  Sharpe asserted that nothing prevents River North (which is no longer owned by the Behans) "from protecting attacks on its assets," that the turnover order does not determine the rights of any third party, including River North, and that Sharpe did not violate the order because the order did not require him to do anything.[39]

At that point, Judge Pittman entered two orders on May 21, 2024.  The first opens this miscellaneous disciplinary matter against Sharpe.[40]  The second order requires that Sharpe hand over all documents relating to his representation of River North (not including privileged information of other clients) and that the Behans and anyone working with the Behans "refrain from interfering with Weslease's exercise of any and all rights conferred under the Turnover order, or any other Order of this Court.  This includes, without limitation, any entry on real property, exercise of control or possession of any asset of River North by the Behans."[41]  Additionally, it requires Sharpe to "withdraw or otherwise nonsuit or [dismiss] . . . any and all petitions or complaints filed by him on behalf of River North Farms, Inc. on or after the entry of the Turnover Order."[42]

Judge Pittman held Sharpe and the Behans in contempt for their conduct and fined Sharpe and the Behans an amount to be paid by May 24, 2024.[43]  When they

---

[38] Doc. 162 at 1–2.

[39] Doc. 163 at 2.

[40] Doc. 166.

[41] Doc. 167 at 1–2.

[42] *Id*. at 1.

[43] Doc. 172 at 18.

failed to timely pay the fine, Judge Pittman set another show cause hearing,[44] but canceled it once he received confirmation that they paid the fine.[45]

Weslease then filed another motion for enforcement of the turnover order.[46] Weslease averred that the Behans deposited two checks payable to River North dated June 5, 2024, and June 6, 2024, and provided pictures of the checks.[47] Weslease believed that depositing the checks violated Judge Pittman's May order that prevented the Behans or anyone working with them from "exercise[ing] . . . control or possession of any asset of River North."[48] Sharpe explained that the checks were loans used to pay for travel to "maintain property with liens to several banks and to pay debts of those properties."[49] Sharpe provided an image of a handwritten contract that appears to concern one of the checks but not the other.[50]

In response, Sharpe stated that "Weslease, if it is finally determined by the Fifth Circuit to be the owner of River Nort *[sic]* Farms, will be the sole beneficiary of the payment of the debts."[51] Sharpe further stated that "Dale and Linda Behan received no benefit of the loans they obtained from their close friends for helping pay the debts of River North Farms."[52] That pleading did not mention that the purpose

---

[44] Doc. 181 at 2.

[45] Doc. 182 at 1.

[46] Doc. 183.

[47] *Id*. at 1–2.

[48] *Id*. at 2 (citing Doc. 167 at 2).

[49] Doc. 183-2 at 1.

[50] Doc. 183-1 at 2.

[51] Doc. 184 at 2.

[52] *Id*.

10

of the loans was to pay for travel, as Sharpe represented to Weslease's counsel just weeks before.

Then, the same day Sharpe filed the above response, Weslease filed a motion for an execution order.  Weslease learned that the Behans had "received and totally diverted $2.2 million through River North Farms between October 2023 and [July 2024]."[53]  Here, Weslease alleged that bank records showed that Sharpe had received around $228,000 from River North and loaned his clients $100,000 without the clients' knowledge.[54]  In Sharpe's email exchange with Weslease's counsel explaining the loan, Sharpe stated "I trust you have advised your client that if the Fifth Circuit overturns the district court orders, there are consequences."[55]

For their part, the Behans, through Sharpe, argued, with respect to the $2.2 million, that "[a]ll funds received by River North Farms prior to [March 20, 2024 (the date of the turnover order)] came from the sale of assets with the participation of Amarillo National Bank."[56]  Nothing discusses any funds received after that date.  As to the loan, Sharpe noted that his firm paid $100,000 to Haynes and Boone because, in another case, his clients were behind on payments to Haynes and Boone.[57]  Then,

> somehow unknown to [Sharpe, the Behans] learned of the attorney's fee payment and told counsel they considered the payment a "loan" and would see that it was repaid, which it was in 2023.  [Sharpe] was not

---

[53] Doc. 185 at 2.

[54] *Id.*

[55] Doc. 185-2 at 3.

[56] Doc. 186 at 4.

[57] *Id.* at 6.

