## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

|  |  |  |
|---|---|---|
| IN RE: J. SHELBY SHARPE | § § § | CASE NO. 4:24-MC-00007-X |

## MOTION FOR PARTIAL RECONSIDERATION OF
## OPINION AND ORDER

TO THE HONORABLE THREE JUDGE PANEL:

**J. Shelby Sharpe**, Respondent, respectfully submits this *Motion for Partial Reconsideration* of the Panel's Opinion and Order of June 3, 2025 [ECF No. 54] (the "Order").

### INTRODUCTION

Respondent deeply respects and is extremely grateful for the time that the Panel has taken from its other pressing obligations and devoted to this matter, as well as the wisdom that the Panel has brought to the process. Mr. Sharpe, therefore, does **not** contest the carefully measured sanctions applied. He has no intention of contesting the result decreed by the Panel – either in this proceeding or by appeal. Indeed, Mr. Sharpe has already complied with the Order and shall continue to do so throughout his dwindling career. [ECF No.54] However, in the wake of the unsealing of the Order, Mr. Sharpe does wish to preserve his legacy of almost sixty years of service as a member of this Court's bar. This parting plea thus asks the Panel to merely consider clarifying or correcting the Order in the wake of recent developments.

### THE *INNOVATIVE SAND* LITIGATION

Weslease certainly has a right to lawfully collect its judgment from the judgment debtors. Weslease must however feel some dishonor for its tactic of shifting the focus from the *impropriety* of its collection efforts to the much easier target of Mr. Sharpe.

Weslease applied for two turnover orders concerning the property of River North Farms, first before Judge Pittman [ECF No. 90] and then before Judge O'Connor [Case No. 4:22-cv-01013-O]. Both applications were denied.

Weslease then filed a *third* turnover application and finally succeeded in securing a unique "turnover" order from Judge Pittman. [ECF No. 137] Weslease then turned this turnover order against Sharpe as it ever widened the order's scope through the mechanism of a string of loosely named "enforcement orders". This effort was the unfortunate genesis of this disciplinary action on May 21, 2024.

When this string of orders was appealed, Weslease changed course. It secured a receiver for River North's property in September 2024 and adopted the revised position that the prior orders – used to sully Mr. Sharpe – were now irrelevant. Following this new course, Weslease sought dismissal of the consolidated appeals on the grounds that the validity of the appealed orders – used to sully Mr. Sharpe – were now "moot".

In its recent pronouncement (which came just days after the Panel's decision in this matter), the Fifth Circuit, while agreeing that the appeal was indeed mooted by the subsequent appointment of a receiver, took pains to note that it "***questioned***" the validity of the turnover order entered by the district court in February 2024 – ***the genesis of all subsequent actions that led to the May 2024 "charging order" that initiated this disciplinary proceeding.*** *Weslease 2028 Operating LP v. Linda Behan, et. al., --F.3d--, No. 24-10246 (consol.) slip. op. at p.6-7, n.2 (*June 6, 2025). (The opinion is attached as Exhibit 1 to this Motion.)

Sadly, Mr. Sharpe had already been branded for allegedly defying these mooted and questionable orders, so the matter was hardly "moot" from his standpoint.

Weslease had similar course earlier in the litigation. Weslease first sought a novel recovery against Mr. Sharpe *via* a "motion" for disgorgement. Sadly, this "motion" was granted, together with a "temporary suspension" of Mr. Sharpe on the basis of an alleged violation of Rule 1.08 of the Texas Rules of Professional Conduct, on November 7, 2024. This suspension gravely impacted Mr. Sharpe's fate in this pending disciplinary proceeding. When the disgorgement order was challenged on appeal, the Fifth Circuit found that the district court "likely erred" in several respects in ordering "disgorgement" including its analysis of Rule 1.08. *Weslease 2018 v. Sharpe, --F.3d – No. 24-10998* slip op. at p.4-5 (5th Cir. December 10, 2024). (This opinion is attached as Exhibit 2) As stated, the same disgorgement miscue was the genesis of the district court's temporary suspension of Mr. Sharpe on November 7, 2024.

When this questioning opinion came out, Weslease then again changed course in its litigation tactics. It purported to cure its mistake by abandoning its improper disgorgement claim, thus again "mooting" this matter – while Mr. Sharpe was left suspended and holding the bag of this disciplinary proceeding (which of course was not "mooted"). Bypassing jurisdictional concerns, Weslease secured an "indicative ruling" from Judge Pittman of March 14, 2025, that Weslease once again used to "moot" the appeal. (This "indicative ruling" is attached as Exhibit 3). The true victim of this improvident "motion" was, of course, Mr. Sharpe.

Mr. Sharpe's client, the "Aggie" master's degree holder, should also feel a deep sense of shame. It was constantly the practice of this client to parasitically sponge off a staunchly loyal and kind old man and allow Mr. Sharpe to take the heat for the client's financial irresponsibility, as he "wheeled and dealed" in transactions that Sharpe knew nothing of until the transactions landed in the ditch. Frequently, things would be done – entirely without the knowledge of Mr. Sharpe – which would then be dumped before Mr. Sharpe to "clean up".

Again, where is any sense of decency by these free-wheeling parties? Is an elderly man, who has lived an exemplary life (both professionally and personally), no longer an object of respect? Is such an elder now, instead, simply the patsy for the corrupt or avaricious to be misused as a litigation pawn and made an object of scorn and ridicule through repetitive, grinding maneuvers or appeals to an aging vanity?

Before this becomes the published law, we pray that the Panel review the scant (often hearsay) evidence proffered at the hearing on this matter and determine if the *probative*, "clear and convincing evidence" truly warrants such a shift in focus – from the slick deeds of the parties to inadequate efforts of misused, elderly advocate.

### THE OBVIOUS BLUNDER

Obviously, Mr. Sharpe does not challenge (and has never challenged) that he violated the order of suspension issued by Judge Pittman on November 7, 2024 (at the same time Judge Pittman he issued the improvident "disgorgement" rapaciously sought by Weslease). Mr. Sharpe admits that he should not have done so. His impermissible filing was a needless response to a post-trial request of the court-appointed receiver – that was instantly struck and sanctioned. It was stupid error, but one that was instantly rectified and penalized. While the Panel rightfully believes that this error was a disregard of Judge Mark Pittman's order of suspension, for an aged advocate like Sharpe, it was mere stupidity brought on by wishful thinking…not deliberate disobedience. Mr. Sharpe is duly remorseful and contrite for his stupidity.

### THE OTHER SINS ARE NOW LESS CLEAR

Sharpe does, however, respectfully ask the Panel to reconsider its findings that he violated multiple orders of Judge Pittman since these orders have been rendered suspect by the Fifth Circuit's recent *dicta*. The validity of these orders will now never be tested on appeal because they

have been magically "mooted" by Weslease's maneuvers. But the *dicta* of the appellate court render all orders suspect and subject to renewed scrutiny in this closely related disciplinary proceeding. The record before the Panel, Mr. Sharpe believes, reveals that the only order he violated was the stupidity mentioned above. The Panel is asked to reconsider the language of each suspect order along with the applicable law – especially as clarified by recent, very purposeful *dicta* of the Fifth Circuit. The Panel should give weight to these compelling *dicta* when determining if Sharpe's conduct was a willful violation of any order.

**ORDERS ALLEGEDLY VIOLATED**

Since all orders Sharpe alleged to have been violated are "enforcement orders" of the basic turnover order, the heart of reconsideration is the pertinent language of the turnover order Judge Pittman signed.

> "It is further **ORDERED t**hat Defendants Linda Behan and Dale Behan . . . shall turnover[1] all stock/membership in River North Farm, LLC[2] ("River North") to the United States Marshal, Fort Worth office. The Marshals are authorized and hereby commanded to take any and all necessary actions to ensure transfer all rights and ownership of the Behans concerning to River North's stock to Weslease."

> It is further ORDERED that this Order can serve as a muniment of title or other legally binding evidence of Weslease's ownership of 100% of the stock of River North as of the date signed below."

While Sharpe totally agrees that until an order is overturned on appeal, it must be obeyed, Still, how can order ever be overturned, if the issue of the order's scope and validity is now "moot" (as Weslease claimed)?  The Fifth Circuit in its recent unpublished opinion purposefully questioned (in a footnote at page 6-7) whether "the Turnover Order's conveyance of stock to Weslease granted

---

[1] It was undisputed that Amarillo National Bank had possession for the stock with the voting rights since 2014 thereby preventing the Behans from complying with the order.

[2] River North is an Oklahoma corporation, not a limited liability company

Weslease any rights in real property owned by River North, a non-judgment debtor third party."
The Fifth Circuit footnote went on to declare that "an individual shareholder, by virtue of its
ownership of shares, does not own the corporations' assets." Then, the footnote concludes that
"Texas courts construing the turnover statute have expressly and consistently held that it may be
used to reach only the assets of parties to the judgment, not the assets of non-judgment [debtor]
third parties."

**FILING STATE COURT LAWSUITS**

The Panel has determined that Sharpe's filing of two lawsuits for slander of title in state
courts on behalf of River North was unethical. The Panel's opinion states that Sharpe, by filing
these state court suits, was attempting to prevent the collection of the judgment.

Yet Sharpe's conduct does not violate any language found in any order and, in the wake of
the Fifth Circuit's dicta, seems a defensible (even if imprudent) exercise of advocacy. The Panel
can plainly see the language of the turnover order is not directed at Sharpe. Indeed, there is no
language in any order prohibiting Sharpe from representing a non-party to the judgment in state
court litigation. The Panel's opinion finding that filing the state court actions contravened one of
Judge Pittman's orders is not supported by the language of any of Judge Pittman's orders.
Furthermore, the footnote in the Fifth Circuit's recent opinion indicates that Sharpe's conduct in
filing the state court suits for a non-judgment debtor cannot be an attempt to prevent the *proper*
collection of the judgment but can be an arguable (even if audacious) protection of a client's rights.

The Panel finds Sharpe made inconsistent statements to the court regarding these lawsuits.
Respectfully, Sharpe submits that a careful examination of those statements reveals that this is not
the case. First, the Behans are judgement debtors in their *individual* capacity – not in their
representative capacities as the duly elected officers or directors of River North, placed in these

positions by the holder of the voting rights to River North's stock, Amarillo National Bank. The position that the Behans took that they could not provide gate codes to property they did and do not own, but is owned by a non-judgment party controlled by Amarillo National Bank, is – according to the Fifth Circuit's footnote – entirely correct. The filing of the state court suits at the instance of the Behans as officers of this non-judgment party was not a violation of any *proper order*, including the turnover order the Panel finds was violated. This was not a facilitation of the Behan's violation of any order, as the Panel states, but was proper protection of the River North property. A bold, but correct, advocate should not be castigated for his audacity – even though other advocates might have chosen a more timid, cautious path.

### CONDUCT CONCERNING THE AZLE PROPERTY

Just as Mr. Sharpe was improperly attacked by Weslease, he was obviously misused by his own clients. The Azle property episode is a clear example.

As the Fifth Circuit points out, the Azle property belonged to a non-judgment party. It was *part* of the same tract of realty that was the subject of the suit in Judge O'Connor's court where the court denied turnover relief and found both that River North was not a judgment debtor and not an alter ego of the Behans. Sharpe was never sanctioned by even Judge Pittman for violating any order concerning the Azle property.

The Panel found that Sharpe violated his ethical duties by failing to make some manner of disclosure to the prospective purchaser of the property. Mr. Sharpe humbly requests the Panel to re-examine this finding, considering its unsealing of the Panel's Order.

The Panel, in making this finding, first points out that Sharpe was listed as a "notice party" in the contract. There is no evidence – and certainly not clear and convincing evidence – that Sharpe ever saw the contract or approved being listed as a "notice party". Mr. Sharpe (the only

live witness to appear before the Panel) repeatedly verified under oath that he did not see the contract or authorize being listed as a notice party. Dale Behan's sworn declaration corroborates Sharpe's lack of involvement. There is no contrary evidence – and certainly not clear and convincing evidence, to contradict this testimony.

The second matter pointed to by the Panel to support this finding is that the Behans supposedly wanted their lawyer to review the contract. Yet, there is no evidence that the Behans ever submitted the contract to Sharpe for his review. Indeed, Dale Behan's declaration says the exact opposite, as does Sharpe's sworn testimony.

Finally, the Panel points to an email. The email is not addressed to Sharpe, but Sharpe allegedly received a copy of the email. As Mr. Sharpe stated, even though aged, he frequently receives hundreds of emails each day. He testified unequivocally before the Panel he did not see the email. The fact that an email is sent to someone's email address is no proof the recipient ever saw it.

The reasoning that because Sharpe, after the fact, reached out to Weslease to perhaps clear up closing problems, does not indicate either foreknowledge or culpability. He was contacted after the fact by the ever-seeking Behans to clean up yet another of their escalating problems. Again, in his loyalty and generosity, Sharpe attempted to help, but made it clear that, if something could not be worked out with Weslease, the closing could not go forward.

There is no evidence, much less clear and convincing evidence, that Sharpe perpetuated any fraud on the prospective purchaser at a time when they were expending money to buy the property or that Sharpe acted in violation of the language of any order. Sharpe's testimony to the Panel that he did not learn of the transaction until "there was a problem with the closing" is not contradicted in his deposition testimony. In his deposition, Sharpe was asked if he assisted Mr.

Behan "in any way with the transaction". He correctly answered, "with the closing". This is not equivalent to an answer he assisted with any earlier aspect of the transaction. Indeed, later in the deposition, Sharpe testifies that he had no idea of when the transaction was started.[3]

Finally, from a legal perspective, the River North property was never a proper subject of the turnover order entered by Judge Pittman. The Fifth Circuit footnote points out with glaring clarity that non-judgment party's property is not a proper subject for collection of the judgment.

### LACK OF CANDOR CONCERNING FORMER LAW CLERK

The Panel opinion states Sharpe lacked candor in his deposition when asked about the indirect retention of a former law clerk for Judge Pittman to serve as co-counsel.

Certainly, the *materiality* of these matters must again be questioned. Obviously, the participation of a former law clerk was not a concealed fact and is not improper. Moreover, the participation of this innocent young man obviously had no impact on Judge Pittman's decision – other than to perhaps anger the court. But, most importantly, Mr. Sharpe's testimony was not lacking in candor.

Sharpe answered in his deposition that he learned of a former law clerk's relationship to Judge Pittman "just before the hearing". Indeed, he sent an email to Amarillo National Bank four days before the hearing pointing out a jurisdictional issue that might impact the hearing, that Sharpe had conferred with various learned colleagues about the issue, and that, *inter alia,* that there was a former clerk assisting the lead lawyer from Jackson Walker who might argue this subsidiary issue at the coming hearing. The Panel is apparently interpreting "just before the hearing" as the very same day as the hearing.  But Sharpe did not testify to that. Four days before the hearing can

---

[3] Sharpe Deposition p, 62 (The transcript is attached as Exhibit 4)

reasonably be interpreted as "just before" the hearing – particularly under the "clear and convincing" evidentiary standard.

A review of the transcript reveals that Sharpe thought a senior member of the Jackson Walker firm was going to be at the hearing as lead counsel – not the former law clerk. Sharpe learned that the senior member was not going to be at the hearing when the former law clerk arrived to tell him that he was there because the senior member had a doctor's appointment. To interpret Sharpe's testimony as lacking in candor is not in accordance with a "clear and convincing" standard of proof. Mr. Sharpe respectfully ask that this finding be reconsidered.

CONCLUSION

Mr. Sharpe seeks only a partial reconsideration of the Panel's wise and well-considered Order. As he ends his career, he seeks to protect his reputation, so that his career can be ended honorably, not dishonorably. When one measures the record before the Panel using the standard of proof the Panel states it must use, there is only one thing that Sharpe is clearly and convincingly guilty of and that is the violation of the suspension order. Is such conduct worthy of any additional approbation? Are the Fifth Circuit's dicta in two orders meaningless? A published Order castigating Mr. Sharpe, while leaving the parties to the *Innovative Sand* litigation to roam willy-nilly through the halls of justice, seems neither warranted by "clear and convincing" evidence, nor in accord with proportionality.

Respectfully Submitted,


/s/  Marshall M. Searcy, Jr.
Marshall M. Searcy, Jr.
State Bar No. 17955500
marshall@marshallsearcylaw.com
MARSHALL SEARCY LAW
950 Commerce Street
Fort Worth, Texas 76102
Tel:  817-336-7220


ATTORNEY FOR RESPONDENT



## CERTIFICATE OF SERVICE

I certify that on this 17th day of June 2025, a true and correct copy of the foregoing was served electronically on all counsel of record who are deemed to have consented to electronic service via electronic mail.

/s/  Marshall M. Searcy, Jr.
Marshall M. Searcy, Jr.


## CERTIFICATE OF CONFERENCE

J. Shelby Sharpe, Respondent, hereby certifies that Respondent's counsel, Marshall M. Searcy, Jr., attempted to confer with Special Prosecutors, Geff Anderson and Steve Fahey and at the time of filing had not received a response. Thus, it is presented to the Court for consideration.

/s/ Marshall M. Searcy, Jr.
Marshall M. Searcy, Jr.

## **CERTIFICATE OF COMPLIANCE**

I additionally certify that on this 17th day of June 2025, a paper copy of this Motion was hand-delivered to Judge Means in accord with Judge Means' Local Rule.

*/s/  Marshall M. Searcy, Jr.*
Marshall M. Searcy, Jr.

# EXHIBIT 1

# *United States Court of Appeals*
### FIFTH CIRCUIT
#### OFFICE OF THE CLERK

LYLE W. CAYCE
CLERK

TEL. 504-310-7700
600 S. MAESTRI PLACE,
Suite 115
NEW ORLEANS, LA 70130

June 06, 2025

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW:

        No. 24-10246    Weslease 2018 v. Behan
                        USDC No. 4:20-CV-776
                        USDC No. 4:20-CV-776
                        USDC No. 4:20-CV-776
                        USDC No. 4:20-CV-776
                        USDC No. 4:20-CV-776

Enclosed is an order entered in this case.

Sincerely,

LYLE W. CAYCE, Clerk

*Lisa E. Ferrara*

By: _____
Lisa E. Ferrara, Deputy Clerk
504-310-7675

Mr. Justin Neal Bryan
Mr. John Robert Forshey
Ms. Lynda Lee Lankford
Mr. J. Shelby Sharpe
Mr. James Eamonn Sherry

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 6, 2025

Lyle W. Cayce
Clerk

No. 24-10246
CONSOLIDATED WITH
Nos. 24-10366, 24-10822, 24-10898

WESLEASE 2018 OPERATING, L.P.,

*Plaintiff—Appellee*,

*versus*

LINDA BEHAN; DALE BEHAN,

*Defendants—Appellants*,

CONSOLIDATED WITH

No. 24-10460

WESLEASE 2018 OPERATING, L.P.,

*Plaintiff—Appellee*,

*versus*

LINDA BEHAN; DALE BEHAN,

*Defendants—Appellants*,

J. SHELBY SHARPE,

*Appellant*.

---

Appeals from the United States District Court
for the Northern District of Texas
USDC Nos. 4:20-CV-776

---

## UNPUBLISHED ORDER

Before ELROD, *Chief Judge*, and KING and GRAVES, *Circuit Judges*.

PER CURIAM:

IT IS ORDERED that the Behans' motion for an expedited ruling is DISMISSED AS MOOT.

*Appellant.*

---

Appeals from the United States District Court
for the Northern District of Texas
USDC No. 4:20-CV-776

---

Before ELROD, *Chief Judge*, and KING and GRAVES, *Circuit Judges*.
PER CURIAM:*

Dale and Linda Behan, two judgment creditors, appeal the district court's turnover order transferring an interest in stock from them to Weslease 2018 Operating, the judgment debtor. The Behans also appeal four orders enforcing the turnover order. Because the district court later superseded all of these orders when it appointed a receiver to take possession of the Behans' property, we DISMISS these consolidated appeals as moot.

I

Around a decade ago, Weslease 2018 Operating lent the Behans and several of their companies around $7 million in two separate loans to finance the purchase of equipment. The Behans and their companies failed to repay these debts. So Weslease sought, and later obtained, two judgments against them. *Weslease 2018 Operating, LP v. Behan*, No. 1:19-cv-157, slip op. at 1 (D.N.D. Dec. 22, 2021); *Weslease 2018 Operating, LP v. Innovative Sand Sols., LLC*, No. 4:20-CV-0776-P, 2022 WL 1604787, (N.D. Tex. May 10, 2022), *aff'd*, 2022 WL 17614861 (5th Cir. Dec. 13, 2022).

To collect on these two judgments, Weslease filed three turnover applications under Texas Civil Practice & Remedies Code § 31.002,[1] which

---

* This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

[1] The Federal Rules of Civil Procedure authorize federal courts to execute judgments using the law of the state in which the court is located. Fed. R. Civ. P. 69(a)(1).

permits judgment creditors to seize nonexempt property from judgment debtors to satisfy unpaid judgments. In the first two applications, Weslease requested certain real property owned by River North Farms, Inc., a corporation in which the Behans held all shares of outstanding stock. Both applications were denied on the grounds that Texas law only permits a judgment creditor to collect property owned by the judgment debtor. Because the real property was owned by River North, the courts held that it was not subject to turnover.

In February 2024, Weslease filed its third turnover application. This time, it requested the Behans' stock interest in River North and a list of all of the Behans' assets. The district court granted this request in the "Turnover Order," and ordered the Behans to "turnover all stock/membership in [River North] to the United States Marshals, Fort Worth office." As it explained, Weslease, by virtue of the Turnover Order, became the 100% owner of River North's stock. The Behans timely appealed this order.

Thereafter, Weslease attempted to access River North-owned real property. The Behans and their counsel, J. Shelby Sharpe, refused to grant Weslease access, asserting that the Behans remained River North's directors with exclusive authority over that real property. So, starting in March 2024, Weslease filed several motions to enforce the Turnover Order. The district court granted these motions in four separate "Enforcement Orders."

Generally speaking, the Enforcement Orders required the Behans to "refrain from interfering with Weslease's exercise of any and all rights conferred under the Turnover Order, or any other Order of this Court." For example, the court ordered the Behans to provide Weslease with "gate

---

Here, Weslease filed its turnover applications in the U.S. District Court for the Northern District of Texas, so Texas law applies.

codes, keys, or anything else necessary for Weslease to access" the River North-owned real property after the Behans refused Weslease's requests for this information. The court also ordered the Behans to "withdraw or otherwise cause the nonsuit or dismissal" of state-court litigation that the Behans had filed on River North's behalf challenging Weslease's right to the real property.

In each of the four Enforcement Orders, the district court also ordered the Behans to pay Weslease's attorneys' fees. In the second and fourth orders, the court ordered the Behans to pay Weslease $5,000 as sanctions for their actions that led to the motions to enforce. Further, the court's second order held the Behans and Sharpe jointly and severally liable for the sanctions.

The Behans timely appealed each of these orders. We later consolidated the Behans' appeals of the Turnover Order and the four Enforcement Orders.

In September 2024, after these appeals were filed, the district court appointed a receiver to take "exclusive custody, control, and possession of non-exempt property of whatever kind and wherever situated" of the Behans, including "all entities owned in whole or to the extent they are owned in part by" the Behans. This order explicitly "supersede[d] and/or amend[ed]" the prior orders, except for the portions of the orders that awarded attorneys' fees and sanctions. The Behans did not appeal the order appointing a receiver.

II

The parties agree that we have jurisdiction over the appeals of the Turnover and Enforcement Orders because they are "final decision[s]" under 28 U.S.C. § 1291. *See Hewlett-Packard Co. v. Quanta Storage, Inc.*, 961

4

F.3d 731, 741–42 (5th Cir. 2020) (concluding that turnover and enforcement orders under Texas law are final and appealable under § 1291).

The Behans make two arguments regarding the Turnover Order: (1) Weslease's requested turnover relief is barred by res judicata because its two prior turnover applications were denied; and (2) the property ordered turned over is not subject to turnover under Texas law. The Behans argue that the Enforcement Orders are improper because they exceed the authority granted to the district court under Texas law. Weslease disagrees.

Weslease and the receiver, who submitted an *amicus* brief to the court, contend that these appeals are now moot following the appointment of the receiver. We consider mootness first because it is a "threshold jurisdictional inquiry." *DeOtte v. Nevada*, 20 F.4th 1055, 1064 (5th Cir. 2021) (citation omitted).

A

"[M]ootness accounts for such events that occur during the litigation." *Pool v. City of Houston*, 978 F.3d 307, 313 (5th Cir. 2020). "As a general rule, 'any set of circumstances that eliminates actual controversy after the commencement of a lawsuit renders that action moot.'" *Env't Conservation Org. v. City of Dallas*, 529 F.3d 519, 527 (5th Cir. 2008) (citation omitted). "If intervening circumstances make it impossible for the court to 'grant any effectual relief,' the case is moot." *Pool*, 978 F.3d at 313 (quoting *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012)).

Under similar circumstances, we recently concluded that a district court's post-appeal orders mooted the appeal in *Securities & Exchange Commission v. Barton*, No. 22-11242, 2024 WL 1087366, at *3 (5th Cir. Mar. 13, 2024). There, one party appealed the district court's ratification of a receiver's proposed settlement agreement. *Id.* at *2. After the appeal was filed, the district court entered a new receivership order and simultaneously

ratified the prior settlement agreement. *Id.* We explained that the appeal was moot because the post-appeal order had become the "'operative' ruling of the district court" that the appellant needed to attack to obtain its requested relief. *Id.* at *3. Similarly, we have dismissed an appeal as moot where district and bankruptcy courts had "effectively vacat[ed]" the order from which the appeal arose. *In re Ondova Ltd. Co.*, 619 F. App'x 362, 365 (5th Cir. 2015).

So too here. In this case, the district court's order appointing a receiver explicitly "supersedes and/or amends all portions of the court's prior orders directing the turnover of assets of any Receivership Parties to Weslease." The term "Receivership Parties" is defined to include "all entities owned in whole or to the extent they are owned in part by" the Behans. In other words, the Behans' property previously turned over to Weslease is now in the possession of the receiver.

The Behans contend that, following their appeals, the district court lacked jurisdiction to appoint a receiver. But they have not appealed the order appointing a receiver, so we do not consider the district court's jurisdiction to enter that order. *See Flast v. Cohen*, 392 U.S. 83, 96 (1968) ("[T]he oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions." (citation omitted)).

Accordingly, we cannot grant any effectual relief to the Behans. *See Pool*, 978 F.3d at 313. Any controversy now lies between the Behans and the receiver, not Weslease. These five appeals are now moot, except for the awards of attorneys' fees and sanctions, which the district court specifically left intact.[2] *See id.*

---

[2] This opinion concludes only that these appeals are moot, not that the Behans' arguments are without foundation. Indeed, on the record and arguments before us, we question whether the Turnover Order's conveyance of stock to Weslease granted Weslease any rights in real property owned by River North, a non-judgment debtor third party. *See*

24-10246
c/w Nos. 24-10366, 24-10460, 24-10822, 24-10898

B

Having concluded that these five appeals are now moot, all that remains is for us to review the award of attorneys' fees and sanctions.

The Texas turnover statute permits a district court to award both attorneys' fees and sanctions. *See* Tex. Civ. Prac. & Rem. Code § 31.002(c), (e). The Behans do not argue that the awards themselves were improper. Rather, they contend that they are entitled to reimbursement for fees and sanctions because the Turnover and Enforcement Orders are "invalid." Weslease, by contrast, contends that the awards are proper because they were within the district court's discretion under § 31.002 and the underlying Orders were valid. While both parties addressed the possible mootness of the Orders, neither offered a proposed course of action with respect to the fees and sanctions in the event that we held that the Orders were moot.

We have previously concluded that we lacked § 1291 jurisdiction to resolve fee and sanction disputes where the underlying merits issues remained before the district court. In *Pool v. City of Houston*, for example, we held that an order denying attorneys' fees became an "interim" order when another panel of this court had remanded the merits issues to the district court. 858 F. App'x 732, 734 (5th Cir. 2021) (citing *Shipes v. Trinity Indus., Inc.*, 883 F.2d 339, 341–45 (5th Cir. 1989)). In *Quilling v. Funding Resource Group*, we did the same for contempt sanctions because the sanctions were

---

*Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003) ("An individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets . . . ."); *Bollore S.A. v. Imp. Warehouse, Inc.*, 448 F.3d 317, 322 (5th Cir. 2006) ("Texas courts construing the turnover statute have expressly and consistently held that it may be used to reach only the assets of parties to the judgment, not the assets of non-judgment [debtor] third parties."). The Behans may continue to press their substantive arguments in district court proceedings involving the receiver's possession of the Behans' property, or in appeals arising out of the same.

7

24-10246
c/w Nos. 24-10366, 24-10460, 24-10822, 24-10898

"part and parcel" of continuing litigation in the district court. 227 F.3d 231,
235–36 (5th Cir. 2000).

The district court may modify its conclusions underlying the Orders
in future proceedings involving the receiver. If that occurs, the Behans and
Sharpe may seek relief from the fee awards or sanctions. We decline to grant
that relief at this juncture.

\*    \*    \*

Accordingly, we DISMISS these appeals as moot.

# *United States Court of Appeals*
**FIFTH CIRCUIT**
**OFFICE OF THE CLERK**

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

June 05, 2025

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW

Regarding:    Fifth Circuit Statement on Petitions for Rehearing
              or Rehearing En Banc

    No. 24-10246    Weslease 2018 v. Behan
                    USDC No. 4:20-CV-776
                    USDC No. 4:20-CV-776
                    USDC No. 4:20-CV-776
                    USDC No. 4:20-CV-776
                    USDC No. 4:20-CV-776

Enclosed is a copy of the court's decision.  The court has entered
judgment under Fed. R. App. P. 36.  (However, the opinion may yet
contain typographical or printing errors which are subject to
correction.)

Fed. R. App. P. 39 through 41, and Fed. R. App. P. 39, 40, and 41
govern costs, rehearings, and mandates.  **Fed. R. App. P. 40 require
you to attach to your petition for panel rehearing or rehearing en
banc an unmarked copy of the court's opinion or order.**  Please
read carefully the Internal Operating Procedures (IOP's) following
Fed. R. App. P. 40 for a discussion of when a rehearing may be
appropriate, the legal standards applied and sanctions which may
be imposed if you make a nonmeritorious petition for rehearing en
banc.

<u>Direct Criminal Appeals</u>.  Fed. R. App. P. 41 provides that a motion
for a stay of mandate under Fed. R. App. P. 41 will not be granted
simply upon request.  The petition must set forth good cause for
a stay or clearly demonstrate that a substantial question will be
presented to the Supreme Court.  Otherwise, this court may deny
the motion and issue the mandate immediately.

<u>Pro Se Cases</u>.  If you were unsuccessful in the district court
and/or on appeal, and are considering filing a petition for
certiorari in the United States Supreme Court, you do not need to
file a motion for stay of mandate under Fed. R. App. P. 41.  The
issuance of the mandate does not affect the time, or your right,
to file with the Supreme Court.

<u>Court Appointed Counsel</u>.  Court appointed counsel is responsible
for filing petition(s) for rehearing(s) (panel and/or en banc) and
writ(s) of certiorari to the U.S. Supreme Court, unless relieved
of your obligation by court order.  If it is your intention to
file a motion to withdraw as counsel, you should notify your client
promptly, **and advise them of the time limits for filing for**

**rehearing and certiorari.**   Additionally, you MUST confirm that this information was given to your client, within the body of your motion to withdraw as counsel.

The judgment entered provides that each party is to bear their own costs pay on appeal.

Sincerely,

LYLE W. CAYCE, Clerk

*Melissa Mattingly*

By: _____
Melissa V. Mattingly, Deputy Clerk

Enclosure(s)

Mr. Justin Neal Bryan
Mr. John Robert Forshey
Ms. Lynda Lee Lankford
Mr. J. Shelby Sharpe
Mr. James Eamonn Sherry

# EXHIBIT 2

# *United States Court of Appeals*
## FIFTH CIRCUIT
### OFFICE OF THE CLERK

**LYLE W. CAYCE**
**CLERK**

**TEL. 504-310-7700**
**600 S. MAESTRI PLACE,**
**Suite 115**
**NEW ORLEANS, LA 70130**

December 10, 2024

MEMORANDUM TO COUNSEL OR PARTIES LISTED BELOW:

    No. 24-10998   Weslease 2018 v. Sharpe
               USDC No. 4:20-CV-776

Enclosed is an order entered in this case.

Sincerely,

LYLE W. CAYCE, Clerk

By:  _____
Melissa B. Courseault, Deputy Clerk
504-310-7701

Mr. Justin Neal Bryan
Ms. Karen S. Mitchell
Mr. J. Shelby Sharpe

Subject:   **24-10998 Weslease 2018 v. Sharpe "Non Dispositive Court Order denying stay pending appeal" (4:20-CV-776)**

Date:      12/10/2024 9:39:54 AM Central Standard Time

From:      cmecf_cascprocessing@ca5.uscourts.gov

To:        utlawman@aol.com


\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing.


PLEASE DO NOT REPLY TO THIS EMAIL AS IT ORIGINATES FROM AN UNATTENDED EMAIL ADDRESS.

United States Court of Appeals for the Fifth Circuit

Notice of Docket Activity

The following transaction was entered on 12/10/2024 at 9:38:03 AM Central Standard Time and filed on 12/10/2024

Case Name:     Weslease 2018 v. Sharpe
Case Number:   24-10998
Document(s):   Document(s)


Docket Text:
COURT ORDER denying Motion for stay pending appeal filed by Appellant J. Shelby Sharpe [6] [24-10998] (MBC)

Notice will be electronically mailed to:

Mr. Justin Neal Bryan: jbryan@mccathernlaw.com, cvaladez@mccathernlaw.com, receptionist@mccathernlaw.com
Ms. Karen S. Mitchell, Clerk of Court: TXND_Appeals@txnd.uscourts.gov
Mr. J. Shelby Sharpe: ntlawman@aol.com


The following document(s) are associated with this transaction:
Document Description: Non Dispositive Court Order
Original Filename: 24-10998 Weslease v. Sharpe - Stay Opinion (Final Corrected).pdf
Electronic Document Stamp:
[STAMP acecfStamp_ID=1105048708 [Date=12/10/2024] [FileNumber=10492554-0]
[ab014fb68b88200ee262f5a8224fef5c04bcab2992df59d9bd98e16117424669f3ed0eabba45360fbcc7de70df9bc2a1d9f94b6bab49f70fed7d1997278a5ff1]]

Document Description: MOT-2 Letter
Original Filename: /opt/ACECF/live/forms/MelissaCourseault_2410998_10492554_MotionNotice-MOT-2_381.pdf
Electronic Document Stamp:
[STAMP acecfStamp_ID=1105048708 [Date=12/10/2024] [FileNumber=10492554-1]
[0005fe26b00c1aed2b721a5fe6e9e30683a2def976221921ddc03a7bd6e1fa1ea8ade65f52cac2a30ca57ed055a2e422dc5cf19f6bbe4763ca28483556d8c639]]
Recipients:

- Mr. Justin Neal Bryan
- Ms. Karen S. Mitchell, Clerk of Court
- Mr. J. Shelby Sharpe

# United States Court of Appeals for the Fifth Circuit

No. 24-10998

United States Court of Appeals
Fifth Circuit
**FILED**
December 10, 2024

Lyle W. Cayce
Clerk

WESLEASE 2018 OPERATING, L.P.,

*Plaintiff—Appellee,*

*versus*

J. SHELBY SHARPE,

*Appellant.*

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 4:20-CV-776

UNPUBLISHED ORDER

Before SOUTHWICK, WILLETT, and OLDHAM, *Circuit Judges*.
PER CURIAM:

J. Shelby Sharpe was ordered to disgorge $100,000 because the district court determined that he violated fiduciary duties owed to River North Farms, Inc. Sharpe requests a stay of that order pending appeal. Because Sharpe faces no irreparable injury, we deny his request.

No. 24-10998

I

The background of this case is long and convoluted. We provide only a short synopsis of the facts relevant to this stay application.

Weslease 2018 Operating, LP ("Weslease") won a money judgment against Dale and Linda Behan ("the Behans") and two LLCs that the Behans owned and controlled—Innovative Sand Solutions, LLC and Bull Moose Pipeline, LLC. To execute the judgment, Weslease sought and won a turnover order. The turnover order required the Behans to turn over all stock in River North Farms, Inc.[1] ("River North") to U.S. Marshals, who were obligated to transfer all rights and ownership to Weslease. Weslease thus became the sole shareholder of River North when the district court entered the turnover order.

J. Shelby Sharpe is the Behans' lawyer. He also represents their various entities, including River North. One of Sharpe's co-counsel from a different law firm represented another Behan-related entity called Lindale Pipeline, LLC ("Lindale"). Lindale was not paying its legal bills. To ensure that the co-counsel continued working on the Lindale case, Sharpe wired $97,519.81[2] via his law firm to that lawyer's firm. Sharpe allegedly did not tell anyone why he did so. When the Behans found out about the payment over a year later, they reimbursed Sharpe's firm in the amount of $100,000 through River North.[3]

---

[1] The district court refers to this entity as River North Farms, LLC. But that court's March 22, 2024 order says that the two names are interchangeable, as there must have been some uncertainty about the type of entity at issue at the time. The record on appeal reveals that the entity at issue is a corporation.

[2] The district court rounded up the number to $100,000.

[3] It is uncertain whether this "reimbursement" was $97,519.81 or $100,000, as it was part of a larger payment to Sharpe's firm that included other outstanding bills. At least some record evidence indicates it was $100,000. So we treat it as such for purposes of resolving the stay.

2

Case 4:24-mc-00007-X    Document 58    Filed 06/17/25    Page 31 of 226    PageID 875
Case: 24-10998    Document: 23-1    Page: 3    Date Filed: 12/10/2024

No. 24-10998

Here's where the turnover order and the $100,000 collide. After Weslease gained complete ownership over River North's shares by way of the turnover order, Weslease discovered the $100,000 payment to Sharpe's firm. In response, Weslease moved for disgorgement of the money from Sharpe.

The district court granted that motion. It concluded that Sharpe's payment on behalf of Lindale was a loan reimbursed by his clients (the Behans and River North). It then held that this constituted a "business transaction" that violated Texas Disciplinary Rule of Professional Conduct 1.08(a) ("TDRPC"). And because the district court concluded that this was a "clear and serious violation of duty to a client" that warranted fee forfeiture, *Burrow v. Arce*, 997 S.W.2d 229, 237, 241 (Tex. 1999) (quotation omitted), the court ordered Sharpe to pay $100,000 into the registry of the court.

Sharpe timely appealed that order. He asks this court for a stay pending appeal. We granted an administrative stay after Weslease did not timely respond in order to further consider Sharpe's stay request.

II

"A stay is not a matter of right, even if irreparable injury might otherwise result." *Nken v. Holder*, 556 U.S. 418, 433 (2009) (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926)). As such, stays "are granted only in extraordinary circumstances." *Williams v. Zbaraz*, 442 U.S. 1309, 1311 (1979) (Stevens, J., in chambers) (quoting *Graves v. Barnes*, 405 U.S. 1201, 1203 (1972) (Powell, J., in chambers)). Four factors guide our discretion to issue a stay: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where

Case 4:24-mc-00007-X    Document 58    Filed 06/17/25    Page 32 of 226    PageID 876
Case: 24-10998    Document: 23-1    Page: 4    Date Filed: 12/10/2024

No. 24-10998

the public interest lies." *Nken*, 556 U.S. at 434 (quoting *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987)).

We consider only two factors here: (A) Weslease's likelihood of success on the merits, and (B) whether Weslease will be irreparably injured absent a stay.

A

On the merits, the district court likely erred. We note a few of its likely errors. Assuming Weslease brought this motion as a derivative claim on behalf of River North, it appears Weslease did not comply with Oklahoma's demand requirement.[4] *See* OKLA. STAT. tit. 12, § 2023.1 (1984); *Hargrave v. Canadian Valley Elec. Co-op., Inc.*, 1990 OK 43, ¶ 11–12, 792 P.2d 50, 54. Nor does it seem that Weslease complied with Federal Rule of Civil Procedure 23.1. And we find it unlikely that Weslease could evade these requirements by simply bringing a derivative claim via motion instead of in a separate lawsuit.

In the alternative, assuming this was a direct claim by Weslease in its individual capacity, Texas law does not permit a shareholder to "recover damages individually for injury to the corporation." *Wingate v. Hajdik*, 795 S.W.2d 717, 718 (Tex. 1990); *accord Pike v. Tex. EMC Mgmt., LLC*, 610

---

[4] Under Texas choice-of-law rules, the requirements governing a derivative action by shareholders of a corporation are determined by the state of incorporation's laws. TEX. BUS. ORGS. CODE § 21.562(a); *see also In re Helix Energy Sols. Grp., Inc.*, 440 S.W.3d 167, 174 (Tex. App.— Houston [14th dist.] 2013). River North was incorporated in Oklahoma. So Oklahoma law governs the requirements of the derivative claim here. But Texas law governs direct claims. *See Condon v. Kadakia*, 661 S.W.3d 443, 452–53 (Tex. App.—Houston [14th dist.] 2023), *rev. denied* (Nov. 10, 2023). And Texas law governs the elements of the fiduciary duty claim here because it does not involve the internal affairs of the corporation. *See* TEX. BUS. ORGS. CODE §§ 1.102, 1.105; *State Farm Mut. Auto. Ins. Co. v. Lopez*, 156 S.W.3d 550, 557 n.7 (Tex. 2004) (noting that the "internal affairs doctrine" covers "matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders" (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982))).

4

No. 24-10998

S.W.3d 763, 775–76 (Tex. 2020). And under Texas law, a lawyer's fiduciary duties generally extend only to his clients—here, River North and the Behans. *See, e.g.*, 48 ROBERT P. SCHUWERK ET AL., TEXAS PRACTICE SERIES: HANDBOOK OF TEXAS LAWYER & JUDICIAL ETHICS § 2:10 (2024 ed.) (listing exceptions to the general rule, none of which apply here). Weslease likely trips on each point.

Finally, we are not certain Sharpe's actions constituted a "clear and serious" violation of TDRPC 1.08(a). *See Burrow*, 997 S.W.2d at 241. The meaning of "business transaction" for purposes of that rule has received little judicial interpretation by Texas courts, and we have not located an analogous case. So it is difficult to conclude in this posture that Sharpe "kn[ew] that the conduct was wrongful." *See id.* Even assuming Sharpe violated TDRPC 1.08(a), therefore, fee forfeiture is likely not available here.

Thus, Sharpe is likely to succeed on the merits.

B

Sharpe, however, faces no irreparable injury absent a stay. The failure to make this showing is "critical." *Nken*, 556 U.S. at 434.

If Sharpe ultimately succeeds on the merits of his appeal, the *entire* money judgment is recoverable. This strongly weighs against a finding of irreparable injury. *See, e.g.*, *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472–73 (5th Cir. 1985). We have also held that an applicant's need "to 'liquidate' to obtain the funds to pay" a money judgment does not establish an irreparable injury. *Campbell v. Guetersloh*, 287 F.2d 878, 880 & n.2 (5th Cir. 1961). And Sharpe nowhere alleges that he cannot liquidate assets to satisfy the district court's order. Moreover, this is not a situation where temporary "loss threatens the very existence of the movant's business." *Texas v. EPA*, 829 F.3d 405, 434 & n.1 (5th Cir. 2016);

5

Case 4:24-mc-00007-X    Document 58    Filed 06/17/25    Page 34 of 226    PageID 878
Case: 24-10998    Document: 23-1    Page: 6    Date Filed: 12/10/2024

No. 24-10998

*accord Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021).

In response, Sharpe counters that he will be unable to pay the full $100,000 and will thus be subject to civil contempt and the attendant risk of imprisonment. But "a party's complete inability, due to poverty or insolvency, to comply with an order to pay court-imposed monetary sanctions *is a defense* to a charge of civil contempt." *In re White-Robinson*, 777 F.3d 792, 798 (5th Cir. 2015) (alteration omitted) (quoting *Huber v. Marine Midland Bank*, 51 F.3d 5, 10 (2d Cir. 1995)). So civil contempt and thus imprisonment are not available here.

\*        \*        \*

Although Sharpe is likely to succeed on the merits, he has suffered no irreparable injury. Thus, we DENY Sharpe's request for a stay pending appeal.

# EXHIBIT 3

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**WESLEASE 2018 OPERATING, LP,**

    Plaintiff,

v.

                                  **No. 4:20-cv-00776-P**

**INNOVATIVE SAND SOLUTIONS, LLC,
ET AL.,**

    Defendants.

### INDICATIVE RULING

On November 6, 2024, the Court entered an Order granting in part Plaintiff's Motion for Disgorgement of Funds and ordered Mr. J. Shelby Sharpe to pay $100,000 into the registry of the Court. ECF No. 251. Having reviewed the appellate record regarding this matter, the Court finds it appropriate to issue this indicative ruling. FED. R. CIV. P. 62.1.

While the Court still strongly believes that Shape violated his professional obligations in making an undisclosed loan on behalf of his clients, and that his candor with the Court was wanting, it is clear to the Court that Sharpe made that loan through his law firm. It is also evident that Sharpe's clients repaid that loan to the firm and not to Sharpe personally. Thus, it appears that disgorgement should have been against the firm and not Sharpe personally.

Furthermore, many of the arguments presented to the Fifth Circuit—arguments made for the first time at the appellate level—raise additional questions. Given the aforementioned, should the Court have the Motion for Disgorgement before it now, it would **DENY** without prejudice the motion in its entirety and refer the issue for further investigation to the Court appointed Receiver, Mr. Robert Forshey. The Receiver, having full control and view of the relevant assets and bank accounts, is better suited to determine the propriety of the relevant payments made by Dale and Linda Behan (or by entities they own or control) to Sharpe. Further, the Receiver has full authority to file any

appropriate motion for the recovery of any funds that were paid in violation of this Court's orders or the rules of professional conduct. Any recovered funds could be paid to the registry of the Court for proper disbursement. Further, it is **ORDERED** that a copy of this order shall be filed by the clerk of the Court in appellate case no. 24-10998.

   **SO ORDERED** on this **14th day of March 2025.**

MARK T. PITTMAN
UNITED STATES DISTRICT JUDGE

# EXHIBIT 4

1

Oral Deposition - James Shelby Sharpe
January 22, 2025

1           UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF TEXAS
2              FORT WORTH DIVISION

3                          )
                           )
4   IN RE: J. SHELBY SHARPE    )      NO. 4:24-mc-00007-P
                           )
5                          )

6

7

8

9               ORAL DEPOSITION

10            JAMES SHELBY SHARPE

11             JANUARY 22, 2025

12

13

14

15

16          ORAL DEPOSITION OF JAMES SHELBY SHARPE,

17   produced as a witness at the instance of Anderson &

18   Riddle, L.L.P., and duly sworn, was taken in the above-

19   styled and numbered cause on January 22, 2025, from

20   10:20 a.m. to 12:59 p.m., before Adrianne Harris,

21   Certified Shorthand Reporter in and for the State of

22   Texas, at the offices of J. Shelby Sharpe, 6100 Western

23   Place, Suite 912, Fort Worth, Texas, pursuant to the

24   Federal Rules of Civil Procedure and the provisions

25   stated on the record or attached hereto.

Julia Whaley & Associates
214-668-5578  JulieTXCSR@gmail.com

Oral Deposition - James Shelby Sharpe
January 22, 2025

1                              APPEARANCES

2    FOR J. SHELBY SHARPE:

3          Mr. Marshall Mayes Searcy
           MARSHALL SEARCY LAW
4          950 Commerce Street
           Fort Worth, Texas  76102
5          Phone: (817)336-7220
           Email: marshall@marshallsearcylaw.com

6

7    FOR ANDERSON & RIDDLE, L.L.P.:

8          Mr. Geffrey W. Anderson
           ANDERSON & RIDDLE, L.L.P.
9          1604 Eighth Avenue
           Fort Worth, Texas  76104
10         Phone: (817)334-0059
           Fax: (817)334-0425
11         Email: ganderson@andersonriddle.com

12         - and -

13         Mr. Stephen Fahey
           LAW OFFICE OF STEVE FAHEY, PLLC
14         640 Taylor Street
           Suite 1200
15         Fort Worth, Texas  76102
           Phone: (682)301-0330
16         Email: steve@sfaheylaw.com

17

18   ALSO PRESENT:

19   Ms. Martha Sharpe

20

21

22

23

24

25

Julia Whaley & Associates
214-668-5578  JulieTXCSR@gmail.com

Oral Deposition - James Shelby Sharpe
January 22, 2025

1                          INDEX

2                                                        PAGE

3   Appearances.................................    02

4   Agreements..................................    04

5

    JAMES SHELBY SHARPE
6
          Examination by Mr. Fahey...............    05
7

8   Witness' Signature Page/Corrections.........    110

9
    Reporter's Certificate......................    112
10

11

12                        EXHIBITS

13

    EXHIBIT              DESCRIPTION              PAGE
14
    1        Order on second motion for
15           enforcement of turnover order and
             show cause order 5/21/24            08
16  2        Sharpe email 8/30/24                19
    3        Final judgment 1/9/24               30
17  4        Sharpe email 7/9/24 (8:20 a.m.)     31
    5        Sharpe email 7/9/24 (8:19 a.m.)     36
18  6        [no exhibit identified]             n/a
    7        Bank statement                      49
19  8        Sharpe email 6/7/24                 58
    9        Order of temporary suspension
20           11/7/24                             90
    10       Linda Behan and Dale Behan's
21           Response to Receiver's Motion to
             Sell Land Free and Clear 12/13/24   91
22  11       Sharpe email 3/29/24                102

23

24

25

                   Julia Whaley & Associates
            214-668-5578  JulieTXCSR@gmail.com

Oral Deposition - James Shelby Sharpe
January 22, 2025

1                        AGREEMENTS

2

3    DEPOSITION OF:  JAMES SHELBY SHARPE

4    DATE:  JANUARY 22, 2025

5    CASE NO. 4:24-mc-00007-P

6

     TAKEN PURSUANT TO:
7         (X) Notice
          ( ) Agreement
8         ( ) Court Order
          (X) Rules of Civil Procedure
9

10   ORIGINAL TO:
          ( ) Witness
11        (X) Witness's Attorney (Mr. Searcy)
          ( ) Producing Attorney
12        ( ) Waived

13

     NUMBER OF DAYS FOR SIGNATURE:
14        ( ) 20 days
          (X) 30 days
15        ( ) other:

16

     MISCELLANEOUS:
17        ( ) Any objection made by one party inures to all
                 parties.
18        (X) An unsigned copy may be used at any trial or
                 hearing.

19

20

21

22

23

24

25

Oral Deposition - James Shelby Sharpe
January 22, 2025

| | |
|---|---|
| 1 | JAMES SHELBY SHARPE, |
| 2 | the said witness, having been first duly cautioned and |
| 3 | sworn to testify to the truth, the whole truth and |
| 4 | nothing but the truth, testified under oath as follows: |
| 5 | EXAMINATION |
| 6 | BY MR. FAHEY: |
| 10:20 7 | Q.  Mr. Sharpe, can I have you -- and I know you did |
| 10:20 8 | it a minute ago, but can you tell us your full name on |
| 10:20 9 | the record. |
| 10:20 10 | A.  James Shelby Sharpe. |
| 10:20 11 | Q.  And you know that we're here today in Case |
| 10:20 12 | 4:24-mc-00007, which is miscellaneous action, and |
| 10:21 13 | Mr. Anderson and I have been directed by Judges Means, |
| 10:21 14 | Hendrix, and Starr to investigate four things; and I just |
| 10:21 15 | wanted to talk about those so we have a clear |
| 10:21 16 | understanding on the record. |
| 10:21 17 | The first is, whether you engaged in conduct |
| 10:21 18 | unbecoming of a member of the bar.  Second, whether you |
| 10:21 19 | failed to comply with any rule or order of Judge Pittman. |
| 10:21 20 | Third, whether you engaged in any unethical behavior; and |
| 10:21 21 | fourth, whether you are unable to conduct litigation |
| 10:21 22 | properly.  Do you understand, Mr. Sharpe, that those are |
| 10:21 23 | the four areas the courts directed Mr. Anderson and I to |
| 10:21 24 | look into in this matter? |
| 10:21 25 | A.  Yes. |

Oral Deposition - James Shelby Sharpe
January 22, 2025

10:21  1       Q.  Okay.  Obviously you understand that your

10:21  2   answers today are under oath --

10:21  3       A.  Yes.

10:21  4       Q.  -- and they can be used in our investigative

10:21  5   findings to the court and in the hearing in this matter,

10:21  6   which is currently set for February.  Do you understand

10:21  7   that?

10:21  8       A.  Yes.

10:21  9       Q.  Okay.  Just preliminaries we've done a million

10:21 10   times, but if -- if you don't understand one of my

10:21 11   questions, please ask me to repeat it and I'm happy to do

10:22 12   so, and rephrase it if you need anything clarified, I'm

10:22 13   happy to do that.  Do you understand that?

10:22 14       A.  Yes.

10:22 15       Q.  Okay.  Is there any mental or physical reason

10:22 16   you're not able to answer any of my questions today?

10:22 17       A.  Not that I'm aware of.

10:22 18       Q.  Okay.  Mr. Sharpe, how many years have you been

10:22 19   a practicing attorney?

10:22 20       A.  September 20, 1965.

10:22 21       Q.  Okay.  I'm bad at -- so you're almost coming up

10:22 22   on 60 years?

10:22 23       A.  Correct.

10:22 24       Q.  Okay.  And how many years have you -- of that 60

10:22 25   have you been admitted to practice in the Northern

Oral Deposition - James Shelby Sharpe
January 22, 2025

10:22  1    District?

10:22  2          A.  Let's see, 1966 is when I was admitted.

10:22  3          Q.  Okay.  And obviously, just for the record, with

10:22  4    all your years of experience, you -- it's fair to say you

10:22  5    are very familiar with the Federal Rules of Civil

10:22  6    Procedure, right?

10:22  7          A.  Yes.

10:22  8          Q.  The Texas Disciplinary Rules of Professional

10:22  9    Conduct?

10:23  10         A.  Yes.

10:23  11         Q.  The Dondi Properties decision that sort of

10:23  12    established standards of conduct for attorneys practicing

10:23  13    in the Northern District?

10:23  14         A.  Yes.

10:23  15         Q.  Before the proceedings in this case, have you

10:23  16    ever been sanctioned by any court?

10:23  17         A.  No.

10:23  18         Q.  Okay.  Have you ever had any disciplinary action

10:23  19    taken by Texas Bar or any other state bars?

10:23  20         A.  No.

10:23  21         Q.  All right.  Now I'm going to be showing you

10:23  22    various exhibits.

10:23  23         MR. FAHEY:  Mr. Searcy, is -- do you need to see

10:23  24    these before?  I don't have extra copies, but -- okay.

10:23  25         MR. SEARCY:  Fire away.

Oral Deposition - James Shelby Sharpe
January 22, 2025

10:23  1        A.  Do you want us to make some extra copies for

10:23  2    you.

10:23  3        Q.  (By Mr. Fahey) No, it's fine.

10:23  4        A.  Okay.

10:23  5        Q.  If you need it to show it to Mr. Searcy --

10:23  6        A.  Okay.

10:23  7        Q.  -- please do.  So I'm showing you --

10:23  8            MR. FAHEY:  If we can at some point mark this.

       9                (Brief interruption and Exhibit 1 marked.)

10:24 10            MR. SEARCY:  May I look at that just a moment --

10:24 11            MR. FAHEY:  Of course.

10:24 12            MR. SEARCY:  -- Stephen.

10:24 13            MR. FAHEY:  Yeah.

10:24 14            MS. SHARPE:  I can go make a copy real quick if

10:24 15    you want me to.

10:24 16            MR. SEARCY:  Thank you.

10:24 17            MR. FAHEY:  Sure.

10:24 18        Q.  (By Mr. Fahey) So, Mr. Sharpe, I'm showing you

10:24 19    what is docketed in Case No. 4:20-cv-00776 as Document

10:24 20    167, and do you recognize that?

10:24 21        A.  Yes.

10:24 22        Q.  Okay.  And this is an order -- it's styled as

10:24 23    Order on Second Motion for Enforcement of Turnover Order

10:24 24    and Show Cause Order, and it's dated May 21st of 2024.

10:24 25    Do you see that?

Oral Deposition - James Shelby Sharpe
January 22, 2025

10:25 1      A.  I do.

10:25 2      Q.  Now this is a case -- it's got a long style.

10:25 3  Can you and I agree, for purposes of this deposition,

10:25 4  we'll just call it Innovative Sands case?

10:25 5      A.  That'll be fine, sir.

10:25 6      Q.  Okay.  So are -- you are the counsel of record

10:25 7  in this case, one of the counsels of record in this case,

10:25 8  right?

10:25 9      A.  The only --

10:25 10      Q.  Okay.

10:25 11      A.  -- until I was directed to withdraw.

10:25 12      Q.  Okay.  And who are your clients in this case?

10:25 13      A.  Innovative Sand Solutions, Bull Moose Pipeline,

10:25 14  Lindale Pipeline, Dale and Linda Behan.

10:25 15      Q.  Okay.  And if we turn to Page 2, do you see the

10:25 16  first full paragraph that says -- starts with:  It is

10:25 17  further ordered?

10:25 18      A.  I do.

10:25 19      Q.  Okay.  And it says it is further ordered the

10:25 20  Behans, and any and all persons working on concert with

10:25 21  them or with notice of this order or the turnover order,

10:25 22  refrain from interfering with Weslease's exercise of any

10:26 23  and all rights conferred under the turnover order, or any

10:26 24  other order of this court.  This includes, without

10:26 25  limitation, any entry on real property, exercise of

Oral Deposition - James Shelby Sharpe
January 22, 2025

10:26 1   control or possession of any asset of River North by the

10:26 2   Behans.  Did I read that correctly?

10:26 3       A.  You did.

10:26 4       Q.  Do -- would you agree that the restriction of

10:26 5   this order applied to you as someone with notice of this

10:26 6   order?

10:26 7       A.  Of course.

10:26 8       Q.  Okay.  And also somebody who had notice of Judge

10:26 9   Pittman's earlier turnover order, also, right?

10:26 10      A.  Yes.

10:26 11      Q.  Okay.  Would you also -- would it apply to you

10:26 12  as somebody who -- since there's sort of two clauses in

10:26 13  that paragraph we just read, were you also someone

10:26 14  working in concert with the Behans?

10:26 15      A.  I don't understand what you mean by "working in

10:26 16  concert."

10:26 17      Q.  Well, that's what the language of the order --

10:26 18  you've said that you think that --

10:26 19      A.  Yeah.

10:26 20      Q.  -- the second part applies to you because you

10:26 21  had notice of the order or the turnover order.  Do you

10:27 22  believe the first clause applies to you, also, as someone

10:27 23  working in concert with the Behans?

10:27 24      A.  As their lawyer, I instructed them concerning

10:27 25  what the judge ordered, that they needed to obey it.  So

Oral Deposition - James Shelby Sharpe
January 22, 2025

10:27 1    if that's concert, well, then, yes.

10:27 2        Q.  Okay.  Now, are you aware of a real estate

10:27 3    transaction that occurred on or about August 9th of 2024

10:27 4    where Dale and Linda Behan signed a real estate sale

10:27 5    agreement on behalf of River North Farms, LLC?

10:27 6        A.  I learned about it later concerning a problem

10:27 7    that was occurring with respect to closing on that

10:27 8    transaction, I think.  I think you're talking about the

10:27 9    Azle property of River North Farms.  Is that what

10:27 10   you're -- is that what this is referring to, your

10:27 11   question?

10:28 12       Q.  My question is, I'm aware of -- we are aware of

10:28 13   a real estate transaction that -- that occurred on or

10:28 14   about August 9th of 2024; and so one of my next questions

10:28 15   is going to be:  What is your understanding of that

10:28 16   property, the property involved?

10:28 17       A.  If this is referring to the Azle property, I

10:28 18   became aware of it when I learned from Dale Behan that

10:28 19   there was a problem with the closing on the transaction,

10:28 20   and that's how I became aware of it.  I was not involved

10:28 21   with the contracts or anything.  That's where my

10:28 22   awareness became.

10:28 23       Q.  Do you recall when you became aware of the

10:28 24   transaction?

10:28 25       A.  No, I don't.

Oral Deposition - James Shelby Sharpe
January 22, 2025

10:28  1        Q.  Had the Behans already signed the sales

10:28  2   agreement with the purchaser?

10:28  3        A.  Well, since it was going to closing, they had

10:28  4   to.

10:28  5        Q.  Okay.

10:28  6            MR. ANDERSON:  And if I could jump in here --

10:28  7            THE WITNESS:  Sure.

10:28  8            MR. ANDERSON:  -- just to -- that may make the

10:28  9   day quicker, just ask one or two questions.  That -- so

10:28 10   that's --

10:28 11            MR. SEARCY:  Certainly.

10:29 12            MR. ANDERSON:  -- after August 9th of 2024 --

10:29 13            THE WITNESS:  Uh-huh.

10:29 14            MR. ANDERSON:  -- is when you found out about

10:29 15   this?

10:29 16            THE WITNESS:  All I know, is I found out about

10:29 17   it when Dale called and said there was a problem with the

10:29 18   closing.

10:29 19            MR. ANDERSON:  Okay.

10:29 20            THE WITNESS:  That's -- now when that was,

10:29 21   before that date or after that date, I don't -- I have no

10:29 22   recollection of it.

10:29 23            MR. ANDERSON:  Before Dale called you and said

10:29 24   there's a problem with the closing, you did not know

10:29 25   anything about this transaction?

Oral Deposition - James Shelby Sharpe
January 22, 2025

10:29  1          THE WITNESS:  Correct.

10:29  2      Q.  (By Mr. Fahey) Who was the purchaser on this

10:29  3  transaction?

10:29  4      A.  A company out of California, is my

10:29  5  understanding.

10:29  6      Q.  Do you remember the company's name?

10:29  7      A.  No.

10:29  8      Q.  Do you recall what the purchase price was?

10:29  9      A.  I do not.

10:29 10      Q.  And you said, to the best of your recollection,

10:29 11  the property was located in Azle, Texas?

10:29 12      A.  The property that I was called about is

10:29 13  concer- -- is considered to be the Azle property.  Now

10:30 14  whether it's in the city limits of Azle, I don't know.

10:30 15  All I know, is it's considered to be the Azle property,

10:30 16  and I know that property was the subject of a lawsuit in

10:30 17  Judge O'Connor's court.  So that's -- that's really all I

10:30 18  know about the property.

10:30 19      Q.  Mr. Sharpe, do you know an address or anything

10:30 20  more specific?

10:30 21      A.  I do not.

10:30 22      Q.  So you didn't -- before you got called by

10:30 23  Mr. Behan regarding a problem with the closing, you were

10:30 24  not involved in any kind of negotiation of the sales

10:30 25  agreement; is that right?

Oral Deposition - James Shelby Sharpe
January 22, 2025

10:30  1        A.   Correct.

10:30  2        Q.   Now, after he called you with a problem with the

10:30  3    closing, what did you do as -- as a lawyer, did you

10:30  4    assist him in any way with that transaction?

10:30  5        A.   With the closing, no.

10:30  6        Q.   Did you interact with the purchaser or their

10:30  7    legal counsel in any way?

10:30  8        A.   Yes.

10:30  9        Q.   Okay.  Tell us about that.

10:30 10        A.   That it needed to not close and that the

10:31 11    purchase money, or whatever money had been paid, needed

10:31 12    to be returned.

10:31 13        Q.   Do you recall, did you talk to the person

10:31 14    directly or an attorney?

10:31 15        A.   It was an attorney, and I want to think the

10:31 16    attorney was up in the northeast, which -- this is

10:31 17    California, I understood, and here they got an attorney

10:31 18    coming from the northeast.  I think it was New Jersey, if

10:31 19    I'm not mistaken.

10:31 20        Q.   How would you describe your work with that

10:31 21    attorney?  How much work did you do on this matter?

10:31 22        A.   Conversation, other than to just try to

10:31 23    encourage her to put some papers together so it could

10:31 24    come to an end and go back to square one, either that or

10:31 25    put it in escrow and wait to see what happened; but it

Oral Deposition - James Shelby Sharpe
January 22, 2025

10:31  1   couldn't -- it wasn't going forward, I made that clear.

10:31  2        Q.   Why was it not going forward?

10:31  3        A.   Because it couldn't.

10:31  4        Q.   Well, when you say it couldn't, what do -- what

10:32  5   do you mean by that?

10:32  6        A.   Well, Judge Pittman's order.

10:32  7        Q.   Okay.

        8                    (Reporter clarification.)

10:32  9        Q.   (By Mr. Fahey) And do you mean the turnover

10:32 10   order, or what order specifically, if you recall?

10:32 11        A.   That would have to be an enforcement order

10:32 12   because the turnover order only conveyed the title of

10:32 13   stock --

10:32 14        Q.   Okay.

10:32 15        A.   -- and so it had to have been enforcement order.

10:32 16        Q.   Okay.  Had the enforcement order came down -- so

10:32 17   if this transaction was negotiated or signed by the

10:32 18   Behans on August 9th, was it an order that came after

10:32 19   August 9th?

10:32 20        A.   I don't know the timing on the order, and I

10:32 21   don't know how long the negotiations had been going on

10:32 22   concerning this property.  I couldn't tell you if it went

10:32 23   back to when the O'Connor suit was in progress or had

10:32 24   come to an end, or if it was something that developed

10:32 25   after that, I don't know because I just was not involved.

Oral Deposition - James Shelby Sharpe
January 22, 2025

10:33  1        Q.   Okay.  Did you induce the purchaser to put down

10:33  2   a nonrefundable deposit as part of the deal?

10:33  3        A.   No.

10:33  4        Q.   Did -- was there a nonrefundable deposit as part

10:33  5   of the deal?

10:33  6        A.   I don't know.

10:33  7        Q.   Do you know anything about a deposit put down as

10:33  8   part of that transaction?

10:33  9        A.   Other than the fact that I knew there was some

10:33 10   money put down, that's reason why I told that it either

10:33 11   needed to go into escrow and nothing happened or it

10:33 12   needed to be refunded and they needed to do, but some

10:33 13   real estate agent is the one who handled the contract, I

10:33 14   understand; and I learned that from the purchaser's --

10:33 15        Q.   Okay.

10:33 16        A.   -- lawyer.

10:33 17        Q.   So as far as this nonrefundable deposit, is it

10:33 18   your testimony, Mr. Sharpe, that you only learned of that

10:33 19   when you came in at the point to stop the -- tell that --

10:33 20   tell this attorney that this transaction could not close?

10:33 21        A.   That is correct.

10:34 22        Q.   At the time you -- and I'm going -- overlapping

10:34 23   a little bit with Mr. Anderson's question, but do you

10:34 24   have any sense month-wise of when this conversation or

10:34 25   these conversations with the attorney took place?  If the

Oral Deposition - James Shelby Sharpe
January 22, 2025

10:34 1   transaction sales agreement was signed August 9th of

10:34 2   2024, are you talking later in August?  Is this

10:34 3   September?  Do you have any sense of that?

10:34 4       A.  I have no recollection of when it was.

10:34 5       Q.  Okay.  When you -- Mr. Behan called you to

10:34 6   handle this matter, did you -- and you reached out to the

10:34 7   attorney, what was the end result of your talks with the

10:34 8   attorney for the purchaser?

10:34 9       A.  Well, he didn't call me and ask me to handle it.

10              (Reporter clarification.)

10:34 11      Q.  (By Mr. Fahey) And this is Mr. Behan did not?

10:34 12      A.  Mr. Behan did not.  He just simply told me that

10:34 13  there was a problem with the closing, and I told him that

10:35 14  it can't close; and then I got a call from the lawyer for

10:35 15  the purchaser.  Now, how she got my number, I don't know.

10:35 16  But I did not call her.  She called me.

10:35 17      Q.  And why did she call you?

10:35 18      A.  Because of the problem that they were running

10:35 19  into with the closing, and that's when I told her it

10:35 20  can't close, either the money goes -- stays in escrow if

10:35 21  the people are still interested and they wait and see

10:35 22  what happens, or the money gets refunded.

10:35 23          I said, to me, that's something that the clients

10:35 24  have to negotiate, but -- or discuss, but I said those

10:35 25  are the two options to her; and that's what I told her.

Oral Deposition - James Shelby Sharpe
January 22, 2025

10:35 1    Q.  And what happened after that?

10:35 2    A.  As far as I know, it didn't close, and I don't

10:35 3    know whether they refunded the money or it's in escrow.

10:35 4    I have no idea.

10:36 5    Q.  But when you were talking with her, you were

10:36 6    acting as Mr. Behan's attorney; is that fair?

10:36 7    A.  Well, she called me and said, I understand that

10:36 8    you represent Mr. Behan, and I said yes, I do; and she

10:36 9    told me what the problem was, and I told her what they

10:36 10   needed to do one way or the other, but I just simply

10:36 11   answered her questions.  But, yeah, I was representing

10:36 12   Dale at the time because I had a matter on appeal.

10:36 13   Q.  Okay.  Did you provide any -- at that point when

10:36 14   you learned about this transaction, did you provide any

10:36 15   notice to Weslease or their counsel about this potential

10:36 16   sale of land?

10:36 17   A.  No.  Not that I recall.

10:36 18   Q.  Do you know if the Behans did?

10:36 19   A.  I don't know.  I -- if they did, I don't know.

10:37 20   I know I didn't.  Because I wasn't involved in the

10:37 21   transaction, so I didn't do anything.

10:37 22   Q.  When the purchaser's attorney called you --

10:37 23   A.  Uh-huh.

10:37 24   Q.  -- did they reference in any way contacting you

10:37 25   because of talking to Weslease or their counsel?

Oral Deposition - James Shelby Sharpe
January 22, 2025

10:37  1          A.  Not that I recall.

10:37  2          Q.  There's a filing from Weslease that's on the

10:37  3    docket that makes a representation -- the attorney for

10:37  4    Weslease makes a representation that the purchaser

10:37  5    believed that they were misled by you and the Behans in

10:37  6    this transaction.

10:37  7              Was there any discussion when this attorney

10:37  8    called you, any representation from that attorney, that

10:37  9    an accusation that you or the Behans had misled the

10:37 10    attorney's client?

10:37 11          A.  I don't recall that ever being said to me, in

10:38 12    the conversation I had with the attorney, that they felt

10:38 13    Dale and Linda Behan had made a misrepresentation.  I

10:38 14    know I couldn't have, because I didn't make any because I

10:38 15    wasn't involved, other than as I've testified.

10:38 16              MR. FAHEY:  Can we mark this as Exhibit 2,

10:38 17    please.

      18                              (Exhibit 2 marked.)

10:38 19          Q.  (By Mr. Fahey) Mr. Sharpe, I'm showing you

10:38 20    what's been marked as Exhibit 2.  Take a minute, and if

10:38 21    Mr. Searcy needs to look at that.

10:38 22          A.  Yeah, I remember this.

10:38 23              MR. SEARCY:  May I see that --

10:38 24              THE WITNESS:  Yeah.

10:38 25              MR. SEARCY:  -- Mr. Sharpe, if you've completed

Oral Deposition - James Shelby Sharpe
January 22, 2025

10:38  1    your...

10:38  2             THE WITNESS:  Oh, yeah.  Yeah.

10:39  3        A.   That accurately sums up what I told her

10:39  4    verbally.

10:39  5        Q.   (By Mr. Fahey) Okay.

10:39  6             MR. SEARCY:  Thank you.

10:39  7        Q.   (By Mr. Fahey) So, Mr. Sharpe, Exhibit 2, do you

10:39  8    recognize this -- it's an email.  Do you recognize that?

10:39  9        A.   I do.

10:39 10        Q.   And can you tell us for the record what it is.

10:39 11        A.   It's an email from me to the attorney for the

10:39 12    purchaser, prospective purchaser.

10:39 13        Q.   So we were talking a minute ago about this

10:39 14    attorney calling you.  Would this be this Dorothy

10:40 15    Bolinsky?

10:40 16        A.   Yes.

10:40 17        Q.   Okay.  And you refer to her as Dotty in this

10:40 18    email; is that right?

10:40 19        A.   That's the way she referred to herself.

10:40 20        Q.   Okay.

10:40 21        A.   That's why I put that.

10:40 22        Q.   Now your email's dated August 30th of 2024.  Do

10:40 23    you see that?

10:40 24        A.   I do see that.

10:40 25        Q.   When in time -- and it's about 2:00 in the

Oral Deposition - James Shelby Sharpe
January 22, 2025

10:40 1    afternoon that you send this, Central Time.  When did

10:40 2    she -- when did you and her have this call where she

10:40 3    called you, given the date on this email is August 30th,

10:40 4    was it earlier that day?  Does this jog your memory on

10:40 5    when that might have occurred?

10:40 6        A.  It doesn't jog my memory, but my -- I'm -- and I

10:40 7    told my witnesses never to guess.

10:40 8        Q.  Please don't.

10:40 9        A.  I would --

10:40 10       Q.  I mean, do you recall --

10:40 11       A.  No, I do not.

10:40 12       Q.  -- when you had the phone call?

10:40 13       A.  I do not.

10:40 14       Q.  Okay.  Is it fair to say this email was a

10:40 15   follow-up to the phone call you had?

10:40 16       A.  Oh, absolutely.

10:40 17       Q.  Because you're referring her -- to her as Dotty,

10:40 18   so you presumably had a phone call where she introduced

10:40 19   herself as Dotty?

10:40 20       A.  Correct.

10:40 21       Q.  Okay.

10:40 22       A.  Otherwise I would have said Ms. Bolinsky.

10:41 23       Q.  Okay.  Now there's some other people copied on

10:41 24   this email.  Do you see those?  One, two, three, four,

10:41 25   five, six, I believe.  Five.

Oral Deposition - James Shelby Sharpe
January 22, 2025

10:41  1       A.  I do.

10:41  2       Q.  Five.  So who are these individuals?

10:41  3    Luke@2mac.com, do you know who that is?

10:41  4       A.  I have no idea who that is.

10:41  5       Q.  Okay.  Now, is it fair to say this does not look

10:41  6    like it's a reply email?  This looks like it's an email

10:41  7    that you drafted; is that fair?

10:41  8       A.  It is an email I drafted, but I had to get this

10:41  9    information from some source.  I want to -- I want to

10:41 10    think that I might have gotten an email from her prior to

10:41 11    this, where she copied these individuals, while this is

10:41 12    not a reply -- because otherwise, except for Dale Behan,

10:41 13    I don't even know these other people.

10:42 14       Q.  So you don't know nathan.kivi@hotelierco.com?

10:42 15       A.  Have no idea who that is.

10:42 16       Q.  Scott@latigo-group.com?

10:42 17       A.  Have no idea.

10:42 18       Q.  Stevencrofts.realtor@gmail.com?

10:42 19       A.  My -- I think that's Dale Behan's Realtor, I

10:42 20    think that's who that is, but I don't know that for

10:42 21    certain.

10:42 22       Q.  And dbehan@behangroup.com is Dale Behan?

10:42 23       A.  That is correct.

10:42 24       Q.  Okay.  And this is titled Azle Property; is that

10:42 25    right?

Oral Deposition - James Shelby Sharpe
January 22, 2025

10:42 1       A.   Correct.

10:42 2       Q.   Okay.  And what are you essentially telling her

10:42 3   in this email, and attaching?

10:42 4       A.   Telling her it's not going forward and here's

10:42 5   why.

10:42 6       Q.   Okay.  And what is the order that you're

10:42 7   attaching to this?

10:42 8       A.   It's an order of August 30th, 2024 from Judge

10:43 9   Pittman, is what it is.

10:43 10      Q.   Okay.  And is it right that this attachment that

10:43 11  you're saying -- so essentially you're attaching this and

10:43 12  saying this is why the sale can't go forward; is that

10:43 13  fair?

10:43 14      A.   Well, my email says attached is an order I

10:43 15  received a few minutes ago, and once I got it and I had

10:43 16  had that conversation with her, I sent that to her along

10:43 17  with the order so she would understand that this was --

10:43 18  this property was going to be controlled by the court and

10:43 19  it could not go forward.

10:44 20      Q.   So you sent this email at 2:07 --

10:44 21      A.   Uh-huh.

10:44 22      Q.   -- p.m. on August 30th, right?

10:44 23      A.   Yes.

10:44 24      Q.   And the order from Judge Pittman that you're

10:44 25  forwarding is -- was at 12:28 p.m. --

Oral Deposition - James Shelby Sharpe
January 22, 2025

10:44 1      A.   Right.

10:44 2      Q.   -- Central, the same day.

10:44 3      A.   Correct.

10:44 4      Q.   About an hour and a half before --

10:44 5      A.   Yeah.

10:44 6      Q.   -- this email.  So tell me again, she called

10:44 7   you?

10:44 8      A.   Uh-huh.

10:44 9      Q.   And you can't remember when that was?

10:44 10     A.   Correct.

10:44 11     Q.   And at that point, she knew that the sale wasn't

10:44 12  going to go forward, or you told her in that phone call

10:44 13  that the sale wasn't going to go forward?

10:44 14     A.   I told her that it couldn't go forward, but I

10:44 15  was basing that on the fact that -- that the enforcement

10:44 16  orders concerning that wouldn't let it go forward.

10:44 17          But this one that came in there, that I sent

10:44 18  her, was the latest of the enforcement orders that had

10:44 19  come down, because there had been enforcement orders

10:45 20  going over several months.

10:45 21     Q.   So, Mr. Sharpe, your testimony is, you had

10:45 22  already told the purchaser's attorney, based on a prior

10:45 23  order of Judge Pittman, that the sale couldn't happen,

10:45 24  and that this order was yet another reason why the sale

10:45 25  couldn't happen; is that fair?

Oral Deposition - James Shelby Sharpe
January 22, 2025

10:45 1      A.  Correct.  That'd be -- that'd be fair.

10:45 2      Q.  Now, in this email, you don't reference any

10:45 3  other orders, right?

10:45 4      A.  No.

10:45 5      Q.  You just say:  Unle- -- attached is an order I

10:45 6  received a few minutes ago.  Unless Weslease has agreed

10:45 7  to the sale going forward as we have agreed, we are dead

10:45 8  in the water until the Fifth Circuit straightens this

10:45 9  out.  Did I read that correctly?

10:45 10     A.  That is correct.

10:45 11     Q.  What did you mean by "unless Weslease has agreed

10:45 12 to the sale going forward as we have agreed"?

10:45 13     A.  Well, I understood that apparently there had

10:45 14 been some conversation with Weslease.  That's what I

10:45 15 remember her telling me, and that's why I said unless

10:45 16 Weslease has agreed to the sale going forward where the

10:46 17 proceeds of it would go into an escrow account at the

10:46 18 title company and be held there until the Fifth Circuit

10:46 19 ruled -- I said unless Weslease has agreed to going

10:46 20 forward, we're dead in the water.

10:46 21         In other words, I made it very clear, without

10:46 22 Weslease approval of it going forward, it wasn't going

10:46 23 anywhere.

10:46 24     Q.  Had you had any conversations with Weslease

10:46 25 about this transaction?

Oral Deposition - James Shelby Sharpe
January 22, 2025

10:46   1       A.  No.  Not that I recall.  I know at some point I

10:46   2   did, but I don't -- I don't recall that I'd had it at

10:46   3   that point.  But I couldn't tell you when it was.

10:46   4       Q.  Okay.  Did you get the sense that the

10:46   5   purchaser's attorney had had conversations with Weslease

10:46   6   at this time on August 30th?

10:46   7       A.  Yeah.  Otherwise I wouldn't say unless Weslease

10:46   8   has greed to the sale going forward.  I get -- I got the

10:46   9   impression that Weslease had talked to them.

10:46 10       Q.  Now, this Azle property, you mentioned earlier

10:47 11   that it had a connection to a case in Judge O'Connor's

10:47 12   court?

10:47 13       A.  That is correct.

10:47 14       Q.  Explain what you mean by that.

10:47 15       A.  In November of 2022, Weslease filed an

10:47 16   application for turnover in Judge Pittman's court.  He

10:47 17   denied it, explaining the law perfectly, and also said

10:47 18   there is a case pending in Judge O'Connor's court where

10:47 19   the issue will be decided.

10:47 20         January 4 of 2024, a bench trial was held in

10:47 21   Judge O'Connor's court.  At the conclusion of it, he

10:47 22   granted our motion for directed verdict, denied all

10:47 23   relief Weslease sought, explained that River North Farms

10:47 24   was not a judgment debtor to Weslease, that there was no

10:48 25   indication that the Behans had used it to pierce the

Oral Deposition - James Shelby Sharpe
January 22, 2025

10:48 1    corporate veil or that they had used it as an alter ego.

10:48 2    Those are findings that -- that he made.  So

10:48 3    their attempt to get a turnover of property that River

10:48 4    North Farms had sold to a doctor and his wife was denied.

10:48 5    Q.  Can I interrupt you right there, Mr. Sharpe --

10:48 6    A.  Sure.

10:48 7    Q.  -- I'm sorry.  When you say "doctor and his

10:48 8    wife," is that Richard and Marla Robinson?

10:48 9    A.  That is correct.

10:48 10    Q.  Okay.  Please go forward.  I just wanted to

10:48 11    clarify.

10:48 12    A.  And so this Azle property, apparently, after

10:48 13    that was over with, the real estate agent that was

10:48 14    working for River North Farms found a purchaser for some

10:48 15    of the other Azle property.  That's -- and when that

10:49 16    happened, I have no idea.

10:49 17    All I know, is we got through in January.  That

10:49 18    was the rule -- the ruling of the court, that Weslease

10:49 19    was not entitled to a turnover of any River North Farms

10:49 20    property.

10:49 21    Q.  And pardon me backing up a little bit.

10:49 22    Because --

10:49 23    A.  Sure.

10:49 24    Q.  -- obviously you --

10:49 25    A.  Please back up.

Oral Deposition - James Shelby Sharpe
January 22, 2025

10:49 1      Q.  -- lived it, you were counsel of record, but --

10:49 2      A.  Yeah.

10:49 3      Q.  -- Geff and I aren't -- or Mr. Anderson and I

10:49 4  weren't involved.  So is it fair to say the Judge

10:49 5  O'Connor litigation -- and just for the record, that was

10:49 6  4:22-cv-1013.  Is it fair to say that that involved the

10:49 7  portion of the Azle property conveyed to Richard and

10:49 8  Marla Robinson?

10:49 9      A.  That's -- it was totally focused on the property

10:49 10 conveyed to the Robinsons, which is a part of a larger

10:49 11 plat of River North Farms property.

10:49 12     Q.  And this proposed transaction --

10:50 13     A.  Uh-huh.

10:50 14     Q.  -- that you got a call from an attorney in the

10:50 15 northeast --

10:50 16     A.  Uh-huh.

10:50 17     Q.  -- that the Behans had been working -- you

10:50 18 know -- had agreed to sell, that was another portion

10:50 19 of --

10:50 20     A.  Of that --

10:50 21     Q.  -- what could be titled the Azle property; is

10:50 22 that fair?

10:50 23     A.  Yes.  Yes.

10:50 24     Q.  Separate from the property, the Robinson

10:50 25 property, that was in O'Connor's court?

Oral Deposition - James Shelby Sharpe
January 22, 2025

10:50  1    A.  It was a some of -- I don't know how much of it,
10:50  2  but it was some of the remaining property that had not
10:50  3  been sold to the Robinsons.
10:50  4    Q.  Okay.  And any order that Judge O'Connor made in
10:50  5  his case, you understand that to only apply to the
10:50  6  portion of the Azle property that was conveyed to the
10:50  7  Robinsons?
10:50  8    A.  No.
10:50  9    Q.  No.  Okay.
10:50 10    MR. SEARCY:  I'm sorry, could you read -- an
10:51 11  F-16 just took off over me, and I didn't hear the answer.
10:51 12    MR. FAHEY:  Fair enough.
10:51 13    MR. SEARCY:  Would you mind reading that back to
10:51 14  me.  May I, Stephen?
10:51 15    MR. FAHEY:  Yeah, of course.
      16          (The record was read as requested.)
10:51 17    MR. SEARCY:  Okay.  Thank you.
10:51 18    THE REPORTER:  Uh-huh.
10:51 19    MR. SEARCY:  Thank you.
10:51 20    MR. FAHEY:  Sure.  Thank you.
10:51 21    Q.  (By Mr. Fahey) So can you explain what you mean
10:51 22  by "no."
10:51 23    A.  Yes.
10:51 24    Q.  Please explain.
10:51 25    A.  You used the word "only."  Res judicata applies

Oral Deposition - James Shelby Sharpe
January 22, 2025

10:51  1    not only to what's decided there, but what could have

10:51  2    been raised in that claim.  Because if they were seeking

10:52  3    turnover of just the portion of the Robinsons, they also

10:52  4    could have sought turnover, as they have later done, for

10:52  5    all of the property.

10:52  6            So under the principles of res judicata, that

10:52  7    judgment not only applied to what he decided, but what he

10:52  8    also could have decided, and there's a lot of good Fifth

10:52  9    Circuit opinions on that.

10:52 10        Q.  Let me mark -- Mr. Sharpe, I'm showing you

10:52 11    what's been marked as Exhibit 3.  Do you recognize that?

      12                          (Exhibit 3 marked.)

10:52 13        A.  I do.  It's the O'Connor judgment.

10:52 14        Q.  (By Mr. Fahey) And do you see in paragraph 2 of

10:52 15    that judgment in Judge O'Connor's case, he describes the

10:52 16    land at issue in his case as, quote, the portion of the

10:52 17    Fort Worth property conveyed to Richard and Marla

10:52 18    Robinson --

10:52 19        A.  Yeah.

10:52 20        Q.  -- do you see that?

10:52 21        A.  It was dismissed without prejudice.

10:52 22        Q.  Okay.  And do you also see that same language

10:52 23    talking about property conveyed to Richard and Marla

10:53 24    Robinson in paragraph 3?

10:53 25        A.  I do.

Oral Deposition - James Shelby Sharpe
January 22, 2025

10:53 1      Q.  Okay.  So I understand your argument of res

10:53 2   judicata, but --

10:53 3      A.  Uh-huh.

10:53 4      Q.  -- you would agree with me that O'Connor's only

10:53 5   mention or description of the land talks about a portion

10:53 6   of the Fort Worth property conveyed to Richard and Marla

10:53 7   Robinson?

10:53 8      A.  Agreed.

10:53 9      Q.  Okay.

10                        (Exhibit 4 marked.)

10:53 11     Q.  (By Mr. Fahey) Mr. Sharpe, I'm showing you

10:53 12  what's been marked as Exhibit 4.  Take a minute to review

10:53 13  that, please.

10:54 14     A.  Okay.

10:54 15        MR. SEARCY:  May I see that just a moment,

10:54 16  please.  Thank you.

10:54 17     Q.  (By Mr. Fahey) What are we --

10:54 18        MR. SEARCY:  Please proceed.

10:54 19        MR. FAHEY:  Okay.

10:54 20     Q.  (By Mr. Fahey) What are we looking at in

10:54 21  Exhibit 4?

10:54 22     A.  An email with an attachment.

10:54 23     Q.  Okay.  Is it an email from you?

10:54 24     A.  Yes.

10:54 25     Q.  Okay.  And -- maybe we'll wait till Mr. Searcy's

Oral Deposition - James Shelby Sharpe
January 22, 2025

10:54  1    done reviewing it.

10:54  2         MR. SEARCY:  No.  Please proceed.

10:54  3         MR. FAHEY:  Okay.

10:54  4         THE WITNESS:  Thank you.

10:54  5    Q.  (By Mr. Fahey)  What is the date on this email?

10:54  6    A.  July 9.

10:54  7    Q.  2024?

10:54  8    A.  Yes.

10:54  9    Q.  And it's sent to Justin Bryan?

10:54 10    A.  It is.

10:54 11    Q.  And Mr. Bryan is counsel for Weslease; is that

10:54 12    fair?

10:54 13    A.  Yes.

10:54 14    Q.  And what is the attachment?

10:54 15    A.  A handwritten note and a picture of two checks.

10:55 16    Q.  Okay.  And looking at those two checks, is it

10:55 17    fair to say the one in the middle underneath the note is

10:55 18    a check to River North Farms dated June 5th of 2024 for

10:55 19    $10,000?

10:55 20    A.  That's what it shows.

10:55 21    Q.  And does that show it's a check from Bonnie

10:55 22    Wiggs, W-I-G-G-S?

10:55 23    A.  That's what it shows.

10:55 24    Q.  Okay.  Do you know who Bonnie Wiggs is?

10:55 25    A.  Have no clue.

Oral Deposition - James Shelby Sharpe
January 22, 2025

10:55  1        Q.  Do you know what this payment of $10,000 to
10:55  2    River North Farms was?
10:55  3        A.  I do not.
10:55  4        Q.  Have no clue at all?
10:55  5        A.  Have no clue.
10:55  6        Q.  And below the first check there's a sec- -- do
10:55  7    you see there's a second check to River North Farms for
10:55  8    $25,000 from a Jason and Toni, T-O-N-I, Sidler,
10:55  9    S-I-D-L-E-R?
10:56 10        A.  I see that.
10:56 11        Q.  And if -- I might have forgotten to say, do you
10:56 12    see it's dated June 6th, 2024?
10:56 13        A.  I see that.
10:56 14        Q.  One day after the check right above it from
10:56 15    Ms. Wiggs; is that right?
10:56 16        A.  That is correct.
10:56 17        Q.  Do you know who the Sidlers are?
10:56 18        A.  I've heard the name, but I don't know them,
10:56 19    never met them.
10:56 20        Q.  Do you know what this payment to River North
10:56 21    Farms for $25,000 is?
10:56 22        A.  I don't know.  But I seem to recall there was a
10:56 23    debt that River North Farms owed an interest payment on,
10:56 24    and I think it was like something that might have totaled
10:56 25    up to this, and that might have been what -- what the

Oral Deposition - James Shelby Sharpe
January 22, 2025

10:56 1  check was for, was to River North Farms to -- to pay a

10:56 2  debt.  That -- that's a very foggy recollection.

10:56 3      Q.  Are you -- are you -- how sure are you that

10:56 4  that's what this $25,000 check was for?

10:56 5      A.  Ten percent.

10:57 6      Q.  Okay.  So you're -- sort of a guess?

10:57 7      A.  I'm just trying to remember from things that

10:57 8  I -- I do remember there was a matter in Judge Pittman's

10:57 9  court, about $35,000 that River North Farms -- oh, that

10:57 10 Mr. Behan got and paid some debts of River North Farms,

10:57 11 and he got sanctioned for it.

10:57 12     Q.  Okay.

10:57 13     A.  In fact, he was ordered to pay Weslease, I

10:57 14 think, $35,000, if I'm not mistaken.

10:57 15     Q.  Now these checks are dated June 5th and June 6th

10:57 16 of 2024, and your email attaching a photo of them to

10:57 17 Justin Bryan is July 9th of 2024.  Do you recall when you

10:57 18 learned about these two checks?

10:57 19     A.  No, I don't.  I would think in close proximity

10:57 20 to me sending it to him, would be my -- but I don't

10:57 21 remember.

10:57 22     Q.  Do you know if the Behans deposited these

10:57 23 checks?

10:58 24     A.  I do not.

10:58 25     Q.  Have no idea if they deposited them or what bank

Oral Deposition - James Shelby Sharpe
January 22, 2025

10:58  1    they went into?

10:58  2        A.  I can't answer that.  I don't know.  I don't

10:58  3    know.

10:58  4        Q.  You don't know?

10:58  5        A.  No.

10:58  6        Q.  Do you know why you came into possession of the

10:58  7    checks, or at least a possession of a photo of the

10:58  8    checks?

10:58  9        A.  My recollection is that I got a call from Justin

10:58 10    concerning something that pertained to these matters

10:58 11    and -- and I called Dale, and what I sent him --

10:58 12            MR. SEARCY:  Just a minute.  If you're going to

10:58 13    recite a conversation you had with your client, that's

10:58 14    probably a privilege that is not yours.

10:58 15            THE WITNESS:  Well, you're correct that it's a

10:58 16    privilege that's not mine.

10:59 17        A.  But to answer the question without violating any

10:59 18    attorney-client --

10:59 19        Q.  (By Mr. Fahey) Sure.  Of course.

10:59 20            MR. SEARCY:  Good.

10:59 21        A.  -- my -- my recollection is, I got a call from

10:59 22    Justin, and in response to his call, I sent this email

10:59 23    with the attachment.

10:59 24        Q.  (By Mr. Fahey) Okay.

10:59 25        A.  That's my recollection.

Julia Whaley & Associates
214-668-5578  JulieTXCSR@gmail.com

Oral Deposition - James Shelby Sharpe
January 22, 2025

10:59  1          Q.   Okay.

10:59  2               THE WITNESS:   Thank you, good lawyer.

       3                              (Exhibit 5 marked.)

10:59  4          Q.   (By Mr. Fahey) I'm showing you, Mr. Sharpe,

10:59  5     what's been marked as Exhibit 5.   Take a minute to review

10:59  6     that and if Mr. Searcy needs to look at it.

10:59  7               MR. SEARCY:   Oh.   Thank you, sir.

11:00  8               Thank you, sir.

11:00  9          Q.   (By Mr. Fahey) Mr. Sharpe, what is -- what are

11:00 10     we looking at in Exhibit 5?

11:00 11          A.   It's an email from me to Weslease's attorney.

11:00 12          Q.   And it is also, like Exhibit 4, from July 9th of

11:00 13     2024?

11:00 14          A.   Correct.

11:00 15          Q.   And I'll represent to you it looks like it was

11:00 16     one minute -- a different email chain, but one minute

11:00 17     before the -- the email that you sent in Exhibit 4; is

11:00 18     that fair?

11:00 19          A.   I'll accept what you say because I don't

11:00 20     remember.

11:00 21          Q.   8:19 a.m., and Exhibit 4 was sent at 8:20 a.m.;

11:00 22     is that fair?

11:00 23          A.   I would agree that's correct.

11:00 24          Q.   Okay.   So if we look at -- what are you -- if --

11:00 25     now that you've had a chance to review it, what are you

Oral Deposition - James Shelby Sharpe
January 22, 2025

11:01 1    telling Mr. Bryan in this email?

11:01 2        A.  Exactly what it says, that apparently there was

11:01 3    a need to pay a debt of River North Farms and that's what

11:01 4    precipitated what -- what -- what took place.

11:01 5        Q.  And is it fair to say that the loans you're

11:01 6    represented -- representing here, is that in reference to

11:01 7    the two checks that we just looked at?

11:01 8        A.  This would obviously pertain to those two

11:01 9    checks.

11:01 10       Q.  Okay.  You told us a minute ago that you had no

11:01 11   idea what those checks -- who the people were or what the

11:01 12   checks were about.  In this email, you seem to be talking

11:01 13   about that they were loans.

11:01 14       A.  Because I got that information after that email

11:02 15   was sent, I think.

11:02 16       Q.  Well, that -- this email we're looking at here

11:02 17   is one minute before the email that you sent in

11:02 18   Exhibit 4.

11:02 19       A.  Okay.  Well, other than what they state, I agree

11:02 20   that this is accurate.  Exactly when I got the

11:02 21   information, it would have come at the time I got that

11:02 22   and sent that.  So, apparently, these emails were sent

11:02 23   bang, bang, would be my guess.

11:02 24       Q.  And -- and cogni- -- I'm cognizant of --

11:02 25       A.  Yeah.

Oral Deposition - James Shelby Sharpe
January 22, 2025

11:02  1      Q.  -- Mr. Searcy's point on last questions I asked.

11:02  2          So without getting into substance, is it fair to

11:02  3   say that the information that you're providing in this

11:02  4   email may have come from discussions with your client?

11:02  5      A.  Had to.

11:02  6      Q.  Okay.  You say here, the money went into an

11:02  7   account at Legend Bank to pay debts of River North Farms.

11:02  8   The checks were payable to River North Farms.

11:03  9          Does that refresh your memory on where the

11:03 10   checks -- whether they were deposited and where they --

11:03 11   where they were deposited?

11:03 12      A.  Seeing this, yes.

11:03 13      Q.  What do you know about this account at Legend

11:03 14   Bank?

11:03 15      A.  That there's an account at Legend Bank, and

11:03 16   that's it.

11:03 17      Q.  Are you familiar with that account at Legend

11:03 18   Bank?

11:03 19      A.  I'm just -- other than the fact that I

11:03 20   understood the checks went into an account at Legend

11:03 21   Bank, that's -- that's all I know.  Apparently River

11:03 22   North had an account at Legend Bank --

11:03 23      Q.  It's fair --

11:03 24      A.  -- based on that.

11:03 25      Q.  How long have the Behans been your client,

Oral Deposition - James Shelby Sharpe
January 22, 2025

11:03 1    approximately?

11:03 2        A.  Let's see.  Ten years.  Let's see, this is 2015

11:03 3    [sic] now.  Eight years.

11:04 4        Q.  Eight years?

11:04 5        A.  Yeah, something like that.

11:04 6        Q.  Are they a pre- -- do you do a lot of work every

11:04 7    year for the Behans?  Is there just occasional work for

11:04 8    the Behans?  How would you describe them as a client, as

11:04 9    far as a volume of work you do for them?

11:04 10       A.  For them personally, not much.  Some wills, a

11:04 11   general power of attorney, and a healthcare power of

11:04 12   attorney and directive to physicians.

11:04 13       Q.  What about their businesses or their holdings?

11:04 14       A.  I don't know that I can answer it in any

11:04 15   meaningful way.  The first time I was ever asked to

11:05 16   handle something, it would have been a lawsuit in

11:05 17   Houston, Lindale vs. Equinor.

11:05 18           And that's the first time I was ever asked to

11:05 19   give legal advice concerning a business of the Behans,

11:05 20   and that suit, I think, was 2019, 2020 -- somewhere 2019,

11:05 21   that's the first time, and -- except to come in and

11:05 22   evaluate some legal work that the law firm in Houston

11:05 23   representing Lindale was doing that resulted in the

11:05 24   Behans having that lawyer -- that firm replaced with a

11:06 25   law firm here in Fort Worth.

Oral Deposition - James Shelby Sharpe
January 22, 2025

11:06  1          And then the next thing I did from a legal point

11:06  2    of view was, several other entities the Behans own were

11:06  3    added in as parties to that lawsuit --

11:06  4          Q.  Uh-huh.

11:06  5          A.  -- and I represented those entities and got them

11:06  6    out on motions; and then when the law firm in Fort Worth

11:06  7    got upset that I brought Lynne Liberato in to handle all

11:06  8    the motions and the appell- -- appeal, which I knew it

11:06  9    was going on, that firm resigned and I became lead

11:06 10    counsel for that; and I'm still lead counsel for that.

11:06 11          Then there was a lawsuit filed sometime, Fidem

11:06 12    vs. River North Farms, and I filed an answer to that; and

11:06 13    I've continued to remain as lead counsel in the Lindale

11:06 14    vs. Equinor.  And then Weslease filed a lawsuit against

11:07 15    Linda and Innovative Sands in Judge McBride's court, and

11:07 16    the next thing behind that was the suit filed in Judge

11:07 17    Pittman's court; and except to be involved in the defense

11:07 18    of those, that's -- that's -- that's -- that's the extent

11:07 19    of what -- what I've done.

11:07 20          Q.  But it's fair to say that you're pretty --

11:07 21    you're very familiar with the operations of Behans'

11:07 22    businesses, like River North Farms?

11:07 23          A.  To the extent that I have had matters come up in

11:07 24    conjunction with litigation, I'm familiar with it to the

11:07 25    extent of whatever I've had to defend in those pieces of

Oral Deposition - James Shelby Sharpe
January 22, 2025

11:07  1    litigation, the one plaintiffs lawsuit being the Lindale

11:08  2    vs. Equinor.  So I'm only familiar as it relates to the

11:08  3    litigation.

11:08  4        Q.  But it's fair to say it's been substantial

11:08  5    litigation with lots of filings on both sides?

11:08  6        A.  There's been lots of lawsuits against the Behan

11:08  7    entities, yes.

11:08  8        Q.  Yes.  And you've been their lead counsel for

11:08  9    basically the last five years?

11:08 10        A.  I would say that -- that would be correct.

11:08 11        Q.  And you've had quite a bit of dealings with

11:08 12    Amarillo National Bank; is that fair?

11:08 13        A.  I've had communications with them as it related

11:08 14    to the litigation involving the Behans.

11:08 15        Q.  Right.

11:08 16        A.  Yeah.

11:08 17        Q.  Okay.  Substantial communications?

11:08 18        A.  Oh, well, yeah.  Well, when you've got that many

11:08 19    lawsuits, that's substantial.

11:08 20        Q.  Right.  So given your substantial involvement

11:08 21    with Behans and River North Farms, are you telling us

11:08 22    that you don't recognize that the Behans or River North

11:08 23    Farms have an account at Legend Bank?

11:08 24        A.  I just know they have an account there.  But how

11:08 25    long the account's been there, how it's been used, I

Oral Deposition - James Shelby Sharpe
January 22, 2025

11:08  1    don't have any knowledge of that.

11:09  2        Q.  Do you know, Mr. Sharpe, if the Legend Bank

11:09  3    account is Dale or Linda Behan account, personal account,

11:09  4    or is it a River North Farms account?

11:09  5        A.  I know there's a River North Farms account there

11:09  6    because those checks were -- and I think they went to

11:09  7    that bank because I believe that bank is the one that had

11:09  8    an interest payment coming due, I think.  But now, I

11:09  9    really don't know anything more about the account other

11:09 10    than what you've seen.

11:09 11        Q.  If you could turn to Page 2, because this is an

11:09 12    email chain --

11:09 13        A.  Okay.

11:09 14        Q.  -- between you and Mr. Bryan.

11:09 15        A.  Yeah.

11:09 16        Q.  Do you see your message from July 8th, the prior

11:09 17    day --

11:09 18        A.  Yeah.

11:09 19        Q.  -- 3:29 p.m., do you see that?

11:09 20        A.  Yeah.

11:09 21        Q.  You say, the third paragraph down, concerning

11:09 22    any travels of the Behan, this is being done on borrowed

11:09 23    money, not income.

11:09 24        A.  Yeah.

11:09 25        Q.  How do you know that?

Oral Deposition - James Shelby Sharpe
January 22, 2025

11:10 1          A.   That's what I was told.

11:10 2          Q.   And then on the next page, which is the same

11:10 3    email -- just runs over to the next page, Page 3 of this

11:10 4    exhibit -- do you see you say, since they have no income,

11:10 5    whatever they would pay would be from borrowed money?

11:10 6          A.   That's what I'm told.

11:10 7          Q.   Okay.  So that was told to you by their

11:10 8    client -- your client?

11:10 9          A.   Yeah.  Uh-huh.  And that's why I put it in that

11:10 10   letter.

11:10 11         Q.   Given the amount of litigation that you've

11:10 12   handled for the Behans and River North Farms --

11:10 13         A.   Uh-huh.

11:10 14         Q.   -- and other entities over the last five years,

11:10 15   do you have any visibility into their bank accounts?

11:10 16         A.   No, I don't.  Never have.

11:10 17         Q.   Do you have any visibility into their spending

11:10 18   habits?

11:10 19         A.   I do not.

11:10 20         Q.   So you tell Mr. Bryan -- let's go back to the

11:10 21   first page, Mr. Sharpe.  You're basically -- aren't you

11:11 22   saying here, if you read the Exhibit 4 and Exhibit 5 in

11:11 23   conjunction -- let me go back a step.  In the

11:11 24   litigation --

11:11 25         A.   Uh-huh.

Oral Deposition - James Shelby Sharpe
January 22, 2025

11:11 1        Q.  -- that Weslease had filed, we talked about --

11:11 2   we called that, I gu- -- I think we've agreed to call it

11:11 3   the Innovative Sand litigation in front of Judge Pittman.

11:11 4        A.  Right.

11:11 5        Q.  Is it fair to say Judge Pittman had issued an

11:11 6   enforcement order, as you referred to --

11:11 7        A.  Uh-huh.

11:11 8        Q.  -- that said, and I quote, ordered the Behans

11:11 9   not to exercise control or possession of any asset of

11:11 10  River North; do you recall an enforcement order of that

11:11 11  effect?

11:11 12       A.  To that effect, yes.

11:11 13       Q.  Okay.  Do you believe that the Behans depositing

11:11 14  two checks payable to River North Farms is exercising

11:11 15  control or possession over an asset of River North Farms?

11:12 16       A.  I would agree.

11:12 17       Q.  And that was something they were not supposed to

11:12 18  be do under Judge Pittman's order; is that fair?

11:12 19       A.  That is correct.

11:12 20       Q.  So your clients are saying essentially that the

11:12 21  checks are loans from friends?

11:12 22       A.  That's what they've told me.

11:12 23       Q.  So --

11:12 24       A.  And those checks show that they got checks

11:12 25  payable to River North at their request, so --

Oral Deposition - James Shelby Sharpe
January 22, 2025

11:12 1      Q.  Why --

11:12 2      A.  -- that shows that.

11:12 3      Q.  Why would friends of the Behans loan money to a

11:12 4  company of the Behans rather than the Behans themselves?

11:12 5      A.  I have no idea.

11:12 6      Q.  Did you ask that question?

11:12 7          MR. SEARCY:  Oh --

11:12 8      A.  No.

11:12 9      Q.  (By Mr. Fahey) Okay.  Fair enough.  You say

11:13 10  here, there are no loan documents.

11:13 11     A.  That's what I was told.  I've not seen any to

11:13 12  anticipate a question.

11:13 13     Q.  And you say it is from an old pastor that Dale

11:13 14  had previously helped.  Do you know which -- who you're

11:13 15  referring to when you say "an old pastor"?

11:13 16     A.  I have no clue.  That was the language that was

11:13 17  used.  I don't know if that means the guy is old in years

11:13 18  or he -- or -- or as "I have been a pastor for a long

11:13 19  time."  I have no idea.

11:13 20     Q.  Do you need to take a break?

11:13 21     A.  No.  I'm fine.

11:13 22     Q.  Okay.

11:13 23         MR. FAHEY:  Mr. Searcy, do you need a break?

11:13 24         MR. SEARCY:  Yeah.

11:13 25         MR. FAHEY:  Okay.

Oral Deposition - James Shelby Sharpe
January 22, 2025

1          (Recess from 11:13 a.m. to 11:31 a.m.)

11:31  2       Q.   (By Mr. Fahey) Mr. Sharpe, we're back on the

11:31  3   record.  We've talked before the break about the

11:31  4   substantial amount of work you did --

11:31  5       A.   Uh-huh.

11:31  6       Q.   -- or have done, for the Behans and their

11:31  7   entities -- connected entities, let's just call it

11:31  8   that -- over the past five years.  Is that a fair

11:31  9   characterization?

11:31 10       A.   Correct.

11:31 11       Q.   In 2024, are you aware of anybody -- any other

11:31 12   attorney representing the Behans or -- and their entities

11:31 13   other than you?

11:31 14       A.   I'm not aware of it.

11:31 15       Q.   And specifically are you aware of anybody

11:31 16   June 2024 representing the Behans or River North Farms,

11:32 17   or any other entity, other than you?

11:32 18       A.   Not that I'm aware of.  The only -- well, not --

11:32 19   let me correct that.  Because of the appeal of the

11:32 20   Lindale vs. Equinor case, there -- Haynes and Boone is

11:32 21   handling that, and that's a Behan entity.  I know that

11:32 22   Jerry Glas, who tried the case for them, may still from

11:32 23   time to time talk with them.

11:32 24          MR. ANDERSON:  And that's about the Lindale vs.

11:32 25   Equinor --

Julia Whaley & Associates
214-668-5578  JulieTXCSR@gmail.com

Oral Deposition - James Shelby Sharpe
January 22, 2025

11:32  1           THE WITNESS:  That's about the Lindale --

11:32  2           MR. ANDERSON:  -- case?

11:32  3           THE WITNESS:  That's about the Lindale vs.

11:32  4    Equinor.  Because that's pending before the Supreme Court

11:32  5    right now, and that judgment is now up to 30 million,

11:32  6    counting interest.  But there's also a supersedeas on it,

11:32  7    so...

11:32  8           Q.  (By Mr. Fahey) So other than the Lindor [sic]

11:32  9    appeal, you're not aware of any other attorneys working

11:32 10    for the Behans or River North, or any other entity that

11:32 11    they have, besides yourself?

11:32 12           A.  I'm not aware of it.

11:32 13           Q.  Now we talked before the break about Exhibit 5,

11:33 14    I believe, yes, and I'll just put -- show that to you --

11:33 15    show that to you again.  So is -- is it your testimony,

11:33 16    Mr. Sharpe, that the statements you make about the

11:33 17    finances -- what I'm going to characterize as the

11:33 18    financial situation of the Behans, that that is not -- is

11:33 19    that from your personal knowledge?

11:33 20           A.  It would be information I got from my clients,

11:33 21    totally.

11:33 22           Q.  You talk about --

11:33 23           A.  And declarations that -- that they have filed in

11:33 24    Judge Pittman's court.

11:33 25           Q.  You've talked about -- in that email to

Oral Deposition - James Shelby Sharpe
January 22, 2025

11:33 1    Mr. Bryan, or that chain of emails to Mr. Bryan --

11:33 2        A.   Uh-huh.

11:33 3        Q.   -- about these are characterized -- from

11:34 4    information you received from your client --

11:34 5        A.   Correct.

11:34 6        Q.   -- characterized as loans, the checks that we

11:34 7    looked at previously in Exhibit 4; is that fair?

11:34 8        A.   That's what I was told, and a declaration was

11:34 9    signed by -- by Dale Behan to that same effect.

11:34 10        Q.   Do you have any idea why friends of the Behans

11:34 11    would loan them money to the River North entity rather

11:34 12    than to them individually?

11:34 13        A.   I think I can stay consistent with the

11:34 14    declaration that Dale has signed.  He asked the friends,

11:34 15    and I believe this is in the declaration, to make the

11:34 16    checks out to River North Farms because he was going to

11:34 17    pay debts of River North Farms and he didn't want the

11:34 18    checks made out to him because they weren't paying debts

11:35 19    of his, and he asked them -- they -- they were willing to

11:35 20    write it to him under the declaration, but he asked that

11:35 21    it be done to River North Farms because it was going to

11:35 22    go in the River North Farms account at the bank where the

11:35 23    interest payment was due.

11:35 24            That's what I believe his declaration says, and

11:35 25    that's why the friends -- well, let's put it this way,

Oral Deposition - James Shelby Sharpe
January 22, 2025

11:35 1    the check's written based on what Dale told them it was

11:35 2    going to be used for, and it's what it was used for.

11:35 3        Q.  Did you have any involvement in procuring those

11:35 4    checks from friends?

11:35 5        A.  Didn't know anything about it until I saw it.

11:35 6        Q.  Okay.

7                        (Exhibit 7 marked.)

8                        (Reporter clarification.)

11:36 9        Q.  (By Mr. Fahey) Mr. Sharpe, I'm showing you

11:36 10   what's been marked as Exhibit 7.

11:36 11           MR. SEARCY:  Excuse me, what was 6?

11:36 12           MR. FAHEY:  I haven't shown it yet.

11:36 13           MR. SEARCY:  Oh, okay.

11:36 14           MR. FAHEY:  That's what she was pointing out to

11:36 15   me, reminding me.

11:36 16       Q.  (By Mr. Fahey) Do you recognize what I showed

11:36 17   you as Exhibit 7?

11:36 18       A.  No, sir.

11:36 19       Q.  Have you ever seen it before?

11:36 20       A.  If I have seen it or if it was somehow given to

11:36 21   us in response to something, I -- as I look at it, I

11:36 22   don't recall it.  But can I say absolutely that I've

11:36 23   never seen it?  No, I can't say that I've never seen it.

11:36 24       Q.  I won't play a trick memory game here.  As you

11:36 25   can see on the top, it's got the header from a filing.

Oral Deposition - James Shelby Sharpe
January 22, 2025

11:36  1    It's a Weslease -- it's an exhibit to a Weslease filing

11:37  2    in the case --

11:37  3        A.  Yeah.

11:37  4        Q.  -- made August 26, 2024, and I'll repre- --

11:37  5        A.  That was -- yeah, that was probably in

11:37  6    conjunction with a motion they had filed.  That'd be my

11:37  7    guess.

11:37  8        Q.  That's correct.  You can see at the top, right,

11:37  9    that it -- this is styled -- it appears to be a bank

11:37 10    statement for River North Farms, Inc.

11:37 11        A.  Uh-huh.  Yes, sir.

11:37 12        Q.  Okay.  Do you see that there is a transaction,

11:37 13    the second one down, January 19th, 2024, looks like a

11:37 14    wire going out to J. Shelby Sharpe?

11:37 15        A.  I see that.

11:37 16        Q.  And that's in the amount of 67,745?

11:37 17        A.  I see that.

11:37 18        Q.  Okay.  Do you recall receiving that wire from

11:37 19    River North Farms?

11:37 20        A.  No.

11:37 21        Q.  Okay.

11:37 22        A.  But I wouldn't.

11:37 23        Q.  Okay.

11:37 24        A.  It goes to the business manager.  I don't ever

11:37 25    know about those things.

Oral Deposition - James Shelby Sharpe
January 22, 2025

| 11:37 | 1 | Q. You're not monitoring -- |
| 11:37 | 2 | A. No. |
| 11:37 | 3 | Q. -- incoming funds -- |
| 11:37 | 4 | A. No. |
| 11:37 | 5 | Q. -- to your law firm? |
| 11:37 | 6 | A. No. |
| 11:38 | 7 | Q. Okay. If you could turn to the second page of |
| 11:38 | 8 | that, Mr. Sharpe, and I'm going to direct you about |
| 11:38 | 9 | exactly halfway down. There's a transaction on |
| 11:38 | 10 | November 8th of 2023 for $160,000, and again it's styled |
| 11:38 | 11 | as a wire from River North Farms to J. Shelby Sharpe |
| 11:38 | 12 | business. Do you see that? |
| 11:38 | 13 | A. I see that. |
| 11:38 | 14 | Q. Okay. Do you know what the purpose of these two |
| 11:38 | 15 | payments for you -- to you were, the one in November 2023 |
| 11:38 | 16 | and then January 2024? |
| 11:38 | 17 | A. Yes. |
| 11:38 | 18 | Q. What were they? |
| 11:38 | 19 | A. My bookkeeper and office manager informed me |
| 11:38 | 20 | that these were payments received for past due statements |
| 11:38 | 21 | for services that had been rendered, and they were trying |
| 11:38 | 22 | to reduce the balance of what was owed to the firm. |
| 11:38 | 23 | Q. Do you know how much -- let's just freeze at a |
| 11:39 | 24 | point in time -- |
| 11:39 | 25 | A. Okay. |

Julia Whaley & Associates
214-668-5578  JulieTXCSR@gmail.com

Oral Deposition - James Shelby Sharpe
January 22, 2025

11:39  1      Q.  -- of November, when the first payment was made.

11:39  2      A.  Uh-huh.

11:39  3      Q.  Do you know approximately how much the Behans or

11:39  4  River North owed you in legal fees?

11:39  5      A.  Close to a half million.

11:39  6      Q.  And how long had they -- had you done legal work

11:39  7  for them to accumulate a half a million dollars in

11:39  8  services?  Like, what was the pending time period for

11:39  9  that 500,000 past due?

11:39 10      A.  Well, I guess when the McBride suit was filed,

11:39 11  when the Fidem vs. River North was filed, started then,

11:39 12  and then of course the O'Connor case.  It would have been

11:40 13  during that, and -- and my looking at this, it may very

11:40 14  well be that a wire came in from River North and our

11:40 15  bookkeeper was told to also apply that on another debt

11:40 16  for one of the other entities, possibly.  I don't know.

11:40 17          All I know, is I'm seeing this right here.  I

11:40 18  know -- I know River -- in fact, River North still owes

11:40 19  us six figures right now.

11:40 20      Q.  Okay.  Is it your testimony, then,

11:40 21  essentially -- because you're -- a minute ago you were

11:40 22  answering by referring to cases.

11:40 23      A.  Uh-huh.

11:40 24      Q.  Is it fair to say that River North and the

11:40 25  Behans, a collective -- let's just call it the Behans and

Oral Deposition - James Shelby Sharpe
January 22, 2025

11:40 1   their entities --

11:40 2       A.  Uh-huh.

11:40 3       Q.  -- owed you -- in late 2023, owed the law firm,

11:41 4   the -- the Sharpe Law Firm, over a ha- -- or

11:41 5   approximately a half million dollars, and it was for work

11:41 6   that went back potentially five years?

11:41 7       A.  At that particular time it was probably like

11:41 8   300-and-something thousand.  Because since then, we've

11:41 9   had all the stuff going on in these motions, and things

11:41 10  like that, plus appeals, but I know it was well over --

11:41 11  I'd say probably at least 300-and-something thousand.

11:41 12          I though know this, when they sent that in, did

11:41 13  it wipe out?  No.  There was still a substantial debt.

11:41 14  What that -- how much that was, I have no clue, but I --

11:41 15  I just know that it was substantial.

11:41 16      Q.  Was there -- did you have to make frequent

11:41 17  conversations with Mr. Behan and Mrs. Behan about the --

11:41 18  not paying your legal fees?

11:42 19      A.  No.

11:42 20      Q.  Why not?

11:42 21      A.  I don't with a client.  Here's what I do.  If I

11:42 22  determine that I should represent somebody, I begin to

11:42 23  represent them.  I do the work.  I send the bills.  And

11:42 24  if the bills get paid, they get paid.  If they don't, I

11:42 25  continue to represent the client till I've discharged my

Oral Deposition - James Shelby Sharpe
January 22, 2025

11:42  1    responsibilities, and that's the way I've always done it.

11:42  2        Q.  So you didn't give consideration to stop being

11:42  3    representation of the Behans?

11:42  4        A.  I have never done that with a client because

11:42  5    they could not pay.  If I determined I was to represent

11:42  6    them and -- let me just be fully candid.

11:42  7        Q.  Sure.

11:42  8        A.  I always ask the Lord:  Here's the situation, do

11:42  9    you want me to represent these people?  And if I get a

11:42  10   clear confirmation that he wants me to represent them,

11:43  11   then I represent them, and then I trust him to provide

11:43  12   whatever we need to operate.

11:43  13        And it has worked.  We've been going through --

11:43  14   we've gone through some challenging times, but he's

11:43  15   always taken care of.  But I will -- I will never fail to

11:43  16   discharge my responsibilities to the end, and if I get

11:43  17   paid, I get paid.  If I don't, I don't --

11:43  18        Q.  So you -- is it --

11:43  19        A.  -- but that's the only way I do it.

11:43  20        Q.  Okay.  At the time that this happened, late '23

11:43  21   and then the payment in January of '24, did you have

11:43  22   more -- as far as the Behans owing you several hundred

11:43  23   thousand dollars, did you have a lot of clients that were

11:43  24   in a situation like this, or was it just the Behans stick

11:43  25   out as a -- maybe the highest balance that's owed to you?

Oral Deposition - James Shelby Sharpe
January 22, 2025

11:43  1        A.   They're not the highest balance.

11:43  2        Q.   They're not the --

11:43  3        A.   And, yes --

11:43  4        Q.   -- highest balance?

11:43  5        A.   -- I've got other --

11:43  6        Q.   Okay.

11:43  7        A.   -- clients that fall in that category.

11:43  8        Q.   And you have the same approach for them?

11:44  9        A.   Absolutely.  I always have done that, and I know

11:44 10   that I have been told by countless clients, You're a

11:44 11   unique lawyer, we don't find that in the legal

11:44 12   profession.

11:44 13        Q.   Okay.

11:44 14        A.   But, no, there's -- there -- in fact, I can

11:44 15   think of one right now that involves a mining situation

11:44 16   in Arizona, that they owe us more than that.

11:44 17        Q.   Okay.  For that same kind of --

11:44 18        A.   And -- and churches, too, because I represent

11:44 19   churches and other -- but there are other clients that

11:44 20   are in impecunious situations and -- so, no, the

11:44 21   Behans -- no, they're not -- they're not the largest.

11:44 22        Q.   Does the firm issue -- I understand your

11:44 23   testimony that you --

11:44 24        A.   Uh-huh.

11:44 25        Q.   -- don't really pursue peop- -- or talk to

Oral Deposition - James Shelby Sharpe
January 22, 2025

11:44  1    people or nag clients --

11:44  2         A.   Correct.

11:44  3         Q.   -- that's fair, right?  What about sending past

11:44  4    due --

11:44  5         A.   Oh, of course.

11:44  6         Q.   -- notices?

11:44  7         A.   Yes.

11:44  8         Q.   Of course.

11:44  9         A.   Absolutely.

11:44 10         Q.   Okay.  So you would -- the firm itself --

11:44 11         A.   Yeah.

11:44 12         Q.   -- is sending, Hey, you still owe us 300,000 --

11:44 13         A.   Yeah.

11:44 14         Q.   -- 500,000?

11:44 15         A.   Absolutely.  They -- we -- we continue to send

11:44 16    the bill out there in hopes that'll get paid.  Sometimes

11:45 17    they'll pay part of it and sometimes we'll be through and

11:45 18    we'll get a payment.  I have a feeling that that January

11:45 19    payment had to do with a lot of our work on the O'Connor

11:45 20    lawsuit that had finished January 4, and there was stuff

11:45 21    leading up to that.

11:45 22         Q.   Now I'm not -- I do not want to ask a substance

11:45 23    of any attorney-client conversation.  I'm just going as

11:45 24    what's in the court's record --

11:45 25         A.   Yes.

Oral Deposition - James Shelby Sharpe
January 22, 2025

11:45 1     Q.  -- from vari- -- at various points in the

11:45 2   record --

11:45 3     A.  Uh-huh.

11:45 4     Q.  -- including hearing transcripts, I think it's

11:45 5   been represented that the Behans have a net worth in the

11:45 6   millions of dollars.  Are you familiar with that?  Just

11:45 7   from, again, what's in the --

11:45 8     A.  I remember that being in the record, but they

11:45 9   were not given the opportunity to explain what they put

11:45 10  in the record.

11:45 11    Q.  Okay.  Is there a way, without violating

11:45 12  privilege, that you want to clarify that or provide more

11:45 13  information?

11:45 14    A.  They did provide some information that would

11:45 15  bring clarity to it.  It is true at one time they were

11:46 16  extremely wealthy, 20 million, probably back in the

11:46 17  teens, as a result of selling a company.  But when things

11:46 18  went south with Weslease, not the entity -- that's the

11:46 19  plaintiff.  Weslease was a loaning company.

11:46 20        When things went south in North Dakota because

11:46 21  Weslease failed to provide funds that they agreed to

11:46 22  provide to construct the pipeline, when Weslease failed

11:46 23  provide funds that resulted in this case, and when

11:46 24  Equinor breached its contract and failed to do what they

11:46 25  did, that put them in a big hole, that's -- those things

Oral Deposition - James Shelby Sharpe
January 22, 2025

11:46  1    are what has wiped out what they at one time did have,

11:46  2    those millions, and put them in the situation they're in

11:46  3    now.

11:46  4            I know that, and that's all documented.  That's

11:46  5    not breaching attorney-client privilege, but that's why

11:47  6    they went from multimillionaires to where now they're

11:47  7    very, very -- they're -- they're truly living off of

11:47  8    friends helping them.

11:47  9        Q.  So I understand -- let me put it this way:  So

11:47 10    it is your belief that you aren't owed 500,000,

11:47 11    approximately, in legal fees by -- by a multimillionaire

11:47 12    client?

11:47 13        A.  Correct.

      14                            (Exhibit 8 marked.)

11:47 15        Q.  (By Mr. Fahey) I'm showing you what's been

11:47 16    marked as Exhibit 8.

11:47 17        A.  And remember that 500,000 was just a guess on my

11:47 18    part.

11:47 19        Q.  I understand.

11:47 20        A.  It could be 300.  It could be 600.  It could

11:47 21    be --

11:47 22        Q.  Is it fair to say --

11:47 23        A.  I don't know.

11:47 24        Q.  -- multiple hundred thousand dollars?

11:48 25        A.  That's correct.

Oral Deposition - James Shelby Sharpe
January 22, 2025

11:48  1          Q.   Okay.

11:48  2          A.   Okay.

11:48  3          Q.   And let me just do one ques- -- before we look

11:48  4   at that document and while Mr. Searcy looks at it, just

11:48  5   let me ask you:  Any amounts that the Behans are paying

11:48  6   you would have been in response to invoices provided by

11:48  7   your firm --

11:48  8          A.   Yes.

11:48  9          Q.   -- is that fair?

11:48 10          A.   Absolutely.

11:48 11          Q.   You're -- any legal work you do, you're going to

11:48 12   have a statement and an invoice to a client?

11:48 13          A.   Every month.

11:48 14          Q.   They may not pay it and you're not going to

11:48 15   personally get on a client's case --

11:48 16          A.   Correct.

11:48 17          Q.   -- but you are invoicing all the work you do?

11:48 18          A.   Correct.

11:48 19          Q.   Okay.  Mr. Sharpe, looking at what's been marked

11:48 20   as Exhibit 8, can you tell us what that is.

11:48 21          A.   It's an email from me to Weslease's attorney.

11:48 22          Q.   And that's Justin Bryan?

11:48 23          A.   That is correct.

11:48 24          Q.   And you're copying Preston Tyson and Emily Snow.

11:49 25          A.   Those are people in his law firm that he asked

Oral Deposition - James Shelby Sharpe
January 22, 2025

11:49 1   me to copy.

11:49 2        Q.  Okay.  And this is dated June 7th of 2024; is

11:49 3   that right?

11:49 4        A.  Correct.

11:49 5        Q.  Okay.  What do you say here about the money --

11:49 6   that we just looked at in those bank accounts, the source

11:49 7   of that money or the purpose of why you received that

11:49 8   money, what do you say to Mr. Bryan in this email?

11:49 9        A.  That it came for work we did in defense of the

11:49 10  Weslease suit in O'Connor's court, and I limited it to

11:49 11  there.  But we had previously done work, but I didn't

11:49 12  mention that -- for example, the Fidem thing, but I

11:49 13  didn't mention it.

11:49 14       Q.  I was going to ask you.  Because you say the

11:49 15  money received since September -- November of 2023 was

11:49 16  primarily for services rendered in defense of the

11:49 17  Weslease suit in Judge O'Connor's court.  You use the

11:49 18  word "primarily."

11:49 19       A.  That's primarily.

11:49 20       Q.  What is -- besides the primary O'Connor case,

11:50 21  what else is that?

11:50 22       A.  Well, River North Farms, I had been defending

11:50 23  them in the Fidem lawsuit here in Texas, and there was

11:50 24  one over in Louisiana that I was working with a -- well,

11:50 25  the lawyer here was also working with the one in

Oral Deposition - James Shelby Sharpe
January 22, 2025

11:50  1    Louisiana.

11:50  2              So there was that, and -- and of course at that

11:50  3    time we'd had a -- like the motion in 2022 that was filed

11:50  4    in Judge Pittman's court for turnover that he denied.  I

11:50  5    think they may have not paid that bill back there, but,

11:50  6    no, this -- the funds were primarily for the O'Connor

11:50  7    suit, as it says.

11:50  8        Q.  You also go on to say the funds came from River

11:50  9    North Farms account with Amarillo National Bank that were

11:50 10    generated by River North Farm sales of River North Farm

11:50 11    assets that were done with the knowledge of the bank who

11:51 12    has liens on all of those assets.  Did I read that

11:51 13    correctly?

11:51 14        A.  Correctly.

11:51 15        Q.  A hundred thousand dollars of that amount was

11:51 16    repayment of a loan to the firm that it made during a

11:51 17    time when the cash flow of River North Farms was

11:51 18    inadequate to pay some debts that it needed to pay.

11:51 19              Did I read that sentence?

11:51 20        A.  You read the sentence correctly.

11:51 21        Q.  Okay.  What firm are you referring to when you

11:51 22    say "repayment of a loan to the firm"?

11:51 23        A.  This firm.

11:51 24        Q.  Okay.  J. Shelby Sharpe -- Law Office of J.

11:51 25    Shelby Sharpe?

Oral Deposition - James Shelby Sharpe
January 22, 2025

11:51  1        A.   Right, which is a professional corporation.

11:51  2        Q.   Okay.  And what -- tell me about the loan you're

11:51  3   referring to when you say 100,000 of that amount was

11:51  4   repayment of a loan to the firm.

11:51  5        A.   The word "loan" was characterized by Dale and

11:51  6   Linda Behan.  There was never a loan made by the firm.

11:51  7   That was their characterization of the $100,000.

11:52  8            The $100,000 was sent by this firm, with me as

11:52  9   lead counsel, to Haynes and Boone to pay legal fees

11:52 10   Haynes and Boone had -- had incurred in the Lindale vs.

11:52 11   Equinor that I had asked them to incur.  It was sent

11:52 12   without the knowledge of Dale and Linda Behan.  It was

11:52 13   not considered a loan.  It was simply considered a

11:52 14   payment of a co-counsel's money.

11:52 15            How Dale and Linda Behan discovered what the

11:52 16   firm had done, I do not know, but they said, We consider

11:52 17   that a loan and we're going to see that the firm gets

11:52 18   repaid.  So the loan characterization came from them.

11:52 19   Because we were never going to bill Dale and Linda Behan.

11:52 20   We were not going to bill -- of course, the $100,000 was

11:52 21   payment on legal fees in the Lindale vs. Equinor, which

11:53 22   is not River North Farms.

11:53 23            But I was wanting to get pressure off of Lynne,

11:53 24   who was experiencing pressure from her firm; and Lynne's

11:53 25   been such a close friend of mine, I didn't even tell

Oral Deposition - James Shelby Sharpe
January 22, 2025

11:53 1    Lynne -- and Lynne, to this day, I don't think knows

11:53 2    anything about the 100,000 that the firm paid.

11:53 3        Q.  Let me stop you.  So when you say "Lynne," you

11:53 4    mean Lynne Liberato?

11:53 5        A.  Yes.

11:53 6        Q.  At Haynes and Boone?

11:53 7        A.  Yes.  Because I brought her in as -- to work

11:53 8    with me as -- helping on hearings and to handle the

11:53 9    appeal, which she has done.

11:53 10       Q.  Do you recall when the 100,000 -- just month and

11:53 11   year, when you paid the 100,000 to Haynes and Boone?

11:53 12       A.  It would have -- it would have been probably

11:53 13   2022 or 2023.

11:53 14       Q.  Okay.

11:53 15       A.  But --

11:53 16       Q.  Because that's -- Mr. Sharpe, is that something,

11:53 17   since we're at your offices, that during a break you

11:54 18   could access?  How hard would that be to figure that out?

11:54 19       A.  When -- when the $100,000 was --

11:54 20       Q.  Right.

21         (Phone ringing.)

11:54 22       MR. FAHEY:  We can go off the record for a

11:54 23   second, maybe.

24         (Brief interruption.)

11:54 25       Q.  (By Mr. Fahey) Go ahead, Mr. Sharpe.

Oral Deposition - James Shelby Sharpe
January 22, 2025

11:54  1       A.   I want to think it was either 2023 -- I know

11:55  2    that -- let's put it this way, the only reason the firm

11:55  3    was in an economic position to do that is because at that

11:55  4    time I was lead counsel for the Episcopal Diocese of Fort

11:55  5    Worth, and the amount that this firm was billing was huge

11:55  6    because of all of the work we were having to do; and that

11:55  7    fellow right there knows very well because it was his

11:55  8    client that I had become the lead counsel for.

11:55  9       And since the firm had that, we had -- I want to

11:55 10    think that we had like 300-and-something thousand dollars

11:55 11    in our savings account, and I found that out and I knew

11:55 12    what Lynne's situation was.  I said send that -- wire it

11:55 13    to Haynes and Boone, and we will not bill that.  We will

11:55 14    not inform the Behans.  I am not going to tell Lynne.

11:56 15       But I want to -- but with them getting that, I

11:56 16    almost figure that Haynes and Boone probably assumed that

11:56 17    was funds that came from Lindale to pay on their bill.

11:56 18       MR. SEARCY:  Steve, may I make a sidebar just a

11:56 19    moment?

11:56 20       MR. FAHEY:  Sure.

11:56 21       MR. SEARCY:  I think that this has all been

11:56 22    extensively briefed and we can give you the exact date.

11:56 23    Do you want -- do you want to just leave a blank in the

11:56 24    deposition, and we'll be glad to fill that in as to the

11:56 25    exact date --

Oral Deposition - James Shelby Sharpe
January 22, 2025

11:56  1          MR. FAHEY:  Sure.

11:56  2          MR. SEARCY:  -- of the transaction that he's

11:56  3    referring to.

11:56  4          MR. FAHEY:  Sure.

11:56  5      Q.  (By Mr. Fahey) But I think it's -- your best

11:56  6    recollection is 2023?

11:56  7      A.  I think it's 2023.

11:56  8          MR. SEARCY:  Well, don't guess.

11:56  9      A.  But I don't -- but let me say this, we can get

11:56 10    the exact when it was sent.

11:56 11      Q.  (By Mr. Fahey) Okay.  And like Mr. Searcy's

11:56 12    saying --

11:56 13      A.  I know it wasn't -- I know it wasn't 2024

11:56 14    because we wouldn't have had any money like that.

11:57 15      Q.  Okay.

11:57 16      A.  2023, and it could be 2022.

11:57 17      Q.  Okay.  So '22 or '23.

11:57 18          MR. SEARCY:  Yeah.  We will find out the exact

11:57 19    day and be glad to supply that.

11:57 20          MR. FAHEY:  Thank you, Mr. Searcy.

11:57 21      A.  But know this, there was never a loan.  It's a

11:57 22    one firm paying another firm who's working with us on a

11:57 23    case to pay their attorney's fees, and that's what it was

11:57 24    done.  It was never in an invoice billed to Lindale or

11:57 25    the Behans or anybody else, and that's -- and I believe

Oral Deposition - James Shelby Sharpe
January 22, 2025

11:57 1    this -- in fact, Judge Pittman asked me in a hearing,

11:57 2    Well, Mr. Sharpe, have you done this for other lawyers?

11:57 3         And I said yes, sir, I have.  Because when I

11:57 4    bring a lawyer in to help me with something, I feel an

11:57 5    obligation to pay that lawyer; and if I get reimbursed

11:57 6    from my client, fine, but I've always wanted to be sure

11:57 7    that lawyers working with me knew they were going to get

11:57 8    paid.  And so, yes, I have done that before, and the

11:58 9    client didn't know about it and wasn't billed.

11:58 10        Q.  (By Mr. Fahey) Did you -- when you brought

11:58 11   Haynes and Boone in, Ms. Liberato in, did you have a fee

11:58 12   agreement or some other kind of signed agreement

11:58 13   between -- let's put it this way:  Was -- did Haynes and

11:58 14   Boone have an agreement with Lindale?

11:58 15        A.  Yes.

11:58 16        Q.  Okay.  So it was not with J. Shelby Sharpe Law

11:58 17   Office?

11:58 18        A.  Correct.

11:58 19        Q.  And Lindale is an entity of the Behans?

11:58 20        A.  They own a good portion of it.

11:58 21        Q.  Do they have effective control over it?

11:58 22        A.  Yes.

11:58 23        Q.  Okay.  And you said this a minute ago, but I

11:58 24   just want to be clear on it.

11:58 25        A.  Okay.

Oral Deposition - James Shelby Sharpe
January 22, 2025

11:58  1        Q.  When you paid -- whether it be 2022 or 2023,

11:59  2   when you paid that money, that $100,000, to Haynes and

11:59  3   Boone, the Behans did not know you did that?

11:59  4        A.  Correct.

11:59  5        Q.  Did Ms. --

11:59  6        A.  They never learned it from me.

11:59  7        Q.  Okay.  Did Ms. Liberato call you in advance of

11:59  8   that to complain about nonpayment?

11:59  9        A.  No.

11:59 10        Q.  So why did you know that they hadn't been paid?

11:59 11        A.  Lynne and I have been personal friends since the

11:59 12   130,000 -- the $130 million defamation suit, and as

11:59 13   personal friends, from time to time, I just call her to

11:59 14   talk to her to just see how she's doing; and I

11:59 15   understood, which is not hearsay -- because what I

11:59 16   understand is not somebody saying something.

11:59 17        What I understood, was she was getting some

11:59 18   pressure from the firm because Lindale was not paying its

11:59 19   statements back to them.

12:00 20        Q.  How -- how did you understand that to be the

12:00 21   case if she didn't say anything to you about it?

12:00 22        A.  Like I say, if I say you told me such and such,

12:00 23   that's hearsay.

12:00 24        Q.  Uh-huh.

12:00 25        A.  If I say I understand you to say, that's not

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:00 1    hearsay, and I -- Ardell Young taught me that as a judge

12:00 2    in the 153rd.

12:00 3        Q.  Well, I wish I had an evidence teacher.  I -- I

12:00 4    guess I -- what I'm trying to say is, how --

12:00 5        A.  She just told me that she was getting pressure

12:00 6    because Lindale wasn't paying its statements, and she

12:00 7    says, At this late date in my career, that's not

12:00 8    pleasant; and I said, Lynne, I certainly understand, and

12:00 9    I am so sorry that Lindale is not paying the statements.

12:00 10       Q.  Did she say how much was due?

12:00 11       A.  She did not say anything.  She just said she was

12:00 12   getting pressure from them.

12:00 13       Q.  Did you think the implication was:  Shelby, you

12:01 14   need to talk to your client?

12:01 15       A.  No.

12:01 16       Q.  Why was she talking to you about it, then?

12:01 17       A.  Because we're friends.  We're very good friends.

12:01 18       Q.  You don't think Lynne, by mentioning it to you,

12:01 19   was hoping that you would talk to --

12:01 20       A.  No, not -- no, no.  And I know Lynne real, real

12:01 21   well.

12:01 22       Q.  Does Lynne have the same view on collecting

12:01 23   outstanding legal fees that you have?

12:01 24       A.  I don't think Haynes and Boone has that, and she

12:01 25   works for Haynes and Boone, and I don't know anybody in

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:01 1    Haynes and Boone that has that kind of stick.

12:01 2         But, no, other than the fact we had a

12:01 3    conversation, because we were talking about the appeal

12:01 4    which was underway, and -- I mean, I just called her --

12:01 5    I've always done that since we were involved in this

12:01 6    litigation, and she just mentioned that she was

12:01 7    experiencing that kind of pressure.

12:01 8         She -- but she never even knew that a payment

12:01 9    came from the firm.  Now she may have been told that a

12:02 10   payment towards the stuff came in, but I doubt if their

12:02 11   internal people would say the source of it.

12:02 12      Q.  So you had a -- you -- did you just have one

12:02 13   conversation with Lynne where she --

12:02 14      A.  Just one.

12:02 15      Q.  Okay.  And your testimony is that she didn't

12:02 16   tell you, They owe us X?

12:02 17      A.  She did not.

12:02 18      Q.  Okay.  So how did you know to send her 100,000?

12:02 19      A.  Because I knew how much work had been done, and

12:02 20   while I hadn't seen any of the fees, knowing what Lynne's

12:02 21   hourly rate was, it was not difficult to figure out; and

12:02 22   I know one thing, that 100,000 didn't wipe it out.

12:02 23      Q.  So your -- your testimony is that Lindale, i.e.,

12:02 24   the Behans, still had a pending -- still had an

12:02 25   outstanding balance with Haynes and Boone even after you

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:02  1    paid 100,000?

12:02  2         A.  Correct.

12:02  3         Q.  How did you know that?

12:03  4         A.  Because I knew that it -- I knew because of a

12:03  5    part of discussions where the judgment got assigned to

12:03  6    Amarillo National Bank, and Amarillo National Bank now

12:03  7    owns the judgment.

12:03  8         Q.  The judgment -- did Haynes and Boone get a

12:03  9    judgment against Lindale?

12:03 10         A.  No, no, no, no, no.

12:03 11         Q.  Okay.

12:03 12         A.  Lindale vs. Equinor judgment --

12:03 13         Q.  Okay.

12:03 14         A.  -- that Haynes and Boone is owed was -- the

12:03 15    judgment was assigned to Amarillo National Bank, who have

12:03 16    taken it on a contingency fee to try to get back

12:03 17    attorney's fees that they have not been paid for.

12:03 18         Q.  Do you know what that -- when you saw that, what

12:03 19    the attorney's fees balance was?

12:03 20         A.  I just knew it was six figures of some kind, but

12:03 21    I don't know that I even saw the amount.  I knew it was

12:03 22    big, but --

12:03 23         Q.  And this was after you made the payment to --

12:03 24         A.  Oh, yeah, this was quite some months later.  So

12:03 25    I just knew there was a deficit because the deficit's

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:03  1  what precipitated the judgment being sold, and Haynes and

12:03  2  Boone willing to continue on, on a contingent fee basis,

12:03  3  to cover fees that Lindale couldn't pay.

12:04  4      Q.  When -- so is it your testimony that when you

12:04  5  made the 100,000, you -- Lynne never told you the balance

12:04  6  that was owed to Haynes and Boone, right?

12:04  7      A.  Yes.

12:04  8      Q.  It could have been $50,000, right?

12:04  9      A.  No.

12:04 10      Q.  Well, she didn't tell you.

12:04 11      A.  I know.

12:04 12      Q.  Well, how did you know it was six figures?

12:04 13      A.  Because as lead counsel, I was seeing all the

12:04 14  work that was being done, and I knew what her hourly rate

12:04 15  was, and I knew there weren't payments being made.  So I

12:04 16  was able to, with my own knowledge -- because I saw the

12:04 17  fee agreement letter between Haynes and Boone and

12:04 18  Lindale, I was able to put together -- I knew that

12:04 19  100,000 was just putting a dent to at least not make it

12:04 20  as much pressure on Lynne.

12:04 21      Q.  Well, you said Lynne didn't share figures with

12:04 22  you.  Did she give the impre- -- did she tell you

12:04 23  directly they hadn't made any payments whatsoever?

12:04 24      A.  She did not say anything like that.

12:04 25      Q.  Well, how did you know that and that they had --

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:04 1    that your -- that the Behans hadn't made some payments,

12:05 2    just not enough payments?

12:05 3         A.  She simply said she was getting pressure because

12:05 4    of the fact that there was a lack of payment coming from

12:05 5    Lindale, and that's all she said, and she hated that she

12:05 6    was getting that kind of pressure at this stage of her

12:05 7    career; and that's all she -- that -- hey, let me say

12:05 8    this, that's almost 100 percent of the conversation, and

12:05 9    we went on to other things and never had a conversation.

12:05 10        Q.  It's fair to say that big law firms like Haynes

12:05 11   and Boone, they have people that their only job is to

12:05 12   collect legal fees, would you agree?

12:05 13        A.  I would agree that big law firms have that, yes.

12:05 14   I'm assuming Haynes and Boone does, but I don't know that

12:05 15   for a fact.

12:05 16        Q.  Why did you take it upon yourself to pay that

12:05 17   amount rather than just let Haynes and Boone collect on

12:05 18   their own legal fees?

12:05 19        A.  Because I had a good friend and I wanted

12:05 20   pressure off of her, and that's why I did it.  Because I

12:06 21   brought her in, and me as lead -- and I'm still lead

12:06 22   counsel --

12:06 23        Q.  Uh-huh.

12:06 24        A.  -- and I brought her in, and so therefore I felt

12:06 25   that I should make that payment on those legal fees

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:06  1  because they're in there at my behest.

12:06  2        Q.  But she had an agreement -- Haynes and Boone had

12:06  3  an agreement directly with the Behans --

12:06  4        A.  No -- well, no --

12:06  5        Q.  With Lindale?

12:06  6        A.  With Lindale.

12:06  7        Q.  Okay.  Which was an entity controlled by the

12:06  8  Behans?

12:06  9        A.  Well, okay, but there's an indication that you

12:06 10  can have piercing of a corporate veil because the way you

12:06 11  handle things.  Lindale has -- none of the entities of

12:06 12  the Behans have ever done anything except follow the law

12:06 13  as to how it should be handled, and O'Connor's showing no

12:06 14  piercing corporate veil, no alter ego, nothing.

12:06 15            That was -- and by the way, Lindale was in that

12:06 16  suit.  So I just knew that since I brought a lawyer in,

12:06 17  and this is such a very dear friend -- in the practice of

12:07 18  law you have acquaintances, you have friends, and then

12:07 19  you have dear friends.

12:07 20        Q.  Uh-huh.

12:07 21        A.  And that's a really, really small group.

12:07 22        Q.  Okay.

12:07 23        A.  Lynne is in that group, along with Scott

12:07 24  Brister, Steve Howell, that are in the, quote, dear -- in

12:07 25  fact, our son's named after Steve Howell, so -- and

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:07  1    Lynne, her grandchildren were twins.

12:07  2           So Lynne and I, because of the relationship I

12:07  3    have, and since I brought them in, Haynes and Boone, I

12:07  4    wanted to be sure that a substantial amount was paid to

12:07  5    get the pressure off of her.  That's the whole story,

12:07  6    nothing beyond that.  But I did know -- because as lead

12:08  7    counsel, I'm copied on everything.  I'm not just maybe

12:08  8    going to find something out.

12:08  9           Now, do Haynes and Boone send me a copy of the

12:08 10    bill?  No.  But as lead counsel, there's nothing going on

12:08 11    concerning any aspect of that litigation that I'm not

12:08 12    copied on, even today.

12:08 13       Q.  Did Lynne make any suggestion in your call with

12:08 14    her that they were going to seek to withdraw from

12:08 15    representation because of unpaid fees?

12:08 16       A.  Didn't indicate that.  Like I say, all she --

12:08 17    the conversation was real short where she just brought --

12:08 18    because I say, Hey, how are you doing?  And she said,

12:08 19    Well, I'm sort of struggling right now.

12:08 20           And then she mentioned that, and then we went on

12:08 21    to other things, and that was the conversation.  It was

12:08 22    that short.  Now, I do know, as lead counsel, that

12:08 23    Amarillo National Bank, because of their lien that they

12:08 24    have against Lindale properties, that they were in

12:09 25    discussions with Haynes and Boone.

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:09  1          Because I saw the communications going back and
12:09  2   forth, that:  Instead of pay us paying you on the hourly
12:09  3   rate and whatnot, assign the ju- -- if the judgment's
12:09  4   assigned to us, you take it on a percentage and we'll
12:09  5   move forward.  Had that agreement not been reached,
12:09  6   Haynes and Boone, in my opinion, would have withdrawn,
12:09  7   based on what I was seeing.
12:09  8       Q.  After you talk to Lynne, did you go to the
12:09  9   Behans and ask them to pay her -- to get current on her
12:09 10   bill?
12:09 11       A.  No.
12:09 12       Q.  Why not?
12:09 13       A.  Because I was leaving what Haynes and Boone sent
12:09 14   to Lindale, that was between them.  And I also knew at
12:09 15   the time that Lindale didn't have the money to pay it,
12:09 16   and the Behans didn't have the money to pay it, because
12:09 17   they weren't paying us.
12:09 18       Q.  Well, just because they weren't paying you
12:10 19   didn't mean they have -- didn't have the money; is that
12:10 20   fair?
12:10 21       A.  I know -- I knew -- I knew them well enough to
12:10 22   know that Lindale would have been paying Haynes and
12:10 23   Boone, as it agreed, if Lindale had the ability to do it.
12:10 24   I knew that because they -- they've done what they could,
12:10 25   when they could.

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:10  1       Q.  Given -- given Lynne was a dear friend, if you

12:10  2    knew that the Behans weren't going to be able to pay

12:10  3    Haynes and Boone's bill, why did you bring her on the

12:10  4    case?

12:10  5       A.  At the time I brought Lynne into the case, we're

12:10  6    very early on in the case, and when they entered into the

12:10  7    fee agreement, there was no problem with them paying it.

12:10  8    In fact, as I understand, that the initial bills and

12:10  9    stuff that went out, Lindale paid.  It was only later as

12:10 10    it was getting towards the -- getting headed up towards

12:10 11    trial, that they were beginning to get behind.

12:10 12          But yet in spite of the fact that they were

12:10 13    behind, Lynne and another lawyer in the appellate

12:11 14    division were at the trial, doing all the stuff that was

12:11 15    going on there.  So there was a huge amount of expense

12:11 16    that occurred there that Lindale just did not have to

12:11 17    pay, and the trial lawyer who came in took it on a

12:11 18    contingent fee.  He knew they -- Lindale didn't have the

12:11 19    ability to pay.

12:11 20          But when I brought Lynn in, and when Lindale

12:11 21    signed that judgment -- I mean, that fee agreement, there

12:11 22    was no question they were going to be able to pay it, and

12:11 23    those payments I know were made.

12:11 24       Q.  So you never -- after the call with Lynne, you

12:11 25    never had a conversation with the Behans about the

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:11  1    outstanding fees owed to Haynes and Boone?

12:11  2        A.  Correct.

12:11  3        Q.  Did you tell Lynne Liberato at Haynes and Boone

12:11  4    that you were paying her out of your firm's funds?

12:11  5        A.  No.

12:11  6        Q.  You don't know -- is it fair to say you don't

12:12  7    know one way or the other whether she knows where the

12:12  8    money came from or doesn't -- what's --

12:12  9        A.  I don't know.

12:12 10        Q.  You don't know.  It's possible she knows that

12:12 11    she was paid -- or Haynes and Boone was paid by your

12:12 12    firm?

12:12 13        A.  I can tell you this, if Lynne had gotten that

12:12 14    information, when she got the information, before she

12:12 15    could blink, I would have had a telephone call from her

12:12 16    with a "thank you."

12:12 17        Q.  And you never got a telephone call?

12:12 18        A.  Correct.

12:12 19        Q.  Did you --

12:12 20        A.  But we did have other conversations about the

12:12 21    case as it was ongoing, but Lynne never mentioned

12:12 22    anything -- first of all, she never even mentioned

12:12 23    anything about $100,000 payment coming in on the bill.

12:12 24    She never even mentioned anything further about bills.

12:12 25        Q.  So there was no more -- after the 100,000 was

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:12  1    paid by your firm, you and Lynne never had a conversation

12:12  2    again about outstanding bills --

12:12  3        A.  Correct.

12:12  4        Q.  -- on -- owed by Lindale --

12:12  5        A.  Correct.

12:12  6        Q.  -- i.e., the Behans?

12:13  7        A.  I don't recall any, and I -- because there was

12:13  8    no reason for me to talk about that.  I would have been

12:13  9    talking to her about appellate strategy.

12:13 10        Q.  So before Haynes and Boone went contingent fee

12:13 11    with Lindale --

12:13 12        A.  Uh-huh.

12:13 13        Q.  -- did you have any idea that -- did you have

12:13 14    any personal knowledge that they pa- -- made any more

12:13 15    payments to Haynes and Boone?

12:13 16        A.  I don't know.

12:13 17        Q.  So is it fair to say that you felt it was

12:13 18    necessary to take $100,000 from your firm account and pay

12:13 19    an unpaid bill owed to a much bigger law firm --

12:13 20        A.  Uh-huh.

12:13 21        Q.  -- because of a personal friendship with Lynne

12:13 22    Liberato?

12:13 23        A.  Absolutely, 100 percent the only -- hey, if it

12:13 24    hadn't been for that, there ain't no way I'm sending

12:13 25    Haynes and Boone that kind of money, period.

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:13   1        Q.  Why not just tell the Behans to make this a

12:14   2    priority to pay?  That's a part I don't understand.

12:14   3        A.  I -- I don't know that -- first of all, I don't

12:14   4    know that Lindale had the money to do that.  I don't know

12:14   5    that the Behans personally had the money to do that.  In

12:14   6    fact, I would -- knowing what I knew about how they were

12:14   7    getting financial help, I would've assumed that they did

12:14   8    not.

12:14   9            But like I say, I wasn't looking at this as a

12:14  10    Behan situation.  I'm looking at this as, I bring in a

12:14  11    very dear friend lawyer to help me, and let me say this:

12:14  12    If there's a better appellate lawyer in Texas than Lynne

12:14  13    Liberato, the Supreme Court doesn't know it; and when

12:14  14    they have a -- an appellate seminar, the person in charge

12:14  15    of it is Lynne Liberato.

12:14  16            And she also was recognized by the State Bar of

12:14  17    Texas as the No. 1 appellate lawyer, and that was, I

12:14  18    think, three, four years ago; and I did it because I

12:14  19    brought her in.  It just so happened that the firm came

12:14  20    with her, because I wanted her in to be sure we didn't

12:15  21    have any screwups at the trial, and when it got to the

12:15  22    appellate area, she would be pleased with the record and

12:15  23    everything and she'd be able to handle it.

12:15  24            And because I've done a little bit of appellate

12:15  25    work myself --

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:15  1        Q.  Uh-huh.

12:15  2        A.  -- with the courts doing a real nice job of

12:15  3   affirming what's going on, and I -- when I bring a lawyer

12:15  4   in, I don't -- in fact, right now, there are a couple

12:15  5   lawyers I've brought in on other litigation that has

12:15  6   nothing to do with the Behans, but I've got clients that

12:15  7   are not able to pay them, and I'm paying them because I

12:15  8   brought them in.  They're working for my client, yes, but

12:15  9   they're -- they're helping me to help that.  I just feel

12:15 10   that that's -- that's what I feel I'm obligated to do.

12:15 11        Q.  So just to confirm, no, you didn't make any

12:15 12   calls to the Behans to say, You have retained the No. 1

12:16 13   appellate attorney in the state of Texas, you better pay

12:16 14   her for the work she's doing for you; not a single call

12:16 15   to --

12:16 16        A.  Not --

12:16 17        Q.  -- express that message --

12:16 18        A.  Not a --

12:16 19        Q.  -- or something like it?

12:16 20        A.  Not a single call.

12:16 21        Q.  Mr. Sharpe --

12:16 22        A.  Because -- because I knew, first of all, Lindale

12:16 23   didn't have the money.  That's the reason why River

12:16 24   North -- I mean, that's the reason why Amarillo National

12:16 25   Bank was the focus of it.  Because the assets that they

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:16  1    had liens on concerning Lindale, I knew if any money was

12:16  2    going to come to pick up paying that, it had to come from

12:16  3    Amarillo National Bank.  There was no other place it

12:16  4    could come from.

12:16  5        Q.  Is it fair to say, while you certainly paid the

12:16  6    $100,000 -- you've testified you paid the $100,000

12:16  7    because of your friendship with Ms. Liberato --

12:16  8        A.  Uh-huh.

12:16  9        Q.  -- but you would acknowledge that it could be

12:16 10    viewed that you were giving -- essentially giving the

12:17 11    Behans $100,000 gift by paying their -- at least a

12:17 12    portion of their outstanding legal fees?

12:17 13        A.  Well, first of all, it wasn't the Behans, but it

12:17 14    was my client, Lindale.

12:17 15        Q.  Okay.  Lindale, essentially --

12:17 16        A.  And --

12:17 17        Q.  -- controlled --

12:17 18        A.  -- and you know what --

12:17 19        Q.  -- by the Behans.

12:17 20        A.  -- I figured that it was helping advance that

12:17 21    litigation, which turned out very successful.  Most

12:17 22    people would agree, $24 million jury verdict is not bad.

12:17 23        Q.  Uh-huh.

12:17 24        A.  I've never gotten anything like that, and I knew

12:17 25    that, hey, we happen to have a surplus of funds, I'm

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:17  1    paying a law firm that has come in to help my client, and

12:17  2    down the line it'll all take place with them.  But would

12:17  3    we ever have billed Lindale for that?  No way.

12:17  4        Q.  But the -- you talked earlier --

12:17  5        A.  Now, we bill for other stuff, but we're not

12:17  6    billing for that 100,000.

12:17  7        Q.  Now, the Behans did find out, you mentioned

12:18  8    earlier, that you had made that payment of $100,000 to

12:18  9    Haynes and Boone, right?

12:18 10        A.  About a year later, I think, and how they found

12:18 11    out, I have no clue.

12:18 12        Q.  Tell us your conversation with the Behans

12:18 13    regarding this payment.  I don't believe that would be

12:18 14    legal -- attorney-client privileged communication.  It

12:18 15    wasn't legal advice.

12:18 16        A.  I agree.

12:18 17        Q.  Okay.  So --

12:18 18        A.  I agree.

12:18 19        Q.  -- can you tell us about that conversation where

12:18 20    Mr. Behan -- I assume -- was it Mr. Behan that talked to

12:18 21    you about this?

12:18 22        A.  Nope.

12:18 23        Q.  Who was it?

12:18 24        A.  Linda Behan.

12:18 25        Q.  Okay.  So tell us what Linda Behan said.

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:18  1          A.   Linda Behan said, Shelby, I have learned that

12:18  2    your firm sent $100,000 to Haynes and Boone.  I consider

12:18  3    that a loan and it is going to be repaid.

12:18  4               I told her, I said it was not a loan, and if the

12:19  5    Lord leads you to send the firm, at some point, funds,

12:19  6    that's between you and the Lord.  But I said it is not a

12:19  7    loan, and she said, Well, I consider it a loan and I'm

12:19  8    going to see that your firm gets paid back.

12:19  9               MR. SEARCY:  We all agree that's not --

12:19 10               THE WITNESS:  That's not legal.

12:19 11               MR. SEARCY:  That's not a attorney-client

12:19 12    communication --

12:19 13               THE WITNESS:  Correct.

12:19 14               MR. SEARCY:  -- right --

12:19 15               MR. FAHEY:  Yeah.

12:19 16               THE WITNESS:  Correct.

12:19 17               MR. SEARCY:  -- and we're all nodding our heads

12:19 18    and agreeing that --

12:19 19          A.   Now, hearsay --

12:19 20               MR. SEARCY:  -- that's not a waiver of

12:19 21    privilege.

12:19 22          A.   Hearsay on this, I understand from Linda, that

12:19 23    she found out from their bookkeeper that this 100,000 had

12:19 24    been paid on the Lindale; and the bookkeeper asked her

12:19 25    where did this come from, and she said, I don't have a

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:19  1      clue.  And then she said, Mm-hmm, I bet I know where that

12:20  2      came from, and that's when she jumped my case.

12:20  3          Q.  (By Mr. Fahey) In that conversation, did you use

12:20  4      that as an opportunity to tell Ms. Behan they needed to

12:20  5      pay all the other amounts they owed Haynes and Boone?

12:20  6          A.  No.  Because --

12:20  7          Q.  Why not?

12:20  8          A.  -- at that point, the Haynes and Boone had gone

12:20  9      to contingency fee with Amarillo National Bank.

12:20 10          Q.  But your friend, Lynne Liberato, was presumably

12:20 11      owed -- her firm was owed, as far as you knew, hundreds

12:20 12      of thousands of dollars?

12:20 13          A.  And it got washed into them taking it on a

12:20 14      contingent fee in lieu of being paid.

12:20 15          Q.  So you don't think that there was any pressure

12:20 16      on Ms. Liberato about unpaid bills by Lindale?

12:20 17          A.  I don't know.  After that one conversation Lynne

12:20 18      and I -- Lynne never mentioned anything about pressure on

12:20 19      her, but I just know that at -- at the point where it

12:20 20      went to a contingent fee, Haynes and Boone was owed

12:20 21      several -- it had to have been in the hundreds of

12:21 22      thousands of dollars.

12:21 23          Q.  Do you know -- you said it was about a year

12:21 24      later after you sent the money to Haynes and Boone that

12:21 25      you talked to Linda Behan and she made the -- that you

Julia Whaley & Associates
214-668-5578  JulieTXCSR@gmail.com

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:21  1    had this conversation about she considered it a loan.

12:21  2             You've said that you think the payment to Haynes

12:21  3    and Boone was in 2022 or 2023, and we made --

12:21  4        A.   Correct.

12:21  5        Q.   -- an agreement that --

12:21  6        A.   That we'll find out when we --

12:21  7        Q.   He'll find out.

12:21  8        A.   Yeah.

12:21  9        Q.   But you said it was about a year later.  So is

12:21 10    it fair -- was it this year or last year, 2024, when you

12:21 11    talked to Linda Behan?

12:21 12        A.   It would have been 2023.

12:21 13        Q.   Okay.

12:21 14        A.   Sometime in 2023 that -- that -- that she jumped

12:21 15    me on it.

12:21 16        Q.   And we saw from Exhibit 7 that the first of two

12:21 17    payments from the Behans came to you in -- on

12:21 18    November 8th of 2023 --

12:21 19        A.   Uh-huh.

12:21 20        Q.   -- is that right?

12:21 21        A.   That's what the record says.

12:22 22        Q.   Yeah.  Was your conversation with Ms. Behan

12:22 23    close in time to that payment coming in?

12:22 24        A.   It would have been prior to that, but I don't

12:22 25    know how far much before that, and I -- I'm not even sure

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:22  1    where the funds came from that were wired to the firm.  I

12:22  2    know they came from River North Farms account, but -- I

12:22  3    know River North Farms had -- had some other assets, and

12:22  4    it may very well be that some of that was liquidated and

12:22  5    those funds were used in that payment and -- and the

12:22  6    January of 2024.

12:22  7        Q.  Do you see -- can you look back at Exhibit 7,

12:22  8    Mr. Sharpe.  Do you see the payment on Novem- --

12:22  9    January 19th of 2024 for 67,000 --

12:22 10        A.  Yeah.

12:22 11        Q.  -- 747?

12:22 12        A.  Yeah.

12:22 13        Q.  Okay.  And then we looked at the prior one,

12:22 14    which was November 8th of 2023.  That was 160,000, right?

12:23 15        A.  Yeah.

12:23 16        Q.  So Ms. Behan, Linda Behan, told you sometime

12:23 17    prior to this payment in November 2023 that she

12:23 18    considered the money you paid Ms. Liberato's firm --

12:23 19        A.  The firm, yeah.

12:23 20        Q.  -- a loan of $100,000 --

12:23 21        A.  Yeah.

12:23 22        Q.  -- right?

12:23 23        A.  Yeah.

12:23 24        Q.  But their first payment was 160,000 to you.

12:23 25        A.  Well, that's what the record shows.

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:23  1      Q.  Right.  So -- so they were paying back the money

12:23  2   that they considered a loan and additional funds?

12:23  3      A.  River North Farms did.

12:23  4      Q.  So of the -- those two payments are $227,745 --

12:23  5      A.  Correct.

12:23  6      Q.  -- is it your testimony that 100,000 of that was

12:23  7   repayment of this loan that Ms. Behan had talked to you

12:23  8   about?

12:23  9      A.  That's what she told us, and that's I think what

12:24 10   she instructed our business person to put that back in

12:24 11   the firm's savings account.

12:24 12      Q.  And what was the rest of that money, which was

12:24 13   about $127,745, what were -- was that paid to you for?

12:24 14      A.  Prior bills that were sent out in conjunction

12:24 15   with litigation that the firm had done.  I think they may

12:24 16   have lumped a few bills together to just get rid of

12:24 17   those, so that -- so that they were only sending some

12:24 18   larger bills.  That's -- that's my though.  But I know

12:24 19   when we got the 200-some-odd thousand, they still owed

12:24 20   six figures to the firm on other stuff.

12:24 21      Q.  And so that -- those two payments, just to

12:24 22   confirm, were from River North --

12:24 23      A.  Uh-huh.

12:24 24      Q.  -- not the Behans themselves, but River North?

12:25 25      A.  Totally River North, and apparently it had to --

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:25  1    well, I know it had to have come from things that were

12:25  2    liquidated by River North.

12:25  3        Q.  Why did Lindale not pay you the $100,000 if it

12:25  4    was --

12:25  5        A.  It didn't have the money.  That's the reason why

12:25  6    Amarillo National Bank had the judgment and Haynes and

12:25  7    Boone were doing it on a contingent fee.

12:25  8        Q.  But to be clear, like, Ms. Liberato and Haynes

12:25  9    and Boone didn't do work for River North?

12:25 10        A.  Correct.

12:25 11        Q.  So the -- you paid $100,000 --

12:25 12        A.  For Lindale.

12:25 13        Q.  -- for what Lindale owed --

12:25 14        A.  Uh-huh.

12:25 15        Q.  -- Haynes and Boone --

12:25 16        A.  Uh-huh.

12:25 17        Q.  -- and River North then repaid you the $100,000

12:25 18    that Ms. Behan considered to be a loan; is that a fair

12:25 19    summary of the transaction?

12:25 20        A.  That's a fair summary, but I had no idea where

12:25 21    the funds came from.  All I knew is that we had gotten

12:25 22    paid on some bills.

12:25 23        Q.  So you didn't have anything in your records that

12:25 24    this was coming, like a wire in your bank account that

12:26 25    showed that the source was River North?

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:26 1        A.  Oh, yeah.  Yeah.  Well -- well, the bookkeeper

12:26 2   did.

12:26 3        Q.  Yeah.

12:26 4        A.  Yeah, the bookkeeper did.

12:26 5        Q.  But -- so you knew that it was coming from River

12:26 6   North?

12:26 7        A.  The bookkeeper did.

12:26 8        Q.  Okay.

12:26 9        A.  I didn't know anything, so --

12:26 10       Q.  You thought it was coming from the Behans?

12:26 11       A.  No.  I had no clue.  I just knew that payments

12:26 12  had been made.  I knew River North owed us money, but I

12:26 13  did not know that of that money they had told Tanika to

12:26 14  put 100,000 back in the firm account for what was paid to

12:26 15  Haynes and Boone.

12:26 16       Q.  And so when you paid Haynes and Boone, it came

12:26 17  out of the firm operating account?

12:26 18       A.  Savings account.

12:26 19       Q.  Savings account.  And when the money was paid

12:26 20  back by the Behans, did it go back in the savings

12:26 21  account?

12:26 22       A.  When River North Farms paid the money, it came

12:26 23  in as a wire with instructions from, I'm assuming, Dale

12:26 24  Behan.

12:26 25       Q.  I know that's the sour- -- I know the $100,000

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:26 1    source was River North, but --

12:26 2         A.   Right.

12:26 3         Q.   -- clearly it was directed by Linda and/or Dale

12:26 4    Behan --

12:27 5         A.   Correct.

12:27 6         Q.   -- is that fair?

12:27 7         A.   That is correct.

      8                        (Exhibit 9 marked.)

12:27 9         Q.   (By Mr. Fahey) I'm showing you what's been

12:27 10   marked as Exhibit 9.  Do you recognize that, Mr. Sharpe?

12:27 11        A.   I do.

12:27 12        Q.   Is that the order of temporary suspension --

12:27 13        A.   It is.

12:27 14        Q.   -- from Judge Pittman?

12:27 15        A.   It is.

12:27 16        Q.   Is that dated November 7th, 2024?

12:27 17        A.   It is.

12:27 18        Q.   And that, I think -- though it's two pages, is

12:27 19   it a fair -- it's both sides of that paper, if you want

12:28 20   to --

12:28 21        A.   Oh.

12:28 22        Q.   -- look at it.  Is it fair to say that a summary

12:28 23   of that would be that order temporarily suspended you

12:28 24   from practicing law in the Northern District pending

12:28 25   resolution of the disciplinary matter against you?

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:28  1        A.  That is correct.

    2                              (Exhibit 10 marked.)

12:28  3        Q.  (By Mr. Fahey) I'm showing you what's been

12:28  4    marked as Exhibit 10.  Can you tell me what that is.

12:28  5            MR. SEARCY:  What was the last exhibit, what was

12:28  6    the number?

12:28  7            MR. FAHEY:  Nine.

12:28  8            MR. SEARCY:  What was Exhibit 8?  And I'm sorry

12:29  9    for interrupting.

12:29 10            MR. FAHEY:  That's okay.  This is...

12:29 11            MR. SEARCY:  Great.  Thank you.

12:29 12            MR. FAHEY:  Sure.

12:29 13        Q.  (By Mr. Fahey) So, Mr. Sharpe, looking at

12:29 14    Exhibit 10, is that a filing that was made by Lin- --

12:29 15    it's styled as Linda Behan and Dale Behan's Response to

12:29 16    Receiver's Motion to Sell Land Free and Clear?

12:29 17        A.  Yes.

12:29 18        Q.  And that was made on December 13th, 2024; is

12:29 19    that right?

12:29 20        A.  Correct.  Yes.

12:29 21        Q.  And if you look at Page 4 of Exhibit 10, that is

12:29 22    your electronic signature, J. Shelby Sharpe; is that

12:29 23    right?

12:29 24        A.  Yes.

12:29 25        Q.  And this occurred basically five weeks after you

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:29 1    were temporar- -- temporarily suspended by Judge Pittman

12:29 2    from practicing law in the Northern District; is that

12:29 3    right?

12:29 4         A.  Yes.

12:29 5         Q.  And when you filed this, you knew that you were

12:29 6    temporarily suspended from practicing law in the Northern

12:29 7    District of Texas; is that right?

12:30 8         A.  Yes.

12:30 9         Q.  Why did you file this if you knew you were

12:30 10   temporarily suspended from practice?

12:30 11        A.  When I read the sentence, Mr. Sharpe remains

12:30 12   active in the case that gave rise to this miscellaneous

12:30 13   action, as well as other in the district, I thought that

12:30 14   what he was doing was suspending me from all other stuff

12:30 15   in the district, but that I could continue with the

12:30 16   pending ones; and that's the way I read it.

12:30 17        Now, upon further reading it -- but when I filed

12:30 18   that, that was my understanding, that this would not

12:30 19   be --

12:30 20        Q.  Can I see?

12:30 21        A.  That this would not be violating that order.  In

12:30 22   fact, before I filed it, I went and pulled that order and

12:30 23   looked at it again.  I had two other people look at it to

12:31 24   see what they thought, and they thought that I was

12:31 25   suspended, but not as to -- in fact, the words "Sharpe

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:31 1    remains," I thought that permitted me to file it.

12:31 2            Had I been reading it more carefully, I would

12:31 3    never have filed this answer.  But that's the reason I

12:31 4    did, I misinterpreted that -- that first part.

12:31 5    Otherwise, I would not have filed this.

12:31 6        Q.  Did you seek -- when you had a couple other

12:31 7    people look at that --

12:31 8        A.  Uh-huh.

12:31 9        Q.  -- language in the order, did you seek any kind

12:31 10   of clarification from the court?  Did you call down to

12:31 11   the chambers, for example?

12:31 12       A.  No.  I just really thought Judge Pittman was

12:31 13   being very kind to not have my clients in those pending

12:31 14   cases not have to try to go get -- but I couldn't do

12:31 15   anything else, and so I -- I was thinking -- in fact, I

12:31 16   was very -- in fact, I even went in and said, hey, look

12:31 17   at this order, and look what -- I still remain in such

12:31 18   and such.  And so we were delighted, but reading it,

12:32 19   there's no question that I was suspended from everything

12:32 20   and I just had misread that.

12:32 21       Q.  So your interpretation, if I'm understanding it

12:32 22   right, is because of -- is it fair to say Judge

12:32 23   Pittman's -- in this order of November 7th, his chief

12:32 24   concern and the reason why he was suspending you was the

12:32 25   $100,000 loan matter that we just got done talking; is

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:32 1  that fair?

12:32 2       A.  That is correct, that that's why he suspended

12:32 3  me.  Uh-huh.

12:32 4       Q.  And that -- and so you believe that even though

12:32 5  that was for -- regarding entity controlled by the

12:32 6  Behans, he was going allow you to keep practicing in a

12:32 7  case involving the Behans, but suspend you for everything

12:32 8  else?

12:32 9       A.  Because there was so much continuing activity

12:32 10 going on in this case of enforcement orders, that I would

12:32 11 be permitted to continue to represent the judgment

12:33 12 debtors; and, of course, I represent River North Farms,

12:33 13 that I would be permitted to continue in that case, but

12:33 14 that I could not file or defend any other case.

12:33 15       I guess the thing that -- that really got me

12:33 16 was, Mr. Sharpe remains active in the case that gave rise

12:33 17 to the miscellaneous action, which was the enforcement

12:33 18 order; and that's -- that's what I misread, that -- that

12:33 19 I could still do that.

12:33 20       Because I can tell you this, had I understood

12:33 21 that I was suspended in this case, I would never ever,

12:33 22 ever have filed anything, not at all, because I obey --

12:33 23 in fact, if you look at all the prior orders, they were

12:33 24 obeyed almost in standard.  They were obeyed fully and

12:33 25 completely.

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:33  1           So for me to file something in here where I know
12:34  2   I'm -- that's so totally contrary to my prior conduct in
12:34  3   this case and my entire practice since September 20 of
12:34  4   1965.  I just don't disobey orders, but it was a mistake
12:34  5   on my part in misreading this that caused me to file it.
12:34  6       Q.  Did you have any thought of -- since you asked
12:34  7   for a couple of -- a second and a third opinion of your
12:34  8   reading, did you have any thought of filing a motion for
12:34  9   clarification or something with the court to see if your
12:34 10   interpretation was correct before you made a filing on
12:34 11   behalf of a client?
12:34 12       A.  I -- I thought it was.  Because I thought after
12:34 13   this happened, there would be nothing else happening.
12:34 14   I -- I just -- like I say, I -- it never dawned on me.  I
12:34 15   thought I had read it clearly.
12:34 16       Q.  After November 7th, when you got order --
      17                    (Brief interruption.)
12:34 18       A.  Excuse me.
12:34 19       Q.  (By Mr. Fahey) Oh, sure.
12:35 20       A.  Now.
12:35 21       Q.  After November 7th, when you got that order
12:35 22   temporarily suspending you, did you talk to the Behans --
12:35 23   I'm going to ask this in a way that doesn't call for
12:35 24   attorney-client privileged information.
12:35 25           Did you have any discussions regarding needing

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:35 1    replacement counsel because of your suspension?

12:35 2        A.   I sent the order to the Behans, and after it was

12:35 3    received, I had a conversation in which I told -- it was

12:35 4    with Dale Behan, if I told him, I said, You've seen the

12:35 5    order, and I think Judge Pittman is being very nice that

12:35 6    I'm still able to continue on in this, but I cannot be

12:35 7    involved in anything else.

12:35 8            And that was the extent of what I told Dale

12:35 9    Behan after I sent him this order, who also read it and

12:36 10   looked at it and did not say, Shelby, I don't read that

12:36 11   order that way.  So that's what I did.

12:36 12           And I immediately sent, to all lawyers in the

12:36 13   two cases that I had, a copy of the order stating that I

12:36 14   would -- that I was required to do this and I'm sending

12:36 15   this to you, and they testified at a hearing that they

12:36 16   had gotten the order.  So I had complied with that aspect

12:36 17   of the order.

12:36 18       Q.   At one point in the litigation, the Weslease

12:36 19   litigation -- I guess we call it the Innovative Sand

12:36 20   litigation -- you brought in Jackson Walker, LLP to

12:37 21   assist; is that right?

12:37 22       A.   Correct.

12:37 23       Q.   Why did you bring them in?

12:37 24       A.   Because I was in discussions with them about

12:37 25   going to work of counsel with them so I could transition

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:37 1   my practice, since my physical ability is declining and I

12:37 2   need to get my clients into good hands; and because I

12:37 3   represent the range of clients that I do, I needed to be

12:37 4   able to spend time with one, probably two to three

12:37 5   lawyers to help them transition so my clients would get

12:37 6   to know them, and I would be able to train the lawyers

12:37 7   and be able to get to a point where I was comfortable

12:37 8   with the representation they would have, and my clients

12:37 9   would get that.

12:37 10          So I was in discussions with them about them,

12:38 11  and they were very delighted to have the breadth of

12:38 12  clients.  Because print and electronic media, I've

12:38 13  represented for decades, the number of institutions of

12:38 14  higher learning that I represent, the number of churches

12:38 15  and seminaries that I represent, those are things that

12:38 16  the vast majority of lawyers don't have a clue on how to

12:38 17  handle.  They need help in understanding it.

12:38 18          The business stuff, no problem.  The probate

12:38 19  stuff, generally speaking, no problem.  But that's what I

12:38 20  was doing, was to try to transition everything to Jackson

12:38 21  Walker.

12:38 22      Q.  When you contacted -- so it was a -- bigger than

12:38 23  this case, your whole practice?

12:38 24      A.  Oh, yeah, way bigger than this case.

12:38 25      Q.  Did you want Trevor Paul to work on this case

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:38 1    because he was a former law clerk of Judge Pittman?

12:39 2         A.  Didn't even know Trevor Paul existed in the firm

12:39 3    and had no clue as to any relationship he might have had

12:39 4    with Judge Pittman.  In fact, I found that out just

12:39 5    before the hearing.

12:39 6         Q.  What hearing was that?

12:39 7         A.  It was a hearing on an enforcement motion.

12:39 8         Q.  Do you recall when that was?

12:39 9         A.  No, I don't.  It's on one -- it's -- it's one

12:39 10   that there's an order that's on appeal.

12:39 11        Q.  Were you having --

12:39 12        A.  I think it had to do with the hearing on the

12:39 13   filing of the court -- state court suits for slander of

12:39 14   title at River --

12:39 15        Q.  Okay.

12:39 16        A.  -- North Far- -- it had -- yeah, it had to do

12:39 17   with that hearing.

12:39 18             MR. SEARCY:  I think it's May 21st.

12:39 19        Q.  (By Mr. Fahey) May 21st, 2020- --

12:39 20        A.  Four.

12:39 21        Q.  -- four.  Who was going to argue that motion in

12:39 22   front of Judge Pittman --

12:39 23        A.  Me.

12:39 24        Q.  -- or that response?  You?

12:39 25        A.  Me.

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:39  1      Q.  Was Trevor Paul going to have any role in the
12:39  2  hearing?
12:39  3      A.  Yeah.  There was a -- there was a part of it
12:39  4  that -- I can't remember whether we had divided it up or
12:40  5  whether I was going to make the argument, and after Judge
12:40  6  Pittman came in and said that I had brought a former
12:40  7  clerk of his, I thought, gee-whiz, I mean, he probably
12:40  8  shouldn't make any argument; and I -- I think Trevor may
12:40  9  have made a little bit of an argument, but I don't think
12:40 10  we were ever even permitted to make an argument.
12:40 11      Q.  So whose decision was it to staff this matter
12:40 12  with Trevor Paul?
12:40 13      A.  Somebody in his firm.  It wasn't me.  In fact, I
12:40 14  was thinking it was going to be one of the senior lawyers
12:40 15  that was there instead of Trevor.
12:40 16      Q.  And you -- your testimony is, you didn't know
12:40 17  anything about Trevor Paul's relationship with Judge
12:40 18  Pittman until right before that May 21st hearing?
12:40 19      A.  Correct.
12:40 20      Q.  Like a day before?
12:40 21      A.  I knew it very shortly before that.  I want to
12:41 22  think that the guy I was talking to over at Haynes -- I
12:41 23  mean, at Jackson Walker is the one that said, I'm going
12:41 24  to have Trevor Paul working on this because he's a former
12:41 25  clerk of Judge Pittman.  So that was a call he made, not

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:41 1    me.

12:41 2         Q.  Jackson Walker filed a motion on May 16th,

12:41 3    unopposed motion to withdraw as counsel.

12:41 4         A.  Correct.

12:41 5         Q.  And they state in that motion that

12:41 6    irreconcilable differences have arisen that prevent

12:41 7    Jackson Walker from effectively representing the Behan

12:41 8    defendants in that matter.  Do you know what that meant,

12:41 9    what --

12:41 10        A.  Yeah.  It had to do with the state court suits

12:41 11   filed on the slander of title, filed in the state courts

12:41 12   by River North against Weslease for their deeds,

12:41 13   quitclaim deeds that they had filed in those counties.

12:41 14   That's what it had to do with.

12:41 15        Q.  But what does that mean, irreconcilable

12:41 16   differences?

12:41 17        A.  Well, I can't tell you what -- why they use that

12:42 18   term, but that's what it had to do with.

12:42 19        Q.  Okay.  Was there dispute between you and the

12:42 20   Jackson Walker attorneys?

12:42 21        A.  No.

12:42 22        Q.  Did the Jackson Walker attorneys tell you why

12:42 23   they were -- were withdrawing?

12:42 24        A.  Because I had filed those lawsuits.  They did

12:42 25   not like the fact that I had filed those lawsuits.  They

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:42 1     felt it was a violation of Judge Pittman's order.

12:42 2          Q.  Okay.  Did you --

12:42 3          A.  And --

12:42 4          Q.  -- did you agree with that --

12:42 5          A.  I totally disagreed with that, and I need to

12:42 6     explain that.  I learned in corporations, when I was in

12:42 7     law school, that stockholders do not own the property of

12:42 8     a corporation, even if they are 100 percent stockholders.

12:42 9     The corporation owns the property, not the stockholders.

12:42 10         Dale and Linda Behan were the officers of River

12:42 11    North Farms, and still are the officers of River North

12:43 12    Farms.  They, in the Innovative Sand case, were in there

12:43 13    individually, and River North was not in there.  They

12:43 14    were not in there in a representative capacity as

12:43 15    officers of River North.

12:43 16         When it came to our attention of the quitclaim

12:43 17    deeds that were filed in all of these counties where

12:43 18    Weslease, as 100 percent stockholders, trans- -- well,

12:43 19    100 percent stockholders of River North Farms, transfers

12:43 20    the River North property to Weslease -- first of all, the

12:43 21    quitclaim deed by stockholders to convey corporate

12:43 22    property has no legal foundation whatsoever.

12:43 23         And because they have filed these and the Behans

12:43 24    were still the officers, they authorized me, as officers

12:43 25    of River North Farm, to file these suits in the state

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:44  1    court to clear the title up, which would have gone down

12:44  2    on a summary judgment because it's just fundamental

12:44  3    corporate law that a stockholder cannot convey corporate

12:44  4    property.

12:44  5         So they felt, Shelby, you're prob- -- well, we

12:44  6    know you're right on that, but it's going to tick Judge

12:44  7    Pittman off, and we don't want to be in there with him

12:44  8    ticked off about this.  Now, when he gets a motion

12:44  9    directing me to dismiss them, they were dismissed

12:44 10    immediately.  That's also on appeal to the Fifth Circuit.

12:44 11    But that's why those lawsuits were filed.

12:44 12         But that's the reason why Jackson Walker decided

12:44 13    to -- because they knew with me having done that, it was

12:44 14    going to be a hostile environment, and they just didn't

12:44 15    want to be in the hostile environment.

      16                        (Exhibit 11 marked.)

12:44 17         Q.  (By Mr. Fahey) Okay.  I'm showing you what's

12:45 18    been marked as Exhibit 11.  Take a minute --

12:45 19         A.  Yeah.

12:45 20         Q.  -- to show -- read that and show it to

12:45 21    Mr. Searcy.

12:45 22             MR. SEARCY:  Thank you.

12:45 23         Q.  (By Mr. Fahey) Mr. Sharpe, what -- what are we

12:45 24    looking at here in Exhibit 11?

12:45 25         A.  It's an email from me to Clint Latham, who's the

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:45  1    vice president and general counsel of Amarillo National

12:45  2    Bank.

12:45  3        Q.  And you're copying Dale Behan and Linda Behan;

12:46  4    is that right?

12:46  5        A.  Correct.  Since they are the officers of River

12:46  6    North Farms, and they're also -- their stock and their

12:46  7    voting rights were in Amarillo National Bank's possession

12:46  8    since 2014.

12:46  9        Q.  And this is dated March 29th of 2024, right?

12:46 10        A.  Correct.

12:46 11        Q.  And you sent this from an email address,

12:46 12    utlawman@aol.com, right?

12:46 13        A.  Yes.

12:46 14        Q.  Is that your personal email address?

12:46 15        A.  That's my only email address.

12:46 16        Q.  So work and personal, that's what you use?

12:46 17        A.  Only email address I have ever had, and I did

12:46 18    not ask for UTlawman.

12:46 19        Q.  You didn't?

12:46 20        A.  I spent 45 minutes trying to get an account with

12:46 21    AOL, and I struck out, and I went and propped up in bed;

12:46 22    and my son, Stephen, came by and said, Dad, what did you

12:46 23    get?  I said, Stephen, I got -- I struck out everything.

12:46 24            He said, Oh, I'll get you one.  He's back in

12:46 25    five minutes with that.  I said, Stephen, how in the

Oral Deposition - James Shelby Sharpe
January 22, 2025

```
12:47  1    world could you get that with all the graduates of the
12:47  2    University of Texas and University of Tennessee schools
12:47  3    of law?  He said, Dad, I just put it in, they said okay.
12:47  4          So I've had that as my only email account.
12:47  5      Q.   Okay.  I'd ask you to turn to Page 3.
12:47  6          Do you see an email from you to Clint Latham
12:47  7    dated March 29th, 2024, 10:09 a.m.; do you see that?
12:47  8      A.   Yeah.
12:47  9      Q.   And you say:  Clint, I need one more decle- --
12:47 10    declaration form for you to attach to my reply to
12:47 11    Weslease's motion to enforce the turnover order now set
12:47 12    for hearing this coming Thursday, April 4th, at 3:00 p.m.
12:47 13    It will simply state that Dale has been looking after the
12:47 14    collateral for the bank, including the ranch, for
12:47 15    approximately ten years to protect the bank's collateral.
12:47 16    The bank authorizes him to permit inspection of the
12:47 17    bank's collateral in his presence, but not to remove it.
12:47 18    The bank does not authorize anyone to have the codes to
12:48 19    the ranch, other than Dale Behan, and any destruction of
12:48 20    the locks would be destruction of the bank's collateral.
12:48 21          Did I read that correctly?
12:48 22      A.   You did.
12:48 23      Q.   Was that your personal understanding of the
12:48 24    factual situation regarding the Behans and this ranch?
12:48 25      A.   That was my understanding, yeah.
```

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:48  1      Q.  What are you referring to when you say "the
12:48  2  ranch"?  What property is that?
12:48  3      A.  River North Farms owns a ranch in Hood County,
12:48  4  that River North Farms has owned for 15 years or so, and
12:48  5  it's River North Farms property; and Dale and Linda Behan
12:48  6  as officers have made sure that, one, it was properly
12:48  7  protected because that was collateral of the bank for a
12:48  8  significant loan against it, and it's also collateral to
12:49  9  another bank.
12:49 10      Q.  Was that piece of property going to be at issue
12:49 11  in this hearing that you tell Mr. Latham about coming up
12:49 12  for April 4th?
12:49 13      A.  Yeah.  There was a hearing that Weslease had set
12:49 14  to require Dale to turn over the codes so that they could
12:49 15  access the ranch, and I'm trying to think -- I've looked
12:49 16  at the judgment.  River North Farms is not named in that
12:49 17  judgment.  How can the court order access to a non-
12:49 18  judgment debtor's property?
12:49 19           The fact that they're 100 percent stockholder --
12:49 20  which that in and of itself is totally contrary to the
12:49 21  turnover statute, you cannot transfer property under the
12:49 22  plain language of it.  But even if they did, even if that
12:49 23  were a valid transfer, the officers and directors have
12:50 24  responsibility to protect property that is collateral of
12:50 25  a bank.

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:50 1      Q.  I understand you have that dispute, but that

12:50 2    issue, I assume, you've appealed?

12:50 3      A.  Oh, yeah.  That's the -- I think that's in the

12:50 4    consolidated first appeal.  There -- there are three

12:50 5    appeals that are --

12:50 6      Q.  But it --

12:50 7      A.  -- consolidated.

12:50 8      Q.  It's still on appeal, right?

12:50 9      A.  Yeah.

12:50 10     Q.  Would you agree with me -- you've practiced law

12:50 11   60 years.  If a court has issued an order, like a

12:50 12   district court --

12:50 13     A.  Uh-huh.

12:50 14     Q.  -- and you've appealed it up --

12:50 15     A.  Yeah.

12:50 16     Q.  -- you still have to file the district court's

12:50 17   order --

12:50 18     A.  Absolutely.

12:50 19     Q.  -- unless you've got a stay; is that fair?

12:50 20     A.  Absolutely.  And I have instructed them -- in

12:50 21   fact, those codes were given after the hearing.

12:50 22     Q.  Okay.  Mr. Latham appl- -- replies to you a

12:50 23   couple hours later on March 29th, and he says:  I can't

12:50 24   do that because it's not true to say that Dale's been

12:50 25   looking after the ranch for the bank for approximately

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:50  1    ten years.  I don't even think I even knew about the
12:50  2    ranch until the last two to three years.  We do not have
12:50  3    a security agreement that covers the ranch.  Our lien
12:51  4    against the ranch is a judgment lien by virtue of having
12:51  5    a judgment against River North.  I'm not going sign a
12:51  6    declaration that authorizes anything.  Any declaration I
12:51  7    sign will contain nothing but factual statements.
12:51  8            Did I read that correctly?
12:51  9        A.  Yeah, and I learned -- and that educated me.
12:51 10        Q.  So, essentially, your client had given you
12:51 11    information that was false?
12:51 12        A.  Well, they had given information they thought
12:51 13    was true but was not correct.
12:51 14        Q.  It was not correct according to Mr. Latham; is
12:51 15    that -- is that correct?  Can we agree on that?
12:51 16        A.  Oh, absolutely.  Yeah.  No, I mean, he -- he
12:51 17    disputed what was there, and you'll see my response right
12:51 18    there to your exhibit.  It says, I would never ask you to
12:51 19    sign anything but factual.  Thank you for giving me the
12:51 20    facts.
12:51 21        Q.  And then you make another request of something
12:51 22    he can sign; is that right?
12:51 23        A.  Right.  And he ultimately did sign.
12:51 24        Q.  Okay.
12:51 25        A.  Yeah.

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:51 1          MR. FAHEY:  All right.  Can we take a short

12:51 2   break?

12:51 3          THE WITNESS:  Absolutely.

12:51 4          MR. FAHEY:  Okay.

5                (Recess from 12:51 p.m. to 12:57 p.m.)

12:58 6          MR. ANDERSON:  Okay.  We're concluding the

12:58 7   deposition of Mr. Sharpe today.  A blank was left about

12:58 8   the date of the payment to Haynes and Boone.  Mr. Searcy

12:58 9   is going to send a letter confirming the date of that

12:58 10  payment, and that will serve as the answer to Mr. -- the

12:58 11  question posed to Mr. Sharpe on that issue.

12:58 12         MR. SEARCY:  Absolutely.

12:58 13         MR. ANDERSON:  And we also intend to ask the

12:58 14  court for 14 more days because of the documents that have

12:58 15  come in and the timing of the deposition, and you don't

12:59 16  oppose that?

12:59 17         MR. SEARCY:  I do not.

12:59 18         MR. ANDERSON:  Okay.  The other thing, do you

12:59 19  want copies of all these documents that we have

12:59 20  subpoenaed?

12:59 21         MR. SEARCY:  Yes.

12:59 22         MR. FAHEY:  Okay.

12:59 23         MR. SEARCY:  The exhibits.

12:59 24         MR. ANDERSON:  The exhibits.  Okay.

12:59 25         MR. FAHEY:  And exhibits.

Oral Deposition - James Shelby Sharpe
January 22, 2025

12:59  1          MR. SEARCY:  Yes, just the exhibits.

12:59  2          MR. ANDERSON:  All right.  And so we'll -- you

12:59  3    mean the exhibits of --

12:59  4          THE WITNESS:  To the deposition.

12:59  5          MR. ANDERSON:  Oh, yeah --

12:59  6          MR. SEARCY:  To the deposi- --

12:59  7          MR. ANDERSON:  -- the documents that we've

12:59  8    subpoenaed from third parties, do you want copies of

12:59  9    those?

12:59 10          MR. SEARCY:  No, but I'll -- I'll just simply

12:59 11    arrange with you to come over and just --

12:59 12          MR. ANDERSON:  Absolutely.

12:59 13          MR. SEARCY:  -- briefly look at them.

12:59 14          MR. ANDERSON:  Okay.

12:59 15          MR. SEARCY:  It's too much of a burden to put on

12:59 16    y'all --

12:59 17          MR. ANDERSON:  All right.

12:59 18          MR. SEARCY:  -- to copy all those, and so...

12:59 19          MR. ANDERSON:  Thank you.  That concludes our

12:59 20    side.

12:59 21          MR. SEARCY:  We'll just simply arrange a time --

12:59 22          MR. ANDERSON:  Okay.

12:59 23          MR. SEARCY:  -- and I'll come over and look at

12:59 24    them.

       25              (Proceedings adjourned at 12:59 p.m.)

Oral Deposition - James Shelby Sharpe
January 22, 2025

1                    CHANGES AND SIGNATURE

2    PAGE     LINE     CHANGE                    REASON

3    _____

4    _____

5    _____

6    _____

7    _____

8    _____

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

Oral Deposition - James Shelby Sharpe
January 22, 2025

1        I, JAMES SHELBY SHARPE, having read the

2   foregoing deposition and hereby affix my signature that

3   same is true and correct, except as noted above.

4

5                              _____

6                              JAMES SHELBY SHARPE

7   STATE OF _____)

8   COUNTY OF _____)

9

10        Before me, _____, on this

11   day personally appeared JAMES SHELBY SHARPE, known to me

12   (or proved to me under oath or through

13   _____)(description of identity card or

14   other document) to be the person whose name is subscribed

15   to the foregoing instrument and acknowledged to me that

16   he/she executed the same for the purpose and

17   consideration therein expressed.

18        Given under my hand and seal of office on this

19   _____ day of _____, _____.

20

21                              _____

22                              NOTARY PUBLIC IN AND FOR

23                              THE STATE OF _____

24

25   My Commission Expires: _____

Oral Deposition - James Shelby Sharpe
January 22, 2025

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

```
                        )
                        )
IN RE: J. SHELBY SHARPE )      NO. 4:24-mc-00007-P
                        )
                        )
```

REPORTER'S CERTIFICATE

ORAL DEPOSITION OF JAMES SHELBY SHARPE

JANUARY 22, 2025


1          I, Adrianne Harris, Certified Shorthand

2   Reporter in and for the State of Texas, hereby certify to

3   the following:

4          That the witness, JAMES SHELBY SHARPE, was

5   duly sworn by the officer and that the transcript of the

6   deposition is a true record of the testimony given by the

7   witness;

8          That the deposition transcript was duly

9   submitted on _____ to Mr. Marshall Mayes

10  Searcy, the attorney for the witness, for examination,

11  signature, and return to me by _____.

12         That pursuant to information given to the

13  deposition officer at the time said testimony was taken,

14  the following includes all parties of record and the

Oral Deposition - James Shelby Sharpe
January 22, 2025

1   amount of time used by each party at the time of the

2   deposition:

3
            Mr. Marshall Mayes Searcy (00h00m)
4           Mr. Stephen Fahey (02h13m)

5

6   FOR J. SHELBY SHARPE:

7       Mr. Marshall Mayes Searcy
        MARSHALL SEARCY LAW
8       950 Commerce Street
        Fort Worth, Texas  76102
9       Phone: (817)336-7220
        Email: marshall@marshallsearcylaw.com
10

11  FOR ANDERSON & RIDDLE, L.L.P.:

12      Mr. Geffrey W. Anderson
        ANDERSON & RIDDLE, L.L.P.
13      1604 Eighth Avenue
        Fort Worth, Texas  76104
14      Phone: (817)334-0059
        Fax: (817)334-0425
15      Email: ganderson@andersonriddle.com

16      - and -

17      Mr. Stephen Fahey
        LAW OFFICE OF STEVE FAHEY, PLLC
18      640 Taylor Street
        Suite 1200
19      Fort Worth, Texas  76102
        Phone: (682)301-0330
20      Email: steve@sfaheylaw.com

21

22          That $_____ is the deposition officer's

23  charges to Mr. Geffrey W. Anderson for preparing the

24  original deposition transcript and any copies of

25  exhibits;

Julia Whaley & Associates
214-668-5578  JulieTXCSR@gmail.com

Oral Deposition - James Shelby Sharpe
January 22, 2025

1          I further certify that I am neither counsel

2    for, related to, nor employed by any of the parties in

3    the action in which this proceeding was taken, and,

4    further that I am not financially or otherwise interested

5    in the outcome of this action.

6          Certified to by me on this _____ day of

7    _____, _____.

8

9

10                          _____
                            ADRIANNE HARRIS, CSR
11                          CSR Certificate No. 7967
                            Expiration Date:  10-31-24
12                          Julia Whaley & Associates
                            Firm Registration No. 436
13                          2012 Vista Crest Drive
                            Carrollton, Texas  75007-1640
14                          (214)668-5578/Fax: (972)236-6666

15

16

17

18

19

20

21

22

23

24

25

**MR. ANDERSON: [20]**  12/6 12/8 12/12
12/14 12/19 12/23 46/24 47/2 108/6 108/13
108/18 108/24 109/2 109/5 109/7 109/12
109/14 109/17 109/19 109/22
**MR. FAHEY: [28]**  7/23 8/8 8/11 8/13 8/17
19/16 29/12 29/15 29/20 31/19 32/3 45/23
45/25 49/12 49/14 63/22 64/20 65/1 65/4
65/20 83/15 91/7 91/10 91/12 108/1 108/4
108/22 108/25
**MR. SEARCY: [49]**  7/25 8/10 8/12 8/16
12/11 19/23 19/25 20/6 29/10 29/13 29/17
29/19 31/15 31/18 32/2 35/12 35/20 36/7 45/7
45/24 49/11 49/13 64/18 64/21 65/2 65/8
65/18 83/9 83/11 83/14 83/17 83/20 91/5 91/8
91/11 98/18 102/22 108/12 108/17 108/21
108/23 109/1 109/6 109/10 109/13 109/15
109/18 109/21 109/23
**MS. SHARPE: [1]**  8/14
**THE REPORTER: [1]**  29/18
**THE WITNESS: [17]**  12/7 12/13 12/16
12/20 13/1 19/24 20/2 32/4 35/15 36/2 47/1
47/3 83/10 83/13 83/16 108/3 109/4

## $

**$10,000 [2]**  32/19 33/1
**$100,000 [14]**  62/8 62/20 67/2 78/18 81/6
81/6 81/11 82/8 86/20 88/3 88/11 88/17 89/25
93/25
**$127,745 [1]**  87/13
**$160,000 [1]**  51/10
**$227,745 [1]**  87/4
**$25,000 [3]**  33/8 33/21 34/4
**$50,000 [1]**  71/8

## '

**'22 [1]**  65/17
**'23 [2]**  54/20 65/17
**'24 [1]**  54/21

## 0

**00007 [1]**  5/12
**0059 [2]**  2/10 113/14
**00776 [1]**  8/19
**00h00m [1]**  113/3
**02 [1]**  3/3
**02h13m [1]**  113/4
**0330 [2]**  2/15 113/19
**04 [1]**  3/4
**0425 [2]**  2/10 113/14
**05 [1]**  3/6
**08 [1]**  3/15

## 1

**1/9/24 [1]**  3/16
**10 [5]**  3/20 91/2 91/4 91/14 91/21
**10-31-24 [1]**  114/11
**100 percent [3]**  101/18 101/19 105/19
**100,000 [9]**  62/3 63/2 63/10 63/11 69/18 70/1
71/5 77/25 87/6
**1013 [1]**  28/6
**102 [1]**  3/22
**10:09 a.m [1]**  104/7
**10:20 a.m [1]**  1/20
**11 [4]**  3/22 102/16 102/18 102/24
**11/7/24 [1]**  3/20
**110 [1]**  3/8

**11:13 [1]**  46/1
**11:31 [1]**  46/1
**12/13/24 [1]**  3/21
**1200 [2]**  2/14 113/18
**12:28 p.m [1]**  23/25
**12:51 [1]**  108/5
**12:57 [1]**  108/5
**12:59 [1]**  109/25
**12:59 p.m [1]**  1/20
**13th [1]**  91/18
**14 [1]**  108/14
**16 [1]**  29/11
**160,000 [2]**  86/14 86/24
**1604 [2]**  2/9 113/13
**1640 [1]**  114/13
**167 [1]**  8/20
**16th [1]**  100/2
**19 [1]**  3/16
**1965 [1]**  95/4
**19th [2]**  50/13 86/9

## 2

**20 [2]**  4/14 95/3
**2012 [1]**  114/13
**2019 [2]**  39/20 39/20
**2020 [2]**  39/20 98/19
**2022 [3]**  61/3 67/1 85/3
**2023 [10]**  51/10 51/15 53/3 60/15 65/6 67/1
85/3 85/18 86/14 86/17
**2024 [25]**  8/24 11/3 11/14 12/12 17/2 20/22
26/20 32/7 32/18 33/12 34/16 34/17 36/13
46/11 46/16 50/4 50/13 51/16 60/2 85/10 86/9
90/16 91/18 103/9 104/7
**2025 [4]**  1/11 1/19 4/4 112/9
**214 [1]**  114/14
**21st [4]**  8/24 98/18 98/19 99/18
**22 [4]**  1/11 1/19 4/4 112/9
**236-6666 [1]**  114/14
**24 [10]**  3/15 3/16 3/17 3/17 3/19 3/20
3/21 3/22 114/11
**26 [1]**  50/4
**29th [3]**  103/9 104/7 106/23
**2:00 [1]**  20/25
**2:07 [1]**  23/20
**2mac.com [1]**  22/3

## 3

**3/29/24 [1]**  3/22
**30 [2]**  3/16 4/14
**30 million [1]**  47/5
**300,000 [1]**  56/12
**301-0330 [2]**  2/15 113/19
**30th [4]**  20/22 21/3 23/22 26/6
**31 [1]**  3/17
**334-0059 [2]**  2/10 113/14
**334-0425 [2]**  2/10 113/14
**336-7220 [2]**  2/5 113/9
**36 [1]**  3/17
**3:00 p.m [1]**  104/12
**3:29 p.m [1]**  42/19

## 4

**436 [1]**  114/12
**49 [1]**  3/18
**4:22-cv-1013 [1]**  28/6
**4:24-mc-00007 [1]**  5/12

**4th [2]**  104/12 105/12

## 5

**5/21/24 [1]**  3/15
**500,000 [3]**  52/9 56/14 58/10
**58 [1]**  3/19
**5th [2]**  32/18 34/15

## 6

**6/7/24 [1]**  3/19
**60 [3]**  6/22 6/24 106/11
**6100 [1]**  1/22
**640 [2]**  2/14 113/18
**6666 [1]**  114/14
**668-5578/Fax [1]**  114/14
**67,000 [1]**  86/9
**67,745 [1]**  50/16
**682 [2]**  2/15 113/19
**6th [2]**  33/12 34/15

## 7

**7/9/24 [2]**  3/17 3/17
**7220 [2]**  2/5 113/9
**747 [1]**  86/11
**75007-1640 [1]**  114/13
**76102 [4]**  2/4 2/15 113/8 113/19
**76104 [2]**  2/9 113/13
**7967 [1]**  114/11
**7th [5]**  60/2 90/16 93/23 95/16 95/21

## 8

**8/30/24 [1]**  3/16
**817 [6]**  2/5 2/10 2/10 113/9 113/14 113/14
**8:19 [1]**  3/17
**8:19 a.m [1]**  36/21
**8:20 [1]**  3/17
**8:20 a.m [1]**  36/21
**8th [4]**  42/16 51/10 85/18 86/14

## 9

**90 [1]**  3/20
**91 [1]**  3/21
**912 [1]**  1/23
**950 [2]**  2/4 113/8
**972 [1]**  114/14
**9th [8]**  11/3 11/14 12/12 15/18 15/19 17/1
34/17 36/13

## A

**a.m [8]**  1/20 3/17 3/17 36/21 36/21 46/1 46/1
104/7
**ability [1]**  76/19
**able [4]**  6/16 76/2 76/22 79/23
**about [58]**  5/15 11/3 11/14 12/14 12/16 12/25
14/9 16/7 18/14 18/15 20/13 20/25 24/4 25/25
30/23 31/5 34/18 37/12 37/13 38/13 39/13
44/1 46/3 46/24 47/1 47/3 47/13 47/16 47/22
47/25 48/3 51/8 53/17 56/3 60/5 62/2 63/2
66/9 67/8 67/21 68/16 69/3 76/25 78/2 82/19
82/21 84/16 84/23 85/1 85/9 87/8 87/13 97/10
99/17 102/8 105/11 107/1 108/7
**above [3]**  1/18 33/14 111/3
**Absolutely [3]**  108/3 108/12 109/12
**access [1]**  63/18
**according [1]**  107/14
**account [16]**  38/7 38/13 38/17 41/23 42/3

**account... [11]** 42/3 42/3 42/4 61/9 64/11 78/18 88/24 89/17 89/19 89/21 104/4
**accounts [2]** 43/15 60/6
**accumulate [1]** 52/7
**accusation [1]** 19/9
**acknowledge [1]** 81/9
**acknowledged [1]** 111/15
**acquaintances [1]** 73/18
**acting [1]** 18/6
**action [5]** 5/12 7/18 94/17 114/3 114/5
**active [1]** 94/16
**added [1]** 40/3
**additional [1]** 87/2
**address [3]** 13/19 103/11 103/14
**adjourned [1]** 109/25
**admitted [1]** 6/25
**Adrianne [3]** 1/20 112/12 114/10
**advance [1]** 67/7
**advice [2]** 39/19 82/15
**affix [1]** 111/2
**after [18]** 12/12 12/21 14/2 15/18 18/1 33/14 69/25 70/23 75/8 76/24 77/25 84/24 91/25 95/16 95/21 96/9 104/13 106/25
**afternoon [1]** 21/1
**again [5]** 24/6 47/15 51/10 57/7 78/2
**against [6]** 40/14 70/9 74/24 90/25 107/4 107/5
**ago [7]** 5/8 20/13 25/6 37/10 52/21 66/23 79/18
**agree [8]** 9/3 10/4 31/4 72/12 83/9 101/4 106/10 107/15
**agreed [7]** 25/6 25/7 25/11 25/12 28/18 44/2 57/21
**agreeing [1]** 83/18
**agreement [14]** 4/7 11/5 12/2 13/25 17/1 66/12 66/12 66/14 73/2 73/3 75/5 76/21 85/5 107/3
**agreement that [1]** 85/5
**Agreements [2]** 3/4 3/24
**ahead [1]** 63/25
**all [30]** 4/17 7/4 7/21 9/20 9/23 12/16 26/22 27/17 33/4 52/17 58/4 59/17 61/12 64/21 76/14 83/9 83/17 84/5 94/22 94/23 96/12 101/17 101/20 104/1 108/1 108/19 109/2 109/17 109/18 112/25
**allow [1]** 94/6
**almost [3]** 6/21 64/16 94/24
**already [2]** 12/1 24/22
**also [15]** 2/18 10/8 10/9 10/11 10/13 10/22 30/8 30/22 36/12 47/6 61/8 79/16 96/9 102/10 108/13
**alter [1]** 27/1
**always [3]** 54/15 66/6 69/5
**am [3]** 64/14 114/1 114/4
**Amarillo [3]** 41/12 61/9 74/23
**amount [9]** 43/11 46/4 50/16 61/15 62/3 72/17 74/4 76/15 113/1
**amounts [2]** 59/5 84/5
**Anderson [11]** 1/17 2/7 2/8 2/8 5/13 5/23 28/3 113/11 113/12 113/12 113/23
**Anderson's [1]** 16/23
**andersonriddle.com [2]** 2/11 113/15
**another [4]** 24/24 28/18 76/13 107/21
**answer [5]** 6/16 29/11 40/12 93/3 108/10
**answering [1]** 52/22
**answers [1]** 6/2
**account [59]** 4/17 4/18 4/25 4/25 6/16 7/8 7/18 7/19 9/20 9/22 9/23 9/25 10/1 13/24 14/4 14/7 16/24 17/3 18/13 18/14 18/24 19/7 19/8 25/2 25/24 27/19 29/4 42/22 43/15 43/17 44/9 46/11 46/17 47/9 47/10 48/10 49/3 56/23 59/5 59/11 71/23 74/11 74/13 78/13 78/14 78/14 79/21 80/11 84/15 93/9 95/6 95/8 95/25 99/1 104/19 107/6 113/24 114/2
**anybody [2]** 46/11 46/15
**anyone [1]** 104/18
**anything [10]** 6/12 12/25 13/19 16/7 63/2 67/21 88/23 94/22 99/17 107/6
**anywhere [1]** 25/23
**aol.com [1]** 103/12
**appeal [4]** 47/9 69/3 102/10 106/8
**appealed [2]** 106/12 106/14
**APPEARANCES [2]** 2/1 3/3
**appeared [1]** 111/11
**appears [1]** 50/9
**appellate [7]** 76/13 79/12 79/14 79/17 79/22 79/24 80/13
**appl [1]** 106/22
**applied [2]** 10/5 30/7
**applies [2]** 10/20 10/22
**apply [2]** 10/11 29/5
**approach [1]** 55/8
**approval [1]** 25/22
**approximately [6]** 39/1 52/3 53/5 58/11 104/15 106/25
**April [2]** 104/12 105/12
**April 4th [2]** 104/12 105/12
**are [44]** 5/21 5/22 6/2 7/5 9/6 9/6 9/12 11/2 11/12 17/2 17/25 22/2 23/2 25/7 27/2 31/17 31/20 33/17 34/1 34/3 34/3 34/15 36/9 36/24 36/25 38/17 39/6 41/21 44/20 44/21 45/10 46/11 46/15 48/3 57/6 58/1 59/5 59/17 61/21 87/4 97/15 101/11 102/23 105/1
**area [1]** 79/22
**areas [1]** 5/23
**aren't [3]** 28/3 43/21 58/10
**argue [1]** 98/21
**argument [1]** 31/1
**arisen [1]** 100/6
**arrange [2]** 109/11 109/21
**as [69]** 1/17 5/4 8/19 8/22 10/5 10/12 10/22 14/3 14/3 16/2 16/4 16/7 16/17 16/17 18/6 19/16 19/20 20/17 21/17 21/19 25/7 25/12 27/1 29/16 30/11 30/16 31/12 36/5 39/8 39/8 39/9 40/3 40/13 44/6 47/17 48/6 49/10 49/17 49/24 51/11 54/22 54/22 54/25 56/23 58/16 59/20 61/7 62/8 64/24 74/6 74/10 74/22 79/9 79/19 79/17 84/4 84/11 84/11 90/10 91/4 91/15 100/3 101/14 101/18 101/24 102/18 104/4 108/10 111/3
**ask [10]** 6/11 12/9 45/6 56/22 59/5 60/14 75/9 95/23 104/5 108/13
**asked [4]** 38/1 39/18 62/11 95/6
**aspect [2]** 74/11 96/16
**asset [3]** 10/1 44/9 44/15
**assets [2]** 61/11 61/12
**assign [1]** 75/3
**assigned [1]** 75/4
**assist [2]** 14/4 96/21
**Associates [1]** 114/12
**assume [2]** 82/20 106/2
**assumed [1]** 64/16
**attach [1]** 104/10
**attaching [4]** 23/3 23/7 23/11 34/16
**attachment [2]** 23/10 32/14
**attempt [1]** 27/3
**attention [1]** 101/16
**attorney [26]** 4/11 4/11 6/19 14/14 14/21 16/20 16/25 17/7 17/8 18/6 18/22 19/3 19/7 19/8 20/14 24/22 26/5 28/14 46/12 56/23 58/5 80/13 82/14 83/11 95/24 112/21
**attorney's [2]** 19/10 70/19
**attorney-client [5]** 56/23 58/5 82/14 83/11 95/24
**attorneys [4]** 7/12 47/9 100/20 100/22
**August [12]** 11/3 11/14 12/12 15/18 15/19 17/1 17/2 20/22 21/3 23/22 26/6 50/4
**August 26 [1]** 50/4
**August 30th [3]** 20/22 21/3 23/22
**August 9th [4]** 11/3 11/14 12/12 17/1
**authorize [1]** 104/18
**authorized [1]** 101/24
**authorizes [2]** 104/16 107/6
**Avenue [2]** 2/9 113/13
**aware [7]** 11/2 11/12 11/12 11/23 46/11 46/15 47/9
**away [1]** 7/25
**Azle [6]** 13/11 22/24 26/10 28/7 28/21 29/6

**B**

**back [14]** 29/13 43/20 43/23 46/2 53/6 61/5 67/19 75/1 83/8 86/7 87/1 89/20 89/20 103/24
**backing [1]** 27/21
**bad [1]** 6/21
**balance [5]** 54/25 55/4 69/25 70/19 71/5
**bank [20]** 3/18 34/25 38/7 38/14 38/18 41/12 41/23 42/2 43/15 50/9 60/6 61/9 61/11 74/23 88/24 104/14 104/16 104/18 105/25 106/25
**bank's [3]** 104/15 104/17 104/20
**bar [3]** 5/18 7/19 79/16
**bars [1]** 7/19
**based [3]** 24/22 49/1 75/7
**basically [3]** 41/9 43/21 91/25
**be [37]** 4/18 6/4 7/21 11/15 20/14 28/21 37/12 40/17 43/5 44/18 49/2 50/9 63/18 64/24 65/19 66/6 66/24 67/1 67/20 74/4 76/2 76/22 79/20 79/22 79/23 81/9 82/13 88/8 88/12 90/23 92/19 102/7 102/14 102/15 104/20 105/10 111/14
**became [1]** 11/23
**because [37]** 10/20 18/25 21/17 24/19 27/22 42/11 47/4 52/21 57/20 60/14 62/19 63/16 66/3 67/18 69/3 74/2 74/6 74/15 74/23 75/1 75/18 78/21 79/18 79/20 79/24 81/7 93/22 94/20 94/22 96/1 97/12 98/1 101/23 102/2 102/13 106/24 108/14
**been [32]** 5/2 5/13 6/18 6/25 7/16 19/20 24/19 28/17 30/11 31/12 36/5 38/25 41/4 41/8 49/10 54/13 57/5 58/15 59/6 59/19 62/25 64/21 67/10 69/9 71/8 75/5 90/9 91/3 93/2 102/18 104/13 106/24
**before [20]** 1/20 7/15 7/24 12/21 12/23 13/22 24/4 36/17 37/17 46/3 47/3 47/13 49/19 59/3 66/8 78/10 95/10 99/18 99/20 111/10
**behalf [2]** 11/5 95/11
**Behan [33]** 3/20 11/4 13/23 17/5 17/11 22/22 42/3 42/22 53/17 53/17 62/12 62/15 62/19 79/10 82/20 82/20 82/25 84/4 84/25 85/11 85/22 86/16 86/16 87/7 88/18 90/4 91/15 96/9

**B**

**Behan...** [5]  100/7 101/10 103/3 103/3 104/19
**Behan's** [3]  3/20 18/6 91/15
**behangroup.com** [1]  22/22
**Behans** [66]  9/20 10/2 10/14 10/23 12/1 15/18
  18/18 19/5 19/9 26/25 28/17 34/22 38/25 39/7
  39/8 39/19 39/24 40/2 41/21 41/22 43/12 44/8
  44/13 45/3 45/4 45/4 46/6 46/12 46/16 47/10
  47/18 48/10 52/3 52/25 52/25 54/3 54/22
  54/24 57/5 59/5 64/14 66/19 67/3 69/24 72/1
  73/3 73/8 75/9 76/2 76/25 78/6 79/1 80/12
  81/11 81/19 82/7 82/12 85/17 87/24 89/10
  89/20 94/6 94/7 95/22 101/23 104/24
**Behans'** [1]  40/21
**behavior** [1]  5/20
**behind** [2]  40/16 76/13
**being** [2]  42/22 54/2
**belief** [1]  58/10
**believe** [7]  10/22 21/25 44/13 47/14 48/24
  82/13 94/4
**believed** [1]  19/5
**below** [1]  33/6
**bench** [1]  26/20
**besides** [2]  47/11 60/20
**best** [2]  13/10 65/5
**better** [2]  79/12 80/13
**between** [4]  42/14 66/13 83/6 100/19
**beyond** [1]  74/6
**big** [2]  57/25 72/10
**bigger** [2]  78/19 97/22
**bill** [9]  61/5 62/19 62/20 64/13 64/17 74/10
  75/10 76/3 78/19
**billed** [1]  66/9
**bills** [2]  78/2 84/16
**bit** [4]  16/23 27/21 41/11 79/24
**blank** [2]  64/23 108/7
**Bolinsky** [1]  20/15
**Bonnie** [2]  32/21 32/24
**Boone** [32]  62/9 62/10 63/6 63/11 64/13
  64/16 66/11 66/14 67/3 69/25 70/8 71/6 72/11
  72/17 73/2 74/3 74/9 74/25 75/6 77/1 77/3
  77/11 78/10 78/15 82/9 84/5 84/24 85/3 88/9
  88/15 89/16 108/8
**Boone's** [1]  76/3
**borrowed** [2]  42/22 43/5
**both** [2]  41/5 90/19
**breached** [1]  57/24
**breaching** [1]  58/5
**breadth** [1]  97/11
**break** [6]  45/20 45/23 46/3 47/13 63/17 108/2
**Brief** [3]  8/9 63/24 95/17
**briefed** [1]  64/22
**briefly** [1]  109/13
**bring** [4]  66/4 76/3 79/10 96/23
**brought** [6]  66/10 73/16 74/3 76/20 79/19
  96/20
**Bryan** [10]  32/9 32/11 34/17 37/1 42/14
  43/20 48/1 48/1 59/22 60/8
**burden** [1]  109/15
**business** [3]  39/19 51/12 97/18
**businesses** [2]  39/13 40/22

**C**

**call** [19]  9/4 17/17 21/2 21/12 21/15 21/18
  24/12 28/14 44/2 46/7 52/25 67/7 74/13 76/24
  77/17 80/14 93/10 95/23 96/19
**called** [11]  12/17 12/23 13/22 14/2 17/5 18/22

**calling** [1]  20/14
**calls** [1]  80/12
**came** [16]  15/16 15/18 16/19 24/17 35/6 61/8
  62/18 64/17 69/9 69/10 76/17 77/8 79/19
  85/17 89/16 101/16
**can** [23]  5/7 5/8 6/4 8/8 8/14 9/3 19/16 20/10
  27/5 29/21 49/25 50/8 59/20 63/22 64/22
  82/19 86/7 91/4 92/20 94/20 107/15 107/22
  108/1
**can't** [3]  23/12 24/9 106/23
**cannot** [2]  102/3 105/21
**capacity** [1]  101/14
**card** [1]  111/13
**care** [1]  54/15
**carefully** [1]  93/2
**Carrollton** [1]  114/13
**case** [27]  4/5 5/11 7/15 8/19 9/2 9/4 9/7 9/7
  9/12 26/11 29/5 30/15 30/16 47/2 50/2 57/23
  59/15 60/20 67/21 76/4 94/7 94/16 94/21 95/3
  97/23 97/25 101/12
**cases** [2]  52/22 96/13
**cash** [1]  61/17
**cause** [3]  1/19 3/15 8/24
**caused** [1]  95/5
**cautioned** [1]  5/2
**Central** [2]  21/1 24/2
**certainly** [2]  12/11 81/5
**Certificate** [3]  3/9 112/7 114/11
**Certified** [3]  1/21 112/12 114/6
**certify** [1]  112/13 114/1
**chain** [3]  36/16 42/12 48/1
**challenging** [1]  54/14
**chambers** [1]  93/11
**chance** [1]  36/25
**CHANGE** [1]  110/2
**CHANGES** [1]  110/1
**characterization** [2]  46/9 62/18
**characterize** [1]  47/17
**characterized** [2]  48/3 48/6
**charge** [1]  79/14
**charges** [1]  113/23
**check** [6]  32/18 32/21 33/6 33/7 33/14 34/4
**check's** [1]  49/1
**checks** [15]  32/16 34/15 34/18 34/23 35/7
  35/8 37/7 37/11 37/12 38/8 38/10 44/14 44/21
  48/6 49/4
**chief** [1]  93/23
**churches** [1]  97/14
**Circuit** [3]  25/8 30/9 102/10
**Civil** [3]  1/24 4/8 7/5
**clarification** [5]  15/8 17/10 49/8 93/10 95/9
**clarified** [1]  6/12
**clarify** [2]  27/11 57/12
**clause** [1]  10/22
**clauses** [1]  10/12
**clear** [7]  3/21 5/15 25/21 66/24 88/8 91/16
  102/1
**clearly** [1]  90/3
**clerk** [1]  98/1
**client** [20]  19/10 35/13 38/4 38/25 39/8 43/8
  43/8 48/4 56/23 58/5 58/12 59/12 66/6 66/9
  68/14 82/14 83/11 95/11 95/24 107/10
**client's** [1]  59/15
**clients** [6]  9/12 17/23 44/20 54/23 56/1 97/12
**Clint** [2]  104/6 104/9
**close** [3]  16/20 62/25 85/23

**clue** [3]  33/4 53/14 97/16
**co** [1]  62/14
**co-counsel's** [1]  62/14
**codes** [1]  104/18
**cogni** [1]  37/24
**cognizant** [1]  37/24
**collateral** [5]  104/14 104/15 104/17 104/20
  105/24
**collect** [2]  72/12 72/17
**collecting** [1]  68/22
**collective** [1]  52/25
**come** [6]  24/19 38/4 39/21 108/15 109/11
  109/23
**coming** [7]  6/21 85/23 88/24 89/5 89/10
  104/12 105/11
**Commerce** [2]  2/4 113/8
**Commission** [1]  111/25
**communication** [2]  82/14 83/12
**communications** [2]  41/17 75/1
**company** [1]  45/4
**company's** [1]  13/6
**complain** [1]  67/8
**completed** [1]  19/25
**completely** [1]  94/25
**complied** [1]  96/16
**comply** [1]  5/19
**concern** [1]  93/24
**concerning** [3]  39/19 42/21 74/11
**concert** [3]  9/20 10/14 10/23
**concludes** [1]  109/19
**concluding** [1]  108/6
**conclusion** [1]  26/21
**conduct** [5]  5/17 5/21 7/9 7/12 95/2
**conferred** [1]  9/23
**confirm** [2]  80/11 87/22
**confirming** [1]  108/9
**conjunction** [1]  43/23
**connected** [1]  46/7
**connection** [1]  26/11
**consider** [2]  62/16 83/7
**consideration** [2]  54/2 111/17
**considered** [6]  62/13 62/13 85/1 86/18 87/2
  88/18
**construct** [1]  57/22
**contacted** [1]  97/22
**contacting** [1]  18/24
**contain** [1]  107/7
**contingent** [2]  76/18 78/10
**continued** [1]  40/13
**contract** [1]  57/24
**contrary** [1]  95/2 105/20
**control** [6]  10/1 44/9 44/15 66/21
**controlled** [3]  73/7 81/17 94/5
**conversation** [13]  16/24 35/13 56/23 69/3
  69/13 74/21 76/25 78/1 82/12 82/19 84/3 85/1
  85/22
**conversations** [4]  16/25 25/24 26/5 53/17
**convey** [2]  101/21 102/3
**conveyed** [5]  28/7 29/6 30/17 30/23 31/6
**copied** [3]  21/23 74/7 74/12
**copies** [4]  7/24 108/19 109/8 113/24
**copy** [5]  4/18 8/14 74/9 96/13 109/18
**copying** [1]  59/24 103/3
**corporate** [4]  27/1 101/21 102/3 102/3
**correct** [9]  13/1 35/15 50/8 83/13 83/16 95/10
  107/14 107/15 111/3

**Corrections [1]** 3/8

**correctly [5]** 10/2 25/9 61/13 104/21 107/8

**could [12]** 12/6 16/20 28/21 29/10 30/8 42/11 51/7 63/18 71/8 81/9 94/19 104/1

**couldn't [3]** 15/4 24/23 24/25

**counsel [15]** 9/6 14/7 18/15 18/25 28/1 32/11 40/13 41/8 62/9 74/7 74/10 74/22 96/1 100/3 114/1

**counsel's [1]** 62/14

**counsels [1]** 9/7

**counties [1]** 101/17

**counting [1]** 47/6

**COUNTY [1]** 111/8

**couple [3]** 93/6 95/7 106/23

**course [8]** 8/11 29/15 35/19 56/8 61/2 62/20

**court [22]** 1/1 4/8 6/5 7/16 9/24 26/12 26/21 27/18 28/25 40/15 40/17 47/4 60/17 61/4 79/13 93/10 95/9 102/1 106/11 106/12 108/14 112/1

**court's [2]** 56/24 106/16

**courts [1]** 5/23

**covers [1]** 107/3

**Crest [1]** 114/13

**CSR [2]** 114/10 114/11

**current [1]** 75/9

**currently [1]** 6/6

**cv [2]** 8/19 28/6

**D**

**Dad [1]** 104/3

**Dakota [1]** 57/20

**Dale [18]** 3/20 11/4 12/17 12/23 22/22 42/3 45/13 49/1 62/12 62/15 62/19 90/3 91/15 96/8 101/10 103/3 104/13 104/19

**Dale's [1]** 106/24

**date [10]** 4/4 12/21 12/21 21/3 32/5 64/22 64/25 108/8 108/9 114/11

**dated [9]** 8/24 20/22 32/18 33/12 34/15 60/2 90/16 103/9 104/7

**day [11]** 12/9 21/4 24/2 33/14 42/17 63/1 65/19 99/20 111/11 111/19 114/6

**days [4]** 4/13 4/14 4/14 108/14

**dbehan [1]** 22/22

**dead [1]** 25/7

**deal [2]** 16/2 16/5

**dealings [1]** 41/11

**dear [4]** 73/17 73/19 76/1 79/11

**debt [1]** 53/13

**debtor [1]** 26/24

**debts [2]** 38/7 61/18

**decades [1]** 97/13

**December [1]** 91/18

**December 13th [1]** 91/18

**decided [3]** 30/7 30/8 102/12

**decision [2]** 7/11 99/11

**declaration [4]** 48/24 104/10 107/6 107/6

**decle [1]** 104/9

**deed [1]** 101/21

**deeds [1]** 101/17

**defendants [1]** 100/8

**defense [2]** 40/17 60/16

**delighted [1]** 97/11

**denied [3]** 26/22 27/4 61/4

**deposi [1]** 109/6

**deposit [4]** 16/2 16/4 16/7 16/17

**deposited [4]** 34/22 34/25 38/10 38/11

**deposition [16]** 1/9 1/16 4/3 9/3 64/24 108/7 108/15 109/4 111/2 112/8 112/17 112/19 112/24 113/2 113/22 113/24

**describe [2]** 14/20 39/8

**describes [1]** 30/15

**description [3]** 3/13 31/5 111/13

**destruction [2]** 104/19 104/20

**did [87]** 5/7 10/2 12/24 14/3 14/3 14/6 14/13 14/21 16/1 16/4 17/6 17/11 17/17 18/13 18/14 18/18 18/24 21/1 21/2 25/9 25/11 26/4 40/1 45/6 46/4 49/3 53/12 53/16 54/21 54/23 57/25 58/1 61/12 61/19 66/10 66/11 66/13 67/3 67/3 67/5 67/7 67/10 67/20 68/10 68/13 69/12 69/18 70/3 70/8 71/12 71/22 71/22 71/25 72/16 74/6 74/13 75/8 76/3 76/16 77/3 77/19 78/13 78/13 79/18 82/7 84/3 88/3 89/20 92/9 93/4 93/6 93/9 93/10 95/6 95/8 95/22 95/25 96/10 96/11 96/23 97/25 100/22 101/2 101/4 104/21 105/22 107/8

**didn't [19]** 13/22 29/11 54/2 62/25 66/9 67/21 69/15 71/10 71/21 75/19 76/18 79/20 80/11 88/9 88/23 99/16 102/14 103/19

**differences [2]** 100/6 100/16

**different [1]** 36/16

**direct [1]** 51/8

**directed [4]** 5/13 5/23 26/22 90/3

**directing [1]** 102/9

**directly [3]** 14/14 71/23 73/3

**directors [1]** 105/23

**discharge [1]** 54/16

**disciplinary [3]** 7/8 7/18 90/25

**discovered [1]** 62/15

**discuss [1]** 17/24

**discussion [1]** 19/7

**discussions [4]** 38/4 74/25 95/25 97/10

**dismiss [1]** 102/9

**dismissed [1]** 102/9

**disobey [1]** 95/4

**dispute [2]** 100/19 106/1

**district [11]** 1/1 1/1 7/1 7/13 90/24 92/2 92/7 106/12 106/16 112/1 112/1

**division [3]** 1/2 76/14 112/2

**do [101]** 5/22 6/6 6/11 6/13 6/13 7/23 8/7 8/20 8/25 9/15 10/4 10/21 11/23 13/6 13/8 13/19 14/3 14/13 14/21 15/4 15/5 15/9 16/7 16/23 17/3 18/18 20/7 20/8 20/22 21/10 21/24 22/3 30/11 30/14 30/20 30/22 32/24 33/1 33/6 33/11 33/17 33/20 34/17 34/22 35/6 38/13 39/6 39/6 39/9 42/1 42/16 42/19 42/25 43/4 43/15 43/17 44/10 44/13 44/18 45/14 45/20 45/23 48/10 49/16 50/12 50/18 51/12 51/14 51/23 52/3 56/22 57/24 59/3 59/11 59/17 60/5 60/8 62/16 63/10 64/23 64/23 66/21 70/18 74/9 74/22 84/23 86/1 86/8 88/9 90/10 94/19 96/14 98/8 100/8 104/6 104/7 106/24 107/2 108/17 108/18 108/8

**docket [1]** 19/3

**docketed [1]** 8/19

**doctor [2]** 27/4 27/7

**document [3]** 8/19 59/4 111/14

**documented [1]** 58/4

**documents [4]** 45/10 108/14 108/19 109/7

**does [8]** 21/4 22/5 32/21 38/9 55/22 68/22 100/15 104/18

**doesn't [3]** 77/8 79/13 95/23

**doing [4]** 39/23 76/14 80/14 97/20

**domain [4]** 62/7 5/22 85/25 104/24 61/15 64/10 84/12

**don't [26]** 6/10 7/24 12/21 21/8 22/14 25/2 35/4 41/22 54/17 54/17 55/25 63/1 65/8 68/18 77/6 77/6 77/10 79/4 82/13 84/15 95/4 96/10 97/16 102/7 107/1 108/15

**Dondi [1]** 7/11

**done [13]** 6/9 32/1 40/19 42/22 46/6 52/6 61/11 62/16 66/8 69/5 79/24 93/25 102/13

**Dorothy [1]** 20/14

**Dotty [3]** 20/17 21/17 21/19

**doubt [1]** 69/10

**down [9]** 15/16 16/1 16/7 24/19 42/21 50/13 51/9 93/10 102/1

**drafted [1]** 22/7

**Drive [1]** 114/13

**due [3]** 52/9 56/4 68/10

**duly [4]** 1/18 5/2 112/16 112/19

**during [2]** 61/16 63/17

**E**

**each [1]** 113/1

**earlier [5]** 10/9 21/4 26/10 82/4 82/8

**effect [1]** 44/11

**effective [1]** 66/21

**effectively [1]** 100/7

**ego [1]** 27/1

**Eight [1]** 39/4

**Eighth [2]** 2/9 113/13

**electronic [2]** 91/22 97/12

**else [2]** 60/21 94/8

**email [40]** 2/5 2/11 2/16 3/16 3/17 3/17 3/19 3/22 20/8 20/18 21/3 21/14 21/24 22/6 22/6 22/3 23/20 24/6 25/2 31/23 32/5 34/16 36/16 36/17 37/1 37/12 37/16 37/17 38/4 42/12 43/3 47/25 60/8 103/11 103/14 104/4 104/6 113/9 113/15 113/20

**email's [1]** 20/22

**emails [1]** 48/1

**Emily [1]** 59/24

**employed [1]** 114/2

**end [2]** 17/7 54/16

**enforce [1]** 104/11

**enforcement [8]** 3/15 8/23 15/16 24/18 24/19 44/6 44/10 94/17

**engaged [2]** 5/17 5/20

**enough [3]** 29/12 45/9 72/2

**entire [1]** 95/3

**entities [6]** 40/2 43/14 46/7 46/7 46/12 53/1

**entitled [1]** 27/19

**entity [6]** 46/17 47/10 48/11 66/19 73/7 94/5

**entry [1]** 9/25

**environment [2]** 102/14 102/15

**Equinor [6]** 40/14 46/25 47/4 57/24 62/11 62/21

**essentially [7]** 23/2 23/11 44/20 52/21 81/10 81/15 107/10

**established [1]** 7/12

**estate [3]** 11/2 11/4 11/13

**evaluate [1]** 39/22

**even [9]** 62/25 69/8 69/25 74/12 94/4 105/22 105/22 107/1 107/1

**ever [6]** 71/7 71/8 39/18 49/19 94/21 94/22

**every [1]** 39/6

**everything [4]** 74/7 79/23 94/7 97/20

**evidence [1]** 68/3

**exact [3]** 64/22 64/25 65/18

exactly [1]  51/9
examination [3]  3/6 5/5 112/21
example [1]  93/11
except [3]  39/21 40/17 111/3
Excuse [1]  49/11
executed [1]  111/16
exercise [3]  9/22 9/25 44/9
exercising [1]  44/14
exhibit [44]  3/13 3/18 8/9 19/16 19/18 19/20
 20/7 30/11 30/12 31/10 31/12 31/21 36/3 36/5
 36/10 36/12 36/17 36/21 37/18 43/4 43/22
 43/22 47/13 48/7 49/7 49/10 49/17 50/1 58/14
 58/16 59/20 85/16 86/7 90/8 90/10 91/2 91/4
 91/5 91/8 91/14 91/21 92/12 102/18 102/24
Exhibit 10 [3]  91/4 91/14 91/21
Exhibit 11 [2]  102/18 102/24
Exhibit 2 [2]  19/20 20/7
Exhibit 3 [1]  30/11
Exhibit 4 [7]  31/12 31/21 36/17 36/21 37/18
 43/22 48/7
Exhibit 5 [4]  36/5 36/10 43/22 47/13
Exhibit 7 [3]  49/17 85/16 86/7
Exhibit 8 [3]  58/16 59/20 91/8
Exhibit 9 [1]  90/10
exhibits [8]  3/12 7/22 108/23 108/24 108/25
 109/1 109/3 113/25
expense [1]  76/15
experience [1]  7/4
experiencing [2]  62/24 69/7
Expiration [1]  114/11
Expires [1]  111/25
explain [3]  26/14 29/21 29/24
explained [1]  26/23
express [1]  80/17
expressed [1]  111/17
extensively [1]  64/22
extent [2]  40/18 96/8
extra [1]  7/24

F

F-16 [1]  29/11
fact [5]  52/18 69/2 76/12 94/23 105/19
factual [2]  104/24 107/7
Fahey [7]  2/13 2/13 3/6 5/6 113/4 113/17
 113/17
fail [1]  54/15
failed [4]  5/19 57/21 57/22 57/24
fair [43]  7/4 18/6 21/14 22/5 22/7 23/13 24/25
 28/4 28/6 28/22 29/12 32/12 32/17 36/18
 36/22 37/5 38/2 38/23 40/20 41/4 41/12 44/5
 44/18 45/9 46/8 48/7 52/3 56/3 58/22 59/9
 72/10 75/20 77/6 78/17 81/5 85/10 88/18 90/6
 90/19 90/22 93/22 94/1 106/19
false [1]  107/11
familiar [4]  7/5 38/17 40/21 57/6
far [4]  16/17 39/9 54/22 84/11
Farm [3]  61/10 61/10 101/25
Farms [28]  11/5 26/23 27/4 27/19 32/18 33/2
 33/7 33/21 38/7 38/8 40/12 40/22 41/21 41/23
 42/4 43/12 44/14 44/15 46/16 50/10 50/19
 51/11 61/9 61/17 62/22 101/11 101/12 101/19
Fax [3]  2/10 113/14 114/14
February [1]  6/6
Federal [2]  1/24 7/5
fee [4]  66/11 76/18 76/21 78/10
feel [1]  66/4

felt [2]  78/17 102/5
few [1]  25/6
Fidem [1]  40/11
Fifth [3]  25/8 30/8 102/10
figure [2]  63/18 64/16
figures [3]  52/19 71/12 71/21
file [5]  92/9 95/1 95/5 101/25 106/16
filed [15]  40/11 40/12 40/14 40/16 44/1 61/3
 92/5 92/17 93/3 93/5 94/22 100/2 101/17
 101/23 102/11
filing [6]  19/2 49/25 50/1 91/14 95/8 95/10
filings [1]  41/5
fill [1]  64/24
Final [1]  3/16
finances [1]  47/17
financial [1]  47/18
financially [1]  114/4
find [4]  65/18 74/8 82/7 85/7
findings [2]  6/5 27/2
fine [2]  8/3 66/6
Fire [1]  7/25
firm [32]  39/22 39/24 39/25 51/5 53/3 53/4
 55/22 56/10 59/7 61/16 61/21 61/22 62/4 62/8
 62/16 62/17 62/24 63/2 64/9 67/18 69/9 77/12
 78/1 78/18 78/19 79/19 83/5 83/8 84/11 86/18
 89/17 114/12
firm's [1]  77/4
firms [1]  72/10
first [13]  5/2 5/17 9/16 10/22 33/6 39/18
 39/21 43/21 52/1 85/16 86/24 93/4 101/20
five [9]  21/25 21/25 22/1 41/9 43/14 46/8 53/6
 91/25 103/25
flow [1]  61/17
follow [1]  21/15
follow-up [1]  21/15
following [2]  112/14 112/25
follows [1]  5/4
foregoing [2]  111/2 111/15
forgotten [1]  33/11
form [1]  104/10
former [1]  98/1
FORT [12]  1/2 1/23 2/4 2/9 2/15 30/17 31/6
 39/25 112/2 113/8 113/13 113/19
forth [1]  75/2
forward [9]  15/2 23/12 24/12 24/13 25/7
 25/12 25/22 27/10 75/5
forwarding [1]  23/25
found [2]  12/14 12/16 64/11
foundation [1]  101/22
four [5]  5/14 5/23 21/24 79/18 98/21
fourth [1]  5/21
Free [2]  3/21 91/16
freeze [1]  51/23
frequent [1]  53/16
friend [5]  62/25 73/17 76/1 79/11 84/10
friends [8]  44/21 45/3 48/10 48/25 49/4 58/8
 73/18 73/19
friendship [2]  78/21 81/7
front [2]  44/3 98/22
full [2]  5/8 9/16
fully [1]  94/24
fundamental [1]  102/2
funds [9]  51/3 57/21 57/23 61/6 61/8 64/17
 77/4 83/5 87/2
further [5]  9/17 9/19 92/17 114/1 114/4

game [1]  49/24
ganderson [2]  2/11 113/15
gave [1]  94/16
Geff [1]  28/3
Geffrey [3]  2/8 113/12 113/23
generally [1]  97/19
generated [1]  61/10
get [13]  26/4 27/3 54/16 54/17 59/15 62/23
 66/5 66/7 70/8 74/5 75/9 103/24 104/1
gets [3]  62/17 83/8 102/8
getting [3]  38/2 64/15 67/17
gift [1]  81/11
give [4]  39/19 54/2 64/22 71/22
given [9]  21/3 41/20 43/11 76/1 76/1 107/10
 111/18 112/17 112/23
giving [2]  81/10 81/10
glad [2]  64/24 65/19
gmail.com [1]  22/18
go [12]  8/14 23/12 24/12 24/13 27/10 43/20
 43/23 61/8 63/22 63/25 75/8 89/20
going [43]  7/21 11/15 15/2 16/22 24/12 24/13
 24/20 25/7 25/12 25/22 25/22 35/12 47/17
 49/2 50/14 51/8 54/13 56/23 59/11 59/14
 60/14 62/17 62/19 62/20 64/14 66/7 74/8
 74/10 74/14 75/1 76/2 76/15 76/22 83/8 94/6
 95/23 98/21 99/1 102/6 102/14 105/10 107/5
 108/9
gone [2]  54/14 102/1
good [3]  30/8 35/20 36/2
got [12]  9/2 13/22 27/17 28/14 49/25 77/17
 79/21 93/25 94/15 95/16 95/21 106/19
gotten [1]  96/16
graduates [1]  104/1
granted [1]  26/22
Great [1]  91/11
group.com [1]  22/16
gu [1]  44/2
guess [5]  34/6 65/8 68/4 94/15 96/19

H

ha [1]  53/4
habits [1]  43/18
had [61]  7/18 10/8 10/21 12/1 15/16 19/9
 21/12 21/15 21/18 24/18 24/19 24/21 25/24
 25/24 26/5 26/5 26/11 26/25 27/1 27/4 28/17
 28/18 35/13 36/25 37/10 41/11 44/1 44/5
 45/14 52/6 52/6 61/3 62/10 62/10 62/11 62/16
 64/9 64/9 64/10 68/3 69/2 69/12 69/24 69/24
 71/25 73/2 73/2 75/5 76/25 78/1 82/8 85/1
 87/7 93/1 93/6 94/20 96/13 96/16 96/16 104/4
 107/10
had a [1]  61/3
hadn't [3]  67/10 71/23 72/1
half [3]  24/4 52/7 53/5
halfway [1]  51/9
hand [1]  111/18
handle [3]  17/6 79/23 97/17
handled [1]  43/12
happen [2]  24/23 24/25
happened [3]  18/1 54/20 79/19
happy [2]  6/11 6/13
hard [1]  63/18
Harris [3]  1/20 112/12 114/10
has [9]  25/6 25/11 54/13 58/1 61/12 64/21
 101/22 104/13 106/11
have [88]  5/7 5/13 5/15 6/18 6/24 6/25 7/15

James Shelby Sharpe - January 22, 2025

have... **[81]** 7/18 7/24 12/21 16/24 17/3 17/24
21/2 21/5 25/7 25/12 30/8 33/4 33/11 34/25
38/4 38/25 41/23 43/4 43/15 43/17 46/6 47/11
48/10 49/3 49/19 53/14 53/16 54/21 54/23
55/8 57/5 58/1 59/6 59/12 61/5 66/3 66/8
66/11 66/14 66/21 68/22 68/23 69/9 69/12
71/8 72/11 73/18 73/18 73/19 74/3 74/24 75/6
75/19 75/19 76/16 76/18 78/13 78/13 79/14
79/21 80/12 88/23 93/3 93/5 94/22 95/6 95/8
95/25 97/11 97/16 99/1 100/6 101/23 102/1
104/18 105/23 106/1 106/16 107/2 108/14
108/19
**haven't [1]** 49/12
**having [6]** 5/2 39/24 98/11 102/13 107/4
111/1
**Haynes [33]** 62/9 62/10 63/6 63/11 64/13
64/16 66/11 66/13 67/2 69/25 70/8 71/6 72/10
72/17 73/2 74/3 74/9 74/25 75/6 76/3 77/1
77/3 77/11 78/10 78/15 82/9 84/5 84/24 85/2
88/8 88/15 89/16 108/8
**he [17]** 14/2 26/21 27/2 30/7 30/7 30/15 61/4
76/18 93/24 94/6 98/1 102/8 103/24 104/3
106/23 107/22 111/16
**He'll [1]** 85/7
**he's [3]** 54/14 65/2 103/24
**he/she [1]** 111/16
**header [1]** 49/25
**heads [1]** 83/17
**hear [1]** 29/11
**hearing [9]** 4/18 6/5 57/4 96/15 98/6 99/2
99/18 104/12 105/11
**held [1]** 26/20
**help [3]** 66/4 79/11 97/17
**helped [1]** 45/14
**helping [1]** 58/8
**Hendrix [1]** 5/14
**her [25]** 17/25 17/25 18/5 20/17 21/2 21/17
21/17 23/2 24/12 24/18 62/24 69/4 69/18 74/5
74/14 75/9 75/9 76/3 77/4 79/19 79/20 79/20
80/14 83/4 84/11
**here [13]** 5/11 12/6 37/6 37/16 38/6 39/25
43/22 45/10 49/24 52/17 60/5 95/1 102/24
**hereby [2]** 111/2 112/13
**hereto [1]** 1/25
**herself [1]** 21/19
**Hey [1]** 56/12
**higher [1]** 97/14
**highest [2]** 54/25 55/4
**him [4]** 14/4 96/9 102/7 104/16
**his [7]** 27/4 27/7 29/5 30/16 48/24 93/23
104/17
**holdings [1]** 39/13
**hole [1]** 57/25
**hoping [1]** 68/19
**hostile [2]** 102/14 102/15
**hoteliercо.com [1]** 22/14
**hour [1]** 24/4
**hourly [1]** 75/2
**hours [1]** 106/23
**Houston [1]** 39/22
**how [24]** 6/18 6/24 14/20 14/21 34/3 38/25
39/8 42/25 51/23 52/3 52/6 53/14 62/15 63/18
67/20 67/20 68/4 68/10 69/18 70/3 71/12
71/25 97/16 103/25
**huge [1]** 76/15
**huh [8]** 12/13 29/18 40/4 67/24 72/23 73/20

**hundred [3]** 54/22 58/24 61/15
**hundreds [1]** 84/11

## I

**I understand [1]** 55/22
**I'd [1]** 104/5
**I'll [7]** 36/15 47/14 50/4 103/24 109/10
109/10 109/23
**I'll repre [1]** 50/4
**I'm [37]** 6/11 6/12 6/21 7/21 8/7 8/18 11/12
16/22 19/19 27/7 29/10 30/10 31/11 36/4
37/24 47/17 49/9 51/8 52/17 56/22 56/23
58/15 68/4 74/7 74/7 74/11 79/10 83/7 90/9
91/3 91/8 93/21 95/2 95/23 96/14 102/17
107/5
**I've [17]** 40/13 40/19 66/6 69/5 79/24 97/12
104/4
**i.e [2]** 69/23 78/6
**idea [4]** 34/25 37/11 48/10 78/13
**identified [1]** 3/18
**identity [1]** 111/13
**immediately [2]** 96/12 102/10
**implication [1]** 68/13
**impre [1]** 71/22
**inadequate [1]** 61/18
**Inc [1]** 50/10
**includes [1]** 9/24 112/25
**including [2]** 57/4 104/14
**income [2]** 42/23 43/4
**incoming [1]** 51/3
**incur [1]** 62/11
**incurred [1]** 62/10
**INDEX [1]** 2/20
**indication [1]** 26/25
**individually [2]** 48/12 101/13
**individuals [1]** 22/2
**induce [1]** 16/1
**inform [1]** 64/14
**information [6]** 38/3 48/4 57/13 95/24 107/11
112/23
**Innovative [5]** 9/4 40/15 44/3 96/19 101/12
**inspection [1]** 104/16
**instance [1]** 1/17
**Instead [1]** 75/2
**institutions [1]** 97/13
**instrument [1]** 111/15
**intend [1]** 108/13
**interact [1]** 14/6
**interest [1]** 47/6
**interested [1]** 114/4
**interfering [1]** 9/22
**internal [1]** 69/11
**interpretation [2]** 93/21 95/10
**interrupt [1]** 27/5
**interrupting [1]** 91/9
**interruption [3]** 8/9 63/24 95/17
**introduced [1]** 21/18
**inures [1]** 4/17
**investigate [1]** 5/14
**investigative [1]** 6/4
**invoice [1]** 59/12
**invoices [1]** 59/6
**invoicing [1]** 59/17
**involved [6]** 11/16 13/24 28/4 28/6 40/17 69/5
**involvement [2]** 41/20 49/3
**involving [1]** 94/7

**irreconcilable [2]** 30/18 30/20
**is [151]**
**issue [5]** 30/16 55/22 105/10 106/2 108/11
**issued [2]** 44/5 106/11
**it [150]**
**it's [35]** 7/4 8/3 8/22 8/24 9/2 20/8 20/25 22/6
22/6 32/9 32/21 33/12 35/15 38/23 40/20 41/4
41/4 49/2 49/25 50/1 50/1 51/10 57/4 65/5
72/10 77/10 90/18 90/19 91/15 98/18 102/2
102/6 106/8 106/24 109/15
**It's fair [1]** 38/23
**its [2]** 57/24 67/18
**itself [2]** 56/10 105/20

## J

**Jackson [7]** 96/20 97/20 100/1 100/7 100/20
100/22 102/12
**JAMES [10]** 1/10 1/16 3/5 4/3 4/19 111/1
111/6 111/11 112/8 112/15
**JANUARY [10]** 1/11 1/19 4/4 26/20 27/17
50/13 51/16 54/21 86/9 112/9
**January 19th [2]** 50/13 86/9
**January 2024 [1]** 51/16
**January 4 [1]** 26/20
**Jason [1]** 33/8
**job [1]** 72/11
**jog [1]** 21/4
**ju [1]** 75/3
**Judge [23]** 5/19 10/8 23/24 24/23 26/11 26/21
28/4 29/4 30/15 40/15 40/16 44/3 44/5 44/18
60/17 61/4 90/14 92/1 93/22 98/1 98/22 99/17
102/6
**Judges [1]** 5/13
**judgment [11]** 3/16 26/24 30/7 30/15 47/5
70/8 70/9 76/21 102/2 107/4 107/5
**judgment's [1]** 75/3
**judicata [2]** 30/6 31/2
**Julia [1]** 114/12
**July [3]** 34/17 36/12 42/16
**July 8th [1]** 42/16
**July 9th [2]** 34/17 36/12
**jump [1]** 12/6
**June [6]** 32/18 33/12 34/15 34/15 46/16 60/2
**June 2024 [1]** 46/16
**June 5th [2]** 32/18 34/15
**June 6th [1]** 33/12
**June 7th [1]** 60/2
**just [54]** 5/14 6/9 7/3 8/10 9/4 10/13 12/8
12/9 25/5 27/10 28/5 29/11 31/15 35/12 37/7
39/7 43/3 46/7 47/14 51/23 52/25 53/15 54/24
56/23 57/6 59/3 59/4 60/6 63/10 64/18 64/23
66/24 69/4 69/6 69/12 72/2 72/17 73/16 74/7
75/18 76/16 79/1 79/19 80/11 87/21 93/25
95/4 102/2 102/14 104/3 109/1 109/10 109/11
109/21
**Justin [3]** 32/9 34/17 59/22

## K

**keep [1]** 94/6
**kind [5]** 13/24 55/17 66/12 69/7 93/9
**knew [13]** 24/11 64/11 66/7 69/8 73/16 76/2
76/18 84/11 89/5 92/5 92/9 102/13 107/1
**know [54]** 5/7 5/11 12/16 12/24 13/19 16/7
18/18 22/3 22/14 27/17 28/18 32/24 33/1
33/17 33/20 34/22 35/4 35/6 38/13 42/2 42/25
45/14 51/14 51/23 52/3 52/17 52/18 52/18
53/12 53/15 58/4 62/16 66/9 67/3 67/10 69/18

know... **[18]** 70/3 70/18 71/12 71/25 74/6 74/22 76/23 77/6 77/7 77/10 79/13 84/23 89/25 89/25 95/1 99/16 100/8 102/6
**knowledge [4]** 47/19 61/11 62/12 78/14
**known [1]** 111/11
**knows [3]** 63/1 77/7 77/10

# L

**L.L.P [5]** 1/18 2/7 2/8 113/11 113/12
**land [5]** 3/21 18/16 30/16 31/5 91/16
**language [4]** 10/17 30/22 93/9 105/22
**last [6]** 38/1 41/9 43/14 85/10 91/5 107/2
**late [2]** 53/3 54/20
**later [4]** 17/2 84/24 85/9 106/23
**latest [1]** 24/18
**Latham [4]** 104/6 105/11 106/22 107/14
**latigo [1]** 22/16
**latigo-group.com [1]** 22/16
**law [21]** 2/3 2/13 39/22 39/25 51/5 53/3 53/4 61/24 66/16 72/10 73/18 78/19 90/24 92/2 92/6 98/1 102/3 104/3 106/10 113/7 113/17
**lawsuit [3]** 40/3 40/11 40/14
**lawsuits [1]** 102/11
**lawyer [11]** 14/3 36/2 39/24 66/4 66/5 73/16 76/13 76/17 79/11 79/12 79/17
**lawyers [3]** 66/7 96/12 97/16
**lead [6]** 40/13 41/8 62/9 74/6 74/10 74/22
**leads [1]** 83/5
**learned [3]** 16/18 18/14 34/18
**learning [1]** 97/14
**least [2]** 35/7 81/11
**leave [1]** 64/23
**left [1]** 108/7
**legal [19]** 14/7 39/19 39/22 40/1 52/4 52/6 53/18 58/11 59/11 62/9 62/21 68/23 72/12 72/18 81/12 82/14 82/15 83/10 101/22
**Legend [5]** 38/7 38/13 38/17 41/23 42/2
**let [8]** 30/10 43/23 58/9 59/3 59/5 63/3 72/17 79/11
**let's [6]** 43/20 46/7 48/25 51/23 52/25 66/13
**letter [1]** 108/9
**Liberato [11]** 63/4 66/11 67/7 77/3 78/22 79/13 79/15 81/7 84/10 84/16 88/8
**Liberato's [1]** 86/18
**lien [3]** 74/23 107/3 107/4
**liens [1]** 61/12
**like [18]** 22/6 22/6 36/12 36/15 40/22 50/13 52/8 54/24 61/3 64/10 65/11 72/10 79/9 80/19 88/8 88/24 99/20 106/11
**limitation [1]** 9/25
**Lin [1]** 91/14
**Linda [15]** 3/20 11/4 40/15 42/3 62/12 62/15 62/19 82/25 84/25 85/11 86/16 90/3 91/15 101/10 103/3
**Lindale [25]** 39/23 40/13 46/24 47/1 47/3 62/10 62/21 64/17 66/14 66/19 67/18 69/23 70/9 73/5 73/15 74/24 76/16 76/18 76/20 78/4 78/11 81/15 84/16 88/3 88/13
**Lindale owed [1]** 88/13
**Lindor [1]** 47/8
**LINE [1]** 110/2
**litigation [11]** 5/21 28/5 41/5 43/11 43/24 44/3 69/6 74/11 96/18 96/19 96/20
**little [3]** 16/23 27/21 79/24
**lived [1]** 28/1
**living [1]** 58/7

**LLP [1]** 96/20
**loan [19]** 45/3 45/10 48/11 61/16 61/22 62/2 62/4 62/13 62/17 62/18 83/4 83/7 83/7 85/1 86/20 87/2 87/7 88/18 93/25
**loans [4]** 37/5 37/13 44/21 48/6
**located [1]** 13/11
**locks [1]** 104/20
**long [3]** 9/2 38/25 52/6
**look [14]** 5/24 8/10 19/21 22/5 36/6 36/24 59/3 86/7 90/22 91/21 93/7 94/23 109/13 109/23
**looked [5]** 37/7 48/7 60/6 86/13 96/10
**looking [11]** 31/20 32/16 36/10 37/16 59/19 79/9 79/10 91/13 102/24 104/13 106/25
**looks [4]** 22/6 36/15 50/13 59/4
**Lord [2]** 83/5 83/6
**lot [3]** 30/8 39/6 54/23
**lots [1]** 41/5
**Luke [1]** 22/3
**Lynn [1]** 76/20
**Lynne [23]** 62/23 63/1 63/1 63/3 63/4 64/14 68/18 68/22 69/13 71/5 71/21 74/2 74/13 75/8 76/1 76/13 76/24 77/3 78/1 78/21 79/12 79/15 84/10
**Lynne's [2]** 62/24 64/12

# M

**made [19]** 4/17 25/21 27/2 29/4 50/4 52/1 61/16 70/23 71/5 71/23 72/1 76/23 78/14 82/8 84/25 85/3 91/14 91/18 95/10
**majority [1]** 97/16
**make [9]** 8/14 12/8 47/16 53/16 64/18 74/13 79/1 80/11 107/21
**makes [2]** 19/3 19/4
**many [2]** 6/18 6/24
**March [3]** 103/9 104/7 106/23
**March 29th [2]** 103/9 104/7
**mark [3]** 8/8 19/16 30/10
**marked [20]** 8/9 19/18 19/20 30/11 30/12 31/10 31/12 36/3 36/5 49/7 49/10 58/14 58/16 59/19 90/8 90/10 91/2 91/4 102/16 102/18
**Marla [5]** 27/8 28/8 30/17 30/23 31/6
**marshall [8]** 2/3 2/3 2/5 112/20 113/3 113/7 113/7 113/9
**marshallsearcylaw.com [2]** 2/5 113/9
**Martha [1]** 2/19
**matter [8]** 5/24 6/5 14/21 17/6 90/25 93/25 99/11 100/8
**may [16]** 4/18 8/10 8/24 12/8 19/23 29/14 31/15 38/4 59/14 61/5 64/18 69/9 98/18 98/19 99/18 100/2
**May 16th [1]** 100/2
**May 21st [3]** 8/24 98/18 99/18
**maybe [4]** 31/25 54/25 63/23 74/7
**Mayes [4]** 2/3 112/20 113/3 113/7
**mc [4]** 1/4 4/5 5/12 112/4
**McBride's [1]** 40/15
**me [38]** 6/11 8/15 17/23 24/6 27/21 29/11 29/14 30/10 31/4 43/23 49/11 49/15 49/15 58/9 59/3 59/5 62/2 62/8 63/3 66/4 66/7 74/9 79/11 79/11 91/4 94/15 95/1 95/5 101/24 102/9 102/13 106/10 111/10 111/11 111/12 111/15 112/22 114/6
**mean [12]** 15/5 15/9 21/10 25/11 26/14 29/21 63/4 69/4 75/19 76/21 100/15 109/3
**Means [1]** 5/13

**mean [1]** 97/12
**media [1]** 97/12
**member [1]** 5/18
**memory [3]** 21/4 38/9 49/24
**mental [1]** 6/15
**mention [1]** 31/5
**mentioned [4]** 26/10 69/6 74/20 82/7
**mentioning [1]** 68/18
**message [2]** 42/16 80/17
**middle [1]** 32/17
**might [2]** 21/5 33/11
**million [4]** 6/9 47/5 52/7 53/5
**millions [2]** 57/6 58/2
**mind [1]** 29/13
**mine [2]** 35/16 62/25
**minute [13]** 5/8 19/20 20/13 31/12 35/12 36/5 36/16 36/16 37/10 37/17 52/21 66/23 102/18
**minutes [2]** 25/6 103/25
**miscellaneous [3]** 4/16 5/12 94/17
**misinterpreted [1]** 93/4
**misled [2]** 19/5 19/9
**misread [1]** 94/18
**misreading [1]** 95/5
**mistake [1]** 95/4
**moment [3]** 8/10 31/15 64/19
**money [18]** 38/6 42/23 43/5 45/3 48/11 60/5 60/7 60/8 60/15 62/14 67/2 75/19 77/8 84/24 86/18 87/1 87/12 89/19
**monitoring [1]** 51/1
**month [2]** 16/24 63/10
**month-wise [1]** 16/24
**months [1]** 24/20
**more [8]** 13/20 54/22 57/12 77/25 78/14 93/2 104/9 108/14
**motion [13]** 3/14 3/21 8/23 26/22 61/3 91/16 95/8 98/21 100/2 100/3 100/5 102/8 104/11
**move [1]** 75/5
**Mr [20]** 2/3 2/8 2/13 3/6 4/11 5/6 5/22 5/23 6/18 13/19 16/18 106/22 108/10 112/20 113/3 113/4 113/7 113/12 113/17 113/23
**Mr. [59]** 5/7 5/13 7/23 8/5 8/18 13/23 16/23 17/5 17/11 18/6 19/19 19/21 19/25 20/7 24/21 27/5 28/3 30/10 31/11 31/25 32/11 36/4 36/6 36/9 37/1 38/1 42/2 42/14 42/23 43/21 45/23 46/2 47/16 48/1 48/1 49/9 51/8 53/17 59/4 59/19 60/8 63/16 63/25 65/11 65/20 80/21 82/20 82/20 86/8 90/10 91/13 94/16 102/21 102/23 105/11 107/14 108/7 108/8 108/11
**Mr. Anderson [2]** 5/13 28/3
**Mr. Anderson's [1]** 16/23
**Mr. Behan [6]** 13/23 17/5 17/11 53/17 82/20 82/20
**Mr. Behan's [1]** 18/6
**Mr. Bryan [7]** 32/11 37/1 42/14 43/20 48/1 48/1 60/8
**Mr. Latham [2]** 105/11 107/14
**Mr. Searcy [9]** 7/23 8/5 19/21 36/6 45/23 59/4 65/20 102/21 108/8
**Mr. Searcy's [3]** 31/25 38/1 65/11
**Mr. Sharpe [28]** 5/7 8/18 19/19 19/25 20/7 24/21 27/5 30/10 31/11 36/4 36/9 42/2 43/21 46/2 47/16 49/9 51/8 59/19 63/16 63/25 80/21 86/8 90/10 91/13 94/16 102/23 108/7 108/11
**Mrs. [1]** 53/17
**Mrs. Behan [1]** 53/17
**Ms [4]** 2/19 67/5 84/4 84/16
**Ms. [10]** 33/15 66/11 67/7 81/7 85/22 86/16

**Ms.... [4]** 86/18 87/7 88/8 88/18
**Ms. Behan [4]** 85/22 86/16 87/7 88/18
**Ms. Liberato [4]** 66/11 67/7 81/7 88/8
**Ms. Liberato's [1]** 86/18
**Ms. Wiggs [1]** 33/15
**much [7]** 14/21 51/23 52/3 53/14 68/10 78/19 109/15
**multimillionaire [1]** 58/11
**multimillionaires [1]** 58/6
**multiple [1]** 58/24
**my [16]** 6/10 6/16 11/12 11/14 54/16 66/6 75/6 92/18 95/2 95/3 95/5 104/4 104/10 111/2 111/18 111/25
**myself [1]** 79/25

**N**

**n/a [1]** 3/18
**nag [1]** 56/1
**name [3]** 5/8 13/6 111/14
**nathan.kivi [1]** 22/14
**National [3]** 41/12 61/9 74/23
**necessary [1]** 78/18
**need [8]** 6/12 7/23 8/5 45/20 45/23 68/14 97/17 104/9
**needed [2]** 61/18 84/4
**needing [1]** 95/25
**needs [2]** 19/21 36/6
**negotiate [1]** 17/24
**negotiated [1]** 15/17
**negotiation [1]** 13/24
**neither [1]** 114/1
**net [1]** 57/5
**never [10]** 54/15 62/19 69/8 71/5 76/24 76/25 77/17 78/1 93/3 94/21
**next [5]** 11/14 40/1 40/16 43/2 43/3
**Nine [1]** 91/7
**no [29]** 1/4 3/18 4/5 8/1 12/21 26/24 29/9 29/22 32/2 33/4 34/25 37/10 43/4 45/10 53/13 53/14 61/6 69/2 74/10 76/22 77/25 80/11 97/18 97/19 101/22 109/10 112/4 114/11 114/12
**No. [3]** 8/19 79/17 80/12
**No. 1 [2]** 79/17 80/12
**No. 4:20-cv-00776 [1]** 8/19
**nodding [1]** 83/17
**nonpayment [1]** 67/8
**nonrefundable [3]** 16/2 16/4 16/17
**North [50]** 10/1 11/5 26/23 27/4 27/19 32/18 33/2 33/7 33/20 38/7 38/8 40/12 40/22 41/21 41/22 42/4 43/12 44/10 44/14 44/15 46/16 47/10 48/11 50/10 50/19 51/11 52/4 52/18 52/24 57/20 61/9 61/10 61/10 61/17 62/22 87/22 87/24 88/9 88/17 88/25 89/6 90/1 101/11 101/11 101/13 101/15 101/19 101/20 101/25 107/5
**northeast [1]** 28/15
**NORTHERN [7]** 1/1 6/25 7/13 90/24 92/2 92/6 112/1
**not [68]** 6/16 12/24 13/24 15/2 16/20 17/11 22/5 26/24 27/19 30/7 35/14 35/16 42/23 44/9 44/17 47/9 47/18 51/1 53/18 53/20 55/2 56/22 56/22 58/5 59/14 59/14 61/5 62/13 62/16 62/20 62/22 64/13 64/14 64/14 66/16 67/3 67/18 72/2 74/7 74/11 75/5 75/12 76/16 79/1 80/14 83/4 83/6 83/9 83/10 83/11 83/20 84/7 87/24 88/3 92/18 93/5 94/22 96/10 101/13

**NOTARY [1]** 111/22
**note [1]** 32/17
**noted [1]** 111/3
**nothing [4]** 5/4 74/6 74/10 107/7
**notice [6]** 4/7 9/21 10/5 10/8 10/21 18/15
**notices [1]** 56/6
**Novem [1]** 86/8
**November [11]** 51/10 51/15 52/1 60/15 85/18 86/14 86/17 90/16 93/23 95/16 95/21
**November 2023 [2]** 51/15 86/17
**November 7th [4]** 90/16 93/23 95/16 95/21
**November 8th [3]** 51/10 85/18 86/14
**now [26]** 7/21 9/1 11/2 12/20 14/1 20/22 21/23 22/5 25/1 26/10 34/15 36/25 47/5 47/5 47/13 52/19 56/22 58/3 58/6 69/9 74/9 74/22 82/7 92/17 102/8 104/11
**number [4]** 4/13 91/6 97/13 97/14
**numbered [1]** 1/19

**O**

**O'Connor [4]** 28/5 29/4 60/20 61/6
**O'Connor's [6]** 26/11 26/21 28/25 30/15 31/4 60/17
**oath [3]** 5/4 6/2 111/12
**obey [1]** 94/22
**obeyed [2]** 94/24 94/24
**objection [1]** 4/17
**obligation [1]** 66/5
**obviously [3]** 6/1 7/3 27/24
**occasional [1]** 39/7
**occurred [5]** 11/3 11/13 21/5 76/16 91/25
**off [7]** 29/11 58/7 62/23 63/22 74/5 102/7 102/8
**office [5]** 2/13 61/24 66/17 111/18 113/17
**officer [2]** 112/16 112/24
**officer's [1]** 113/22
**officers [6]** 101/10 101/11 101/15 101/24 101/24 105/23
**offices [2]** 1/22 63/17
**Oh [7]** 20/2 36/7 45/7 49/13 95/19 103/24 109/5
**okay [123]**
**old [2]** 45/13 45/15
**one [22]** 4/17 6/10 9/7 11/14 12/9 21/24 24/17 32/17 33/14 36/16 36/16 37/17 50/13 51/15 58/1 59/3 69/12 77/7 86/13 96/18 103/24 104/9
**only [6]** 16/18 29/5 30/7 31/4 72/11 104/4
**operating [1]** 89/17
**operations [1]** 40/21
**opinion [2]** 75/6 95/7
**opinions [1]** 30/9
**opportunity [1]** 84/4
**oppose [1]** 108/16
**options [1]** 17/25
**ORAL [3]** 1/9 11/16 112/8
**order [48]** 3/14 3/15 3/15 3/19 4/8 5/19 8/22 8/23 8/23 8/24 9/21 9/21 9/23 9/24 10/5 10/6 10/9 10/17 10/22 10/21 15/10 15/10 15/16 15/18 23/6 23/24 24/23 24/24 25/5 29/4 44/6 44/10 44/18 90/12 90/23 93/9 93/23 94/18 95/16 95/21 96/9 96/11 96/13 96/16 96/17 104/11 106/11 106/17
**ordered [3]** 9/17 9/19 44/8
**orders [5]** 24/18 24/19 25/3 94/23 95/4

**other [24]** 4/15 7/19 9/24 21/23 25/3 25/21 40/2 43/14 46/11 46/13 46/17 46/17 47/8 47/9 47/10 66/12 69/2 74/21 77/7 84/5 93/6 104/19 108/18 111/14
**otherwise [2]** 93/5 114/4
**our [7]** 6/4 26/22 64/11 83/17 101/16 107/3 109/19
**out [17]** 12/14 12/16 17/6 25/9 49/14 50/14 53/13 54/25 58/1 63/18 64/11 65/18 74/8 77/4 82/7 85/7 89/17
**outcome [1]** 114/5
**outstanding [5]** 68/23 69/25 77/1 78/2 81/12
**over [10]** 24/20 29/11 43/3 43/14 44/15 46/8 53/4 66/21 109/11 109/23
**over a [1]** 53/4
**overlapping [1]** 16/22
**owe [2]** 56/12 69/16
**owed [13]** 52/4 53/3 53/3 54/25 58/10 71/6 77/1 78/4 78/19 84/5 84/11 84/11 88/13
**owes [1]** 52/18
**owing [1]** 54/22
**own [2]** 40/2 72/18

**P**

**p.m [8]** 1/20 23/22 23/25 42/19 104/12 108/5 108/5 109/25
**pa [1]** 78/14
**page [11]** 3/2 3/8 3/13 9/15 42/11 43/2 43/3 43/3 43/21 51/7 91/21 104/5 110/2
**Page 2 [2]** 9/15 42/11
**Page 3 [1]** 104/5
**Page 4 [1]** 91/21
**Page/Corrections [1]** 3/8
**pages [1]** 90/18
**paid [22]** 54/17 54/17 61/5 63/2 63/11 66/8 67/1 67/2 67/10 70/1 74/4 77/11 77/11 78/1 81/5 81/6 83/8 86/18 87/13 88/11 89/16 89/19
**paper [1]** 90/19
**paragraph [5]** 9/16 10/13 30/14 30/24 42/21
**pardon [1]** 27/21
**part [7]** 10/20 16/2 16/4 16/8 79/2 93/4 95/5
**parties [5]** 4/17 40/3 109/8 112/25 114/2
**party [2]** 4/17 113/1
**past [3]** 46/8 52/9 56/3
**pastor [2]** 45/13 45/15
**Paul [3]** 97/25 99/1 99/12
**Paul's [1]** 99/17
**pay [20]** 38/7 43/5 59/14 61/18 61/18 62/9 64/17 66/5 72/16 75/2 75/9 76/2 76/17 76/19 76/22 78/18 79/2 80/13 84/5 88/3
**payable [2]** 38/8 44/14
**paying [8]** 53/18 59/5 67/18 75/2 75/18 77/4 81/11 87/1
**payment [18]** 33/1 33/20 52/1 54/21 62/14 62/21 69/8 69/10 70/23 82/8 82/13 85/2 85/23 86/8 86/17 86/24 108/8 108/10
**payments [9]** 51/15 71/23 72/1 72/2 76/23 78/15 85/17 87/4 87/21
**pending [4]** 47/4 52/8 69/24 90/24
**peop [1]** 55/25
**people [6]** 21/23 37/11 56/1 69/11 72/11 93/7
**percent [3]** 101/18 101/19 105/19
**percentage [1]** 75/4
**period [1]** 52/8
**permit [1]** 104/16
**person [3]** 14/13 79/14 111/14

**personal [7]** 42/3 47/19 78/14 78/21 103/14 103/16 104/23
**personally [2]** 59/15 111/11
**persons [1]** 9/20
**phone [11]** 2/5 2/10 2/15 21/12 21/15 21/18 24/12 63/21 113/9 113/14 113/19
**photo [2]** 34/16 35/7
**physical [1]** 6/15
**piece [1]** 105/10
**pierce [1]** 26/25
**pipeline [1]** 57/22
**Pittman [11]** 5/19 23/24 24/23 44/3 44/5 90/14 92/1 98/1 98/22 99/18 102/7
**Pittman's [5]** 10/9 40/17 44/18 61/4 93/23
**place [2]** 1/23 16/25
**plain [1]** 105/22
**play [1]** 49/24
**please [10]** 6/11 8/7 19/17 21/8 27/10 29/24 31/13 31/16 31/18 32/2
**pleased [1]** 79/22
**PLLC [2]** 2/13 113/17
**point [9]** 8/8 16/19 18/13 24/11 38/1 40/1 51/24 83/5 96/18
**pointing [1]** 49/14
**points [1]** 57/1
**portion [6]** 28/7 28/18 29/6 30/16 31/5 81/12
**posed [1]** 108/11
**possession [5]** 10/1 35/6 35/7 44/9 44/15
**possible [1]** 77/10
**potential [1]** 18/15
**potentially [1]** 53/6
**practice [5]** 6/25 73/17 92/10 95/3 97/23
**practiced [1]** 106/10
**practicing [6]** 6/19 7/12 90/24 92/2 92/6 94/6
**pre [1]** 39/6
**preliminaries [1]** 6/9
**preparing [1]** 113/23
**presence [1]** 104/17
**PRESENT [1]** 2/18
**pressure [6]** 62/23 62/24 67/18 69/7 74/5 84/15
**Preston [1]** 59/24
**presumably [2]** 21/18 84/10
**pretty [1]** 40/20
**prevent [1]** 100/6
**previously [2]** 45/14 48/7
**price [1]** 13/8
**primarily [3]** 60/16 60/18 61/6
**primary [1]** 60/20
**principles [1]** 30/6
**print [1]** 97/12
**prior [6]** 24/22 42/16 86/13 86/17 94/23 95/2
**priority [1]** 79/2
**privilege [5]** 35/14 35/16 57/12 58/5 83/21
**privileged [2]** 82/14 95/24
**prob [1]** 102/5
**probably [2]** 35/14 64/16
**probate [1]** 97/18
**problem [6]** 12/17 12/24 13/23 14/2 97/18 97/19
**Procedure [3]** 1/24 4/8 7/6
**proceed [2]** 31/18 32/2
**proceeding [1]** 114/3
**proceedings [2]** 7/15 109/25
**procuring [1]** 49/3
**produced [1]** 1/17

**producing [1]**
**Professional [1]** 7/8
**properly [1]** 5/22
**properties [2]** 7/11 74/24
**property [23]** 9/25 11/16 11/16 13/11 22/24 26/10 27/3 27/20 28/7 28/21 28/24 28/25 29/6 30/17 30/23 31/6 101/20 101/22 102/4 105/2 105/10 105/21 105/24
**proposed [1]** 28/12
**protect [2]** 104/15 105/24
**proved [1]** 111/12
**provide [6]** 18/13 18/14 57/12 57/21 57/22 57/23
**provided [1]** 59/6
**providing [1]** 38/3
**provisions [1]** 1/24
**PUBLIC [1]** 111/22
**purchase [1]** 13/8
**purchaser [6]** 12/2 13/2 14/6 16/1 17/8 19/4
**purchaser's [3]** 18/22 24/22 26/5
**purpose [3]** 51/14 60/7 111/16
**purposes [1]** 9/3
**pursuant [3]** 1/23 4/6 112/23
**pursue [1]** 55/25
**put [10]** 16/1 16/7 47/14 48/25 57/25 58/2 58/9 66/13 104/3 109/15

**Q**

**ques [1]** 59/3
**question [5]** 11/12 16/23 45/6 76/22 108/11
**questions [5]** 6/11 6/16 11/14 12/9 38/1
**quick [1]** 8/14
**quicker [1]** 12/9
**quitclaim [2]** 101/16 101/21
**quite [1]** 41/11
**quote [2]** 30/16 44/8

**R**

**ranch [8]** 104/14 104/19 104/24 105/2 106/25 107/2 107/3 107/4
**rate [1]** 75/3
**rather [3]** 45/4 48/11 72/17
**RE [2]** 1/4 112/4
**reached [2]** 17/6 75/5
**read [14]** 10/2 10/13 25/9 29/10 29/16 43/22 61/12 61/19 96/9 96/10 102/20 104/21 107/8 111/1
**reading [4]** 29/13 92/17 93/2 95/8
**real [5]** 8/14 9/25 11/2 11/4 11/13
**really [2]** 55/25 94/15
**reason [6]** 6/15 24/24 93/3 93/24 102/12 110/2
**recall [10]** 11/23 13/8 14/13 15/10 21/10 34/17 44/10 50/18 63/10 98/8
**received [4]** 25/6 48/4 60/7 60/15
**Receiver's [2]** 3/21 91/16
**receiving [1]** 50/18
**Recess [2]** 46/1 108/5
**recite [1]** 35/13
**recognize [7]** 8/20 20/8 20/8 30/11 41/22 49/16 90/10
**recognized [1]** 79/16
**recollection [3]** 12/22 13/10 65/6
**record [17]** 1/25 5/9 5/16 7/3 9/6 9/7 20/10 28/1 28/5 29/16 46/3 56/24 57/2 63/22 79/22 112/17 112/25
**records [1]** 88/23

**reference [3]** 18/24 25/2 37/6
**referred [1]** 44/6
**referring [7]** 21/17 45/15 52/22 61/21 62/3 65/3 105/1
**refrain [1]** 9/22
**refresh [1]** 38/9
**regarding [5]** 13/23 82/13 94/5 95/25 104/24
**Registration [1]** 114/12
**reimbursed [1]** 66/5
**related [1]** 114/2
**relationship [2]** 74/2 99/17
**relief [1]** 26/23
**remain [1]** 40/13
**remains [1]** 94/16
**remember [2]** 13/6 24/9
**reminding [1]** 49/15
**remove [1]** 104/17
**rendered [1]** 66/16
**repaid [2]** 62/18 88/17
**repayment [4]** 61/16 61/22 62/4 87/7
**repeat [1]** 6/11
**rephrase [1]** 6/12
**replaced [1]** 39/24
**replacement [1]** 96/1
**replies [1]** 106/22
**reply [2]** 22/6 104/10
**Reporter [5]** 1/21 15/8 17/10 49/8 112/13
**Reporter's [2]** 3/9 112/7
**repre [1]** 50/4
**represent [3]** 36/15 97/14 97/15
**representation [5]** 19/3 19/4 19/8 54/3 74/15
**representative [1]** 101/14
**represented [3]** 37/6 57/5 97/13
**representing [5]** 37/6 39/23 46/12 46/16 100/7
**request [1]** 107/21
**requested [1]** 29/16
**required [1]** 96/14
**res [2]** 30/6 31/1
**resolution [1]** 90/25
**response [4]** 3/21 59/6 91/15 98/24
**responsibilities [1]** 54/16
**responsibility [1]** 105/24
**rest [1]** 87/12
**restriction [1]** 10/4
**result [1]** 17/7
**resulted [2]** 39/23 57/23
**retained [1]** 80/12
**return [1]** 112/22
**review [3]** 31/12 36/5 36/25
**reviewing [1]** 32/1
**Richard [5]** 27/8 28/7 30/17 30/23 31/6
**Riddle [5]** 1/18 2/7 2/8 113/11 113/12
**right [46]** 7/6 7/21 9/8 10/9 13/25 20/18 22/25 23/10 23/22 23/25 33/4 33/14 33/15 41/15 41/20 47/5 50/8 52/17 52/19 56/3 60/3 63/20 71/6 71/8 82/9 83/14 85/20 86/14 86/22 87/1 91/19 91/23 92/3 92/7 93/22 96/21 99/18 102/6 103/4 103/9 103/12 106/8 107/22 108/1 109/2 109/17
**rights [1]** 9/23
**ringing [1]** 63/21
**rise [1]** 94/16
**River [50]** 10/1 11/5 26/23 27/3 27/19 32/18 33/2 33/7 33/20 38/7 38/8 40/12 40/22 41/21 41/22 42/4 43/12 44/10 44/14 44/15 46/16

**River... [29]** 47/10 48/11 50/10 50/19 51/11 52/4 52/18 52/18 52/24 61/8 61/10 61/10 61/17 62/22 87/22 87/24 88/9 88/17 88/25 89/5 90/1 101/10 101/11 101/13 101/15 101/19 101/20 101/25 107/5
**Robinson [6]** 27/8 28/8 28/24 30/18 30/24 31/7
**Robinsons [1]** 29/7
**role [1]** 99/1
**rule [2]** 5/19 27/18
**Rules [4]** 1/24 4/8 7/5 7/8
**ruling [1]** 27/18
**runs [1]** 43/3

## S

**S-I-D-L-E-R [1]** 33/9
**said [25]** 5/2 10/18 12/17 12/23 13/10 17/23 17/24 44/8 62/16 64/12 66/3 66/23 71/21 82/25 83/4 83/6 83/7 84/23 85/2 85/9 103/24 103/25 104/3 104/3 112/24
**sale [9]** 11/4 18/16 23/12 24/11 24/13 24/23 24/24 25/7 25/12
**sales [4]** 12/1 13/24 17/1 61/10
**same [8]** 24/2 30/22 43/2 55/8 55/17 68/22 111/3 111/16
**sanctioned [1]** 7/16
**Sand [3]** 44/3 96/19 101/12
**Sands [2]** 9/4 40/15
**savings [3]** 64/11 89/19 89/20
**saw [3]** 70/18 75/1 85/16
**say [47]** 7/4 15/4 21/14 22/5 25/5 27/7 28/4 28/6 32/17 33/11 37/5 38/3 38/6 40/20 41/4 42/21 43/4 44/5 45/9 45/13 45/15 52/24 58/22 60/5 60/8 60/14 61/8 61/22 62/3 63/3 67/21 68/4 68/10 69/11 72/10 77/6 78/17 79/9 79/11 80/12 81/5 90/22 93/22 96/10 104/9 105/1 106/24
**saying [5]** 23/11 23/12 43/22 44/20 65/12
**says [5]** 9/16 9/19 48/24 61/7 106/23
**schools [1]** 104/2
**Scott [1]** 22/16
**screwups [1]** 79/21
**seal [1]** 111/18
**Searcy [16]** 2/3 2/3 4/11 7/23 8/5 19/21 36/6 45/23 59/4 65/20 102/21 108/8 112/21 113/3 113/7 113/7
**Searcy's [3]** 31/25 38/1 65/11
**sec [1]** 33/6
**second [9]** 3/14 5/18 8/23 10/20 33/7 50/13 51/7 63/23 95/7
**security [1]** 107/3
**see [27]** 7/23 8/25 9/15 19/23 20/23 21/24 30/14 30/20 30/22 31/15 33/7 33/12 42/16 42/19 43/4 49/25 50/8 50/12 51/12 62/13 87/3 86/7 86/8 92/20 95/9 104/6 104/7
**seeing [2]** 52/17 75/7
**seek [3]** 74/14 93/6 93/9
**seem [1]** 37/12
**seen [1]** 49/19
**sell [3]** 3/21 28/18 91/16
**seminar [1]** 79/14
**seminaries [1]** 97/15
**send [6]** 21/1 64/12 69/18 74/9 83/5 108/9
**sending [3]** 56/3 56/12 96/14
**sense [3]** 16/24 17/3 26/4
**sent [13]** 23/20 24/17 32/9 36/17 36/21 37/17

**sentence [1]** 61/19
**Separate [1]** 28/24
**September [3]** 17/3 60/15 95/3
**September 20 [1]** 95/3
**serve [1]** 108/10
**services [2]** 52/8 60/16
**set [2]** 6/6 104/11
**several [3]** 24/20 40/2 54/22
**sfaheylaw.com [2]** 2/16 113/20
**share [1]** 71/21
**SHARPE [60]** 1/4 1/10 1/16 1/22 2/2 2/19 3/5 3/16 3/17 3/17 3/19 3/22 4/3 5/1 5/7 5/22 6/18 8/18 13/19 16/18 19/19 19/25 20/7 24/21 27/5 30/10 31/11 36/4 36/9 42/2 43/21 46/2 47/16 49/9 50/14 51/8 51/11 53/4 59/19 61/24 61/25 63/16 63/25 66/16 80/21 86/8 90/10 91/13 91/22 94/16 102/23 108/7 108/11 111/1 111/6 111/11 112/4 112/8 112/15 113/6
**she [33]** 17/17 21/2 21/2 21/18 24/6 24/11 49/14 67/17 67/21 68/10 68/16 69/6 69/6 69/8 69/8 69/9 69/13 69/15 71/10 71/22 71/22 73/2 74/20 77/7 77/10 77/11 79/16 79/22 83/7 84/25 85/1 86/17 111/16
**she'd [1]** 79/23
**she's [1]** 80/14
**SHELBY [24]** 1/4 1/10 1/16 1/22 2/2 3/5 4/3 5/1 50/14 51/11 61/24 61/25 66/16 68/13 91/22 96/10 102/5 111/1 111/6 111/11 112/4 112/8 112/15 113/6
**short [2]** 74/22 108/1
**Shorthand [2]** 1/21 112/12
**show [8]** 3/15 8/5 8/24 32/21 47/14 47/15 102/20 102/20
**showed [2]** 49/16 88/25
**showing [12]** 7/21 8/7 8/18 19/19 30/10 31/11 36/4 49/9 58/15 90/9 91/3 102/17
**shown [1]** 49/12
**sic [1]** 47/8
**side [1]** 109/20
**sidebar [1]** 64/18
**sides [2]** 41/5 90/19
**Sidler [1]** 33/8
**Sidlers [1]** 33/17
**sign [3]** 107/5 107/7 107/22
**signature [6]** 3/8 4/13 91/22 110/1 111/2 112/22
**signed [6]** 11/4 12/1 15/17 17/1 66/12 76/21
**simply [4]** 62/13 104/13 109/10 109/21
**since [10]** 10/12 43/4 60/15 63/17 64/9 69/5 73/16 74/3 95/3 95/6
**single [1]** 80/14
**sir [3]** 36/7 36/8 66/3
**situation [6]** 47/18 54/24 58/2 64/12 79/10 104/24
**six [3]** 21/25 52/19 71/12
**Snow [1]** 59/24
**so [90]** 5/15 6/12 6/21 8/7 8/18 9/6 11/14 12/9 13/22 15/16 16/17 20/7 20/13 21/18 22/2 22/14 23/11 23/20 24/6 24/21 27/2 28/4 29/21 30/1 31/1 34/6 36/24 38/2 41/20 43/7 43/20 44/20 44/23 47/7 47/8 47/15 54/1 54/18 56/10 58/9 58/9 61/1 62/18 63/3 65/17 66/8 66/16 67/10 69/12 69/18 69/23 71/4 73/16 74/1 76/15 76/24 77/25 78/10 78/17 79/19 80/11 82/17 82/25 84/15 85/9 86/16 87/1 87/1 87/4 87/21 88/11 88/23 89/16 91/13 93/21

**sold [1]** 27/4
**some [9]** 8/8 21/23 39/22 54/14 61/18 66/12 67/17 72/1 83/5
**somebody [2]** 10/8 10/12
**someone [3]** 10/5 10/13 10/22
**something [10]** 17/23 44/17 63/16 64/10 66/4 74/8 80/19 95/1 95/9 107/21
**sometime [2]** 40/11 86/16
**somewhere [1]** 39/20
**sorry [3]** 27/7 29/10 91/8
**sort [3]** 7/11 10/12 34/6
**sought [1]** 26/23
**sour [1]** 89/25
**source [4]** 60/6 69/11 88/25 90/1
**south [1]** 57/20
**speaking [1]** 97/19
**specific [1]** 13/20
**specifically [2]** 15/10 46/15
**spending [1]** 43/17
**spite [1]** 76/12
**staff [1]** 99/11
**standard [1]** 94/24
**standards [1]** 7/12
**Starr [1]** 5/14
**starts [1]** 9/16
**state [10]** 1/21 7/19 79/16 80/13 100/5 101/25 104/13 111/7 111/23 112/13
**stated [1]** 1/25
**statement [3]** 3/18 50/10 59/12
**statements [3]** 47/16 67/19 107/7
**STATES [2]** 1/1 112/1
**stating [1]** 96/13
**statute [1]** 105/21
**stay [1]** 106/19
**step [1]** 43/23
**Stephen [6]** 2/13 8/12 29/14 103/25 113/4 113/17
**steve [5]** 2/13 2/16 64/18 113/17 113/20
**Stevencrofts.realtor [1]** 22/18
**stick [1]** 54/24
**still [10]** 52/18 53/13 56/12 69/24 69/24 94/19 101/11 101/24 106/8 106/16
**stockholder [2]** 102/3 105/19
**stockholders [3]** 101/18 101/19 101/21
**stop [3]** 16/19 54/2 63/3
**stop the [1]** 16/19
**story [1]** 74/5
**straightens [1]** 25/8
**Street [4]** 2/4 2/14 113/8 113/18
**stuff [4]** 69/10 76/14 97/18 97/19
**style [1]** 9/2
**styled [5]** 1/19 8/22 50/9 51/10 91/15
**submitted [1]** 112/20
**subpoenaed [2]** 108/20 109/8
**subscribed [1]** 111/14
**substance [2]** 38/2 56/22
**substantial [7]** 41/4 41/17 41/20 46/4 53/13 53/15 74/4
**such [2]** 62/25 73/17
**suggestion [1]** 74/13
**suit [5]** 39/20 40/16 60/17 61/7 73/16
**Suite [3]** 1/23 2/14 113/18
**suits [1]** 101/25
**summary [3]** 88/19 90/22 102/2
**supersedeas [1]** 47/6

James Shelby Sharpe - January 22, 2025

| | | |
|---|---|---|
| supply [1] 65/19 | etch [3] 40/17 40/19 51/16<br>54/21 68/16 73/18 74/20 74/20 86/13 88/17<br>107/21 | transfers [1] 101/19 |

supply [1] 65/19
supposed [1] 44/17
Supreme [2] 47/4 79/13
sure [14] 8/17 12/7 29/20 34/3 35/19 54/7 64/20 65/1 65/4 66/6 74/4 79/20 91/12 95/19
suspend [1] 94/7
suspended [5] 90/23 92/1 92/6 92/10 94/21
suspending [2] 93/24 95/22
suspension [3] 3/19 90/12 96/1
sworn [3] 1/18 5/3 112/16

**T**

T-O-N-I [1] 33/8
take [9] 19/20 31/12 36/5 45/20 72/16 75/4 78/18 102/18 108/1
taken [6] 1/18 4/6 7/19 54/15 112/24 114/3
talk [8] 5/15 14/13 47/22 55/25 68/14 68/19 75/8 95/22
talked [9] 44/1 46/3 47/13 47/25 82/4 82/20 84/25 85/11 87/7
talking [9] 17/2 18/5 18/25 20/13 30/23 37/12 68/16 69/3 93/25
talks [2] 17/7 31/5
Taylor [2] 2/14 113/18
teacher [1] 68/3
telephone [1] 77/17
tell [24] 5/8 14/9 16/19 16/20 20/10 24/6 43/20 59/20 62/2 62/25 64/14 69/16 71/10 71/22 77/3 79/1 82/12 82/19 82/25 84/4 91/4 94/20 100/22 105/11
telling [3] 23/2 37/1 41/21
temporar [1] 92/1
temporarily [5] 90/23 92/1 92/6 92/10 95/22
temporary [2] 3/19 90/12
ten [2] 104/15 107/1
Tennessee [1] 104/2
testified [3] 5/4 81/6 96/15
testify [1] 5/3
testimony [12] 16/18 24/21 47/15 52/20 55/23 69/15 69/23 71/4 87/6 99/16 112/17 112/24
TEXAS [20] 1/1 1/22 1/23 2/4 2/9 2/15 7/8 7/19 13/11 79/12 79/17 80/13 92/7 104/2 112/1 112/13 113/8 113/13 113/19 114/13
than [10] 45/4 46/13 46/17 47/8 48/12 69/2 72/17 79/12 97/22 104/19
Thank [14] 8/16 20/6 29/17 29/19 29/20 31/16 32/4 36/2 36/7 36/8 65/20 91/11 102/22 109/19
that [452]
that and [1] 102/20
that's [51] 10/17 12/10 12/20 17/23 17/25 19/2 34/4 35/13 35/16 39/18 39/21 40/18 40/18 40/18 40/18 46/24 47/1 47/3 47/4 48/24 48/25 49/14 50/8 50/16 54/25 56/3 57/25 58/4 58/4 58/5 59/22 63/16 74/5 79/2 83/6 83/9 83/10 83/11 83/20 89/25 91/10 93/3 94/18 94/18 95/2 96/11 97/19 102/10 102/11 102/12 103/16
their [21] 14/6 18/15 18/25 27/3 39/13 39/13 41/8 43/7 43/15 43/17 46/6 46/12 53/1 64/17 69/10 72/11 72/18 74/23 81/11 81/12 86/24
them [25] 9/21 34/16 34/25 39/8 39/9 48/11 48/12 49/1 52/7 55/8 57/25 58/2 58/8 62/11 62/18 64/15 67/19 74/3 75/9 96/23 97/10 97/10 102/9 109/13 109/24
themselves [2] 45/4 87/24

there [28] 6/15 12/17 16/4 19/7 24/17 24/19 26/24 27/5 39/7 40/11 45/10 50/12 53/13 53/16 57/11 61/2 61/5 76/15 76/15 76/16 76/21 77/25 84/15 100/19 101/12 101/13 101/14 102/7
there's [11] 10/12 12/24 19/1 21/23 30/8 33/6 33/7 47/6 51/9 74/10 79/12
therein [1] 111/17
these [12] 7/24 16/25 22/2 34/15 34/18 34/22 48/3 51/14 101/17 101/23 101/25 108/19
they [64] 6/4 18/24 19/5 27/1 34/25 35/1 37/13 38/10 38/10 38/11 39/6 43/4 43/5 44/17 47/11 51/18 52/6 53/12 57/21 57/24 58/1 58/6 59/14 61/5 62/16 66/7 66/21 67/10 69/16 71/23 71/25 72/11 74/14 74/23 74/24 75/18 75/19 76/12 76/18 78/14 79/14 84/4 84/5 87/1 87/2 94/23 94/24 96/15 96/15 97/11 97/17 100/5 100/23 101/12 101/13 101/23 101/24 102/5 102/9 102/13 102/14 104/3 105/22
they had [1] 71/25
they're [6] 55/1 58/2 58/6 58/7 58/7 105/19
thing [4] 40/1 40/16 94/15 108/18
things [5] 5/14 57/20 57/25 74/21 97/15
think [17] 10/18 39/20 44/2 57/4 61/5 63/1 64/10 64/21 65/5 68/13 68/18 79/18 84/15 85/2 90/18 98/18 107/1
third [4] 5/20 42/21 95/7 109/8
this [133]
those [20] 5/15 5/22 17/24 21/24 27/2 32/16 37/11 40/18 49/3 57/25 58/2 60/6 61/12 76/23 87/4 87/21 97/15 102/11 109/9 109/18
though [3] 53/12 90/18 94/4
thought [3] 89/10 95/6 95/8
thousand [4] 54/23 58/24 61/15 64/10
thousands [1] 84/12
three [3] 21/24 79/18 107/2
through [4] 27/17 54/13 54/14 111/12
Thursday [1] 104/12
tick [1] 102/6
ticked [1] 102/8
till [1] 31/25
time [17] 16/22 20/25 21/1 26/6 39/18 39/21 51/24 52/8 54/20 58/1 61/3 61/17 85/23 109/21 112/24 113/1 113/1
times [2] 6/10 54/14
timing [1] 108/15
title [1] 102/1
titled [2] 22/24 28/21
today [5] 5/11 6/2 6/16 74/12 108/7
told [11] 17/25 24/12 24/22 37/10 43/7 49/1 69/9 71/5 83/4 86/16 96/8
Toni [1] 33/8
too [1] 109/15
took [1] 16/25 29/11 76/17
top [2] 49/25 50/8
totally [2] 95/2 105/20
towards [1] 69/10
trans [1] 101/18
transaction [18] 11/3 11/13 11/24 12/25 13/3 14/4 15/17 16/8 16/20 17/1 18/14 19/6 25/25 28/12 50/12 51/9 65/2 88/19
transcript [3] 112/16 112/19 113/24
transcripts [1] 111/18

transfers [1] 101/19
transition [1] 97/20
travels [1] 42/22
Trevor [4] 97/25 99/1 99/12 99/17
trial [5] 4/18 26/20 76/14 76/17 79/21
trick [1] 49/24
true [3] 106/24 111/3 112/17
truly [1] 58/7
truth [3] 5/3 5/3 5/4
try [1] 97/20
trying [1] 68/4
turn [4] 9/15 42/11 51/7 104/5
turnover [12] 3/15 8/23 9/21 9/23 10/9 10/21 15/9 27/3 27/19 61/4 104/11 105/21
two [15] 10/12 12/9 17/25 21/24 32/16 34/18 37/7 44/14 51/14 85/16 87/4 87/21 90/18 96/13 107/2
Tyson [1] 59/24

**U**

Uh [8] 12/13 29/18 40/4 67/24 72/23 73/20 80/1 81/23
Uh-huh [8] 12/13 29/18 40/4 67/24 72/23 73/20 80/1 81/23
unable [1] 5/21
unbecoming [1] 5/18
under [8] 5/4 6/2 9/23 30/6 44/18 105/21 111/12 111/18
underneath [1] 32/17
understand [13] 5/22 6/1 6/6 6/10 6/13 29/5 31/1 55/22 58/9 58/19 67/20 79/2 106/1
understanding [6] 5/16 11/15 92/18 93/21 97/17 104/23
understood [2] 67/17 94/20
underway [1] 69/4
unethical [1] 5/20
UNITED [2] 1/1 112/1
University [2] 104/2 104/2
Unle [1] 25/5
unless [3] 25/6 25/11 106/19
unopposed [1] 100/3
unpaid [3] 74/15 78/19 84/16
unsigned [1] 4/18
until [3] 25/8 99/18 107/2
up [7] 6/21 21/15 27/21 47/5 102/1 105/11 106/14
upon [2] 72/16 92/17
us [14] 5/8 14/9 20/10 37/10 41/21 52/19 56/12 59/20 69/16 75/2 75/4 82/12 82/19 82/25
use [3] 60/17 84/3 103/16
used [7] 4/18 6/4 26/25 27/1 49/2 49/2 113/1
utlawman [1] 103/12

**V**

valid [1] 105/23
vari [1] 57/1
various [2] 7/22 57/1
vast [1] 97/16
veil [1] 27/1
verdict [1] 26/22
very [7] 7/5 25/21 40/21 58/7 58/7 73/17 79/11 97/11
view [2] 40/2 68/22
viewed [1] 81/10
violating [1] 57/11

**virtue [1]** 107/4

**visibility [2]** 43/15 43/17

**Vista [1]** 114/13

**volume [1]** 39/9

**vs [6]** 40/12 40/14 46/24 47/3 62/10 62/21

# W

**W-I-G-G-S [1]** 32/22

**wait [1]** 31/25

**Waived [1]** 4/12

**waiver [1]** 83/20

**Walker [7]** 96/20 97/21 100/2 100/7 100/20 100/22 102/12

**want [14]** 8/15 56/22 57/12 64/9 64/15 64/23 64/23 66/24 90/19 97/25 102/7 102/15 108/19 109/8

**wanted [5]** 5/15 27/10 66/6 74/4 79/20

**wanting [1]** 62/23

**was [168]**

**wasn't [6]** 24/11 24/13 25/22 66/9 79/9 82/15

**water [1]** 25/8

**way [11]** 14/4 14/7 18/24 48/25 57/11 58/9 66/13 73/15 77/7 95/23 96/11

**we [51]** 5/15 8/8 9/15 10/13 11/12 19/16 20/13 25/7 25/7 25/12 27/17 31/17 31/20 36/10 36/24 37/7 44/1 44/2 47/13 48/6 59/3 60/6 62/16 62/19 62/20 63/22 64/9 64/10 64/13 64/22 65/18 69/2 69/3 69/5 74/20 79/20 83/9 85/3 85/16 86/13 93/25 96/19 102/5 102/7 102/23 107/2 107/15 108/1 108/13 108/19

**we'd [1]** 61/3

**we'll [6]** 9/4 31/25 64/24 75/4 109/2 109/21

**we're [7]** 5/11 37/16 46/2 62/17 63/17 83/17 108/6

**we've [6]** 6/9 44/2 46/3 54/13 54/14 109/7

**weeks [1]** 91/25

**well [15]** 10/17 15/4 35/15 37/16 48/25 65/8 68/1 71/10 71/12 71/21 71/25 75/18 83/7 101/18 102/5

**went [7]** 35/1 38/6 53/6 57/20 58/6 74/20 78/10

**were [55]** 10/13 13/23 18/5 18/5 19/5 20/13 28/1 37/11 37/12 37/13 38/8 38/10 38/11 40/2 44/17 51/15 51/18 52/21 54/23 61/6 61/9 61/11 62/19 62/20 66/7 69/3 69/5 74/14 74/24 76/12 76/14 76/22 76/23 77/4 81/10 87/1 87/13 87/22 92/1 92/5 92/9 94/23 94/24 97/11 98/11 100/23 100/23 101/10 101/12 101/14 101/17 101/24 102/9 102/11 105/23

**weren't [3]** 28/4 75/18 76/2

**Weslease [23]** 18/15 18/25 19/2 19/4 25/6 25/11 25/22 25/24 26/5 26/23 26/24 27/18 32/11 40/14 44/1 50/1 50/1 57/21 57/22 60/17 96/18 101/18 101/20

**Weslease's [2]** 9/22 104/11

**Western [1]** 1/22

**Whaley [1]** 114/12

**what [88]** 8/19 10/17 11/15 13/8 14/3 15/4 15/4 15/10 17/7 17/25 18/1 20/10 23/2 23/6 25/11 26/14 28/21 29/21 30/7 30/7 31/17 31/20 32/5 32/14 33/1 33/20 34/4 34/25 36/9 36/9 36/24 36/25 37/11 37/11 38/13 39/13 40/19 40/19 47/17 48/24 49/1 49/2 49/11 49/14 49/16 51/14 51/18 52/8 53/14 56/3 57/24 58/1 58/1 59/20 60/5 60/8 60/20 60/21

**whatever [1]** 43/5

**whatnot [1]** 75/3

**whatsoever [2]** 71/23 101/22

**when [56]** 11/23 12/14 12/17 12/20 15/4 16/19 16/24 17/5 18/5 18/13 18/22 19/7 20/25 21/1 21/2 21/5 21/12 24/9 27/7 34/17 45/15 53/12 57/20 57/22 57/23 61/17 61/21 62/3 63/3 63/10 63/11 66/3 66/10 67/1 67/2 70/18 71/1 71/4 76/20 76/20 79/13 79/21 85/10 89/16 89/19 92/5 92/17 93/6 95/16 95/21 97/22 98/8 101/16 102/8 105/1

**where [12]** 11/4 21/2 21/18 38/9 38/10 38/11 58/6 69/13 77/7 82/19 95/1 101/17

**whether [7]** 5/17 5/18 5/20 5/21 38/10 67/1 77/7

**which [13]** 5/12 6/6 43/2 45/14 62/21 69/4 73/7 86/14 87/12 94/17 102/1 105/20 114/3

**while [2]** 59/4 81/5

**who [16]** 9/12 10/8 10/12 13/2 22/2 22/3 32/24 33/17 37/11 45/14 61/11 62/24 76/17 82/23 96/9 98/21

**whole [3]** 5/3 74/5 97/23

**whose [2]** 99/11 111/14

**why [26]** 15/1 17/17 23/12 24/24 35/6 45/1 45/3 48/10 48/25 53/20 58/5 60/7 67/10 68/16 72/16 75/12 76/3 79/1 84/7 88/1 92/9 93/24 96/23 100/22 102/11 102/12

**wife [2]** 27/4 27/8

**Wiggs [3]** 32/22 32/24 33/15

**will [8]** 54/15 54/15 64/13 64/13 65/18 104/13 107/7 108/10

**wipe [1]** 53/13

**wiped [1]** 58/1

**wire [5]** 50/14 50/18 51/11 64/12 88/24

**wise [1]** 16/24

**wish [1]** 68/3

**withdraw [2]** 74/14 100/3

**withdrawing [1]** 100/23

**withdrawn [1]** 75/6

**without [5]** 9/24 25/21 38/2 57/11 62/12

**witness [6]** 1/17 4/10 5/2 112/15 112/18 112/21

**Witness' [1]** 3/8

**Witness's [1]** 4/11

**won't [1]** 49/24

**word [1]** 60/18

**words [1]** 25/21

**work [16]** 14/20 14/21 39/6 39/7 39/9 39/22 46/4 52/6 53/5 59/11 59/17 79/25 80/14 88/9 97/25 103/16

**worked [1]** 54/13

**working [6]** 9/20 10/14 10/23 28/17 47/9 66/7

**world [1]** 104/1

**worth [13]** 1/2 1/23 2/4 2/9 2/15 30/17 31/6 39/25 57/5 112/2 113/8 113/13 113/19

**would [31]** 10/4 10/11 10/11 14/20 20/14 29/13 31/4 39/8 43/5 43/5 45/3 48/11 56/10 59/6 63/18 68/19 69/11 72/12 75/6 79/22 81/9 82/13 90/23 92/18 93/2 93/5 94/21 96/14

**written [1]** 49/1

# Y

**y'all [1]** 109/16

**yeah [11]** 8/13 19/24 20/2 20/2 29/15 45/24 65/18 83/15 85/22 89/1 109/5

**year [6]** 39/7 63/11 84/23 85/9 85/10 85/10

**years [14]** 6/18 6/22 6/24 7/4 39/4 41/9 43/14 46/8 53/6 79/18 104/15 106/11 107/1 107/2

**yes [6]** 41/8 47/14 66/3 66/8 108/21 109/1

**yet [3]** 24/24 49/12 76/12

**you [465]**

**you're [27]** 6/16 21/17 23/6 23/11 23/11 23/24 34/6 35/12 35/15 37/5 38/3 40/20 40/21 43/21 45/14 47/9 51/1 52/21 59/11 59/11 59/14 59/24 62/2 102/5 102/6 103/3

**you're prob [1]** 102/5

**you've [13]** 10/18 19/25 36/25 41/8 41/11 43/11 47/25 81/6 85/2 106/2 106/10 106/14 106/19

**your [63]** 5/8 6/1 7/4 9/12 11/15 13/10 14/20 16/18 17/7 20/1 20/22 21/4 24/21 31/1 34/16 35/13 38/4 38/9 38/25 41/20 42/16 43/8 44/20 47/15 47/19 48/4 51/5 52/20 53/18 55/22 58/10 59/7 63/17 65/5 68/14 69/15 69/23 69/23 71/4 72/1 74/13 77/4 77/11 78/1 78/18 81/7 82/12 83/8 84/10 85/22 87/6 88/23 88/24 91/22 93/21 95/7 95/9 96/1 97/23 99/16 103/14 104/23 107/10

**yours [1]** 35/14

**yourself [2]** 47/11 72/16

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **WESLEASE 2018 OPERATING LP,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **vs.** | § | **Case No: 4:20-cv-00776-P** |
| | § | |
| | § | |
| **INNOVATIVE SAND SOLUTIONS, LLC,** | § | |
| **BULL MOOSE PIPELINE, LLC,** | § | |
| **LINDALE PIPELINE, LLC,** | § | |
| **DALE BEHAN, AND LINDA BEHAN,** | § | |
| | § | |
| *Defendants.* | § | |

## ORDER ON SECOND MOTION FOR ENFORCEMENT OF TURNOVER ORDER AND SHOW CAUSE ORDER

Now before the Court is Weslease's Motion for Enforcement of Turnover Order and Show Cause Order ("Motion"). The Court hereby **GRANTS** same.

IT IS THEREFORE **ORDERED**, Shelby Sharpe ("Sharpe"), counsel for Linda and Dale Behan ("Behans"), shall, within seven (7) days of this Order, withdraw or otherwise cause the nonsuit or dismissal of any and all petitions or complaints filed by him on behalf of River North Farms, Inc. on or after the entry of the Turnover Order (as defined in the Motion).

IT IS FURTHER **ORDERED**, Shelby Sharpe shall produce all documents and communications in his or his firm's possession created or obtained pursuant to Sharpe's or his firm's provision of legal services to River North Farms, Inc. ("River North"). This does not include any privileged information created solely for the purpose of providing legal services to the Behans, or any other client, and not River



EXHIBIT 1
WIT: *Sharpe*
DATE: 1-22-25
ADRIANNE HARRIS

North. This ordered production does include any privileged information concerning legal services by Sharpe or his firm where River North was a joint client along with any other clients, including the Behans.

IT IS FURTHER **ORDERED**, the Behans, and any and all persons working on concert with them or with notice of this Order or the Turnover Order, refrain from interfering with Weslease's exercise of any and all rights conferred under the Turnover Order, or any other Order of this Court. This includes, without limitation, any entry on real property, exercise of control or possession of any asset of River North by the Behans.

IT IS FURTHER **ORDERED**, that the Behans and Sharpe are jointly and severally liable for monetary sanctions to Weslease in the amount of $5000. The Behans and Sharpe shall pay this amount no later than seven (7) days of this Order.

IT IS FURTHER **ORDERED**, Dale Behan and Linda Behan shall remit $7500 as reasonable attorneys' fees no later than fourteen (14) days of this order.

Nothing in this Order modifies, alters, or affects the findings and Orders entered by the Court from the bench at the hearing held on May 21, 2024 in any way.

**SIGNED** this **21st day of May 2024**.

Mark T. Pittman
UNITED STATED DISTRICT JUDGE

# EXHIBIT "D"



EXHIBIT   2
WIT: _Sharpe_
DATE: _1-22-25_
ADRIANNE HARRIS

10/24, 2:08 PM                                                                                              Azle Prop

Subject:    **Azle Property**

Date:       8/30/2024 2:07:49 PM Central Daylight Time

From:       utlawman@aol.com

To:         dorothy.bolinsky@faegredrinker.com

Cc:         luke@2mac.com, dbehan@behangroup.com, nathan.kivi@hotelierco.com, scott@latigo-group.com, stevencrofts.realtor@gmail.com

## Dotty,

Attached is an order I received a few minutes ago. Unless Weslease has agreed to the sale going forward as we have agreed, we are dead in the water until the Fifth Circuit straightens this out.

Sent from AOL Desktop

*J. Shelby Sharpe*
*Law Offices of J. Shelby Sharpe, P.C.*
*6100 Western Place, Suite 912*
*Fort Worth, Texas 76107*
*Phone: 817-338-4900*
*Facsimile: 817-332-6818*

From: scanner@imaginetechgroup.com
To: utlawman@aol.com
Sent: 8/30/2024 1:24:59 PM Central Daylight Time
Subject:

--------------------
TASKalfa 3554ci
[00:17:c8:f2:b9:79]
--------------------

The information contained in this correspondence is private and may not be distributed without the written consent of Imagine Technology Group.

Case 4:20-cv-00776-P    Document 204-4    Filed 09/03/24    Page 5 of 6 Solution for Miscella... PageID 2780

Subject:    Activity in Case 4:20-cv-00776-P Weslease 2018 Operating, LP v. Innovative Sand
Solutions, LLC et al Order on Motion for Miscellaneous Relief

Date:    8/30/2024 12:28:11 PM Central Daylight Time

From:    ecf_txnd@txnd.uscourts.gov

To:    Courtmail@txnd.uscourts.gov

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this
e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits
attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of
all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees
apply to all other users. To avoid later charges, download a copy of each document during this first
viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

U.S. District Court

Northern District of Texas

**Notice of Electronic Filing**

The following transaction was entered on 8/30/2024 at 12:27 PM CDT and filed on 8/30/2024
Case Name:    Weslease 2018 Operating, LP v. Innovative Sand Solutions, LLC et al
Case Number:    4:20-cv-00776-P
Filer:
WARNING: CASE CLOSED on 05/10/2022
Document Number: 203

Docket Text:
ORDER: Having reviewed the Motions and responses, the Court finds that a hearing is not
necessary at this time. Accordingly, Weslease's request for a hearing is DENIED. However, the
Court finds that the [195], [199] Motions should otherwise be GRANTED. (See order for
specifics.) (Ordered by Judge Mark Pittman on 8/30/2024) (jnp)

4:20-cv-00776-P Notice has been electronically mailed to:

Ralph H Duggins    rduggins@canteyhanger.com, adrake@canteyhanger.com

J. Shelby Sharpe    utlawman@aol.com, kgentry@sharpefirm.com

Joseph Edward Johnson, III    ejohnson@mayerllp.com, cpreston@mayerllp.com, gchatman@mayerllp.com,
spilgrim@mayerllp.com, jharris@mayerllp.com

Justin Neal Bryan    jbryan@mccathernlaw.com, arnolds@mccathernlaw.com, jbland@mccathernlaw.co,
jbland@mccathernlaw.com, receptionist@mccathernlaw.com

Sounia Senemar    ssenemar@mccathernlaw.com

Preston Joseph Tyson    ptyson@mccathernlaw.com, mrivas@mccathernlaw.com

4:20-cv-00776-P Notice required by federal rule will be delivered by other means (as detailed in the
Clerk's records for orders/judgments) to:

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

WESLEASE 2018 OPERATING, LP,

Plaintiff,

v.                                                            No. 4:20-cv-00776-P

INNOVATIVE SAND SOLUTIONS, LLC,
ET AL.,

Defendants.

ORDER

Before the Court is judgment creditor Weslease 2018 Operating, LP's Third Motion for Enforcement of Turnover Order (ECF No. 195) and Request for Hearing and Fourth Motion for Enforcement of Turnover Order (ECF No. 199). Having reviewed the Motions and responses, the Court finds that a hearing is not necessary at this time. Accordingly, Weslease's request for a hearing is **DENIED**. However, the Court finds that the Motions should otherwise be **GRANTED**. Accordingly, it is **ORDERED** that:

(1) the law firm of Barnes, Bailey, Janoush & Dick, P.A. shall pay the $14,147.42 held in its trust account at the direction of Weslease within three (3) business days of notice of this Order, which may be provided via electronic mail;

(2) the Behans shall, within three (3) business days of this Order, withdraw their objection to any instruction by Weslease concerning any and all assets of River North Farms, LLC ("River North") to the law firm of Barnes, Bailey, Janoush & Dick, P.A. and provide their consent to the payment of the foregoing amount at the direction of Weslease;

(3) the Behans and their new counsel shall, within three (3) business days of this Order, withdraw their appeal evidenced by the notice filed in the Justice Court, Precinct Two of Hood County, Texas with Cause No. EC2400327;

(4) the Behans and their counsel are prohibited from the closing of the any transaction involving real estate owned by River North at the time the Turnover Order was entered, including the putative transaction identified in the Motion, absent the written consent of Weslease; and

(5) the Behans shall remit to Westlease $5,000 in reasonable attorney's fees for the bringing of these Motions.[1]

**SO ORDERED** on this 30th day of August 2024.

_____
**MARK T. PITTMAN**
**UNITED STATES DISTRICT JUDGE**

---

[1] The Court, having considered the loadstar method, finds that this attorney's fees award is appropriate in light of the hours reasonably expended in the bringing of these Motions multiplied by a reasonable hourly rate for this district. Additionally, having considered the *Johnson* factors, the Court finds that a modification is not necessary in this case.

2

EXHIBIT
WIT: _Sharpe_
DATE: _1-22-25_
ADRIANNE HARRIS

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| WESLEASE 2018 OPERATING LP, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 4:22-cv-01013-O |
| | § | |
| LINDA BEHAN, *et al.*, | § | |
| | § | |
| Defendants. | § | |

**FINAL JUDGMENT**

This Judgment is issued pursuant to Fed. R. Civ. P. 58(a).

This action came on for consideration by the Court, and the issues having been duly considered and a decision duly rendered,

It is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that:

1.     The above-captioned case is **DISMISSED**.

2.     Plaintiff's cause of action for fraudulent transfer regarding the portion of the Fort Worth property conveyed to Defendants Richard Robinson and Marla Robinson is **DISMISSED without prejudice**, per the Notice of Voluntary Dismissal (ECF No. 90).

3.     Plaintiff's cause of action for turnover order requiring Defendants Dale Behan and Linda Behan to cause Defendant River North Farms, LLC to convey to Plaintiff the portion of the Fort Worth property conveyed to Defendants Richard Robinson and Marla Robinson is **DISMISSED with prejudice** to the refiling of the same.

4.     Plaintiff's cause of action for declaratory judgment on Plaintiff's security interest relative to that of Defendant Amarillo National Bank with respect to the debt of

Defendant Lindale Pipeline, LLC is **DISMISSED with prejudice** to the refiling of the same.

5.  Plaintiff's Expedited Motion for Leave to Amend Complaint, Expedited Discovery, Temporary Restraining Order, and Request for Hearing (ECF Nos. 81, 87) is **DENIED**.

6.  No additional claims or causes of action by any party are pending against any party. This Final Judgment fully and finally resolves all issues between Plaintiff and Defendants in the above-captioned case and may be appealed. Any relief not specifically granted in this Final Judgment is **DENIED** and any parties not otherwise disposed of are **DISMISSED**.

**SO ORDERED** on this **9th day** of **January, 2024**.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

| | |
|---|---|
| **From:** | J. Shelby Sharpe |
| **To:** | Justin N. Bryan |
| **Subject:** | Fwd: Note |
| **Date:** | Tuesday, July 9, 2024 8:20:26 AM |
| **Attachments:** | IMG_3594.HEIC.heic |

EXHIBIT 4
WIT: _Sharpe_
DATE: _1-22-25_
ADRIANNE HARRIS

**EXTERNAL EMAIL CAUTION!**
This email originated from outside of the organization.

Justin,

Here attached is a picture of the note and the checks.

Sent from AOL Desktop

*J. Shelby Sharpe*
*Law Offices of J. Shelby Sharpe, P.C.*
*6100 Western Place, Suite 912*
*Fort Worth, Texas 76107*
*Phone: 817-338-4900*
*Facsimile: 817-332-6818*

From: utlawman@aol.com
To: utlawman@aol.com
Sent: 7/9/2024 8:04:35 AM Central Daylight Time
Subject: Note

Sent from my iPhone



Today is June 6, 2024

This is a binding confidential agreement between Jason Sidler & Dale Bolen.

I, Jason Sidler am loaning Dale Bolen $55,000. That is due in 6 months or Nov 6, 2024. There is no grace period or extensions.

The interest rate is 10% over the 6 months. Therefore the payment will be 38,500 due on November 6, 2024.

Dale Bolen is now testifying that he has a current revenue stream from which to save up the money to pay me back on Nov. 6, 2024.

I will not take any collateral at that time. I must be CASH only!!!

Dale's signature _____ /S/ _____   Date 6/6/24

Jason's signature _____   Date 6/6/24

Witness = Linda Bolen   Signature: _____   Date 6/6/24

| | |
|---|---|
| **From:** | J. Shelby Sharpe |
| **To:** | Justin N. Bryan |
| **Cc:** | Preston Tyson |
| **Subject:** | Re: Williston |
| **Date:** | Tuesday, July 9, 2024 8:19:02 AM |

**EXTERNAL EMAIL CAUTION!**
This email originated from outside of the organization.

Justin,

The loans came from close friends. There are no loan documents, except for one that is on a single sheet of paper, which I will send you. It is from an old pastor that Dale had previously helped years ago.

The money went into an account at Legend Bank to pay debts of River North Farms. The checks were payable to River North Farms.

All travel has been to maintain property with liens to several banks and to pay debts of those properties.

The Behans have no trusts and are not beneficiaries of any trust.

Sent from AOL Desktop

*J. Shelby Sharpe*
*Law Offices of J. Shelby Sharpe, P.C.*
*6100 Western Place, Suite 912*
*Fort Worth, Texas 76107*
*Phone: 817-338-4900*
*Facsimile: 817-332-6818*
In a message dated 7/9/2024 12:37:17 AM Central Daylight Time, jbryan@mccathernlaw.com writes:

I



EXHIBIT 5
WIT: Sharpe
DATE: 1-22-25
ADRIANNE HARRIS

Shelby,

Please provide the information concerning their loans. Who is/are the lender(s)?
Provide copies of the agreements. Which accounts did they receive the money in?

Also, please provide whether the Behans 1) are beneficiaries of any trusts, 2) whether
they have created any trusts, and 3) whether they have contributed any assets to a
trust. Please provide all information concerning the trusts and trustees. This includes
copies of the trust documents, contact information for the trustees, and dates and
amounts of funding.

Justin

> On Jul 8, 2024, at 3:29 PM, J. Shelby Sharpe <utlawman@aol.com>
> wrote:
>
> **EXTERNAL EMAIL CAUTION!**
> This email originated from outside of the organization.

## Justin,

The Behans have never had an ownership
interest in RWS. Only Williston Basin has
had an ownership interest. Dale has not had
any interest in it since Morelock assigned his
interest and Dale assigned his interest in
Williston to Chris Anderson.

If he is still on the RWS account, that is an
error. Only Chris Anderson should be on
that account since he is the only one who
has an interest in Williston Basin.

Concerning any travels of the Behans this is
being done on borrowed money not income.

I will ask if there is any amount of money

they can begin to pay on the judgment.
Since they have no income, whatever they
would pay would be from borrowed money.

Sent from AOL Desktop

*J. Shelby Sharpe*
*Law Offices of J. Shelby Sharpe, P.C.*
*6100 Western Place, Suite 912*
*Fort Worth, Texas 76107*
*Phone: 817-338-4900*
*Facsimile: 817-332-6818*
In a message dated 7/5/2024 2:03:01 AM Central Daylight Time,
jbryan@mccathernlaw.com writes:

Shelby,

As you know, we are preparing a motion concerning the assets
held in the name of RWS. More specifically, that they be paid to
our client for partial satisfaction of their judgment debts. In the
meantime, does your client agree to not disburse them until the
Court decides the motion?

Also, your clients have still not made a single payment towards
the judgment debts. But they are apparently traveling and
spending funds elsewhere. Our clients demand a payment. What
amount can they pay this week?

Justin

On Jul 3, 2024, at 10:44 PM, J. Shelby Sharpe
<utlawman@aol.com> wrote:

EXTERNAL EMAIL CAUTION!
This email originated from outside of the organization.

Preston,

Here is the document I told you I would send you showing the transfer of interest of 640Water in RWS to Williston.

Sent from AOL Desktop

*J. Shelby Sharpe*
*Law Offices of J. Shelby Sharpe, P.C.*
*6100 Western Place, Suite 912*
*Fort Worth, Texas 76107*
*Phone: 817-338-4900*
*Facsimile: 817-332-6818*

From: scanner@imaginetechgroup.com
To: utlawman@aol.com
Sent: 7/3/2024 3:30:32 PM Central Daylight Time
Subject:

--------------------
TASKalfa 3554ci
[00:17:c8:f2:b9:79]
--------------------
The information contained in this correspondence is private and may not be distributed without the written consent of Imagine Technology Group.

# Sharpe Ex 6

# Not Identified

RIVER NORTH FARMS INC
XXXXX5795
Statement Ending 01/31/2024
Page 3 of 4

# COMMERCIAL CHECKING-XXXXX5795 (continued)

## Account Activity (continued)

| Post Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 01/18/2024 | CHECK # 1104 | $2,500.00 | | $644,008.88 |
| 01/19/2024 | WIRE/OUT-202401900850;BNF J. SHELBY SHARP OPERATING ACCOUNT;OBI REF- WEST LEASE | $67,745.00 | | $576,263.88 |
| 01/22/2024 | XX8427 POS PURCHASE 8443046618COLORE 8443046618 CA 00000000 022650 | $76.87 | | $576,187.01 |
| 01/23/2024 | XX8648 POS PURCHASE TURKEY MOUNTAIN SANCTUARY TX 00005918 000017 | $65.40 | | $576,121.61 |
| 01/23/2024 | WIRE/OUT-202402300521;BNF GALILIO ENERGY SOLUTIONS | $120,000.00 | | $456,121.61 |
| 01/30/2024 | DEPOSIT | | $1,408.22 | $457,529.83 |
| 01/30/2024 | WIRE/OUT-202403000732;BNF RHINO HOLDINGS, LLC | $5,000.00 | | $452,529.83 |
| 01/31/2024 | CHECK # 1108 | $25,000.00 | | $427,529.83 |
| 01/31/2024 | Ending Balance | | | $427,529.83 |

## Checks Cleared

| Check Nbr | Date | Amount | Check Nbr | Date | Amount |
|---|---|---|---|---|---|
| 1103 | 01/05/2024 | $10,000.00 | 1106* | 01/03/2024 | $2,100.00 |
| 1104 | 01/18/2024 | $2,500.00 | 1108* | 01/31/2024 | $25,000.00 |

* Indicates skipped check number

## Daily Balances

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 01/02/2024 | $728,077.32 | 01/12/2024 | $704,298.40 | 01/22/2024 | $576,187.01 |
| 01/03/2024 | $725,977.32 | 01/16/2024 | $673,075.88 | 01/23/2024 | $456,121.61 |
| 01/05/2024 | $715,977.32 | 01/17/2024 | $653,075.88 | 01/30/2024 | $452,529.83 |
| 01/08/2024 | $708,977.32 | 01/18/2024 | $644,008.88 | 01/31/2024 | $427,529.83 |
| 01/11/2024 | $705,117.09 | 01/19/2024 | $576,263.88 | | |

## Overdraft and Returned Item Fees

| | Total for this period | Total year-to-date | Previous year-to-date |
|---|---|---|---|
| Total Overdraft Fees | $0.00 | $0.00 | $0.00 |
| Total Returned Item Fees | $0.00 | $0.00 | $76.00 |

EXHIBIT 7
WIT: Sharpe
DATE: 1-22-25
ADRIANNE HARRIS

# COMMERCIAL CHECKING-XXXXX5795 (continued)

## Account Activity (continued)

| Post Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 11/02/2023 | XX8648 POS PURCHASE THE ALCHEMIST SA ELLSWORTH ME 99999999 134953 | $50.00 | | $2,034,982.91 |
| 11/02/2023 | XX8648 POS PURCHASE TST* MARGARITAS ELLSWORTH ME 72120764 020764 | $70.00 | | $2,034,912.91 |
| 11/02/2023 | XX8648 POS PURCHASE THE UPS STORE 33 ELLSWORTH ME 00010002 025547 | $191.61 | | $2,034,721.30 |
| 11/02/2023 | WIRE/OUT-202330600421;BNF GALILIO ENERGY SOLUTIONS | $10,000.00 | | $2,024,721.30 |
| 11/02/2023 | WIRE/OUT-202330600420;BNF MANG CING | $35,000.00 | | $1,989,721.30 |
| 11/02/2023 | BARCLAYCARD US CREDITCARD 1058259338 | $7,468.52 | | $1,982,252.78 |
| 11/02/2023 | CHECK # 1063 | $2,059.00 | | $1,980,193.78 |
| 11/02/2023 | CHECK # 1061 | $14,000.00 | | $1,966,193.78 |
| 11/03/2023 | XX8648 POS PURCHASE TST* 86 This Ellsworth ME 00000000 070227 | $30.08 | | $1,966,163.70 |
| 11/03/2023 | TRAVELERS RETRY PYMT BPITPIXXXXX7319 | $589.00 | | $1,965,574.70 |
| 11/03/2023 | CHECK # 1067 | $10,000.00 | | $1,955,574.70 |
| 11/03/2023 | CHECK # 1073 | $30,000.00 | | $1,925,574.70 |
| 11/06/2023 | CHECK # 1072 | $35,000.00 | | $1,890,574.70 |
| 11/06/2023 | CHECK # 1064 | $75,000.00 | | $1,815,574.70 |
| 11/07/2023 | DEPOSIT | | $24,106.18 | $1,839,680.88 |
| 11/07/2023 | CHECK # 1069 | $10,000.00 | | $1,829,680.88 |
| 11/07/2023 | CHECK # 1077 | $15,000.00 | | $1,814,680.88 |
| 11/07/2023 | CHECK # 1075 | $25,500.00 | | $1,789,180.88 |
| 11/08/2023 | XX8648 POS PURCHASE TST* DMF - Post Bangor ME 00000000 061813 | $32.30 | | $1,789,148.58 |
| 11/08/2023 | WIRE/OUT-202331200824;BNF J SHELBY SHARPE BUSINESS | $160,000.00 | | $1,629,148.58 |
| 11/08/2023 | CHECK # 1078 | $3,000.00 | | $1,626,148.58 |
| 11/08/2023 | CHECK # 1068 | $4,749.50 | | $1,621,399.08 |
| 11/09/2023 | CHECK # 1076 | $12,500.00 | | $1,608,899.08 |
| 11/10/2023 | WIRE/OUT-202331400822;BNF GALILIO ENERGY SOLUTIONS | $20,000.00 | | $1,588,899.08 |
| 11/10/2023 | CHECK # 1074 | $10,000.00 | | $1,578,899.08 |
| 11/13/2023 | XX8648 POS PURCHASE 025 BRAUMS STORE SAPULPA OK 03771234 058720 | $17.09 | | $1,578,881.99 |
| 11/13/2023 | XX8648 POS PURCHASE COWSER TIRE AND FT WORTH TX 00000000 019643 | $3,938.26 | | $1,574,943.73 |
| 11/13/2023 | CHECK # 1079 | $2,000.00 | | $1,572,943.73 |
| 11/14/2023 | XX8648 POS PURCHASE UNITED RV FORT WORTH TX 96696945 458285 | $79.01 | | $1,572,864.72 |
| 11/14/2023 | XX8427 POS PURCHASE PAX8 INC HTTPSWWW.PAX8 CO JRU6KKQN 038845 | $445.16 | | $1,572,419.56 |
| 11/15/2023 | TRAVELERS PER INSUR BPITPIXXXXX6021 | $28.94 | | $1,572,390.62 |
| 11/16/2023 | WIRE/IN-202332000944;ORG BANK OF AMERICA;REF 20233200090500 | | $9,955.00 | $1,582,345.62 |
| 11/16/2023 | Final Credit for Dispute 7306 5746 | | $222.58 | $1,582,568.20 |
| 11/16/2023 | WIRE/OUT-202332000905;BNF BUFFALO CREEK SURVEYOR LLC | $10,000.00 | | $1,572,568.20 |
| 11/16/2023 | CHECK # 1080 | $100,000.00 | | $1,472,568.20 |
| 11/20/2023 | XX8648 POS PURCHASE STATE BUSINESS F 512-745-2471 TX 78578686 078686 | $495.00 | | $1,472,073.20 |
| 11/20/2023 | XX8648 POS PURCHASE COSTCO WHSE #117 FORT WORTH TX 99117313 645436 | $633.06 | | $1,471,440.14 |
| 11/20/2023 | WIRE/OUT-202332400461;BNF JOE D BALLARD | $10,000.00 | | $1,461,440.14 |

| From: | J. Shelby Sharpe |
|---|---|
| To: | Justin N. Bryan |
| Cc: | Preston Tyson; Emily Snow |
| Subject: | Re: River North Assets paid to Counsel |
| Date: | Friday, June 7, 2024 2:44.07 PM |
| Attachments: | image001.png |

**EXTERNAL EMAIL CAUTION!**
This email originated from outside of the organization.

Justin,

We have no money of River North Farm's in the firm's escrow account. The money received since November of 2023 was primarily for services rendered in defense of the Weslease suit in Judge O'Connor's court. The funds came from River North Farms account with Amarillo National Bank that were generated by RNF sales of RNF assets that were done with the knowledge of the bank who has liens on all of those assets. $100,000 of that amount was repayment of a loan to the firm that it made during a time when the cash flow of RNF was inadequate to pay some debts that it needed to pay.

All transfers of RNF funds have been done with the knowledge of the bank because of its liens on RNF property.

Thus, your client's suspicions are totally unfounded.

I trust you have advised your client that if the Fifth Circuit overturns the district court orders, there are consequences.

Shelby

EXHIBIT 8
WIT: Sharpe
DATE: 1-22-25
ADRIANNE HARRIS

Sent from AOL Desktop

**J. Shelby Sharpe**
**Law Offices of J. Shelby Sharpe, P.C.**
**6100 Western Place, Suite 912**
**Fort Worth, Texas 76107**
**Phone: 817-338-4900**
**Facsimile: 817-332-6818**

In a message dated 6/7/2024 11:18:01 AM Central Daylight Time, jbryan@mccathernlaw.com
writes:

Shelby,

I am emailing concerning the amount of funds your firm received as putative payment
by River North. Our math and available records indicate your firm has received at
least $228,000 from River North since November 2023. We have the following
questions:

- What amounts of these payments (any payment by River North), if any, remain
  in your trust account?
- Our client believes these amounts constitute fraudulent transfers and may
  otherwise be subject to disgorgement. Before we assert any litigation claims
  concerning moneys you received from River North, we ask whether you/your
  firm would be willing to discuss and pre-suit resolution.

We are asking these questions on behalf of our client in its capacity as the controlling
shareholder of River North pursuant to the Turnover Order and other Orders. As such,
you are obligated to provide this information. We look forward to your prompt
response. Thank you.

Justin

Justin Bryan

*Partner*

3710 Rawlins Street, Suite 1600
Dallas, Texas 75219
**p:** 214.730.4512 | **f:** 214.741.4717

jbryan@mccathernlaw.com

**McCATHERN**
SHOKOUHI · EVANS

DALLAS
FRISCO
HOUSTON
LOS ANGELES

This electronic transmission (and/or the documents accompanying it) may contain confidential information belonging to the sender that is protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510 and 2521 and may be legally privileged. This message (and any associated files) is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential, subject to copyright or constitutes a trade secret. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this message, or files associated with this message, is strictly prohibited. If you have received this communication in error, please notify McCathern, PLLC immediately by telephone 214.741.2662 and destroy the original message. Messages sent to and from us may be monitored.

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

IN RE: J. SHELBY SHARPE,

No. 4:24-mc-00007-P

## ORDER OF TEMPORARY SUSPENSION

The above numbered and styled miscellaneous action was opened on May 21, 2024, for the purpose of conducting a disciplinary hearing against J. Shelby Sharpe, as his conduct in another matter before the Court[1] "appears to be antithetical to the profession." ECF No. 1 at 2. Despite the Court opening of this matter, Mr. Sharpe's suspect conduct has not waned. *See* Case No. 4:20-cv-776-P ECF Nos. 183, 195, 198, 199.

*Inter alia*, Mr. Sharpe has been accused of making a $100,000.00 unknown loan to his clients in violation of his professional obligations under Texas Disciplinary Rule of Professional Conduct 1.08(a). At a September 25, 2024 hearing—after being reminded of his *Miranda* Rights—Mr. Sharpe admitted to making an unknown and undisclosed loan on behalf of his clients to another firm. *See* Case No. 4:20-cv-776-P ECF No. 239 at 18–20 (*Miranda* Rights), 21–28 (Mr. Sharpe testifying that: 1) his clients had outstanding legal fees with another law firm; 2) he paid $100,000 of those outstanding legal fees with his law firm's funds; 3) he did so without his clients' knowledge; 4) when his clients found out they considered it a loan; and 5) his clients fully reimbursed him the $100,000 he paid on their behalf, which he accepted.). While Sharpe insists that the $100,000 payment on his client's behalf was not a loan, the undisputed facts necessitate the opposite conclusion. Consequently, it has become evident to the undersigned that in addition to other actions that appear to be unbecoming of an officer of the Court, Mr. Sharpe may have committed actions which may be described as criminal in nature.

---

[1] *Westlease 2018 Operating, LP., v. Innovative Sand Solutions, LLC*, Case No. 4:20-cv-776-P.


EXHIBIT  9
WIT: Sharpe
DATE: 1-22-25
ADRIANNE HARRIS

Mr. Sharpe remains active in the case that gave rise to this miscellaneous action, as well as on other cases in this district.[2] In an abundance of caution—because the Court wishes to avoid any further violations, criminal or otherwise—the Court finds it prudent to temporarily suspend Mr. Sharpe from practicing in the Northern District of Texas pending the resolution of this disciplinary matter against him.[3] If Mr. Sharpe is found to have committed no violations at the resolution of this matter, his membership to the bar of this Court will be reinstated in full. Meanwhile, however, Mr. Sharpe is obligated to notify all of his clients who have cases pending in the Northern District of Texas, and opposing counsel and co-counsel in each of those cases, of the contents of this Order.

**SO ORDERED** on this **7th day of November 2024.**

MARK T. PITTMAN
UNITED STATES DISTRICT JUDGE

---

[2] *See, e.g., Truckenbrodt v. Behan, et al.,* Case No. 4:24-cv-00654-P

[3] In the event that Chief Judge David Godbey finds it appropriate to appoint a three-judge panel in this case, Sharpe may ask the panel to reconsider this Order.

2

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| WESLEASE 2018 OPERATING LP, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 4:20-cv-00776-P |
| | § | |
| INNOVATIVE SAND SOLUTIONS, | § | |
| LLC, *et al.*; | § | |
| | § | |
| Defendants, | § | |

## LINDA BEHAN AND DALE BEHAN'S REPSONSE TO RECEIVER'S MOTION TO SELL LAND FREE AND CLEAR, JUDICIAL FORECLOSURE OF CERTAIN LIENS, DISTRIBUTE SALES PROCEEDS AND OTHER ASSOCITAED RELIEF

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Defendants Linda Behan, and Dale Behan, (hereafter "the "Behans") file this

response to Receiver's Motion to Sell Land Free and Clear, Judicial Foreclosure of

Certain Liens, Distribute Sales Proceeds, and Other Associated Relief, hereafter

"Receiver's Motion," [ECF 258] filed by Receiver J. Robert Forshey.

### I.    Posture of Receiver's Motion

Judgment in these proceedings is against Innovative Sand Solutions, Bull Moose

Pipeline, LLC, Lindale Pipeline, LLC, Linda Behan and Dale Behan [ECF 216].

Subsequently, the Court signed a Turnover Order that stated it served as a muniment



EXHIBIT  10
WIT: Sharpe
DATE: 1-22-25
ADRIANNE HARRIS

of title transferring all of the ownership of the stock the Behans owned in River North Farms, Inc. to Plaintiff Weslease 2018 Operating LP, hereafter "Weslease," [ECF 140] after having previously denied an earlier application for turnover relief. [ECF 95]. Some six months later the Court appointed the receiver "to take exclusive custody, control, and possession of non-exempt **property of** whatever kind and wherever situated of **the Debtors**." [ECF 237]. **River North Farms, Inc. is NOT a judgment debtor.**

## II. Reasons the Receiver's Motion Should be Denied

There are several reasons the Receiver's motion should be denied.

First, River North Farms, Inc. is not a judgment debtor in the judgment of the Court that the Receiver has been appointed to collect from the judgment debtors. *Western Inn Corporation v. Bert Heyl*, 452 S.W.2d 752, 759 (Tex. Civ. App.– Fort Worth 1970, writ ref'd, n.r.e), quoting from *Gossett v. State*, 417 S.W2d 730, 733 (Tex. Civ. App. – Eastland, writ ref'd, n.r.e)  "a corporation is an entity separate and apart from its stockholders and ownership of stock is not the same as individual ownership by such stockholders." See also *Diaz v. SMS Fin. Cap., LLC*, Case No. 05-21-00690-cv, 2013 WL 5604236, at *4-6 (Tex. App. – Dallas Aug. 30, 2023, no pet.)

(holding the trial court abused discretion by ordering the turnover of assets held by third parties who were not judgment debtors)

Second, the Fifth Circuit and the Texas Supreme Court have consistently held that the "turnover statute may be used to reach only assets of parties to the judgment, not assets of non-judgment debtors." *Bollore S.A. v. Imp. Warehouse,* Inc. 448 F.3d 317, 322-23 (5th Cir. 2006); *Beaumont Bank v. Butler*, 806 S.W.2d 223, 227 (Tex. 1991).

Third, the Honorable Reed O'Connor in January of this year in a suit filed by Weslease against the Behans and River North Farms seeking a turnover of River North Farms real property signed a judgment preceded by findings that although Weslease has alleged the Behans own and control River North Farms, River North Farms is not a judgment debtor of Weslease, and even if the Behans owned all of the stock in River North Farms there was no basis to pierce the corporate veil nor has it operated as an alter ego of the Behans.[ECF 100]. See O'Connor Findings and Judgment in Attachment A.

**WHEREFORE**, Linda Behan and Dale Behan pray that the Court deny the Receiver's Motion to sell River North Farm property.

Respectfully submitted,

/s/ J. Shelby Sharpe
J. Shelby Sharpe (TX Bar No. 18123000)

6100 Western Place, Suite 912
Fort Worth, Texas 76107
(817) 338-4900
(817) 632-2487 Fax No.

**ATTORNEY FOR LINDA BEHAN and
DALE BEHAN**

## CERTIFICATE OF SERVICE

I hereby certify that on December 13,2024, a true and correct copy of the

foregoing document has been served via ECF to all attorneys of record.

/s/ J. Shelby Sharpe
J. Shelby Sharpe

 Outlook

---

**Re: Declaration**

---

**From** J. Shelby Sharpe <utlawman@aol.com>

**Date** Fri 3/29/2024 3:37 PM

**To** Clint.Latham@anb.com <Clint.Latham@anb.com>

**Cc** dbehan@behangroup.com <dbehan@behangroup.com>; lbehan@behangroup.com <lbehan@behangroup.com>

Clint,

If you do not feel comfortable in signing a third declaration that would be factually accurate, I respect your decision.

Happy Easter!

Sent from AOL Desktop

**_J. Shelby Sharpe_**
**_Law Offices of J. Shelby Sharpe, P.C._**
**_6100 Western Place, Suite 912_**
**_Fort Worth, Texas 76107_**
**_Phone: 817-338-4900_**
**_Facsimile: 817-332-6818_**

In a message dated 3/29/2024 3:34:29 PM Central Daylight Time, Clint.Latham@anb.com writes:

> Shelby,
>
> I am not eager to continue injecting myself into a case in which ANB is not a party, and my two declarations thus far don't seem to have had any effect. While I could sign a third one that says ANB has not to this point exercised its voting rights, I don't see any point in doing that unless it was in response to someone saying that we had. Weslease is not going to say that ANB voted to appoint new directors. Why not just submit a corporate document that shows who the directors are?

EXHIBIT 11
WIT: Sharpe
DATE: 1-22-25
ADRIANNE HARRIS

Happy Easter to everyone!

---

**From:** J. Shelby Sharpe <utlawman@aol.com>
**Sent:** Friday, March 29, 2024 12:34 PM
**To:** Latham, Clint <Clint.Latham@anb.com>
**Cc:** dbehan@behangroup.com; lbehan@behangroup.com
**Subject:** Re: Declaration

Clint,

I would never ask yo to sign anything but factual. Thank you for giving me the facts.

Can you state that the bank with its possession of the stock and the right to vote the shares has never voted different directors and officers than those in those positions at the time the stock was received. I remember that is what I understood you to say when you and Dale and I talked some days ago.

Sent from AOL Desktop

*J. Shelby Sharpe*

*Law Offices of J. Shelby Sharpe, P.C.*

*6100 Western Place, Suite 912*

*Fort Worth, Texas 76107*

*Phone: 817-338-4900*

*Facsimile: 817-332-6818*

In a message dated 3/29/2024 12:24:34 PM Central Daylight Time, Clint.Latham@anb.com writes:

I can't do that because it's not true to say that Dale has been looking after the ranch "for the bank . . . for approximately 10 years." I don't think I even knew about the ranch until the last 2-3 years. We do not have a security agreement that covers the ranch; our lien against the ranch is a judgment lien by virtue of having a judgment against River North. I'm not going to sign a declaration that authorizes anything. Any declaration I sign will contain nothing but factual statements.

**From:** J. Shelby Sharpe <utlawman@aol.com>
**Sent:** Friday, March 29, 2024 10:09 AM
**To:** Latham, Clint <Clint.Latham@anb.com>
**Cc:** dbehan@behangroup.com; lbehan@behangroup.com
**Subject:** Declaration

Clint,

I need one more declaration form you to attach to my reply to Weslease's motion to enforce the turnover order now set for a hearing this coming Thursday, April 4 at 3:00 p.m. It will simply state that Dale has been looking after the collateral for the bank, including the ranch for approximately 10 years to protect the bank's collateral. The bank authorizes him to permit inspection of the bank's collateral in his presence but not to remove it. The bank does not authorize anyone to have the codes to the ranch other than Dale Behan and any destruction of the locks would be a destruction of the bank's collateral.

I need this declaration this Monday if possible.

Shelby

Sent from AOL Desktop

*J. Shelby Sharpe*

*Law Offices of J. Shelby Sharpe, P.C.*

*6100 Western Place, Suite 912*

*Fort Worth, Texas 76107*

*Phone: 817-338-4900*

*Facsimile: 817-332-6818*

**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | | |
|---|---|---|
| **WESLEASE 2018 OPERATING LP,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **vs.** | § | **Case No: 4:20-cv-00776-P** |
| | § | |
| | § | |
| **INNOVATIVE SAND SOLUTIONS, LLC,** | § | |
| **BULL MOOSE PIPELINE, LLC,** | § | |
| **LINDALE PIPELINE, LLC,** | § | |
| **DALE BEHAN, AND LINDA BEHAN,** | § | |
| | § | |
| *Defendants.* | § | |

---

**ORDER ON SECOND MOTION FOR ENFORCEMENT OF TURNOVER ORDER
AND SHOW CAUSE ORDER**

---

Now before the Court is Weslease's Motion for Enforcement of Turnover Order and Show Cause Order ("Motion"). The Court hereby **GRANTS** same.

IT IS THEREFORE **ORDERED**, Shelby Sharpe ("Sharpe"), counsel for Linda and Dale Behan ("Behans"), shall, within seven (7) days of this Order, withdraw or otherwise cause the nonsuit or dismissal of any and all petitions or complaints filed by him on behalf of River North Farms, Inc. on or after the entry of the Turnover Order (as defined in the Motion).

IT IS FURTHER **ORDERED**, Shelby Sharpe shall produce all documents and communications in his or his firm's possession created or obtained pursuant to Sharpe's or his firm's provision of legal services to River North Farms, Inc. ("River North"). This does not include any privileged information created solely for the purpose of providing legal services to the Behans, or any other client, and not River



EXHIBIT 1
WIT: *Sharpe*
DATE: *1-22-25*
ADRIANNE HARRIS

North. This ordered production does include any privileged information concerning legal services by Sharpe or his firm where River North was a joint client along with any other clients, including the Behans.

IT IS FURTHER **ORDERED**, the Behans, and any and all persons working on concert with them or with notice of this Order or the Turnover Order, refrain from interfering with Weslease's exercise of any and all rights conferred under the Turnover Order, or any other Order of this Court. This includes, without limitation, any entry on real property, exercise of control or possession of any asset of River North by the Behans.

IT IS FURTHER **ORDERED**, that the Behans and Sharpe are jointly and severally liable for monetary sanctions to Weslease in the amount of $5000. The Behans and Sharpe shall pay this amount no later than seven (7) days of this Order.

IT IS FURTHER **ORDERED**, Dale Behan and Linda Behan shall remit $7500 as reasonable attorneys' fees no later than fourteen (14) days of this order.

Nothing in this Order modifies, alters, or affects the findings and Orders entered by the Court from the bench at the hearing held on May 21, 2024 in any way.

**SIGNED** this **21st day of May 2024**.

Mark T. Pittman
UNITED STATED DISTRICT JUDGE

# EXHIBIT "D"

EXHIBIT  2

WIT: Sharpe

DATE: 1-22-25

ADRIANNE HARRIS

Case 4:20-cv-00776-P    Document 204-4    Filed 09/03/24    Page 2 of 5    PageID 2779

| Subject: | **Azle Property** |
|---|---|
| Date: | 8/30/2024 2:07:49 PM Central Daylight Time |
| From: | utlawman@aol.com |
| To: | dorothy.bolinsky@faegredrinker.com |
| Cc: | luke@2mac.com, dbehan@behangroup.com, nathan.kivi@hotelierco.com, scott@latigo-group.com, stevencrofts.realtor@gmail.com |

## Dotty,

Attached is an order I received a few minutes ago. Unless Weslease has agreed to the sale going forward as we have agreed, we are dead in the water until the Fifth Circuit straightens this out.

Sent from AOL Desktop

*J. Shelby Sharpe*
*Law Offices of J. Shelby Sharpe, P.C.*
*6100 Western Place, Suite 912*
*Fort Worth, Texas 76107*
*Phone: 817-338-4900*
*Facsimile: 817-332-6818*

From: scanner@imaginetechgroup.com
To: utlawman@aol.com
Sent: 8/30/2024 1:24:59 PM Central Daylight Time
Subject:

--------------------
TASKalfa 3554ci
[00:17:c8:f2:b9:79]
--------------------

The information contained in this correspondence is private and may not be distributed without the written consent of Imagine Technology Group.

Case 4:20-cv-00776-P   Document 204-4   Filed 09/03/24   Page 5 of 6   PageID 2780

**Subject:** Activity in Case 4:20-cv-00776-P Weslease 2018 Operating, LP v. Innovative Sand Solutions, LLC et al Order on Motion for Miscellaneous Relief

**Date:** 8/30/2024 12:28:11 PM Central Daylight Time

**From:** ecf_txnd@txnd.uscourts.gov

**To:** Courtmail@txnd.uscourts.gov

This is an automatic e-mail message generated by the CM/ECF system. Please **DO NOT RESPOND to this** e-mail because the mail box is unattended.

***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

U.S. District Court

Northern District of Texas

**Notice of Electronic Filing**

The following transaction was entered on 8/30/2024 at 12:27 PM CDT and filed on 8/30/2024
**Case Name:** Weslease 2018 Operating, LP v. Innovative Sand Solutions, LLC et al
**Case Number:** 4:20-cv-00776-P
**Filer:**
**WARNING: CASE CLOSED on 05/10/2022**
**Document Number:** 203

**Docket Text:**
**ORDER:** Having reviewed the Motions and responses, the Court finds that a hearing is not necessary at this time. Accordingly, Weslease's request for a hearing is DENIED. However, the Court finds that the [195], [199] Motions should otherwise be GRANTED. (See order for specifics.) (Ordered by Judge Mark Pittman on 8/30/2024) (jnp)

**4:20-cv-00776-P Notice has been electronically mailed to:**

**Ralph H Duggins**   rduggins@canteyhanger.com, adrake@canteyhanger.com

**J. Shelby Sharpe**   utlawman@aol.com, kgentry@sharpefirm.com

**Joseph Edward Johnson, III**   ejohnson@mayerllp.com, cpreston@mayerllp.com, gchatman@mayerllp.com, spilgrim@mayerllp.com, tharris@mayerllp.com

**Justin Neal Bryan**   jbryan@mccathernlaw.com, arnolds@mccathernlaw.com, jbland@mccathernlaw.co, jbland@mccathernlaw.com, receptionist@mccathernlaw.com

**Sounia Senemar**   ssenemar@mccathernlaw.com

**Preston Joseph Tyson**   ptyson@mccathernlaw.com, mrivas@mccathernlaw.com

**4:20-cv-00776-P Notice required by federal rule will be delivered by other means (as detailed in the Clerk's records for orders/judgments) to:**

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

WESLEASE 2018 OPERATING, LP,

Plaintiff,

v.                                          No. 4:20-cv-00776-P

INNOVATIVE SAND SOLUTIONS, LLC,
ET AL.,

Defendants.

### ORDER

Before the Court is judgment creditor Weslease 2018 Operating, LP's Third Motion for Enforcement of Turnover Order (ECF No. 195) and Request for Hearing and Fourth Motion for Enforcement of Turnover Order (ECF No. 199). Having reviewed the Motions and responses, the Court finds that a hearing is not necessary at this time. Accordingly, Weslease's request for a hearing is **DENIED**. However, the Court finds that the Motions should otherwise be **GRANTED**. Accordingly, it is **ORDERED** that:

(1) the law firm of Barnes, Bailey, Janoush & Dick, P.A. shall pay the $14,147.42 held in its trust account at the direction of Weslease within three (3) business days of notice of this Order, which may be provided via electronic mail;

(2) the Behans shall, within three (3) business days of this Order, withdraw their objection to any instruction by Weslease concerning any and all assets of River North Farms, LLC ("River North") to the law firm of Barnes, Bailey, Janoush & Dick, P.A. and provide their consent to the payment of the foregoing amount at the direction of Weslease;

Case 4:24-mc-00007-X    Document 58    Filed 06/17/25    Page 202 of 226    PageID 1046

Case 4:20-cv-00776-P   Document 204-4    Filed 09/03/24    Page 5 of 5    PageID 2782
Document 203    Filed 08/30/24    Page 2 of 2    PageID 2764

(3) the Behans and their new counsel shall, within three (3) business days of this Order, withdraw their appeal evidenced by the notice filed in the Justice Court, Precinct Two of Hood County, Texas with Cause No. EC2400327;

(4) the Behans and their counsel are prohibited from the closing of the any transaction involving real estate owned by River North at the time the Turnover Order was entered, including the putative transaction identified in the Motion, absent the written consent of Weslease; and

(5) the Behans shall remit to Westlease $5,000 in reasonable attorney's fees for the bringing of these Motions.[1]

SO ORDERED on this 30th day of August 2024.

_Mark T. Pittman_

MARK T. PITTMAN
UNITED STATES DISTRICT JUDGE

---

[1] The Court, having considered the loadstar method, finds that this attorney's fees award is appropriate in light of the hours reasonably expended in the bringing of these Motions multiplied by a reasonable hourly rate for this district. Additionally, having considered the *Johnson* factors, the Court finds that a modification is not necessary in this case.

2

EXHIBIT 3
WIT: _Sharpe_
DATE: _1-22-25_
ADRIANNE HARRIS

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | | |
|---|---|---|
| **WESLEASE 2018 OPERATING LP,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | Civil Action No. 4:22-cv-01013-O |
| | § | |
| **LINDA BEHAN,** *et al.,* | § | |
| | § | |
| **Defendants.** | § | |

## FINAL JUDGMENT

This Judgment is issued pursuant to Fed. R. Civ. P. 58(a).

This action came on for consideration by the Court, and the issues having been duly considered and a decision duly rendered,

It is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that:

1.    The above-captioned case is **DISMISSED**.

2.    Plaintiff's cause of action for fraudulent transfer regarding the portion of the Fort Worth property conveyed to Defendants Richard Robinson and Marla Robinson is **DISMISSED without prejudice,** per the Notice of Voluntary Dismissal (ECF No. 90).

3.    Plaintiff's cause of action for turnover order requiring Defendants Dale Behan and Linda Behan to cause Defendant River North Farms, LLC to convey to Plaintiff the portion of the Fort Worth property conveyed to Defendants Richard Robinson and Marla Robinson is **DISMISSED with prejudice** to the refiling of the same.

4.    Plaintiff's cause of action for declaratory judgment on Plaintiff's security interest relative to that of Defendant Amarillo National Bank with respect to the debt of

Defendant Lindale Pipeline, LLC is **DISMISSED with prejudice** to the refiling of the same.

5.   Plaintiff's Expedited Motion for Leave to Amend Complaint, Expedited Discovery, Temporary Restraining Order, and Request for Hearing (ECF Nos. 81, 87) is **DENIED**.

6.   No additional claims or causes of action by any party are pending against any party. This Final Judgment fully and finally resolves all issues between Plaintiff and Defendants in the above-captioned case and may be appealed. Any relief not specifically granted in this Final Judgment is **DENIED** and any parties not otherwise disposed of are **DISMISSED**.

**SO ORDERED** on this **9th day** of **January, 2024**.

Reed O'Connor
**UNITED STATES DISTRICT JUDGE**

| | |
|---|---|
| **From:** | J. Shelby Sharpe |
| **To:** | Justin N. Bryan |
| **Subject:** | Fwd: Note |
| **Date:** | Tuesday, July 9, 2024 8:20:26 AM |
| **Attachments:** | IMG_3594.HEIC.heic |

EXHIBIT 4
WIT: *Sharpe*
DATE: 1-22-25
ADRIANNE HARRIS

**EXTERNAL EMAIL CAUTION!**
This email originated from outside of the organization.

Justin,

Here attached is a picture of the note and the checks.

Sent from AOL Desktop

*J. Shelby Sharpe*
*Law Offices of J. Shelby Sharpe, P.C.*
*6100 Western Place, Suite 912*
*Fort Worth, Texas 76107*
*Phone: 817-338-4900*
*Facsimile: 817-332-6818*

From: utlawman@aol.com
To: utlawman@aol.com
Sent: 7/9/2024 8:04:35 AM Central Daylight Time
Subject: Note

Sent from my iPhone



6-P   Document 183-1   Filed 07/26/24   Page 2 of 2   Page

Today is June 6, 2024

This is a binding contractual agreement between Jason Sidler & Dale Bolar.

I, Jason Sidler am loaning Dale Bolar $55,000. That is due in 6 months on Nov 6, 2024. There is no grace period, or extensions.

The Interest rate is 10% over the 6 months. Therefore the payment will be 38,500 Due on November 6, 2024.

Dale Bolar is now testifying that he has a current revenue stream from which to save up the money to pay me back on Nov 6, 2024.

I will not take any collateral at that time.

I must be CASH only !!!

Dale's signature _____ Date 6/6/24

Jason's signature _____ Date 6/6/24

Witness = Linda Bolar   Signature: _____

Date 6/6/24

| | |
|---|---|
| **From:** | J. Shelby Sharpe |
| **To:** | Justin N. Bryan |
| **Cc:** | Preston Tyson |
| **Subject:** | Re: Williston |
| **Date:** | Tuesday, July 9, 2024 8:19:02 AM |

**EXTERNAL EMAIL CAUTION!**
This email originated from outside of the organization.

Justin,

The loans came from close friends. There are no loan documents, except for one that is on a single sheet of paper, which I will send you. It is from an old pastor that Dale had previously helped years ago.

The money went into an account at Legend Bank to pay debts of River North Farms. The checks were payable to River North Farms.

All travel has been to maintain property with liens to several banks and to pay debts of those properties.

The Behans have no trusts and are not beneficiaries of any trust.

Sent from AOL Desktop

*J. Shelby Sharpe*
*Law Offices of J. Shelby Sharpe, P.C.*
*6100 Western Place, Suite 912*
*Fort Worth, Texas 76107*
*Phone: 817-338-4900*
*Facsimile: 817-332-6818*
In a message dated 7/9/2024 12:37:17 AM Central Daylight Time, jbryan@mccathernlaw.com writes:

ι



EXHIBIT 5
WIT: Sharpe
DATE: 1-22-25
ADRIANNE HARRIS

Shelby,

Please provide the information concerning their loans. Who is/are the lender(s)?
Provide copies of the agreements. Which accounts did they receive the money in?

Also, please provide whether the Behans 1) are beneficiaries of any trusts, 2) whether
they have created any trusts, and 3) whether they have contributed any assets to a
trust. Please provide all information concerning the trusts and trustees. This includes
copies of the trust documents, contact information for the trustees, and dates and
amounts of funding.

Justin

On Jul 8, 2024, at 3:29 PM, J. Shelby Sharpe <utlawman@aol.com>
wrote:

**EXTERNAL EMAIL CAUTION!**
This email originated from outside of the organization.

Justin,

The Behans have never had an ownership
interest in RWS. Only Williston Basin has
had an ownership interest. Dale has not had
any interest in it since Morelock assigned his
interest and Dale assigned his interest in
Williston to Chris Anderson.

If he is still on the RWS account, that is an
error. Only Chris Anderson should be on
that account since he is the only one who
has an interest in Williston Basin.

Concerning any travels of the Behans this is
being done on borrowed money not income.

I will ask if there is any amount of money

they can begin to pay on the judgment. Since they have no income, whatever they would pay would be from borrowed money.

Sent from AOL Desktop

*J. Shelby Sharpe*
*Law Offices of J. Shelby Sharpe, P.C.*
*6100 Western Place, Suite 912*
*Fort Worth, Texas 76107*
*Phone: 817-338-4900*
*Facsimile: 817-332-6818*

In a message dated 7/5/2024 2:03:01 AM Central Daylight Time, jbryan@mccathernlaw.com writes:

Shelby,

As you know, we are preparing a motion concerning the assets held in the name of RWS. More specifically, that they be paid to our client for partial satisfaction of their judgment debts. In the meantime, does your client agree to not disburse them until the Court decides the motion?

Also, your clients have still not made a single payment towards the judgment debts. But they are apparently traveling and spending funds elsewhere. Our clients demand a payment. What amount can they pay this week?

Justin

On Jul 3, 2024, at 10:44 PM, J. Shelby Sharpe <utlawman@aol.com> wrote:

EXTERNAL EMAIL CAUTION!
This email originated from outside of the organization.

Preston,

Here is the document I told you
I would send you showing the
transfer of interest of 640Water
in RWS to Williston.

Sent from AOL Desktop

*J. Shelby Sharpe*
*Law Offices of J. Shelby Sharpe,*
*P.C.*
*6100 Western Place, Suite 912*
*Fort Worth, Texas 76107*
*Phone: 817-338-4900*
*Facsimile: 817-332-6818*

From: scanner@imaginetechgroup.com
To: utlawman@aol.com
Sent: 7/3/2024 3:30:32 PM Central Daylight Time
Subject:

--------------------
TASKalfa 3554ci
[00:17:c8:f2:b9:79]
--------------------

The information contained in this
correspondence is private and may not be
distributed without the written consent of
Imagine Technology Group.

# Sharpe Ex 6

# Not Identified

Case 4:20-cv-00776-P    Document 198-1    Filed 08/26/24    Page 1 of 2    PageID 2697
RIVER NORTH FARMS INC    XXXXX5795    Statement Ending 01/31/2024    Page 3 of 4

# COMMERCIAL CHECKING-XXXXX5795 (continued)

## Account Activity (continued)

| Post Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 01/18/2024 | CHECK # 1104 | $2,500.00 | | $644,008.88 |
| 01/19/2024 | WIRE/OUT-202401900850;BNF J. SHELBY SHARP OPERATING ACCOUNT;OBI REF- WEST LEASE | $67,745.00 | | $576,263.88 |
| 01/22/2024 | XX8427 POS PURCHASE 8443046618COLORE 8443046618 CA 00000000 022650 | $76.87 | | $576,187.01 |
| 01/23/2024 | XX8648 POS PURCHASE TURKEY MOUNTAIN SANCTUARY TX 00005918 000017 | $65.40 | | $576,121.61 |
| 01/23/2024 | WIRE/OUT-202402300521;BNF GALILIO ENERGY SOLUTIONS | $120,000.00 | | $456,121.61 |
| 01/30/2024 | DEPOSIT | | $1,408.22 | $457,529.83 |
| 01/30/2024 | WIRE/OUT-202403000732;BNF RHINO HOLDINGS, LLC | $5,000.00 | | $452,529.83 |
| 01/31/2024 | CHECK # 1108 | $25,000.00 | | $427,529.83 |
| 01/31/2024 | Ending Balance | | | $427,529.83 |

## Checks Cleared

| Check Nbr | Date | Amount | Check Nbr | Date | Amount |
|---|---|---|---|---|---|
| 1103 | 01/05/2024 | $10,000.00 | 1106* | 01/03/2024 | $2,100.00 |
| 1104 | 01/18/2024 | $2,500.00 | 1108* | 01/31/2024 | $25,000.00 |

* Indicates skipped check number

## Daily Balances

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 01/02/2024 | $728,077.32 | 01/12/2024 | $704,298.40 | 01/22/2024 | $576,187.01 |
| 01/03/2024 | $725,977.32 | 01/16/2024 | $673,075.88 | 01/23/2024 | $456,121.61 |
| 01/05/2024 | $715,977.32 | 01/17/2024 | $653,075.88 | 01/30/2024 | $452,529.83 |
| 01/08/2024 | $708,977.32 | 01/18/2024 | $644,008.88 | 01/31/2024 | $427,529.83 |
| 01/11/2024 | $705,117.09 | 01/19/2024 | $576,263.88 | | |

## Overdraft and Returned Item Fees

| | Total for this period | Total year-to-date | Previous year-to-date |
|---|---|---|---|
| Total Overdraft Fees | $0.00 | $0.00 | $0.00 |
| Total Returned Item Fees | $0.00 | $0.00 | $76.00 |

EXHIBIT 7
WIT: Sharpe
DATE: 1-22-25
ADRIANNE HARRIS

Case 4:24-mc-00007-X    Document 58    Filed 06/17/25    Page 213 of 226    PageID 1057

Case 4:20-cv-00776-P    Document 198-1    Filed 08/26/24    Page 2 of 2    PageID 2698
RIVER NORTH FARMS INC    XXXXX5795    Statement Ending 11/30/2023    Page 3 of 8

# COMMERCIAL CHECKING-XXXXX5795 (continued)

## Account Activity (continued)

| Post Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 11/02/2023 | XX8648 POS PURCHASE THE ALCHEMIST SA ELLSWORTH ME 99999999 134953 | $50.00 | | $2,034,982.91 |
| 11/02/2023 | XX8648 POS PURCHASE TST* MARGARITAS ELLSWORTH ME 72120764 020764 | $70.00 | | $2,034,912.91 |
| 11/02/2023 | XX8648 POS PURCHASE THE UPS STORE 33 ELLSWORTH ME 00010002 025547 | $191.61 | | $2,034,721.30 |
| 11/02/2023 | WIRE/OUT-202330600421;BNF GALILIO ENERGY SOLUTIONS | $10,000.00 | | $2,024,721.30 |
| 11/02/2023 | WIRE/OUT-202330600420;BNF MANG CING | $35,000.00 | | $1,989,721.30 |
| 11/02/2023 | BARCLAYCARD US CREDITCARD 1058259338 | $7,468.52 | | $1,982,252.78 |
| 11/02/2023 | CHECK # 1063 | $2,059.00 | | $1,980,193.78 |
| 11/02/2023 | CHECK # 1061 | $14,000.00 | | $1,966,193.78 |
| 11/03/2023 | XX8648 POS PURCHASE TST* 86 This Ellsworth ME 00000000 070227 | $30.08 | | $1,966,163.70 |
| 11/03/2023 | TRAVELERS RETRY PYMT BPITPIXXXXX7319 | $589.00 | | $1,965,574.70 |
| 11/03/2023 | CHECK # 1067 | $10,000.00 | | $1,955,574.70 |
| 11/03/2023 | CHECK # 1073 | $30,000.00 | | $1,925,574.70 |
| 11/06/2023 | CHECK # 1072 | $35,000.00 | | $1,890,574.70 |
| 11/06/2023 | CHECK # 1064 | $75,000.00 | | $1,815,574.70 |
| 11/07/2023 | DEPOSIT | | $24,106.18 | $1,839,680.88 |
| 11/07/2023 | CHECK # 1069 | $10,000.00 | | $1,829,680.88 |
| 11/07/2023 | CHECK # 1077 | $15,000.00 | | $1,814,680.88 |
| 11/07/2023 | CHECK # 1075 | $25,500.00 | | $1,789,180.88 |
| 11/08/2023 | XX8648 POS PURCHASE TST* DMF - Post Bangor ME 00000000 061813 | $32.30 | | $1,789,148.58 |
| 11/08/2023 | WIRE/OUT-202331200824;BNF J SHELBY SHARPE BUSINESS | $160,000.00 | | $1,629,148.58 |
| 11/08/2023 | CHECK # 1078 | $3,000.00 | | $1,626,148.58 |
| 11/08/2023 | CHECK # 1068 | $4,749.50 | | $1,621,399.08 |
| 11/09/2023 | CHECK # 1076 | $12,500.00 | | $1,608,899.08 |
| 11/10/2023 | WIRE/OUT-202331400822;BNF GALILIO ENERGY SOLUTIONS | $20,000.00 | | $1,588,899.08 |
| 11/10/2023 | CHECK # 1074 | $10,000.00 | | $1,578,899.08 |
| 11/13/2023 | XX8648 POS PURCHASE 025 BRAUMS STORE SAPULPA OK 03771234 058720 | $17.09 | | $1,578,881.99 |
| 11/13/2023 | XX8648 POS PURCHASE COWSER TIRE AND FT WORTH TX 00000000 019643 | $3,938.26 | | $1,574,943.73 |
| 11/13/2023 | CHECK # 1079 | $2,000.00 | | $1,572,943.73 |
| 11/14/2023 | XX8648 POS PURCHASE UNITED RV FORT WORTH TX 96696945 458285 | $79.01 | | $1,572,864.72 |
| 11/14/2023 | XX8427 POS PURCHASE PAX8 INC HTTPSWWW.PAX8 CO JRU6KKQN 038845 | $445.16 | | $1,572,419.56 |
| 11/15/2023 | TRAVELERS PER INSUR BPITPIXXXXX6021 | $28.94 | | $1,572,390.62 |
| 11/16/2023 | WIRE/IN-202332000944;ORG BANK OF AMERICA;REF 20233200090500 | | $9,955.00 | $1,582,345.62 |
| 11/16/2023 | Final Credit for Dispute 7306 5746 | | $222.58 | $1,582,568.20 |
| 11/16/2023 | WIRE/OUT-202332000905;BNF BUFFALO CREEK SURVEYOR LLC | $10,000.00 | | $1,572,568.20 |
| 11/16/2023 | CHECK # 1080 | $100,000.00 | | $1,472,568.20 |
| 11/20/2023 | XX8648 POS PURCHASE STATE BUSINESS F 512-745-2471 TX 78578686 078686 | $495.00 | | $1,472,073.20 |
| 11/20/2023 | XX8648 POS PURCHASE COSTCO WHSE #117 FORT WORTH TX 99117313 645436 | $633.06 | | $1,471,440.14 |
| 11/20/2023 | WIRE/OUT-202332400461;BNF JOE D BALLARD | $10,000.00 | | $1,461,440.14 |

| From: | J. Shelby Sharpe |
|---|---|
| To: | Justin N. Bryan |
| Cc: | Preston Tyson; Emily Snow |
| Subject: | Re: River North Assets paid to Counsel |
| Date: | Friday, June 7, 2024 2:44.07 PM |
| Attachments: | image001.png |

**EXTERNAL EMAIL CAUTION!**
This email originated from outside of the organization.

Justin,

We have no money of River North Farm's in the firm's escrow account. The money received since November of 2023 was primarily for services rendered in defense of the Weslease suit in Judge O'Connor's court. The funds came from River North Farms account with Amarillo National Bank that were generated by RNF sales of RNF assets that were done with the knowledge of the bank who has liens on all of those assets. $100,000 of that amount was repayment of a loan to the firm that it made during a time when the cash flow of RNF was inadequate to pay some debts that it needed to pay.

All transfers of RNF funds have been done with the knowledge of the bank because of its liens on RNF property.

Thus, your client's suspicions are totally unfounded.

I trust you have advised your client that if the Fifth Circuit overturns the district court orders, there are consequences.

Shelby

EXHIBIT 8
WIT: Sharpe
DATE: 1-22-25
ADRIANNE HARRIS

Sent from AOL Desktop

**J. Shelby Sharpe**
**Law Offices of J. Shelby Sharpe, P.C.**
**6100 Western Place, Suite 912**
**Fort Worth, Texas 76107**
**Phone: 817-338-4900**
**Facsimile: 817-332-6818**

In a message dated 6/7/2024 11:18:01 AM Central Daylight Time, jbryan@mccathernlaw.com writes:

Shelby,

I am emailing concerning the amount of funds your firm received as putative payment by River North. Our math and available records indicate your firm has received at least $228,000 from River North since November 2023. We have the following questions:

- What amounts of these payments (any payment by River North), if any, remain in your trust account?
- Our client believes these amounts constitute fraudulent transfers and may otherwise be subject to disgorgement. Before we assert any litigation claims concerning moneys you received from River North, we ask whether you/your firm would be willing to discuss and pre-suit resolution.

We are asking these questions on behalf of our client in its capacity as the controlling shareholder of River North pursuant to the Turnover Order and other Orders. As such, you are obligated to provide this information. We look forward to your prompt response. Thank you.

Justin


Justin Bryan

*Partner*

3710 Rawlins Street, Suite 1600
Dallas, Texas 75219
**p:** 214.730.4512 | **f:** 214.741.4717

jbryan@mccathernlaw.com

# MCCATHERN
SHOKOUHI · EVANS

DALLAS
FRISCO
HOUSTON
LOS ANGELES

This electronic transmission (and/or the documents accompanying it) may contain confidential information belonging to the sender that is protected by the Electronic Communications Privacy Act, 18 U.S.C. Sections 2510 and 2521 and may be legally privileged. This message (and any associated files) is intended only for the use of the individual or entity to which it is addressed and may contain information that is confidential, subject to copyright or constitutes a trade secret. If you are not the intended recipient you are hereby notified that any dissemination, copying or distribution of this message, or files associated with this message, is strictly prohibited. If you have received this communication in error, please notify McCathern, PLLC immediately by telephone 214.741.2662 and destroy the original message. Messages sent to and from us may be monitored.

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

**IN RE: J. Shelby Sharpe,**

No. 4:24-mc-00007-P

## ORDER OF TEMPORARY SUSPENSION

The above numbered and styled miscellaneous action was opened on May 21, 2024, for the purpose of conducting a disciplinary hearing against J. Shelby Sharpe, as his conduct in another matter before the Court[1] "appears to be antithetical to the profession." ECF No. 1 at 2. Despite the Court opening of this matter, Mr. Sharpe's suspect conduct has not waned. *See* Case No. 4:20-cv-776-P ECF Nos. 183, 195, 198, 199.

*Inter alia*, Mr. Sharpe has been accused of making a $100,000.00 unknown loan to his clients in violation of his professional obligations under Texas Disciplinary Rule of Professional Conduct 1.08(a). At a September 25, 2024 hearing—after being reminded of his *Miranda* Rights—Mr. Sharpe admitted to making an unknown and undisclosed loan on behalf of his clients to another firm. *See* Case No. 4:20-cv-776-P ECF No. 239 at 18–20 (*Miranda* Rights), 21–28 (Mr. Sharpe testifying that: 1) his clients had outstanding legal fees with another law firm; 2) he paid $100,000 of those outstanding legal fees with his law firm's funds; 3) he did so without his clients' knowledge; 4) when his clients found out they considered it a loan; and 5) his clients fully reimbursed him the $100,000 he paid on their behalf, which he accepted.). While Sharpe insists that the $100,000 payment on his client's behalf was not a loan, the undisputed facts necessitate the opposite conclusion. Consequently, it has become evident to the undersigned that in addition to other actions that appear to be unbecoming of an officer of the Court, Mr. Sharpe may have committed actions which may be described as criminal in nature.

---

[1] *Westlease 2018 Operating, LP., v. Innovative Sand Solutions, LLC*, Case No. 4:20-cv-776-P.


EXHIBIT 9
WIT: Sharpe
DATE: 1-22-25
ADRIANNE HARRIS

Mr. Sharpe remains active in the case that gave rise to this miscellaneous action, as well as on other cases in this district.[2] In an abundance of caution—because the Court wishes to avoid any further violations, criminal or otherwise—the Court finds it prudent to temporarily suspend Mr. Sharpe from practicing in the Northern District of Texas pending the resolution of this disciplinary matter against him.[3] If Mr. Sharpe is found to have committed no violations at the resolution of this matter, his membership to the bar of this Court will be reinstated in full. Meanwhile, however, Mr. Sharpe is obligated to notify all of his clients who have cases pending in the Northern District of Texas, and opposing counsel and co-counsel in each of those cases, of the contents of this Order.

**SO ORDERED** on this **7th day of November 2024.**

MARK T. PITTMAN
UNITED STATES DISTRICT JUDGE

---

[2]*See, e.g., Truckenbrodt v. Behan, et al.*, Case No. 4:24-cv-00654-P

[3]In the event that Chief Judge David Godbey finds it appropriate to appoint a three-judge panel in this case, Sharpe may ask the panel to reconsider this Order.

2

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**FORT WORTH DIVISION**

| | |
|---|---|
| WESLEASE 2018 OPERATING LP, §<br>§<br>Plaintiff, §<br>§<br>v. §<br>§<br>INNOVATIVE SAND SOLUTIONS, §<br>LLC, *et al.*; §<br>§<br>Defendants, §<br>§ | Case No. 4:20-cv-00776-P |

**LINDA BEHAN AND DALE BEHAN'S REPSONSE TO RECEIVER'S**
**MOTION TO SELL LAND FREE AND CLEAR, JUDICIAL**
**FORECLOSURE OF CERTAIN LIENS, DISTRIBUTE SALES PROCEEDS**
**AND OTHER ASSOCITAED RELIEF**

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

Defendants Linda Behan, and Dale Behan, (hereafter "the "Behans") file this

response to Receiver's Motion to Sell Land Free and Clear, Judicial Foreclosure of

Certain Liens, Distribute Sales Proceeds, and Other Associated Relief, hereafter

"Receiver's Motion," [ECF 258] filed by Receiver J. Robert Forshey.

**I.    Posture of Receiver's Motion**

Judgment in these proceedings is against Innovative Sand Solutions, Bull Moose

Pipeline, LLC, Lindale Pipeline, LLC, Linda Behan and Dale Behan [ECF 216].

Subsequently, the Court signed a Turnover Order that stated it served as a muniment



EXHIBIT 10
WIT: Sharpe
DATE: 1-22-25
ADRIANNE HARRIS

of title transferring all of the ownership of the stock the Behans owned in River North Farms, Inc. to Plaintiff Weslease 2018 Operating LP, hereafter "Weslease," [ECF 140] after having previously denied an earlier application for turnover relief. [ECF 95]. Some six months later the Court appointed the receiver "to take exclusive custody, control, and possession of non-exempt **property of** whatever kind and wherever situated of **the Debtors**." [ECF 237]. **River North Farms, Inc. is NOT a judgment debtor.**

### II.    Reasons the Receiver's Motion Should be Denied

There are several reasons the Receiver's motion should be denied.

First, River North Farms, Inc. is not a judgment debtor in the judgment of the Court that the Receiver has been appointed to collect from the judgment debtors. *Western Inn Corporation v. Bert Heyl*, 452 S.W.2d 752, 759 (Tex. Civ. App.– Fort Worth 1970, writ ref'd, n.r.e), quoting from *Gossett v. State*, 417 S.W2d 730, 733 (Tex. Civ. App. – Eastland, writ ref'd, n.r.e) "a corporation is an entity separate and apart from its stockholders and ownership of stock is not the same as individual ownership by such stockholders." See also *Diaz v. SMS Fin. Cap., LLC*, Case No. 05-21-00690-cv, 2013 WL 5604236, at *4-6 (Tex. App. – Dallas Aug. 30, 2023, no pet.)

(holding the trial court abused discretion by ordering the turnover of assets held by third parties who were not judgment debtors)

Second, the Fifth Circuit and the Texas Supreme Court have consistently held that the "turnover statute may be used to reach only assets of parties to the judgment, not assets of non-judgment debtors." *Bollore S.A. v. Imp. Warehouse*, Inc. 448 F.3d 317, 322-23 (5th Cir. 2006); *Beaumont Bank v. Butler*, 806 S.W.2d 223, 227 (Tex. 1991).

Third, the Honorable Reed O'Connor in January of this year in a suit filed by Weslease against the Behans and River North Farms seeking a turnover of River North Farms real property signed a judgment preceded by findings that although Weslease has alleged the Behans own and control River North Farms, River North Farms is not a judgment debtor of Weslease, and even if the Behans owned all of the stock in River North Farms there was no basis to pierce the corporate veil nor has it operated as an alter ego of the Behans.[ECF 100]. See O'Connor Findings and Judgment in Attachment A.

**WHEREFORE**, Linda Behan and Dale Behan pray that the Court deny the Receiver's Motion to sell River North Farm property.

Respectfully submitted,

/s/ J. Shelby Sharpe
J. Shelby Sharpe (TX Bar No. 18123000)

6100 Western Place, Suite 912
Fort Worth, Texas 76107
(817) 338-4900
(817) 632-2487 Fax No.

**ATTORNEY FOR LINDA BEHAN and DALE BEHAN**

## CERTIFICATE OF SERVICE

I hereby certify that on December 13,2024, a true and correct copy of the

foregoing document has been served via ECF to all attorneys of record.

/s/ J. Shelby Sharpe
J. Shelby Sharpe

 Outlook

---

**Re: Declaration**

---

**From** J. Shelby Sharpe <utlawman@aol.com>

**Date** Fri 3/29/2024 3:37 PM

**To** Clint.Latham@anb.com <Clint.Latham@anb.com>

**Cc** dbehan@behangroup.com <dbehan@behangroup.com>; lbehan@behangroup.com <lbehan@behangroup.com>

## Clint,

## If you do not feel comfortable in signing a third declaration that would be factually accurate, I respect your decision.

## Happy Easter!

Sent from AOL Desktop

**J. Shelby Sharpe**
**Law Offices of J. Shelby Sharpe, P.C.**
**6100 Western Place, Suite 912**
**Fort Worth, Texas 76107**
**Phone: 817-338-4900**
**Facsimile: 817-332-6818**

In a message dated 3/29/2024 3:34:29 PM Central Daylight Time, Clint.Latham@anb.com writes:

Shelby,

I am not eager to continue injecting myself into a case in which ANB is not a party, and my two declarations thus far don't seem to have had any effect. While I could sign a third one that says ANB has not to this point exercised its voting rights, I don't see any point in doing that unless it was in response to someone saying that we had. Weslease is not going to say that ANB voted to appoint new directors. Why not just submit a corporate document that shows who the directors are?

EXHIBIT 11
WIT: Sharpe
DATE: 1-22-25
ADRIANNE HARRIS

Happy Easter to everyone!

---

**From:** J. Shelby Sharpe <utlawman@aol.com>
**Sent:** Friday, March 29, 2024 12:34 PM
**To:** Latham, Clint <Clint.Latham@anb.com>
**Cc:** dbehan@behangroup.com; lbehan@behangroup.com
**Subject:** Re: Declaration

Clint,

I would never ask yo to sign anything but factual. Thank you for giving me the facts.

Can you state that the bank with its possession of the stock and the right to vote the shares has never voted different directors and officers than those in those positions at the time the stock was received. I remember that is what I understood you to say when you and Dale and I talked some days ago.

Sent from AOL Desktop

*J. Shelby Sharpe*

*Law Offices of J. Shelby Sharpe, P.C.*

*6100 Western Place, Suite 912*

*Fort Worth, Texas 76107*

*Phone: 817-338-4900*

*Facsimile: 817-332-6818*

In a message dated 3/29/2024 12:24:34 PM Central Daylight Time, Clint.Latham@anb.com writes:

I can't do that because it's not true to say that Dale has been looking after the ranch "for the bank . . . for approximately 10 years." I don't think I even knew about the ranch until the last 2-3 years. We do not have a security agreement that covers the ranch; our lien against the ranch is a judgment lien by virtue of having a judgment against River North. I'm not going to sign a declaration that authorizes anything. Any declaration I sign will contain nothing but factual statements.

**From:** J. Shelby Sharpe <utlawman@aol.com>
**Sent:** Friday, March 29, 2024 10:09 AM
**To:** Latham, Clint <Clint.Latham@anb.com>
**Cc:** dbehan@behangroup.com; lbehan@behangroup.com
**Subject:** Declaration

Clint,

I need one more declaration form you to attach to my reply to Weslease's motion to enforce the turnover order now set for a hearing this coming Thursday, April 4 at 3:00 p.m. It will simply state that Dale has been looking after the collateral for the bank, including the ranch for approximately 10 years to protect the bank's collateral. The bank authorizes him to permit inspection of the bank's collateral in his presence but not to remove it. The bank does not authorize anyone to have the codes to the ranch other than Dale Behan and any destruction of the locks would be a destruction of the bank's collateral.

I need this declaration this Monday if possible.

Shelby

Sent from AOL Desktop

*J. Shelby Sharpe*

*Law Offices of J. Shelby Sharpe, P.C.*

*6100 Western Place, Suite 912*

*Fort Worth, Texas 76107*

*Phone: 817-338-4900*

*Facsimile: 817-332-6818*