11

told the source of the funds that were wired to his firm to repay the money sent to Haynes and Boone.[58]

Weslease then filed another motion for enforcement of the turnover order. That motion alleged that the Behans tapped River North to pay a Mississippi lawyer $75,000 as a deposit for obtaining legal services—but not for legal services for River North, only for legal services for the Behans.[59]  Only $14,147.42 remained in the trust account of the original $75,000.[60]  Weslease tried to recover those funds, but the Behans apparently directed their Mississippi attorney to withhold the money.[61]  The Behans responded by claiming that the money sent to the Mississippi lawyer was a mistake and that the Mississippi lawyer would interplead the money into the registry of the Northern District of Texas.[62]

Then, still trying to recover some of what it is owed, Weslease filed a motion for disgorgement when it learned that Sharpe received $227,745 from River North.[63] In response, Sharpe admitted his firm paid $100,000 to Haynes and Boone on behalf of his clients, but without the clients' knowledge.  But Sharpe does not account for the remainder of the sum.[64]  In other words, he provided an explanation for less than half of the money he received from River North.

---

[58] *Id.*

[59] Doc. 195 at 2.

[60] *Id.*

[61] *Id.*

[62] Doc. 196 at 2.

[63] Doc. 198 at 3.

[64] Doc. 201.

Weslease filed its next motion for enforcement the same day it filed the motion for disgorgement. That day, Weslease learned that the Behans had signed a sale of real estate on behalf of River North on August 9, 2024—after the Behans and Sharpe were prohibited from exercising control over River North assets.[65] Weslease avers that the Behans and Sharpe induced a third party into "putting down a non-refundable deposit."[66] The deposit was caught in time and placed in escrow.[67]

Sharpe responded that the property they attempted to sell was the Brazos property from the case in front of Judge O'Connor.[68] Sharpe argued that Weslease had placed a quitclaim deed on the property,[69] and Sharpe called Weslease's counsel to remove the quitclaim deed to clear the title.[70] The response did not contest that Sharpe was involved in the transaction and that he induced the third-party buyer. Nor did it address how selling River North property was not exercising control over the property. Most notably, Sharpe argued that he cannot be said to have kept the transaction a secret from opposing counsel because "it was [I] who called to the attention of [Weslease's] counsel . . . that a contract of sale of property[, to which] the Honorable Reed O'Connor ruled Weslease was not entitled [ECF 94,] was being [prevented] from closing because of a [quitclaim] deed Weslease had filed"[71] and that:

---

[65] Doc. 199 at 2.

[66] *Id.*

[67] *Id.* at 2–3.

[68] Doc. 200 at 4.

[69] This appears to signify that Sharpe believed that Weslease caused a cloud on the title of the property. *See* Doc. 200 at 2.

[70] *Id.* at 5.

[71] *Id.* at 2.

> Dale Behan thought that because the Azle property was the sole subject of the suit in Judge O'Connor's court he began marketing it after the O'Connor judgment, which he, as President of River North Farms, could sell the balance of it to liquidate the remaining indebtedness never thinking after the Court signed the turnover order that this property was subject to it.[72]

But what went unsaid speaks volumes: Sharpe never refuted the fact that he facilitated the real estate transaction.

Judge Pittman later held a hearing to inquire into the $100,000 "loan" Sharpe paid to Haynes and Boone on behalf of his clients—but without his clients' knowledge. At that hearing, when asked to explain the difference between the $100,000 Sharpe received as "repayment" for the "loan" and the total amount paid to him of roughly $228,000, Sharpe never articulated why that amount from River North ended up in his firm's coffers.[73]

The underlying case led to a flurry of appeals, the status of which are relevant here. The final judgment[74] was appealed and affirmed by the United States Court of Appeals for the Fifth Circuit.[75] The initial order granting turnover[76] was appealed, and the Fifth Circuit denied a stay pending appeal.[77] The order requiring the Behans and Sharpe to refrain from controlling River North property[78] was appealed, and the

---

[72] *Id*. at 2–3.

[73] *See* Doc. 239 at 33–34.

[74] Doc. 79.

[75] Doc. 97.

[76] Doc. 137.

[77] Doc. 143.

[78] Docs. 167 and 170.

14

Fifth Circuit denied a stay pending appeal.[79]  Similarly, Judge Pittman's order that Sharpe disgorge $100,000[80] was appealed, and the Fifth Circuit denied a stay of the disgorgement pending appeal.[81]

Many other orders have been appealed, upon which the Fifth Circuit has not yet acted: unfiling a pleading relating to the two loans from the Behans' friends;[82] granting a motion for enforcement of the turnover order based on money in the Mississippi lawyer's trust account, intercepting an eviction notice, and relating to the real estate transaction with the third party;[83] denying leave to file a sur-reply;[84] striking and unfiling a sur-reply Shelby filed without leave of the Court;[85] granting a motion for clarification as to the second motion for enforcement of the turnover over;[86] setting a May 21, 2024 show cause hearing and ordering related briefing;[87] requiring the Behans to turnover financial records and provide access to the Brazos Property, and awarding attorney's fees;[88] and amending the turnover order to include an LLC or corporation named River North.[89]  Of note, no supersedeas bond or stay has been

---

[79] Doc. 175.

[80] Doc. 251.

[81] *Weslease 2018 Operating, L.P. v. J. Shelby Sharpe*, No. 24-10998 (5th Cir. Dec. 10, 2024), at Doc. 23-1.  The Fifth Circuit found that Sharpe is likely to prevail on the merits of the disgorgement issue but will not suffer irreparable harm by tendering the $100,000.

[82] Doc. 229.

[83] Doc. 203.

[84] Doc. 193.

[85] Doc. 191.

[86] Doc. 179.

[87] Doc. 158.

[88] Doc. 149.

[89] Doc. 139.

entered for the order granting the turnover order requiring that the Behans and Sharpe refrain from controlling River North property[90] or the order granting turnover relief as to the real estate transaction.[91]   In fact, the Fifth Circuit denied a stay pending appeal,[92] and the case has been fully briefed.[93]   Additionally, Judge Pittman superseded his prior turnover orders when he appointed a receiver in the underlying case.[94]   Hence, the appeal focuses mainly on other turnover issues unrelated to restricting Sharpe from exercising control over the property.

While there is some additional activity in the underlying case, the facts as presented bring us up to speed on what all has happened that is immediately relevant to this motion for reconsideration, with the sole exception of the previously mentioned filing by Sharpe of a response for the Behans in this Court after being suspended from practicing before it.[95]

## II. Legal Standards

Sharpe's arguments in support of lifting the temporary suspension implicate three sets of legal standards: due process, standing, and temporary suspensions pending a hearing.

---

[90] Doc. 167.

[91] Doc. 203.

[92] *Weslease 2018 v. Behan*, No. 24-10366, (5th Cir. May 27, 2024), at Doc. 46.

[93] *See Wesleaase 2018*, No. 24-10366 (5th Cir. Nov. 8, 2024), at Doc. 91 (appellant's reply brief filed).

[94] Doc. 237 at 16.  As noted above, the fact that order was later superseded has no bearing on this decision.  *See supra* n.4.

[95] Doc. 276.

Due process has two fundamental elements: notice and an opportunity to respond.[96]  As to notice, that requirement is satisfied when "[a] potential litigant . . . knows about a legal proceeding . . . [and] that his rights could be jeopardized."[97]  "[I]n some cases, such as 'where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause.'"[98]  "In particular, where the State acts to abate an emergent threat to public safety, postdeprivation process satisfies the Constitution's procedural due process requirement."[99]  And "where the potential length or severity of the deprivation does not indicate a likelihood of serious loss and where the procedures underlying the decision to act are sufficiently reliable to minimize the risk of erroneous determination, government may act without providing additional 'advance procedural safeguards.'"[100]  The Supreme Court employs a multi-factor balancing test to determine whether postdeprivation procedures are enough to satisfy due process:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and

---

[96] *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985).

[97] *In re Kendavis Holding Co.*, 249 F.3d 383, 387 (5th Cir. 2001).

[98] *Richards v. McLane*, No. 21-20450, 2023 WL 6533453, at *7 (5th Cir. Oct. 6, 2023) (per curiam) (quoting *Gilbert v. Homar*, 520 U.S. 924, 930 (1997)).

[99] *RBIII, L.P. v. City of San Antonio*, 713 F.3d 840, 844 (5th Cir. 2013).

[100] *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 19 (1978) (quoting *Ingraham v. Wright*, 430 U.S. 651, 680 (1977)).

administrative burdens that the additional or substitute procedural requirement would entail.[101]

When looking to the first factor, courts look to the "length or severity of the deprivation."[102]   For the risk of erroneous deprivation and value of additional procedures, we look to the procedures used by the judiciary in this matter.[103]

Next, standing generally has three elements: injury-in-fact, traceability, and redressability.  Because attorney disciplinary proceedings arise from the Court's supervisory power, the Court generally possesses "jurisdiction to discipline an attorney whose unethical conduct" arises from a "proceeding within that court's control."[104]

Finally, in general, a temporary suspension of a property right is appropriate pending a "prompt judicial or administrative hearing that would definitely determine the issues."[105]  While there is no set test in this context, it is has been treated similarly to a preliminary injunction standard, where the central issue is whether the public interest in protecting the public and the judiciary from unethical attorneys outweighs the attorney's private interest in his ability to practice.[106]

---

[101] *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

[102] *Memphis Light*, 436 U.S. at 19.

[103] *See Richards*, No. 21-20450, 2023 WL 6533453, at *7.

[104] *In re Gopman*, 531 F.2d 262, 266 (5th Cir. 1976).

[105] *Barry v. Barchi*, 443 U.S. 55, 64 (1979).

[106] *Gershenfeld v. Justs. of the Supreme Ct. of Pennsylvania*, 641 F. Supp. 1419, 1424 (E.D. Pa. 1986).

### III. Legal Analysis

Sharpe contends that Judge Pittman should not have entered the temporary suspension for three reasons: (1) "no notice, no hearing, no due process," (2) "standing was not even considered," and (3) "the Court's Rule 1.08 analysis was wrong." The Panel need only cover the first two, as it finds an alternate ground in support of the temporary suspension.

### A. Due Process

As noted above, the Supreme Court employs a multi-factor balancing test to determine what process is due:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[107]

The private interest here is Sharpe's property interest in his privilege to practice law in the Northern District of Texas.[108] The risk of an erroneous deprivation is low. Sharpe was given opportunities to deny allegations against him before Judge Pittman and before this Panel. Because the Panel has not yet had the opportunity to hold a hearing, Sharpe is permitted to supplement the record with any and all relevant materials relating to the suspension.[109] In part, this is to cure the relatively

---

[107] *Mathews*, 424 U.S. at 335.

[108] *See Schware v. Bd. of Bar Examiners of the State of New Mexico*, 353 U.S. 232, 238–39 & n. 5 (1957).

[109] Accordingly, the Court **GRANTS** Sharpe's motions to supplement his briefing before the Panel. Although the Panel grants the motions, the Panel does not rely on their contents because the Panel rests its decision on the alleged real estate transaction and Sharpe's activity in the underlying

scant briefing the Panel has received to this point.  With this additional safeguard, the Panel is confident that it will receive any exculpatory information Sharpe has in due course.

As for the public interest, as detailed below in Part III.C, Sharpe likely induced a third party to put a non-refundable deposit down on a property while under an order from Judge Pittman to not exercise control over River North property.  Sharpe's inability to follow an order from Judge Pittman spells trouble, not just for the judiciary, but also to the public at large who may unwittingly become ensnarled in the contentious underlying litigation because of Sharpe's actions.

Putting all these together, the Panel finds Sharpe does not need a hearing or additional notice on the front end to temporarily suspend his ability to practice in the Northern District of Texas.  Regarding a hearing, the Panel finds that Sharpe's briefing and our review of the voluminous record are more than sufficient to determine whether temporary suspension should continue.  While Sharpe certainly has an interest in practicing here, he remains free to practice elsewhere and earn a living doing so.  As already stated, the risk of an erroneous deprivation is low because Sharpe has already had ample opportunity to apprise the Panel and Judge Pittman of error in Weslease's accusations and has failed to rebut them, as they relate to the

---

case while being suspended rather than the alleged loan made on behalf of Sharpe's clients.  The Fifth Circuit recently denied Sharpe's request for a stay pending appeal of Judge Pittman's disgorgement order.  *Weslease 2018 Operating v. Sharpe*, No. 24-10998 (5th Cir. Dec. 10, 2024) (unpublished order denying stay pending appeal).  In that order, the Fifth Circuit denied the stay for want of irreparable injury but noted that Sharpe was likely to succeed on the merits.  *Id.* at 5.  Because the disgorgement order at Doc. 251 is unrelated to the control order at Doc. 167 that the Panel relies on for this order, the Panel need not consider the contents of that denial.  For clarity, the control order prevents the Behans or anyone working in concert with them from exercising control over River North property.  Doc. 167 at 2.

attempted real estate transaction.  Additionally, Sharpe can supplement the record before the Panel with any exculpatory evidence.  At that time, the Panel may revisit the temporary suspension.  Moreover, the public interest here is exceedingly strong. Sharpe has likely duped a member of the public into purchasing property in violation of Judge Pittman's order.  To prevent any such violations of court orders or danger to the public, Sharpe must be suspended while the Panel's investigators investigate and while the Panel prepares for a hearing.

One final note: the Panel recognizes that Sharpe's suspension began in November 2024 and will likely last until March 2025.  However, the Panel needs time for the investigators to investigate and to hold a hearing.  So any delay is no longer than is necessary to make a determination.  Although that determination may take some time, it will not take longer than necessary to issue a determination.[110]  The Panel is motivated to do so expeditiously because "any 'appreciable delay in going forward with a full hearing' following the suspension would violate due process."[111] Moreover, the Supreme Court has held that even a nine-month delay is not "unconstitutionally lengthy *per se*."[112]   Indeed, to even state a claim for unconstitutional deprivation of due process by delay, the delay must be "unreasonably prolonged."[113]

---

[110] *See Eguia v. Tompkins*, 756 F.2d 1130, 1140–41 (5th Cir. 1985) (noting that absent legitimate reasons for delay, the delay itself becomes a due process violation).

[111] *U. S. Postal Serv. v. Athena Prod., Ltd.*, 654 F.2d 362, 368 n.8 (5th Cir. Unit B 1981) (quoting *Barry v. Barchi*, 443 U.S. 55, 64 (1979).

[112] *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 547 (1985).

[113] *See id.*

## B. Standing

As is the case in other attorney-discipline matters, "[j]urisdiction is not in question here. Federal courts may hold attorneys accountable to state codes of professional conduct and have inherent power to discipline attorneys."[114] For his part, Sharpe argues that because one purported violation occurred before the case in front of Judge Pittman, the temporary suspension cannot issue. That argument is irrelevant because there are sufficient grounds outside of the purported "loan" issue to sustain the temporary suspension.[115]

## C. Grounds for the Temporary Suspension

The Panel must determine if there is a sufficient basis for the temporary suspension. There is because Sharpe likely violated a court order, and a temporary suspension would sufficiently protect the public and judiciary, while still permitting Sharpe to practice outside of the Northern District of Texas.

Again, in general, a temporary suspension of a property right[116] is appropriate pending a "prompt judicial or administrative hearing that would definitely determine the issues."[117] The key question here is whether the public interest in protecting the public and the judiciary from unethical attorneys outweighs the attorney's private

---

[114] *In re Andry*, 921 F.3d 211, 213 n.4 (5th Cir. 2019).

[115] *See infra* Part III.C

[116] While this rule would apply in the more drastic scenario of suspending the license, it is applicable here as an analog. *See Gershenfeld*, 641 F. Supp. at 1424. If this test is met, then surely the less drastic step of suspending the ability to practice in a limited, albeit large, geographic area is appropriate.

[117] *Barry*, 443 U.S. at 64.

interest in his ability to practice.[118]  The Panel looks not only to the allegations here, but also the proportionality of the suspension.  In other words, we ask: "Is the suspension adequately tailored to serve the purpose of protecting the judiciary and public, but not going so far as to punish the attorney on a not-yet-fully-developed set of facts?"

A review of the allegations against Sharpe demonstrates that if those factual allegations are true,[119] he likely violated at least one of Judge Pittman's orders.  The Panel will review the clearest examples.

Sharpe likely facilitated a real estate transaction to induce a third party to purchase River North property in violation of Judge Pittman's order.[120]  Weslease alleged in its August 26 motion for enforcement of the turnover order that it learned "the Behans had signed a purported real estate sale agreement on behalf of River North" and that "the Behans signed it on or about August 9, 2024."  The signing came after Judge Pittman's order requiring "the Behans, and any and all persons working in concert with them . . . [to] refrain from interfering with Weslease's exercise of any and all rights conferred under the Turnover Order, or any other Order of this Court.  This includes, without limitation, any entry on real property, exercise of control or possession of any asset of River North by the Behans."[121]

---

[118] *Gershenfeld*, 641 F. Supp. at 1424.

[119] In this context, truth comes from examining the evidence at the show cause hearing, matters of public record like court filings, and whatever evidence Sharpe marshalled in his motion for reconsideration.

[120] Doc. 199 at 2–3.

[121] Doc. 167 at 2.

Weslease further alleged that "the Behans **_AND_** Sharpe directly participated and induced the third party buyer into putting down a non-refundable deposit."[122] While Sharpe challenges Weslease's allegation that he and the Behans kept the transaction a secret, Sharpe never contests the fact that he "directly participated and induced the third party buyer into putting down a non-refundable deposit."[123] He could have done so in response to Weslease's motion,[124] in his motion to lift the temporary suspension,[125] or in his declaration of compliance,[126] but he did not.

Instead, Sharpe argued that the property involved in the transaction is not subject to Judge Pittman's order because it was subject to another suit in Judge O'Connor's court.[127] In that case, after a bench trial, Judge O'Connor dismissed with prejudice Weslease's turnover claim.[128] But that is not the full story. Judge O'Connor dismissed the turnover cause of action as to a portion of River North's property that had been conveyed to a Mr. and Mrs. Robinson.[129] That judgment says nothing of River North's portion of the real estate.

---

[122] Doc. 199 at 2.

[123] *Id.*

[124] Doc. 200.

[125] Doc. 20.

[126] Doc. 204.

[127] Doc. 200 at 4–5.

[128] *Id.* at 4.

[129] Final Judgment, *Weslease 2018 Operating LP v. Behan*, No. 4:22-CV-1013-O, Doc. 94 at 1, (N.D. Tex. Jan. 9, 2024).

Judge Pittman's order is clear that the Behans no longer own River North.[130] A subsequent order states that the Behans must refrain from "exercise of control or possession of any asset of River North."[131] Thus, attempts to sell River North property would violate that subsequent order.[132]

Sharpe holds the opinion that "title issues could not be resolved by turnover proceedings, and thus ownership could not be conveyed via a turnover order."[133] If Sharpe still believes that, he is entitled to, but he is not entitled to act contrary to a court order, even if that order is later found to lack a basis in law. This is fundamentally an issue of order: the way one asserts a court order is invalid is by appealing it, not violating it. Indeed, it is a "basic proposition that all orders and judgments of courts must be complied with promptly."[134] And if someone believes an "order is incorrect[,] the remedy is to appeal."[135] However, "absent a stay, he must comply promptly with the order pending appeal."[136] "Persons who make private determinations of the law and refuse to obey an order generally risk criminal contempt even if the order is ultimately ruled incorrect."[137] In short, being right on the law is no excuse for violating a court order.

---

[130] Doc. 137 at 1.

[131] Doc. 167 at 2.

[132] *See In re Cowen*, 849 F.3d 943, 950 (10th Cir. 2017) ("It's not hard to come up with examples of such 'acts' that 'exercise control' over, but do not 'obtain possession of,' the estate's property, e.g., a creditor in possession who improperly sells property belonging to the estate.").

[133] Doc. 20 at 11–12.

[134] *Maness*, 419 U.S. at 458.

[135] *Id.*

[136] *Id.*

[137] *Id.*

Nevertheless, the suspension is well-tailored to address the issue at hand: violating orders in the Northern District of Texas. The suspension does not affect Sharpe's ability to practice elsewhere, and Sharpe can still maintain his law practice and earn an income while these proceedings go forward.

In sum, it appears that Sharpe has not only violated at least one unambiguous court order, but in violating that very order potentially wronged an innocent third party by inducing the sale of property his clients have no present authority to sell. Accordingly, to protect the public and the judiciary, the Panel finds that the temporary suspension properly issued.

Independent from the real estate transaction, Sharpe violated another one of Judge Pittman's orders. Judge Pittman temporarily suspended Sharpe's ability to practice before the Northern District of Texas on November 7, 2024.[138] Nevertheless, Sharpe filed a response to a motion on behalf of the Behans in Judge Pittman's court.[139] This remarkable display demonstrates Sharpe cannot, at the present time, comply with court orders—even after this matter was opened against him, even after show cause hearings, even after sanctions, and even as the Panel considered his temporary suspension.

## IV. Conclusion

For the foregoing reasons, the Panel **GRANTS** the motions to supplement his brief (Docs. 22, 25) and **DENIES** the motion to lift the temporary suspension (Doc.

---

[138] Doc. 17.

[139] Doc. 276.

19). J. Shelby Sharpe remains suspended from practicing in the Northern District of Texas pending the Panel's determination after the hearing.

**IT IS SO ORDERED.**

Signed this 18th of December, 2024, for the Panel by:

_____
BRANTLEY STARR
UNITED STATES DISTRICT JUDGE

27